# EXHIBIT T

```
 1            IN THE UNITED STATES DISTRICT COURT
 2                 EASTERN DISTRICT OF TEXAS
 3                       TYLER DIVISION
 4
 5   EMG TECHNOLOGY, LLC,              )
                                       )
 6             Plaintiff,              )
                                       )
 7          vs.                        )Case No.
                                       )6:08-cv-447(LED)
 8   APPLE, INC., AMERICAN AIRLINES,   )
     INC., DELL, INC., HYATT           )VOLUME I
 9   CORPORATION, MARRIOTT             )
     INTERNATIONAL, INC. & BARNES &    )
10   NOBLE, INC.,                      )
                                       )
11             Defendants.             )
12
13
14        *** CONFIDENTIAL - ATTORNEYS' EYES ONLY ***
                    (PAGES 307 TO 311)
15
                    *** CONFIDENTIAL***
16                  (PAGES 312 TO 345)
17
18   DEPOSITION OF:
19             ELLIOT GOTTFURCHT
20             TUESDAY, DECEMBER 15, 2009
21             10:07 A.M.
22
23
24   Reported by:   SUSAN LYNN POBOR
25                  CSR No. 5132
```

Page 18

1  ideas within a few minutes.
2      Q.  Do you remember how many minutes?
3      A.  No.
4      Q.  Was it more than five?
5      A.  I don't know.
6      Q.  Could it have been?
7      A.  Could -- could have -- could have been.
8  I don't recall.
9      Q.  Less than an hour?
10     A.  Probably so, but I still -- I don't
11 recall.
12     Q.  Less than a half an hour?
13     A.  I don't recall.
14     Q.  I'm just asking for your best
15 recollection.
16     A.  Okay.  I -- I -- I --
17     Q.  Okay.
18     A.  It was ten years ago.
19     Q.  Okay.  All right.  So within a few
20 minutes, you and Grant came up with the ideas we've
21 talked about.
22         And all -- all of them were your ideas
23 except for the manipulating the region of the screen
24 for scrolling and zooming.
25         Is that right?

Page 19

1      A.  That's my recollection, but it may have
2  been more than a few minutes.  So I -- I think we
3  clarified that.
4      Q.  Okay.  But definitely less than an hour.
5          Right?
6      A.  I do not recall.
7      Q.  Okay.  Probably less than an hour, I
8  think you said.
9      A.  I don't recall, but it was -- it was
10 that day.
11     Q.  Okay.
12     A.  It --
13     Q.  It was a short time.
14         Right?
15     A.  Well, it's relative.
16     Q.  Was there anybody else there?
17     A.  No.
18     Q.  Now, you mentioned that you wrote down
19 these things.
20         Did you keep that writing?
21     A.  I don't recall.
22     Q.  Have -- have you seen it any time in
23 connection with this case?
24     A.  I don't --
25     MR. BECKER:  Object to form.

Page 20

1      THE WITNESS:  I -- I don't think so.
2  BY MR. STEPHENS:
3      Q.  Do you recall what you wrote it on?
4      A.  No.
5      Q.  Do you recall what you did with the
6  thing you wrote it on?
7      A.  No.
8      Q.  Have you ever built your invention?
9      MR. BECKER:  Object to form.
10     THE WITNESS:  Personally?
11 BY MR. STEPHENS:
12     Q.  Well, either personally or asked someone
13 to do it who worked at your direction or control, yes.
14     A.  Could you define "built" for me?
15     Q.  Made a system that practiced your
16 invention.
17     MR. BECKER:  Object.  Form.
18     THE WITNESS:  I'm not sure I'm qualified to
19 answer that question.
20 BY MR. STEPHENS:
21     Q.  So you don't know whether you've ever
22 built your invention?
23     A.  Well, we have developed some of the
24 invention, I believe, but I -- I'm not qualified to
25 respond to your question.  I'm not --

Page 21

1      Q.  So --
2      A.  I -- I don't have the expertise to -- to
3  answer your question.
4      Q.  So you, as the inventor, don't know
5  whether you've ever made your invention.
6          Is that right?
7      A.  I don't -- no, I said I don't have the
8  expertise to res -- answer your question.
9      Q.  Do you know the answer or not?
10     A.  I don't have the expertise to answer it.
11     Q.  So you don't know.
12         Right?
13     A.  I don't have the expertise to answer it.
14     Q.  What do you mean when you say you don't
15 have the expertise to answer it?
16     A.  I'm not an engineer.
17     Q.  Okay.  And --
18     A.  I've had --
19     Q.  Go ahead.
20     A.  I'm not an engineer, and I've had no
21 educational experience to answer the question.
22     Q.  Okay.  Well, what additional experience
23 do you think you'd need to have in order to tell
24 whether you built the invention?
25     A.  That's the whole idea.  I would not know

Page 22

 1  because I'm not qualified.
 2      Q.  Well, that's what I'm trying to
 3  understand, is what is it that -- what aspect of your
 4  invention is it that you don't understand whether
 5  you've made it or not?
 6      MR. BECKER:  Object.  Form.
 7      THE WITNESS:  I, again, say, I was -- not
 8  qualified to answer your question.
 9  BY MR. STEPHENS:
10      Q.  So you can't even tell me what parts of
11  it you are unsure whether you've built or not.
12          Is that right?
13      A.  I cannot recall at this time what -- I'm
14  unable to answer your question --
15      Q.  Okay.
16      A.  -- at this time.
17      Q.  Have you tried to build your invention?
18      A.  Again, it would fall into the category
19  of that I lack the expertise to know what I have done
20  and what I have not done, so I'm unable to answer your
21  question.
22      Q.  Well, what have you done?
23      A.  Well, over the years, we -- I -- with --
24  with help, developed a prototype that would illustrate
25  some of the elements of the invention.

Page 23

 1      Q.  And you're not qualified to say whether
 2  or not that prototype actually is the invention or
 3  not.
 4          Is that right?
 5      A.  That's correct.
 6      Q.  Okay.  Who has been involved in that
 7  effort to build a prototype?
 8      A.  Rick Soss, S-o-s-s.  His company is
 9  called Protovu.
10      Q.  Okay.  Anyone else?
11      A.  That's all I can think of at the time.
12      Q.  Is Mr. Soss an engineer?
13      A.  I do not know.
14      Q.  What is his area of expertise?
15      A.  I don't have his qualifications, so --
16  that I can recall at this time.
17      Q.  Is he a computer programmer?
18      A.  I -- I just don't have his
19  qualifications.
20      Q.  What -- what has he done -- what has
21  been his involvement in the project?
22      A.  He developed MallTV, the -- the demo of
23  MallTV, the website, the PC website of MallTV, and
24  other illustrations or graphics that I used to show
25  third parties.

Page 24

 1      Q.  At what point did you first have a
 2  prototype that would illustrate some of the elements
 3  of the invention?
 4      A.  I think probably -- I'm just -- just
 5  guessing now -- in 2001.
 6      Q.  And who built that prototype?
 7      A.  I do not recall who that person was.  It
 8  was someone that I had hired.  I don't recall his name
 9  at this time.
10          But MallTV had several different
11  editions over the years.  I think that may have
12  been -- I mean, it may have started with -- in July of
13  1999 when we first envisioned how the Internet would
14  be displayed and navigated on mobile devices and
15  television.  And then it -- throughout the years, I
16  tried to improve upon that.
17      Q.  But it was around 2001 when you first
18  had something you would call a prototype of how it
19  worked.
20          Is that right?
21      A.  It -- it may have been in 2000.
22      Q.  Is there anything you can tie it to,
23  like the presidential election in 2000?
24          Did it happen before that or after it?
25      A.  I don't recall.

Page 25

 1      Q.  Anything else in time that might help
 2  you place when that prototype was completed or built?
 3      A.  I don't recall.
 4      Q.  What was it called?
 5      A.  Prior to MallTV, I think I called it
 6  Fogie & Jack.
 7          If you had the production of documents,
 8  it -- that would be very helpful.
 9      Q.  When did it change from Fogie & Jack to
10  MallTV?
11      A.  I could only guess.
12      Q.  Go ahead and give me your best guess.
13      MR. BECKER:  Object.  Form.
14      THE WITNESS:  2001.
15  BY MR. STEPHENS:
16      Q.  Okay.  Now, you mentioned that you are
17  not an engineer and you're not qualified to say
18  whether the prototype that you have today practices
19  all the elements of your invention.
20          Right?
21      A.  Correct.
22      Q.  Were you capable of implementing your
23  invention, yourself?
24      MR. BECKER:  Object.  Form.
25      THE WITNESS:  Implementing it into --

Merrill Legal Solutions - Houston

1  A.  What would I -- my process be?
2  Q.  Yes.
3  A.  Well, first process would be -- is to
4  call Tom Coester --
5  Q.  Okay.
6  A.  -- and review it with him, to explain
7  what this means.
8  Q.  So you'd ask Mr. Coester to explain what
9  the patent means?
10  A.  No, no -- well, yes.  Again, I haven't
11  looked at this for ten years.
12  Q.  Okay.  And then what?
13  A.  I would review it with him to refresh my
14  recollection, and then I would be better equipped to
15  answer your question.
16  Q.  Okay.
17  A.  I'm sorry.  We had this review with --
18  Q.  So --
19  A.  -- Tom.
20  Q.  -- is it possible you did try to develop
21  a custom browser and you just don't remember?
22  A.  I -- I don't understand what this
23  language means, so I -- I'm unable to answer your
24  question.
25  Q.  Okay.  You understood it when you filed

1  the patent application?
2  A.  Yeah, I -- I read the document several
3  times and had -- in meetings with Tom Coester, and I
4  had a lot of questions and he explained them to me.
5  Q.  Okay.  But you don't understand it
6  today?
7  A.  That's correct.
8  Q.  Okay.
9  A.  Can't recall ten years later.
10  Q.  In that same place in Column 2, just a
11  little bit further on, it says, "Content partners,
12  such as content partner node 14 provide content in a
13  special -- specified format that facilitates its use
14  by the client nodes."
15     Do you see that?
16  A.  Yes.
17  Q.  What format was that?
18  A.  Again, I'm not an expert, and I would
19  have to rely on a review with Tom Coester.
20  Q.  Okay.  So you just don't know?
21  A.  I just -- I don't remember.  I'm not an
22  expert.
23  Q.  When you say you're not an expert, what
24  are you not an expert in?
25  A.  I'm not a expert in the -- in the field

1  that would give me information explained here.
2  Q.  Okay.
3  A.  I'm not an engineer.
4  Q.  Can you show me where in this patent it
5  talks about scrolling or zooming with a finger?
6  A.  I believe the language is, "manipulating
7  region of the screen."
8  Q.  Okay.
9  A.  And I'd have to read the whole patent to
10  remember where that is.
11     But I re -- my recollection is that the
12  patent talked about manipulating a region of the
13  screen for zooming and scrolling.
14  Q.  Okay.  Other than the word "manipulate,"
15  are you aware of any disclosure in this patent that
16  describes using a finger to scroll or zoom?
17  A.  Understanding that my definition of
18  "manipulation" includes a finger.
19  Q.  I --
20  A.  Are you saying other than using the word
21  "manipulation"?
22  Q.  Yes.
23     Other than that one word, are you aware
24  of anything in the patent that discloses using a
25  finger to scroll --

1  A.  I would have to take some time and read
2  this.
3  Q.  Go ahead.
4  A.  It could take an hour.
5     You want me to do it?
6     Okay.
7     Can I mark on this exhibit?
8  Q.  Sure.
9  A.  Okay.  All right.
10  Q.  If it helps, Column 5, it's talking
11  about Figure 5-B being a flow diagram of client side
12  manipulation of a segmented page.
13  A.  So you're referring me to Column 5?
14  Q.  I am --
15  A.  Okay.
16  Q.  -- Line 5.
17  A.  Line 5.
18     You said I couldn't -- I could mark on
19  this?
20  Q.  You can, yes.
21  A.  Okay.  You're asking me to find the word
22  "manipulation"?
23  Q.  No, I'm asking you to point to me where
24  it discloses using a finger to scroll or zoom.
25  A.  The word "finger", you're asking me if

Page 170

1  Q.  "Primary navigation options as used
2  herein are those navigation options that necessarily
3  change between successive matrix layers changing from
4  general to more specific with increases in depth in
5  the matrix."
6      Is that what you're referring to?
7  A.  Yes.
8  Q.  What does that mean, an option that
9  necessarily changes between successive matrix layers?
10     MR. BECKER:  Same objections.
11     THE WITNESS:  And that would be
12 attorney-client privilege.
13 BY MR. STEPHENS:
14 Q.  So you can't tell me anything about your
15 understanding of that phrase without revealing
16 attorney-client privileged information.
17     Is that right?
18 A.  I do not believe so.  I -- I -- I
19 believe that that's something which I had reviewed
20 early on with Tom Coester.
21 Q.  That same quote that I read refers to
22 increases in depth in the matrix.
23     What does -- what does the depth of the
24 matrix mean?
25 A.  Well, I'll go to, from July 1st to

Page 171

1  July 7, what I would think about at that time.
2  Q.  Okay.
3  A.  And at that time, one of the embodiments
4  would be that there would be a drill-down from general
5  to more specific.
6  Q.  Kind of like Yahoo had at the time?
7  A.  Pardon me?
8  Q.  Like Yahoo had at the time --
9      MR. BECKER:  Object to form.
10 BY MR. STEPHENS:
11 Q.  -- where you have categories and you can
12 get more specific?
13 A.  Right.
14 Q.  Okay.
15 A.  It would be like that.
16 Q.  And depth refers to how many links in a
17 hierarchy of categories, something like that?
18 A.  At that particular moment in time, I
19 would think that -- probably thought that that was an
20 embodiment that I had thought about during the period
21 of July 1st to July 7, 1999.
22 Q.  Okay.  And that -- that's what you meant
23 when you said, in some of your documents in that
24 period, that you were working on a filtered Yahoo.
25     Is that right?

Page 172

1  A.  I don't recall that.
2  Q.  You don't remember that?
3      Okay.  We'll get to that.
4      Now, earlier, you mentioned Online Labs
5  and that that was where Albert-Michel Long was
6  employed.
7      Is that right?
8  A.  I don't know what his relationship with
9  Online was, whether it was an employee or consultant.
10 Q.  What was Online Labs' role in connection
11 with your invention?
12 A.  They were referred to me by legal
13 counsel.
14 Q.  Mr. Coester?
15 A.  No, by Jill Pitrini at -- at Manatt.
16 Q.  How do you spell that name?
17 A.  G -- G -- J-i-l-l.
18 Q.  J-i-l-l?
19 A.  Yeah.
20 Q.  What's the last name?
21 A.  P-i-t-r-i-n-i, I believe.
22 Q.  Jill Pitrini?
23 A.  Yes.
24 Q.  Okay.  And how did that happen?
25     How did Jill Pitrini happen to refer

Page 173

1  Online Labs to you?
2  A.  I decided sometime, I think in July,
3  that I would need to engage experts, for them to
4  prepare their component, another component of the
5  invention, other than what Grant and I had supplied to
6  Tom Coester.
7      So I wanted to engage consultants,
8  experts that could work on preparing a document for
9  Tom Coester pertaining to some of the components of
10 the invention.
11 Q.  What components are you referring to?
12 A.  It was ten years ago, and I was guessing
13 that it was -- would have to do with some of the
14 technology, the HTML, XML technology.
15 Q.  Did you have any understanding of HTML
16 prior to your interaction with Online Labs?
17 A.  I did not have any knowledge of it prior
18 to meeting Tom Coester.  So my knowledge of it would
19 have been from Tom Coester.  My understanding would
20 have been from Tom Coester prior to hiring
21 Online Labs.
22     And I don't recall what that -- what --
23 that knowledge I would have had or understanding I
24 would have had during that period of time in 1999.
25 Q.  What was Manatt's role in your

## Page 174

1  invention?
2  MR. BECKER: I'll instruct you, to the extent
3  it requires you to divulge any privileged
4  conversations or advice, I instruct you not to answer.
5  THE WITNESS: I don't believe they were
6  involved in the invention at all other than a
7  referral.
8  BY MR. STEPHENS:
9  Q. And how did you happen to get the
10  referral from Manatt?
11  MR. BECKER: Same instruction.
12  THE WITNESS: Can I answer that?
13  MR. BECKER: As long as you don't divulge the
14  contents of our privileged conversation.
15  THE WITNESS: Jill recommended Tom Coester and
16  recommended Online Labs, and I had been a client of
17  Manatt for many years.
18  BY MR. STEPHENS:
19  Q. In patent matters or other things?
20  A. No, real estate matters.
21  Q. So what happened next after you were
22  introduced to Online Labs?
23  A. I asked them to assemble a group of
24  experts that I could work with, that Tom Coester could
25  work with, to prepare a component which -- of the

## Page 175

1  invention, write a report, and to give that
2  information to Tom Coester, who would write the patent
3  document.
4  Q. And when did you ask him to do that?
5  A. I'm guessing it was in July or early
6  August of 1999.
7  Q. Okay. Who wrote the application that
8  led to the 845 patent?
9  A. The application?
10  Q. Yeah.
11  A. Tom Coester would have written the -- he
12  would have prepared the patent document.
13  Q. Now, was Tom Coester at
14  Morrison & Foerster at the time?
15  A. No, Blakely Sokoloff.
16  Q. Did you change law firms during the
17  course of prosecution of the 845 patent?
18  A. I think the prosecution was over with.
19  I believe it was over with. And I -- I believe that
20  the board had written its report, its brief, reversing
21  the examiner's decision.
22  It was on that process, several-month
23  process where it goes back to the examiner.
24  Q. And that's when you changed law firms?
25  A. I believe so.

## Page 176

1  Q. And why did you change?
2  A. That's attorney-client privilege.
3  Q. So you -- you changed on advice of
4  counsel?
5  A. No, I'm saying that it was
6  attorney-client privilege.
7  Q. Well, your decision to change counsel is
8  not attorney-client privileged unless you did it
9  because an attorney advised you to do it.
10  A. It --
11  Q. If you made up -- if you made up your
12  own mind to do, it's not privileged.
13  A. Okay. I -- it was in conversation with
14  Tom Coester.
15  Q. And you can't tell me what the reason
16  was without revealing --
17  A. Well, I -- I may be able to, if I can go
18  off record and speak to --
19  Q. Sure.
20  A. Because I don't mind telling you. It's
21  just, I want to make sure I do it right.
22  Q. Okay.
23  MR. BECKER: Is this a good time for a break,
24  anyways?
25  MR. STEPHENS: Sure.

## Page 177

1  THE VIDEOGRAPHER: This marks the end of tape
2  Number 2 in the deposition of Elliot Gottfurcht.
3  Going off the record.
4  The time is 3:02 p.m.
5  (Whereupon a recess was taken)
6  THE VIDEOGRAPHER: Back on the record.
7  Here marks the beginning of tape
8  Number 3 in the deposition of Elliot Gottfurcht.
9  The time is 3:32 p.m.
10  BY MR. STEPHENS:
11  Q. Mr. Gottfurcht, before the break, we
12  were talking about Online Labs, and you mentioned that
13  you had asked them to assemble some experts to put
14  together a report that would then work -- Mr. Coester
15  would then use, in part, to draft the patent document.
16  Right?
17  A. Yes.
18  Q. And Online Labs did that.
19  Right?
20  A. Yes, they did.
21  Q. And that report was dated sometime in
22  October.
23  Does that sound right?
24  A. That sounds about right.
25  Q. Did they have an ongoing involvement

Page 178

1  after that?
2      A.  No, after they -- the co-inventors
3  signed off on the patent application, that terminated
4  their engagement, and I continued to engage
5  Albert Long.
6      Q.  So Online --
7          Well, I guess -- let me -- let me back
8  up.
9          Did Online Labs ever try to actually
10 implement anything for you?
11     A.  No.
12     Q.  Did Mr. Long separate from whatever
13 relationship he had with Online Labs at that point?
14     A.  Yes, I believe so.
15     Q.  And he worked directly for you at that
16 point?
17     A.  Yes.
18     Q.  And how long did he continue to work for
19 you?
20     A.  This would have been from approximately
21 November 1999, approximately May of 2000.
22     Q.  So Mr. Long worked directly for you from
23 November '99 to about May of 2000?
24     A.  Correct.
25     Q.  About six months?

Page 179

1      A.  That would be correct.
2      Q.  And what did Mr. Long do for you in that
3  period?
4      A.  He worked on the -- the 845 patent and
5  another patent that we had filed where Mr. Long was a
6  co-inventor.
7      Q.  What was that other patent?
8      A.  I think it was "Make My Tune" patent.
9      Q.  What was that about?
10     A.  That was about converting a photograph
11 on the fly into a cartoon.
12     Q.  Did you get a patent on that?
13     A.  No.
14     Q.  How many other patents do you have
15 that -- or sorry, let me ask it differently.
16         How many patent applications have you
17 filed that claim priority to the parent of the patents
18 in this lawsuit, in other words, the 497 that was
19 filed in November 1999?
20     A.  Can you rephrase the question?
21     Q.  Yeah.
22         How many applications have you filed
23 that are based in any way on the 497 patent that was
24 originally filed in November of 1999?
25     A.  I don't recall.

Page 180

1      Q.  More than three?
2      A.  Yes.
3      Q.  More than five?
4      A.  Yes.
5      Q.  More than ten?
6      A.  I don't recall.
7      Q.  How many patents have issued in that
8  family?
9      A.  Four.
10     Q.  So at least some have gone abandoned.
11 Right?
12     A.  Yes.
13     Q.  Have you instructed your lawyers to turn
14 those documents over, the -- the patent filings and
15 the -- the file histories for those abandoned
16 applications in this litigation?
17     A.  I don't believe so.
18     Q.  Okay.
19         MR. STEPHENS:  We need those, Rob.  We should
20 have had those before this deposition.
21         THE WITNESS:  Are -- are you -- let me just
22 clarify something.
23         Are you talking about new -- new
24 specifications or off the same original
25 specifications?

Page 181

1  BY MR. STEPHENS:
2      Q.  I'm talking about anything that claims
3  any benefit of any kind from the original filing of
4  the 497, whether it's a continuation in part or merely
5  a related application that says, This is a related
6  application.
7      A.  Or a continuation?
8      Q.  Or a continuation.
9      A.  So you're talking about any continuation
10 of the 845?
11     Q.  For the 497.
12     A.  For the 497?
13     Q.  Yes.
14     A.  Okay.
15     Q.  So between five and ten is your best of
16 how many applications --
17     A.  I -- I -- I can't recall how many.  I
18 think there may have been more than ten.
19     Q.  I've seen a document, and we'll probably
20 look at it here in a minute, that said you had 30
21 patent applications pending.
22         Does that ring a bell?
23     A.  I don't call -- recall how many, but
24 there were a number of applications that were pending.
25     Q.  Could there have been 30 applications?

Page 190

1  Q. Has he been continuing to develop the
2  MallTV.com website during the course of this
3  litigation?
4  A. No, we have -- we've put it on hold.
5  Q. When did you put it on hold?
6  A. I would say about the time that the
7  litigation commenced.
8  Q. What did you tell Mr. Soss about that?
9  A. I don't recall if I told him anything.
10  Q. How did it get put on hold?
11  A. I just didn't call him to do additional
12  work.
13  Q. I see.
14     And he didn't have any projects
15  outstanding?
16  A. He didn't -- pardon me?
17  Q. He did not have any projects outstanding
18  at the time the litigation commenced?
19  A. Any projects?
20  Q. Changes to the MallTV.com site?
21  A. I -- I think that we didn't change the
22  MallTV.com site except that -- at the bottom of it
23  where it says "copyright," we added 2009, at the
24  bottom of the web page.
25     I don't know if he did it for the mobile

Page 191

1  site. He may have made that change for the mobile
2  site.
3  Q. When did the iPhone version of MallTV go
4  online?
5  MR. BECKER: Object. Form.
6  THE WITNESS: I don't recall.
7  BY MR. STEPHENS:
8  Q. Was it 2008?
9  A. It's possible 2008.
10  Q. 2007?
11  A. It's possible.
12  Q. 2009?
13  A. No, I think it was 2007, 2008.
14  Q. Okay. Who else has been involved in
15  constructing prototypes of your invention for you?
16  A. Bob Bajor -- Bajaris at Art & Logic.
17  Q. How do you spell his last name?
18  A. I -- I don't recall.
19  Q. Okay. B-a-j-a-r-i-s or something like
20  that?
21  A. Something like that.
22  Q. Now, did you say that Mr. Soss is at
23  Protovu?
24     Was that the name?
25  A. Protovu is his company.

Page 192

1  Q. Anyone else besides Mr. Soss and
2  Mr. Bajaris that was -- has been involved in creating
3  prototypes for you?
4  A. I think that was -- that was -- it was
5  just those two.
6  Q. Who is Angel Gulermovich?
7  A. She works for Art & Logic. She was a
8  consultant for Art & Logic.
9  Q. And who is Daisy Trayham?
10  A. She is also a consultant for
11  Art & Logic.
12  Q. Are there any other people that have
13  been involved in creating prototypes for you?
14  A. I think that Angel's -- was not involved
15  in prototypes. I think that Daisy was involved in the
16  mobile site, working under the direction of -- of Bob.
17  Q. What was Angel's role?
18  A. She was a -- a consultant for
19  Art & Logic.
20  Q. But what was her role in connection with
21  any project for you?
22  A. I think she was just someone that Bob
23  had said had some knowledge, may have wanted to talk
24  to her.
25  Q. And did you talk to her?

Page 193

1  A. I did.
2  Q. And what was the nature of that
3  conversation?
4  A. I discussed certain components of the --
5  that were on my mind.
6  Q. What components?
7  A. I don't recall. I think one had to do
8  with transcoding.
9  Q. Anything else?
10  A. I don't recall. There may have been
11  something else.
12  Q. And how did you come to talk to Angel
13  about transcoding?
14  A. Bob had recommended that if I wanted to
15  have discussions, that she was a knowledgeable person
16  and she's located in Los Angeles, and that I could
17  have some conversation with her.
18  Q. About transcoding specifically?
19  A. No, just about whatever, generally, that
20  I -- you know, would come to my mind.
21  Q. What's -- what kind of work has
22  Art & Logic, generally speaking, done for you?
23  A. They've done -- the bulk of the work was
24  that they had prepared the -- the mobile website,
25  MallTV mobile website.

1  Q. That includes the iPhone portion?
2  A. Yes.
3  Q. And there are other portions, as well?
4  A. I think so. I think it could be
5  accessed from a BlackBerry.
6  Q. So Mr. Soss did the Flash prototype, and
7  Art & Logic did the mobile por -- version.
8     Is that right?
9  A. Art -- they may have worked together on
10 some of the layout, put them in touch with each other.
11 Q. Now, Flash is not XML.
12    Right?
13 A. I -- I don't believe so.
14 Q. How many discussions did you have with
15 Angel?
16 A. A guess, a half a dozen.
17 Q. And when did those -- what period did
18 those take place?
19 A. I think they took place in 19 -- 2008.
20 Q. All of them in 2008?
21 A. I believe so.
22 Q. You talked to her about transcoding.
23    Do you remember any -- anything else
24 that you talked to her about?
25 A. I do not recall. I may have talked to

1  her about some other things. I just don't recall.
2  Q. So what do you remember about your
3  discussions with her?
4  A. I wanted to ask her just -- I'm very
5  curious about -- about mobile websites and -- and
6  things like that, and I -- if I had a question during
7  that period of time, I'd call her up and I would ask
8  her.
9  Q. Did Angel do any work for your lawyers?
10 A. No, I don't believe so.
11 Q. Did she do any work directly or
12 indirectly under their direction or control?
13 A. No, not -- not that I can recall. I
14 don't believe so.
15 Q. Did Mr. Bajaris do any work for your
16 lawyers?
17 A. No, I don't believe so.
18 Q. Did anyone at Art & Logic do any work
19 for your lawyers?
20 A. I do not believe so.
21 Q. Is that also true for the people at
22 Protovu?
23 A. Yes.
24 Q. So they really had no involvement in
25 this lawsuit?

1  A. That's correct.
2  Q. Or any other lawsuit.
3     Is that right?
4  A. Any other lawsuit?
5  Q. Yeah.
6  A. Any other lawsuit --
7  Q. Involving you, I should say.
8  A. No.
9  Q. Okay.
10    MR. STEPHENS: Rob, I was asking you about
11 preserving Mr. Soss' e-mails, and you -- you said you
12 don't have any obligation to do that.
13    Do I understand that right?
14 MR. BECKER: I just --
15    The question is to me?
16 MR. STEPHENS: Yeah.
17 MR. BECKER: That's what I think I said.
18 MR. STEPHENS: Well, do you have an ob -- do
19 you believe that --
20 MR. BECKER: I have --
21 MR. STEPHENS: -- you or Mr. Gottfurcht have
22 an obligation to preserve?
23 MR. BECKER: I -- I don't know. I -- I
24 wouldn't -- I haven't been handling that, so I would
25 have to consult with the others.

1     But I -- I don't think he's an employee
2  of Elliot's. He's a consultant that works for another
3  firm.
4     COURT REPORTER: I don't think he's an
5  employee of what?
6     MR. BECKER: He's an employee of
7  Mr. Gottfurcht's, but rather, a consultant that
8  works for someone else.
9  BY MR. STEPHENS:
10 Q. Is he an employee of EMG, Mr. Soss?
11 A. Oh, no.
12 Q. Okay. Have you ever corresponded with
13 Mr. Soss at the request of Manatt?
14 A. Request of who?
15 Q. Your lawyers.
16 A. No.
17 MR. STEPHENS: Rob, is Manatt representing
18 Mr. Soss?
19 THE WITNESS: No.
20 MR. BECKER: No.
21 BY MR. STEPHENS:
22 Q. Okay. Is Manatt representing any of the
23 folks at Protovu?
24 A. No.
25 Q. Are they representing any of the people

Page 202

1  he sent was one that I had deleted.
2      Q.   Okay.  But he told you he sent some
3  e-mails --
4      A.   He said, "I sent you an e-mail."
5           And I said -- I said, "Oh, I didn't
6  receive an e-mail."
7           But then I went back and I looked, and
8  it was in my junk e-mail.
9           Now, I thought that his e-mail would be
10 Albert Long, so that's what I looked for, but it
11 wasn't.  It was some initials.
12          And so it's possible it went in there
13 automatically or it's possible that when I delete junk
14 e-mails, that I wasn't familiar with it and I would
15 have deleted it.
16     Q.   Did you or -- see an e-mail from him or
17 not in your junk e-mail?
18     A.   Yeah, I did.  I went back to junk e-mail
19 and it was, like, confirmed for Hous --
20          Oh, I think he -- he may have asked,
21 "Are you talking about the Houston's in Century City
22 or the Houston's in Santa Monica?"
23          I think -- I remember getting something
24 like that.
25     Q.   Okay.  And then you think you may have

Page 203

1  deleted it?
2      A.   I may or may not have deleted it.
3      Q.   Okay.  Have you taken any steps to
4  preserve voicemails?
5      A.   No, but I seldom receive messages by
6  voicemail.
7      Q.   Have you taken any steps to preserve
8  text messages?
9      A.   No.
10     Q.   And you did receive some from Mr. Long
11 that you deleted, right, or they --
12     A.   If there were text messages on my phone,
13 whatever he sent me on my phone, I lost because my
14 battery went dead and I had to go buy a new iPhone.
15     Q.   Okay.  And you didn't take any steps to
16 preserve those.
17          Right?
18     A.   Oh, in between?
19     Q.   Yes.
20     A.   No, I did not.
21     Q.   Okay.  And you're not taking any steps
22 now to preserve text messages or voicemail messages.
23          Right?
24     A.   That's correct.
25     MR. STEPHENS:  I'd like that marked, please.

Page 204

1           (Whereupon E. Gottfurcht Exhibit 3 was
2           marked for identification)
3           THE WITNESS:  Do you want me to keep those,
4  still?
5  BY MR. STEPHENS:
6      Q.   Yes, you can keep those.
7           The court reporter has handed you the
8  exhibit marked E. Gottfurcht 3, and that's
9  U.S. Patent 6,604,97.
10          Right?
11     A.   That's correct.
12     Q.   And you're an inventor on that patent.
13          Right?
14     A.   Yes.
15     Q.   And that's the parent to the two patents
16 in this lawsuit.
17          Is that right?
18     A.   Yes.
19     Q.   I'm reminded that we took a break
20 sometime earlier today so you guys could consult and
21 figure out whether you could tell me why you decided
22 to change law firms.
23     A.   Uh-huh.
24     Q.   And what did you determine?
25     A.   That I could tell you.

Page 205

1      Q.   Okay.  Go ahead and tell me, please.
2      A.   Could you repeat the question?
3      Q.   Yeah.
4           Why did you decide to switch from
5  Blakely Sokoloff Taylor & Zafman to
6  Morrison & Foerster when prosecuting the 845 patent?
7      A.   Well, I don't believe it was for
8  prosecuting of the 845.  I think that it had been
9  fully prosecuted and was in that period between the
10 appeal board sending its decision reversing the
11 examiner's decision back to the examiner.
12          So I don't think there was any
13 prosecution.
14          At that particular time, Tom Coester was
15 going on I believe a four-month sabbatical that his
16 firm offers I think every eight years.
17          And Jonathan Miller, who did the bulk of
18 the work at that time, was leaving the firm.
19          That left me without my two attorneys
20 that I had worked with, and so that is the reason why
21 I left the firm.
22     Q.   Okay.  Looking at the 497 patent,
23 there's a number of inventors there.
24          Can you tell me which of those inventors
25 were associated with Online Labs?

## Page 202

1  he sent was one that I had deleted.
2  Q. Okay. But he told you he sent some
3  e-mails --
4  A. He said, "I sent you an e-mail."
5  And I said -- I said, "Oh, I didn't
6  receive an e-mail."
7  But then I went back and I looked, and
8  it was in my junk e-mail.
9  Now, I thought that his e-mail would be
10  Albert Long, so that's what I looked for, but it
11  wasn't. It was some initials.
12  And so it's possible it went in there
13  automatically or it's possible that when I delete junk
14  e-mails, that I wasn't familiar with it and I would
15  have deleted it.
16  Q. Did you or -- see an e-mail from him or
17  not in your junk e-mail?
18  A. Yeah, I did. I went back to junk e-mail
19  and it was, like, confirmed for Hous --
20  Oh, I think he -- he may have asked,
21  "Are you talking about the Houston's in Century City
22  or the Houston's in Santa Monica?"
23  I think -- I remember getting something
24  like that.
25  Q. Okay. And then you think you may have

## Page 203

1  deleted it?
2  A. I may or may not have deleted it.
3  Q. Okay. Have you taken any steps to
4  preserve voicemails?
5  A. No, but I seldom receive messages by
6  voicemail.
7  Q. Have you taken any steps to preserve
8  text messages?
9  A. No.
10  Q. And you did receive some from Mr. Long
11  that you deleted, right, or they --
12  A. If there were text messages on my phone,
13  whatever he sent me on my phone, I lost because my
14  battery went dead and I had to go buy a new iPhone.
15  Q. Okay. And you didn't take any steps to
16  preserve those.
17  Right?
18  A. Oh, in between?
19  Q. Yes.
20  A. No, I did not.
21  Q. Okay. And you're not taking any steps
22  now to preserve text messages or voicemail messages.
23  Right?
24  A. That's correct.
25  MR. STEPHENS: I'd like that marked, please.

## Page 204

1  (Whereupon E. Gottfurcht Exhibit 3 was
2  marked for identification)
3  THE WITNESS: Do you want me to keep those,
4  still?
5  BY MR. STEPHENS:
6  Q. Yes, you can keep those.
7  The court reporter has handed you the
8  exhibit marked E. Gottfurcht 3, and that's
9  U.S. Patent 6,604,97.
10  Right?
11  A. That's correct.
12  Q. And you're an inventor on that patent.
13  Right?
14  A. Yes.
15  Q. And that's the parent to the two patents
16  in this lawsuit.
17  Is that right?
18  A. Yes.
19  Q. I'm reminded that we took a break
20  sometime earlier today so you guys could consult and
21  figure out whether you could tell me why you decided
22  to change law firms.
23  A. Uh-huh.
24  Q. And what did you determine?
25  A. That I could tell you.

## Page 205

1  Q. Okay. Go ahead and tell me, please.
2  A. Could you repeat the question?
3  Q. Yeah.
4  Why did you decide to switch from
5  Blakely Sokoloff Taylor & Zafman to
6  Morrison & Foerster when prosecuting the 845 patent?
7  A. Well, I don't believe it was for
8  prosecuting of the 845. I think that it had been
9  fully prosecuted and was in that period between the
10  appeal board sending its decision reversing the
11  examiner's decision back to the examiner.
12  So I don't think there was any
13  prosecution.
14  At that particular time, Tom Coester was
15  going on I believe a four-month sabbatical that his
16  firm offers I think every eight years.
17  And Jonathan Miller, who did the bulk of
18  the work at that time, was leaving the firm.
19  That left me without my two attorneys
20  that I had worked with, and so that is the reason why
21  I left the firm.
22  Q. Okay. Looking at the 497 patent,
23  there's a number of inventors there.
24  Can you tell me which of those inventors
25  were associated with Online Labs?

Page 206

1    A.  Yes, Manuel Beltran, Steven Woesner,
2  John Marinuzzi, Albert Long, Donald Dukeshire.
3    Q.  And who is Teague McKnight?
4    A.  Teague McKnight?  I hired Teague I think
5  starting in July of 1999 to work on the graphics of
6  the interface and the advertising, part of those
7  graphics.
8    Q.  Uh-huh.  And how did you come to hire
9  Mr. McKnight?
10   A.  He was a friend of a friend.
11   Q.  And who was the friend he was a friend
12 of?
13   A.  I don't remember his name, because he
14 was a friend of another friend.
15   Q.  Okay.  What was Mr. McKnight's
16 background?
17   A.  He -- graphics, graphic design, the
18 Internet, computers.  He had graduated college, I
19 believe, and was in that period before going to
20 business school.
21   Q.  So can you just run through the
22 inventors, here, and tell me what they contributed
23 to of the invention?
24   A.  Well, I'm not able to tell you
25 specifically, because there were times when we all met

Page 207

1  together and everybody threw out a contribution.
2       But the report was prepared by
3  Manuel Beltran.  He was the leader of the group.  And
4  Steven -- Steven Woesner, John Marinuzzi, and
5  Albert Long and Donald Dukeshire, they worked on the
6  report.
7    Q.  Did they provide contributions to the
8  invention other than the things that are described in
9  the report?
10   A.  Not that I recall.
11   Q.  Could you just leaf through the figures
12 of the 497 patent and tell me what, if anything, you
13 can identify as a contribution of Mr. McKnight?
14   A.  He may have worked on Figure 4-A; he
15 may have worked on Figure 5; 4-B is questionable;
16 Figure 8; Figure 9-A, is my recollection; Figure 9-B;
17 Figure 9-C; Figure 9-D; Figure 10-A; 10-B; 10-C; 10-D;
18 10-E; 10-F; 10-G; 11; 12-A; 12-B; 13.
19       That's the best of my recollection.
20   Q.  Now, Figure 8 is the same as Figure 8 in
21 the later patents.
22       Right?
23   A.  Figure what?
24   Q.  Figure 8?
25   A.  8?

Page 208

1       What figure?  Figure 8?
2    Q.  Figure 8, yeah.
3    A.  Just some slight changes.
4    Q.  Not in the 845, is there?
5    A.  Between the 845 and the --
6    Q.  Figure 8 in the -- Figure 8 in the 497,
7  and Figure 8 in the 845 -- oh, I see.  The F and J
8  changed --
9    A.  Correct.
10   Q.  -- in this.  Yeah, you're right.
11       I think you mentioned that
12 Alber-Michel Long contributed Figure 8 in the 845
13 patent.
14       Did he also contribute part of Figure 8
15 in the 497?
16   A.  He may have.
17   Q.  Was his contributions to the 497 patent
18 primarily graphical?
19   A.  He worked with the team, so they -- they
20 were a team and they worked together.  And so I was
21 not privy to all their conversations and meetings.
22 They did write a report.
23       I'm able to -- I'm unable to distinguish
24 what part of that report was contributed to each
25 co-inventor.

Page 209

1    Q.  Okay.  So you don't really know exactly
2  who contributed what to the 497 invention.
3       Right?
4    A.  That would be generally correct.
5    Q.  Okay.  Is there anything that you can
6  specifically identify with any of the individual
7  inventors?
8    A.  Well, I remember going to a meeting.  We
9  had a -- I think the co-inventors had day jobs, and
10 they worked at night and the weekends.  And I recall a
11 couple times I reserved a room at a hotel in
12 Orange County.
13      I thought during that meeting -- I could
14 be wrong, here -- that Manuel Beltran, being the
15 leader of the team, said to Albert, Did you complete
16 the history portion of Figure 11?
17      That's my recollection.
18   Q.  Okay.  Is there any other individual
19 contribution of any inventor that you can recall?
20   A.  No, I -- individually, no.  It was the
21 report that they all worked on collectively.
22      MR. STEPHENS:  Mark that, please.
23      (Whereupon E. Gottfurcht Exhibit 4 was
24      marked for identification)
25      MR. STEPHENS:  This is Number 4.

Page 230

1    A.  I believe so.
2    Q.  Okay.  Does the document that you see on
3 Page 1412 reflect notes of a conversation you had with
4 Mr. Coester?
5    A.  I don't believe so.
6    Q.  Why do you say that?
7    A.  I don't recall taking notes of a
8 conversation I've had with Tom Coester.
9    Q.  Ever?
10   A.  No, not -- not in this document, and --
11 and -- so I don't recall that that would have been
12 notes from conversations with Tom Coester.
13   Q.  Okay.  But it's ten years ago.
14       It could have happened.
15       Right?
16       You just don't remember?
17   A.  I don't think so.
18   MR. BECKER:  I'll object to form.
19 BY MR. STEPHENS:
20   Q.  How are you so sure?
21   A.  Because I don't recall it.
22   Q.  Okay.  But there's a lot of things you
23 don't recall.
24   A.  I understand.
25   Q.  There's a lot of things you don't recall

Page 231

1 from ten years ago.
2       Right?
3    A.  That's correct.
4    Q.  But you do recall that this is not notes
5 from a conversation with Tom Coester.
6       Right?
7    A.  I do not -- I do not recall.  I do not
8 believe that it is.
9    Q.  But you don't know why you read his name
10 on the page, either.
11       Right?
12   A.  That's correct.
13   Q.  Okay.  If you turn to Page 1424, it
14 says, "Fogies.com, enjoying a longer life."
15       Do you see that?
16   A.  Yes.
17   Q.  And then to the left of that, there's
18 some words that are written down, "Jill and Tom," and
19 then there's letter -- words to the left of that.
20       Can you read those?
21   A.  Looks like "trademark" next to Jill, and
22 Tom -- portal?  I can't -- I don't know what that
23 says.
24   Q.  And who was Jill?
25   A.  I don't recall.

Page 232

1    Q.  And who was Tom?
2    A.  I don't recall.
3    Q.  Is that Tom Coester?
4    A.  I don't recall.
5    Q.  And if you'll turn to Page 1428, the top
6 of that page says, "Business Plan"?
7    A.  Yes.
8    Q.  Did you develop a business plan around
9 your invention?
10   A.  I don't recall.
11   Q.  How much money have you spent trying to
12 exploit your invention?
13   MR. BECKER:  Object to form.
14   THE WITNESS:  From 1999?
15 BY MR. STEPHENS:
16   Q.  Yes.
17   A.  A guess?
18   Q.  Your best guess, sure.
19   A.  About $2 million or more.
20   Q.  And how much of that is -- was spent on
21 patent filings and prosecuting?
22   A.  Well, that would be included as part of
23 that.
24   Q.  Well, no, I'm asking you to break it
25 down.

Page 233

1    A.  I don't know how -- I couldn't break
2 that down.
3    Q.  You spent more than a million on
4 patents?
5    A.  No, I think I -- I -- I think that it
6 was about $2 million for patent prosecution,
7 prototypes, and any other related expenses.
8    Q.  Has that all been your own money?
9    A.  Yes.
10   Q.  No investors?
11   A.  No.
12   Q.  Do you have records of what you've
13 spent?
14   A.  I don't recall.
15   Q.  You don't have anybody in charge of
16 keeping records?
17   A.  Well, I'd have to go see if I could find
18 records pertaining to that.
19       That go back ten years?
20   Q.  Any period of time.
21   A.  Yeah, I'd have to check to see if I have
22 those records.
23   Q.  You didn't check to see if you have
24 those records in connection with this lawsuit already?
25   A.  No.

## Page 294

1  documents. But to my memory, at Time Warner, AT&T,
2  Fox, Yahoo, Comcast, I think Microsoft, Cisco. Those
3  are some of the companies I believe that I talked to.
4      Q. And which of those companies did you
5  have meetings with?
6      A. Time Warner, Fox, NBC, AT&T.
7         That's all I can think of then.
8      Q. So you didn't meet with Yahoo?
9      A. I -- I spoke to them on the phone.
10     Q. You didn't meet with Comcast?
11     A. I spoke to them on the phone.
12     Q. You didn't meet with Microsoft?
13     A. I spoke to them on the phone.
14     Q. And you didn't meet with Cisco?
15     A. I talked to them on the phone.
16     Q. Okay. Does EMG have any employees?
17     A. No.
18     Q. Where is its office?
19     A. The office is at my residence, and we
20 have an office in Tyler, Texas.
21     Q. And is the office in Tyler, Texas, the
22 office operated by your lawyer, local counsel?
23     MR. BECKER: Object. Form.
24     THE WITNESS: It's an office where we have our
25 original documents stored.

## Page 295

1  BY MR. STEPHENS:
2      Q. Anything else happen there?
3      A. I think we have a computer, telephone
4  service, I think maybe a safe for the documents.
5      Q. Is that -- was that office arranged for
6  by your lawyer in Tyler?
7      MR. BECKER: And I'll instruct you not to
8  answer, only to the extent that you have to divulge
9  attorney-client advice --
10     MR. STEPHENS: Right.
11     MR. BECKER: -- or communication.
12     MR. STEPHENS: It's got to be legal advice.
13 Renting a space for him does not qualify as legal
14 advice.
15     MR. BECKER: I didn't tell him that.
16 BY MR. STEPHENS:
17     Q. Okay. Did the lawyer arrange for your
18 space in Tyler?
19     A. Did he arrange for the space in Tyler?
20        I think I did.
21     Q. And who did you call?
22     A. I called Charlie Ainsworth's office, our
23 local counsel.
24     Q. And you talked to Charlie and said, I
25 want some space?

## Page 296

1      A. I can't recall who I talked to.
2         I said, "We're sending documents to you.
3  We'd like you to arrange for a space and we'll pay
4  rent to store the documents -- the original
5  documents."
6      Q. You paid your rent to
7  Parker Bunt & Ainsworth?
8      A. No. No, no, no.
9      Q. Who do you pay your rent to?
10     A. I don't know who it is, but it's the
11 landlord of the building.
12     Q. Okay. But Mr. Ainsworth arranged for
13 the --
14     A. I'm not sure whether he did. I -- I'm
15 not testifying to that.
16     Q. Okay. But he's the one you talked to,
17 to make that happen --
18     A. I can't -- I'm not -- somebody --
19     Q. -- that you talked to, to get the space?
20     A. I don't recall.
21     Q. Do you write a check every month for
22 that rent?
23     A. Does EMG write a check?
24     Q. Yes.
25     A. Yes.

## Page 297

1      Q. And who does that check -- who is that
2  paid to?
3      A. I don't recall the name.
4      Q. Okay. It doesn't show up on your legal
5  bill?
6      A. No, no, not at all.
7      Q. Is there any activity that occurs there
8  other than storing documents?
9      A. As far as activity that I know of?
10     Q. Yeah.
11     A. No.
12     Q. Have you ever been there?
13     A. No.
14     Q. Do you know anyone who has ever been in
15 that space?
16     A. Well, I would think that there's
17 somebody from the local counsel's office that had been
18 there to arrange our original documents.
19     Q. But do you know of anyone who's ever
20 been there, specific person?
21     A. No.
22     Q. Okay. Now, tell me about your
23 education, please.
24     A. I graduated from University of
25 Southern California, I think in 1962.

Page 346

1  MR. LANE: Let me just add -- I just want to
2  add one thing on the record for American, since we
3  haven't -- I think that we have been prejudiced by the
4  deposition, given the number of questions the witness
5  hasn't been able to answer.
6      It's caused the deposition to take an
7  inordinate amount of time, the amount of time it took
8  to review documents, as well as now, we found out a
9  lot of documents haven't been produced.
10     So just for American Airlines, we will
11 need to seek additional time to depose Mr. Gottfurcht.
12     Thank you.
13 MR. BECKER: And we disagree with that
14 characterization.
15 MR. STEPHENS: Okay.
16 THE WITNESS: Thank you very much.
17 THE VIDEOGRAPHER: This concludes Volume I in
18 the deposition of Elliot Gottfurcht.
19     The number of tapes used was four. The
20 original videotapes will be retained by Merrill Legal
21 Solutions, Woodland Hills, California.
22     Going off the record.
23     The time is 7:51 p.m.
24 COURT REPORTER: Okay. And you both wanted
25 roughs?

Page 347

1  MR. STEPHENS: Yes.
2  MR. BECKER: Yes.
3  MR. GENET: And I'll just take a copy.
4  COURT REPORTER: Okay. Did you need the
5  roughs tonight, or is it okay for the morning?
6  MR. STEPHENS: Tomorrow is fine.
7  MR. BECKER: That's fine.
8  (Whereupon the deposition was concluded
9  at 7:52 p.m.)

Page 348

1  PENALTY OF PERJURY
2
3
4
5      I hereby declare I am the deponent in the
6  within matter; that I have read the foregoing
7  proceeding and know the contents thereof and I declare
8  that the same is true of my knowledge except as to the
9  matters which are therein stated upon my information
10 or belief, and as to those matters I believe it to be
11 true.
12     I declare under penalty of perjury that the
13 foregoing is true and correct.
14     Executed on the _____ day of
15 _____, 2009, at _____,
16 California.
17
18
19
20
       _____
21     ELLIOT GOTTFURCHT

Page 349

1  STATE OF CALIFORNIA   )
                         )
2                        ) ss.
   COUNTY OF LOS ANGELES )
3
4      I, SUSAN LYNN POBOR, Certified Shorthand
5  Reporter No. 5132 for the State of California, do
6  hereby certify:
7      That prior to being examined, the witness
8  named in the foregoing deposition, was duly sworn to
9  testify the truth, the whole truth, and nothing but
10 the truth;
11     That said deposition was taken down by me in
12 shorthand at the time and place therein named and
13 thereafter reduced by me to typewritten form and that
14 the same is a true, correct, and complete transcript
15 of said proceedings.
16     Before completion of the deposition, review of
17 the transcript [X] was [ ] was not requested. If
18 requested, any changes made by the deponent (and
19 provided to the reporter) during the period allowed
20 are appended hereto.
21     I further certify that I am not interested in
22 the outcome of the action.
23     Witness my hand this _____ day of
24 _____, 2009.
25     _____
       Susan Lynn Pobor, CSR No. 5132

88 (Pages 346 to 349)