# EXHIBIT U

```
 1            IN THE UNITED STATES DISTRICT COURT
 2                 EASTERN DISTRICT OF TEXAS
 3                       TYLER DIVISION
 4
 5   EMG TECHNOLOGY, LLC,              )
                                       )
 6                 Plaintiff,          )
                                       )
 7           vs.                       )Case No.
                                       )6:08-cv-447(LED)
 8   APPLE, INC., AMERICAN AIRLINES,   )
     INC., DELL, INC., HYATT           )VOLUME I
 9   CORPORATION, MARRIOTT             )
     INTERNATIONAL, INC. & BARNES &    )
10   NOBLE, INC.,                      )
                                       )
11                 Defendants.         )
12
13
14
15
16   DEPOSITION OF:
17             GRANT GOTTFURCHT
18             WEDNESDAY, DECEMBER 16, 2009
19             10:19 A.M.
20
21
22
23
24   Reported by:   SUSAN LYNN POBOR
25                  CSR No. 5132
```

Page 86

1  Q. And you heard your lawyer, Mr. Becker,
2  tell the judge that you and your father were
3  unsophisticated with respect to technology.
4     Right?
5  A. I don't recall if those were his exact
6  words.
7  Q. Is that an accurate statement?
8  A. I don't -- I don't recall.
9  Q. I'm not asking whether those were the
10 exact words.
11    Is it an accurate statement that you and
12 your father are unsophisticated with respect to
13 technology?
14 A. You'd have to define "unsophisticated."
15 Q. As you would normally understand that
16 word.
17 MR. BECKER: Object. Form.
18 THE WITNESS: I think there's different
19 degrees of being unsophisticated. You would have to
20 be specific.
21 BY MR. STEPHENS:
22 Q. Okay. So you disagree?
23    You'd say that you are not
24 unsophisticated with respect to technology.
25    Is that right?

Page 87

1  A. I'm not a programmer, I'm not an
2  engineer. If that's your definition of being
3  sophisticated, then I'm unsophisticated in that aspect
4  of technology.
5  Q. I don't have a definition. I'm asking
6  the way you interpreted what Mr. Becker told the
7  judge.
8  MR. BECKER: Object. Form.
9  BY MR. STEPHENS:
10 Q. Do you agree what he told the judge was
11 true with respect to you and your father's level of
12 sophistication regarding the technology?
13 A. It's a broad statement, so I would
14 not -- I would not be able to answer as to Mr. -- my
15 attorney, what he was inferring.
16 Q. So you don't know whether what he told
17 the judge was true or not?
18 MR. BECKER: Object. Form.
19 THE WITNESS: I don't know what he was
20 thinking when he used the word "unsophisticated."
21 Q. Well, neither did the judge.
22    Right?
23 MR. BECKER: Object. Form.
24 BY MR. STEPHENS:
25 Q. Right?

Page 88

1  A. I don't know. Maybe he had an
2  understanding of what he was telling him.
3  Q. So you didn't understand what Mr. Becker
4  meant when he said to the judge that you and your
5  father are unsophisticated with respect to technology.
6     Is that right?
7  A. No.
8  Q. Okay. What --
9  A. I just -- I didn't think about it at the
10 time.
11 Q. Okay.
12 A. I didn't even know -- I don't even know
13 if those were the exact words he used.
14    I would have to -- you know, maybe if
15 there's a transcript and I could read it back and then
16 I could hypothetically --
17 Q. Are you denying that he used those
18 words?
19 A. I don't recall, I really don't.
20 Q. Okay. Do you think they're accurate or
21 not?
22 MR. BECKER: Object. Form.
23 THE WITNESS: Again, I don't know.
24 BY MR. STEPHENS:
25 Q. Okay. Now, he also told the judge that

Page 89

1  you're not experts in the field.
2     Is that accurate?
3  A. Could be.
4  Q. "Yes" or "no"?
5     Is it?
6  A. If experts are defined as programmers
7  and -- and, you know, people who are -- work daily in
8  the field of engineering or programming or have
9  degrees, then that would be accurate.
10 Q. Is that what you understood Mr. Becker
11 to mean when he told the judge you were not experts in
12 the field?
13 A. No.
14 Q. What did you understand it to mean?
15 A. I didn't even think about it. There was
16 a conversation, there was a lot of people on the
17 phone. There was, I think, ten people in conference,
18 and things were going back and forth, and I didn't
19 really understand it to mean anything --
20 Q. Okay.
21 A. -- at the time.
22 Q. He also -- Mr. Becker also told the
23 judge that you and your father had helped capturing
24 the inventions you conceived.
25    Do you remember that?

Page 158

1  And so it made sense for me to -- as a
2  salesperson, to hang it under him; therefore, I would
3  be able to get a full commission on -- on a
4  real estate transaction.
5  So as far as looking for clients to buy
6  and sell real estate, that was something I was doing
7  on my own.
8  Q. Did your father back you in any of your
9  real estate ventures?
10  A. He might have loaned me some money on
11  some of the spec homes I had done.
12  Q. Is he an investor in your yoga activity?
13  A. No, he's not.
14  Q. Do you have any outside investors in
15  that?
16  A. No, I do not.
17  Q. Have you discussed with your father what
18  you will do with the proceeds from this lawsuit?
19  A. The only thing discussed is giving a
20  part of it to charity, 50 percent to charity.
21  Q. What's your understanding of what will
22  happen with the rest?
23  A. That it would be put into, I guess, EMG.
24  Q. Would it end up in the trusts?
25  A. I don't know exactly.

Page 159

1  Q. What's your expectation?
2  A. I would assume that it would.
3  Q. And that ultimately, you'd be the
4  beneficiary of at least part of the money that comes
5  into this lawsuit.
6  Right?
7  A. Yes.
8  Q. I'm handing you E. Gottfurcht 12.
9  Take a look at that and tell me if
10  you've seen that before.
11  A. I don't recall.
12  Q. What's your understanding of the role of
13  the other inventors in the patents in this lawsuit?
14  A. They were hired to work on some of the
15  technical specifications for the patent.
16  Q. And what did they do?
17  A. They put together some flow charts and
18  diagrams.
19  Q. Anything else?
20  A. Not that I could recall.
21  Q. What's your understanding of Mr. Long's
22  contribution to the 845 patent?
23  A. The 845?
24  Do you have a copy of that?
25  Q. It should be one of those you have

Page 160

1  there.
2  A. I have 497 and 196.
3  My overall understanding of what he did
4  was work on some of the graphical interfaces.
5  Q. Anything else?
6  A. I don't know.
7  Q. Okay.
8  A. I know he was part of the group at
9  Online Labs. I don't know what input he had in some
10  of these flow charts. He might have had some input,
11  he might have not. I don't know.
12  Q. When is the first time that you met with
13  patent lawyers in connection with the invention?
14  A. Probably the first week of July of 1999.
15  Q. What do you remember about that meeting?
16  A. I don't recall a lot about the meeting.
17  Q. Do you remember where it was?
18  A. It's been awhile.
19  I don't recall if it was first by phone
20  or if we went into his office, Tom Coester. The firm
21  was Blakely Sokoloff, and his offices I believe were
22  in West L.A.
23  Q. Do you remember anything else about that
24  meeting?
25  A. Not specifically beyond what I've told

Page 161

1  you.
2  Q. Who participated besides you and
3  Mr. Coester?
4  A. Elliot Gottfurcht.
5  Q. Anybody else?
6  A. No.
7  Q. Now, can you tell me the difference
8  between the 459 patent and the 845 or 196 patent?
9  The disclosures are different, and I'd
10  like for you to tell me your understanding of why
11  they're different.
12  A. Can you repeat which patents you're
13  talking about?
14  Q. Yeah. What -- you've got the -- tell me
15  which ones you have.
16  A. 196, 497.
17  Q. Okay. Yeah, what's the difference
18  between the disclosures in those two patents?
19  A. There's different dates.
20  Q. Yeah, one is later.
21  Right?
22  A. Yes. One was issued July 29, 2003; one
23  was October 21st, 2008.
24  Q. I'm wondering where the 845 patent went.
25  Is it in that stack somewhere?

Page 178

1 A. Pressing the screen if the button's on
2 the screen.
3 Q. Yeah, okay. I -- I don't mean virtual
4 buttons on the screen. I mean like a keyboard button.
5 You didn't mean that.
6 Right?
7 A. No.
8 Q. Okay. So as you understood it,
9 "manipulating a region of the screen for scrolling
10 and/or zooming" meant only touching something on the
11 screen.
12 Is that right?
13 MR. BECKER: Object. Form.
14 THE WITNESS: It was -- it was my -- yeah,
15 that's what I envisioned.
16 BY MR. STEPHENS:
17 Q. Okay. Did someone else come up with the
18 idea of pushing a physical button to cause scrolling
19 and/or zooming?
20 A. I don't know. I don't recall.
21 Q. You're not aware of anybody coming up
22 with that idea?
23 A. I don't recall.
24 MR. STEPHENS: Okay. I have no more
25 questions.

Page 179

1 I do want to say, though, that we did
2 address the issue of the assertion of privilege today,
3 but I don't think we addressed the issue of waiver of
4 privilege, so we still may revisit that issue.
5 But I don't have any more questions.
6 MR. BECKER: Anything further?
7 Is American asking questions?
8 MR. GENET: No, not today.
9 MR. BECKER: Okay. Thank you.
10 No questions for me.
11 THE VIDEOGRAPHER: This concludes Volume I in
12 the deposition of Grant Gottfurcht.
13 The number of tapes used was two. The
14 original videotapes will be retained by Merrill Legal
15 Solutions, Woodland Hills.
16 Going off the record.
17 The time is 4:26 p.m.
18 COURT REPORTER: And I'll send you both your
19 roughs.
20 MR. STEPHENS: Thank you.
21 MR. BECKER: Thank you.
22 COURT REPORTER: And you just want the copy,
23 no rough.
24 Correct?
25 MR. GENET: Yes, thank you.

Page 180

1 (Whereupon the deposition was concluded
2 at 4:28 p.m.)

Page 181

PENALTY OF PERJURY

I hereby declare I am the deponent in the within matter; that I have read the foregoing proceeding and know the contents thereof and I declare that the same is true of my knowledge except as to the matters which are therein stated upon my information or belief, and as to those matters I believe it to be true.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on the _____ day of _____, 2009, at _____, California.

_____
GRANT GOTTFURCHT

46 (Pages 178 to 181)

Merrill Legal Solutions - Houston

1-888-513-9800                                       www.merrillcorp.com/law

```
                                          Page 182
 1   STATE OF CALIFORNIA   )
                           )
 2                         ) ss.
     COUNTY OF LOS ANGELES )
 3
 4       I, SUSAN LYNN POBOR, Certified Shorthand
 5   Reporter No. 5132 for the State of California, do
 6   hereby certify:
 7       That prior to being examined, the witness
 8   named in the foregoing deposition, was duly sworn to
 9   testify the truth, the whole truth, and nothing but
10   the truth;
11       That said deposition was taken down by me in
12   shorthand at the time and place therein named and
13   thereafter reduced by me to typewritten form and that
14   the same is a true, correct, and complete transcript
15   of said proceedings.
16       Before completion of the deposition, review of
17   the transcript [X] was [ ] was not requested.  If
18   requested, any changes made by the deponent (and
19   provided to the reporter) during the period allowed
20   are appended hereto.
21       I further certify that I am not interested in
22   the outcome of the action.
23       Witness my hand this _____ day of
24   _____, 2009.
25   _____
          Susan Lynn Pobor, CSR No. 5132
```