**Exhibit O**

**REDACTED**

```
 1            IN THE UNITED STATES DISTRICT COURT
 2                EASTERN DISTRICT OF TEXAS
 3                     TYLER DIVISION
 4
 5   EMG TECHNOLOGY, LLC,                )
                                         )
 6                  Plaintiff,           )
                                         )
 7              vs.                      )Case No.
                                         )6:08-cv-447(LED)
 8   APPLE, INC., AMERICAN AIRLINES,     )
     INC., DELL, INC., HYATT             )VOLUME I
 9   CORPORATION, MARRIOTT               )
     INTERNATIONAL, INC. & BARNES &      )
10   NOBLE, INC.,                        )
                                         )
11                  Defendants.          )
12
13
14        *** CONFIDENTIAL - ATTORNEYS' EYES ONLY ***
                     (PAGES 307 TO 311)
15
                     *** CONFIDENTIAL***
16                   (PAGES 312 TO 345)
17
18   DEPOSITION OF:
19                 ELLIOT GOTTFURCHT
20                 TUESDAY, DECEMBER 15, 2009
21                 10:07 A.M.
22
23
24   Reported by:   SUSAN LYNN POBOR
25                  CSR No. 5132
```

Page 2

```
1        Deposition of ELLIOT GOTTFURCHT, the witness,
2   taken on behalf of the Defendant, APPLE, INC., on
3   Tuesday, December 15, 2009, 10:07 a.m., at
4   555 West 5th Street, Suite 3500, Los Angeles,
5   California, before SUSAN LYNN POBOR, CSR No. 5132,
6   pursuant to Notice.
7
8   APPEARANCES OF COUNSEL:
9   For Plaintiff:
10       MANATT PHELPS & PHILLIPS
         BY:  ROBERT BECKER, ESQ.
11       1001 Page Mill Road
         Building 2
12       Palo Alto, California  94304
         (650) 812-1300
13
    For Defendant, APPLE, INC.:
14
         FISH & RICHARDSON, P.C.
15       BY:  GARLAND STEPHENS, ESQ.
             JOHN R. LANE, ESQ.
16       1221 McKinney
         28th Floor
17       Houston, Texas  77010
         (713) 652-0109
18
    For Defendant, AMERICAN AIRLINES, INC.:
19
         NIXON PEABODY, LLP
20       BY:  RUSSELL J. GENET, ESQ.
         300 South Riverside Plaza
21       16th Floor
         Chicago, Illinois  60606
22       (312) 425-8516
23
    VIDEOGRAPHER:  DANIEL ROCCO
24
    ALSO PRESENT:  JEFF RISH; GRANT GOTTFURCHT
25
```

Page 3

```
1              I N D E X
2   WITNESS       EXAMINATION       PAGE
3   ELLIOT GOTTFURCHT   BY MR. STEPHENS      8
4                BY MR. BECKER      343
5                BY MR. STEPHENS    345
6
7           E X H I B I T S
8   No.        Description        PAGE
9   E. Gottfurcht  United States Patent No.    94
    Exhibit 1     7,020,845 B1
10  E. Gottfurcht  United States Patent No.   162
    Exhibit 2     7,441,196 B2
11
12  E. Gottfurcht  United States Patent No.   204
    Exhibit 3     6,600,497 B1
13  E. Gottfurcht  Copy of an envelope;       209
    Exhibit 4     pages of handwritten
14                notes
15  E. Gottfurcht  Copy of an envelope;       216
    Exhibit 5     handwritten notes
16
17  E. Gottfurcht  Copy of an envelope;       239
    Exhibit 6     handwritten notes
18  E. Gottfurcht  Copy of an envelope;       239
    Exhibit 7     handwritten notes
19
20  E. Gottfurcht  Copy of an envelope;       239
    Exhibit 8     handwritten notes
21  E. Gottfurcht  Copy of an envelope;       239
    Exhibit 9     handwritten notes
22
    E. Gottfurcht  Copy of an envelope;       239
23  Exhibit 10    handwritten notes
24
25
```

Page 4

```
              E X H I B I T S
1                (CONTINUED)
2
    E. Gottfurcht  Copy of an envelope;       239
3   Exhibit 11    handwritten notes
4   E. Gottfurcht  Document entitled, "A      244
    Exhibit 12    Method And Apparatus For
5                Simplifying Access To
                 Online Information And
6                Services"
7   E. Gottfurcht  E-mail from Elliot         252
    Exhibit 13    Gottfurcht to
8                aditya@yahoo-inc.com
9   E. Gottfurcht  E-mail to Elliot           257
    Exhibit 14    Gottfurcht from Mario
10               Longstreet dated May 21,
                 2004
11
12  E. Gottfurcht  E-mail from Rick Soss to   280
    Exhibit 15    Elliot Gottfurcht, The
13               Court's Claim
                 Construction, etc.
14  E. Gottfurcht  E-mail from Elliot         282
    Exhibit 16    Gottfurcht to
15               aguiermovich@artlogic.
                 com; attachment entitled
16               "Reformatting Content
                 Via Transcoding"
17
    E. Gottfurcht  Document showing Flash     322
18  Exhibit 17    presentation entitled
                 "7,020,845 Independent
19               Claim"
20  E. Gottfurcht  Document showing Flash     325
    Exhibit 18    presentation entitled
21               "Patent 7,441,196"
22  Exhibit 19    Document showing Flash      326
                 presentation entitled
23               "Fox"
24  E. Gottfurcht  Document showing Flash     327
    Exhibit 20    presentation entitled
25               "NBC"
```

Page 5

```
              E X H I B I T S
1                (CONTINUED)
2
    E. Gottfurcht  Document showing Flash     327
3   Exhibit 21    presentation entitled
                 "Disney.com"
4
    Exhibit 22    Printout of a web page      328
5                on CNN.com
6   E. Gottfurcht  Document entitled          338
    Exhibit 23    "MallTV Focus Groups
7
8
9
             INFORMATION REQUESTED
10
               (NONE)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 6

I N D E X (CONTINUED)

QUESTIONS INSTRUCTED NOT TO ANSWER

| PAGE | LINE |
|------|------|
| 34 | 2 |
| 48 | 3 |
| 91 | 2 |
| 108 | 15 |
| 167 | 23 |
| 168 | 11 |
| 258 | 10 |
| 258 | 16 |
| 265 | 10 |
| 267 | 14 |
| 268 | 18 |
| 273 | 16 |
| 273 | 22 |
| 301 | 14 |
| 302 | 6 |
| 314 | 2 |
| 328 | 19 |
| 336 | 14 |

---

Page 8

1  Manatt Phelps & Phillips, representing the witness.
2      MR. GENET:  And this is Russ Genet from
3  Nixon Peabody.  I'm here on behalf of
4  American Airlines.
5          And for the record, I just want to state
6  that I'm here on behalf of American Airlines, only.
7  I'm not here on behalf of any of the other defendants
8  that have recently been added to the case, such as
9  Dell or Hyatt.
10      THE VIDEOGRAPHER:  The court reporter today is
11  Susan Pobor of Merrill Legal Solutions.
12          Will the reporter please swear in the
13  witness.
14          ELLIOT GOTTFURCHT,
15      having been first duly sworn, was
16      examined and testified as follows:
17
18          EXAMINATION
19  BY MR. STEPHENS:
20      Q.   Good morning, Mr. Gottfurcht.
21      A.   Good morning.
22      Q.   Could you please state and spell your
23  name for the record.
24      A.   Elliot Gottfurcht, E-l-l-i-o-t,
25  G-o-t-t-f-u-r-c-h-t.

---

Page 7

1          TUESDAY, DECEMBER 15, 2009
2          LOS ANGELES, CALIFORNIA
3              10:07 A.M.
4              ---o0o---
5      THE VIDEOGRAPHER:  Here begins Volume I,
6  videotape Number 1, in the deposition of
7  Elliot Gottfurcht, in the matter of EMG Technology,
8  LLC, versus Apple, Inc., et al., filed in the
9  United States District Court, Eastern District of
10  Texas.  Case number is 6:08-cv-447 (LED).
11          Today's date is Tuesday, December 15,
12  2009.  The time on the video monitor is 10:07 a.m.
13          The video operator today is
14  Daniel Rocco, contracted by Merrill Legal Solutions.
15          This video deposition is taking place at
16  555 West 5th Street, Suite 3500, Los Angeles,
17  California.
18          Counsel, please identify yourselves and
19  state whom you represent.
20      MR. STEPHENS:  Garland Stephens of Fish &
21  Rich -- Richardson, representing Apple.
22          With me today is John Lane, also of
23  Fish & Richardson, and also here for Apple is
24  Jeff Risher.  He's in-house with Apple.
25      MR. BECKER:  And I'm Robert Becker from

---

Page 9

1      Q.   And what's your home address?
2      A.   1033 Ocean Avenue, Santa Monica,
3  California, 90403.
4      Q.   You've been deposed before, I take it?
5      A.   I have not, that I -- that I can recall.
6      Q.   Okay.  Well, just so you understand,
7  this is a sworn deposition, so you're under oath.
8          You understand that.
9          Right?
10      A.   Yes.
11      Q.   And in the event that you are unable to
12  attend the trial in Tyler when that happens, or to the
13  extent that anything you say, if you do attend trial,
14  contradicts what you say here today, this videotape
15  testimony can be played at the trial.
16          Do you understand that?
17      A.   Yes, I do.
18      Q.   Okay.  And we need to try not to speak
19  over each other today so that the court reporter can
20  take everything down.
21          Is there any reason why you can't
22  testify truthfully today?
23      A.   No.
24      Q.   Not taking any medications or anything
25  like that?

Page 10

1      A.   None.
2      Q.   Okay.  Could you tell us what it is that
3  you invented that is in dispute in this case?
4      MR. BECKER:  Object to form.
5  BY MR. STEPHENS:
6      Q.   Oh, if your counsel objects, you can go
7  ahead and answer it unless he tells you not to.
8      A.   Okay.  I didn't hear what he said.
9      Q.   I think he just said "Objection," but
10  I'll let him --
11      MR. BECKER:  Object to form.  That's what I
12  said.
13      THE WITNESS:  Oh, okay.
14      In 1999, on or about July 1st, my son Grant
15  and I envisioned how the Internet would be displayed,
16  navigated, and look like on mobile devices and
17  television.
18  BY MR. STEPHENS:
19      Q.   Anything more?
20      A.   We thought at that time that sometime in
21  the future, Web pages would have to be reformatted to
22  be displayed on mobile devices and television.
23      Q.   Other than thinking that Web pages would
24  have to be reformatted to be displayed on mobile
25  devices and television, was there anything else that

Page 11

1  you thought of as a part of your invention?
2      A.   Yes.  We thought that these Web pages --
3  that they would -- it would be necessary to have a
4  simplified interface for navigation.
5      Q.   Anything else?
6      A.   We thought that the -- the navigation
7  system would be with unique inputs.
8      Q.   Anything else?
9      A.   We thought that these reformatted
10  simplified navigable Web pages would be sister
11  sites --
12      Q.   Anything else?
13      A.   -- that would relate to the standard Web
14  page that was shown on a PC.
15      Q.   Anything else?
16      A.   We thought that these Web pages would be
17  manipulated -- you would manip -- the user would
18  manipulate a region of a screen for zooming and
19  scrolling.
20      Q.   Anything else?
21      A.   That the content would be organized into
22  more general categories.
23      Q.   Anything else?
24      A.   Content may appear in a matrix form.
25      Q.   Anything else?

Page 12

1      A.   That's all I can think of at this
2  moment.
3      Q.   Okay.  You thought of all of those items
4  or aspects that you just mentioned on July 1st, 1999.
5      Is that right?
6      A.   On -- on -- on or about July 1st, 1999.
7      Q.   What leads you to recall that specific
8  date?
9      A.   That is the date that I moved into a new
10  home.  That is the date that we installed, I believe,
11  the plasma -- the new plasma television on the wall.
12  And they also had purchased a new computer.
13      Q.   Can you tell us what the circumstances
14  were?
15      You mentioned you bought a new house,
16  you bought a new plasma TV and a new computer, and
17  that you and Grant came up with this invention.
18      Can you describe how you came up with
19  it?
20      A.   I had never used a computer before.  And
21  so I was sitting in the living room with the plasma on
22  the wall that just had been installed.  Grant had
23  turned on the computer, and my cell phone was -- was
24  nearby.
25      Q.   And what happened then?

Page 13

1      A.   I believe Grant went to either Yahoo.com
2  or AOL.com.
3      Q.   And then what?
4      A.   And he explained to me, This is a -- a
5  Web page here.  And I was curious, fascinated.  I had
6  not seen this before.
7      I think one of the first things that I
8  did was, I -- I counted the choices or links on the
9  page.  And I think he scrolled down so I could see the
10  full page, because you could not see the full page on
11  the screen.
12      Q.   And then what?
13      A.   I thought it was -- it was fascinating.
14      Q.   So just to recap, make sure I've got it
15  right, on July 1st, 1999, you and Grant were in your
16  new home, with your new plasma TV and your new
17  computer, and it was the first time you'd ever seen
18  the Internet and the first time you'd ever used a
19  computer.
20      Is that right?
21      A.   I -- I believe it was the first time
22  that I had seen an Internet page, and I don't -- I
23  don't recall ever using a computer before.
24      Q.   Okay.  And Grant showed you either
25  Yahoo.com or AOL.com.

4 (Pages 10 to 13)

1        Right?
2        A.   Yes.
3        Q.   And then you scrolled down the page and
4   counted the links on the page.
5        Right?
6        A.   Well, I'm not sure I scrolled down the
7   page.  I'm not sure I knew how to do that.  Grant was
8   demonstrating the choices on the page.
9        Q.   Okay.  You or Grant -- or Grant scrolled
10  down the page and counted the links.
11       Right?
12       A.   I believe it was Grant that did that.
13       Q.   Okay.  And had you thought of your
14  invention at this point?
15       A.   Well, it was shortly after that moment
16  when I -- I think the first thing that I did was, I
17  counted the number of choices or links --
18       Q.   Okay.
19       A.   -- on the page.  And I -- I recall that
20  there were -- were ov -- I believe that there were
21  over 100.
22       Q.   Okay.  And so at this point, you still
23  had not come up with your invention.
24       Is that right?
25       MR. BECKER:  Object to form.

1        THE WITNESS:  I don't believe so at that
2   exact -- at that moment.
3   BY MR. STEPHENS:
4        Q.   Okay.  So what happened next in the
5   story of your invention?
6        A.   I looked up at the plasma on the wall, I
7   looked down on the -- and this is what I believe
8   happened -- on the cell phone.  And I said, Sometime
9   in the future, this Internet page, the Internet, would
10  be on television and on the cell phone.
11       Q.   Okay.  What happened next?
12       A.   I took out a pad and a pen, I believe,
13  and I wrote down what would have to change to -- to
14  make it viable to display Web pages on television and
15  on cell -- cellular phones.
16       Q.   Now, did you actually try using the
17  Internet first or did you write down the things that
18  would have to change after Grant demonstrated the
19  Yahoo or AOL homepage?
20       A.   I -- I don't recall.
21       Q.   And the things that you wrote down on
22  the pad, are those the seven or eight things that you
23  mentioned just a few minutes ago as what you invented
24  that day?
25       A.   Yes.

1        Q.   So reformatting, simplified interface,
2   navigation with unique input, sister sites, and the
3   sister sites would relate to a standard Web page on a
4   standard PC, manipulating a region of the screen for
5   scrolling and zooming, content organized in more
6   general categories, and content in a matrix form,
7   those are the things that you wrote down?
8        A.   Generally speaking.  Although, one of
9   them you mentioned, I think it was a little different
10  than the way I said I'm.
11       Q.   Okay.  I'm sorry.  Which one was that?
12       A.   Something about a Web page, the --
13       Q.   That was relating to a standard Web page
14  on a standard PC?  Is that what I got wrong?
15       A.   I -- I -- I -- I'm not quite sure what
16  context that was said.
17       Q.   I was just trying to copy down what you
18  said, but maybe I got it wrong.  It's possible.
19       A.   Okay.
20       Q.   Could -- could you tell me what you
21  intended to say?
22       A.   I -- I don't recall.
23       Q.   It was right after sister sites.  I --
24  you had mentioned sister sites, and then you said
25  something about a normal PC, and maybe I got it wrong.

1        Do you remember what that was?
2        A.   No.
3        If you want to read it back, then I
4   could --
5        Q.   No, that's okay.
6        A.   Okay.
7        Q.   Anything else that you wrote down that
8   would have to change in order to make the Internet
9   viable on a television and cell phone?
10       A.   I don't recall.
11       Q.   How long was it from the time you first
12  saw the Internet to the time you came up with these
13  ideas?
14       A.   Shortly thereafter.
15       Q.   How -- how short?
16       A.   Within a few minutes.
17       And -- and I don't recall during that
18  time whether Grant went to other websites and
19  demonstrated more of the Internet for me before I
20  thought -- began thinking of these ideas.
21       Q.   Okay.
22       A.   And it was Grant who thought of the idea
23  of manipulating a region on the screen for zooming and
24  scrolling.
25       Q.   And so you and Grant came up with these

Page 18

```
 1   ideas within a few minutes.
 2           Do you remember how many minutes?
 3       A.  No.
 4       Q.  Was it more than five?
 5       A.  I don't know.
 6       Q.  Could it have been?
 7       A.  Could -- could have -- could have been.
 8   I don't recall.
 9       Q.  Less than an hour?
10       A.  Probably so, but I still -- I don't
11   recall.
12       Q.  Less than a half an hour?
13       A.  I don't recall.
14       Q.  I'm just asking for your best
15   recollection.
16       A.  Okay.  I -- I -- I --
17       Q.  Okay.
18       A.  It was ten years ago.
19       Q.  Okay.  All right.  So within a few
20   minutes, you and Grant came up with the ideas we've
21   talked about.
22           And all -- all of them were your ideas
23   except for the manipulating the region of the screen
24   for scrolling and zooming.
25           Is that right?
```

Page 19

```
 1       A.  That's my recollection, but it may have
 2   been more than a few minutes.  So I -- I think we
 3   clarified that.
 4       Q.  Okay.  But definitely less than an hour.
 5           Right?
 6       A.  I do not recall.
 7       Q.  Okay.  Probably less than an hour, I
 8   think you said.
 9       A.  I don't recall, but it was -- it was
10   that day.
11       Q.  Okay.
12       A.  It --
13       Q.  It was a short time.
14           Right?
15       A.  Well, it's relative.
16       Q.  Was there anybody else there?
17       A.  No.
18       Q.  Now, you mentioned that you wrote down
19   these things.
20           Did you keep that writing?
21       A.  I don't recall.
22       Q.  Have -- have you seen it any time in
23   connection with this case?
24       A.  I don't --
25       MR. BECKER:  Object to form.
```

Page 20

```
 1       THE WITNESS:  I -- I don't think so.
 2   BY MR. STEPHENS:
 3       Q.  Do you recall what you wrote it on?
 4       A.  No.
 5       Q.  Do you recall what you did with the
 6   thing you wrote it on?
 7       A.  No.
 8       Q.  Have you ever built your invention?
 9       MR. BECKER:  Object to form.
10       THE WITNESS:  Personally?
11   BY MR. STEPHENS:
12       Q.  Well, either personally or asked someone
13   to do it who worked at your direction or control, yes.
14       A.  Could you define "built" for me?
15       Q.  Made a system that practiced your
16   invention.
17       MR. BECKER:  Object.  Form.
18       THE WITNESS:  I'm not sure I'm qualified to
19   answer that question.
20   BY MR. STEPHENS:
21       Q.  So you don't know whether you've ever
22   built your invention?
23       A.  Well, we have developed some of the
24   invention, I believe, but I -- I'm not qualified to
25   respond to your question.  I'm not --
```

Page 21

```
 1       Q.  So --
 2       A.  I -- I don't have the expertise to -- to
 3   answer your question.
 4       Q.  So you, as the inventor, don't know
 5   whether you've ever made your invention.
 6           Is that right?
 7       A.  I don't -- no, I said I don't have the
 8   expertise to res -- answer your question.
 9       Q.  Do you know the answer or not?
10       A.  I don't have the expertise to answer it.
11       Q.  So you don't know.
12           Right?
13       A.  I don't have the expertise to answer it.
14       Q.  What do you mean when you say you don't
15   have the expertise to answer it?
16       A.  I'm not an engineer.
17       Q.  Okay.  And --
18       A.  I've had --
19       Q.  Go ahead.
20       A.  I'm not an engineer, and I've had no
21   educational experience to answer the question.
22       Q.  Okay.  Well, what additional experience
23   do you think you'd need to have in order to tell
24   whether you built the invention?
25       A.  That's the whole idea.  I would not know
```

1  because I'm not qualified.
2      Q.   Well, that's what I'm trying to
3  understand, is what is it that -- what aspect of your
4  invention is it that you don't understand whether
5  you've made it or not?
6      MR. BECKER:  Object.  Form.
7      THE WITNESS:  I, again, say, I was -- not
8  qualified to answer your question.
9  BY MR. STEPHENS:
10     Q.   So you can't even tell me what parts of
11  it you are unsure whether you've built or not.
12     Is that right?
13     A.   I cannot recall at this time what -- I'm
14  unable to answer your question --
15     Q.   Okay.
16     A.   -- at this time.
17     Q.   Have you tried to build your invention?
18     A.   Again, it would fall into the category
19  of that I lack the expertise to know what I have done
20  and what I have not done, so I'm unable to answer your
21  question.
22     Q.   Well, what have you done?
23     A.   Well, over the years, we -- I -- with --
24  with help, developed a prototype that would illustrate
25  some of the elements of the invention.

1      Q.   And you're not qualified to say whether
2  or not that prototype actually is the invention or
3  not.
4      Is that right?
5      A.   That's correct.
6      Q.   Okay.  Who has been involved in that
7  effort to build a prototype?
8      A.   Rick Soss, S-o-s-s.  His company is
9  called Protovu.
10     Q.   Okay.  Anyone else?
11     A.   That's all I can think of at the time.
12     Q.   Is Mr. Soss an engineer?
13     A.   I do not know.
14     Q.   What is his area of expertise?
15     A.   I don't have his qualifications, so --
16  that I can recall at this time.
17     Q.   Is he a computer programmer?
18     A.   I -- I just don't have his
19  qualifications.
20     Q.   What -- what has he done -- what has
21  been his involvement in the project?
22     A.   He developed MallTV, the -- the demo of
23  MallTV, the website, the PC website of MallTV, and
24  other illustrations or graphics that I used to show
25  third parties.

1      Q.   At what point did you first have a
2  prototype that would illustrate some of the elements
3  of the invention?
4      A.   I think probably -- I'm just -- just
5  guessing now -- in 2001.
6      Q.   And who built that prototype?
7      A.   I do not recall who that person was.  It
8  was someone that I had hired.  I don't recall his name
9  at this time.
10         But MallTV had several different
11  editions over the years.  I think that may have
12  been -- I mean, it may have started with -- in July of
13  1999 when we first envisioned how the Internet would
14  be displayed and navigated on mobile devices and
15  television.  And then it -- throughout the years, I
16  tried to improve upon that.
17     Q.   But it was around 2001 when you first
18  had something you would call a prototype of how it
19  worked.
20         Is that right?
21     A.   It -- it may have been in 2000.
22     Q.   Is there anything you can tie it to,
23  like the presidential election in 2000?
24         Did it happen before that or after it?
25     A.   I don't recall.

1      Q.   Anything else in time that might help
2  you place when that prototype was completed or built?
3      A.   I don't recall.
4      Q.   What was it called?
5      A.   Prior to MallTV, I think I called it
6  Fogie & Jack.
7          If you had the production of documents,
8  it -- that would be very helpful.
9      Q.   When did it change from Fogie & Jack to
10  MallTV?
11     A.   I could only guess.
12     Q.   Go ahead and give me your best guess.
13     MR. BECKER:  Object.  Form.
14     THE WITNESS:  2001.
15  BY MR. STEPHENS:
16     Q.   Okay.  Now, you mentioned that you are
17  not an engineer and you're not qualified to say
18  whether the prototype that you have today practices
19  all the elements of your invention.
20         Right?
21     A.   Correct.
22     Q.   Were you capable of implementing your
23  invention, yourself?
24     MR. BECKER:  Object.  Form.
25     THE WITNESS:  Implementing it into --

Page 26

1        Can you clarify "implement"?
2   BY MR. STEPHENS:
3        Q.  Building it.
4        A.  No.
5        Q.  Is Grant an engineer?
6        A.  No.
7        Q.  Would you and Grant together have been
8   able to build your invention?
9        A.  No.
10        Q.  Are you qualified to say whether anyone
11   could build your invention?
12        MR. BECKER:  Object.  Form.
13        THE WITNESS:  Well, I could only -- I believe
14   that there are people out there, yes, that are
15   qualified to build the invention.
16   BY MR. STEPHENS:
17        Q.  And what is the basis of that belief?
18        A.  Well, I see the iPhone and Apple
19   products that have built the invention and -- and
20   websites that have built the invention, so I -- what
21   Grant and I envisioned in July of 1999, I see on the
22   market today.
23        Q.  And it's your understanding that Apple
24   has built your invention.
25        Is that right?

Page 27

1        A.  It's my understanding that Apple has
2   built the invention, yes.
3        Q.  Okay.  Before Apple built your
4   invention, did anyone?
5        A.  I don't recall.
6        Q.  So you don't know whether anybody else
7   built what you believe is your invention before Apple
8   did it.
9        Right?
10        A.  Yes, sir.
11        Q.  Okay.  How can I tell if I'm using your
12   invention?
13        If I look at something and I want to
14   figure out whether or not it's your invention, how --
15   how would I go about it?
16        MR. BECKER:  Object.  Form.
17        And to the extent you're seeking his
18   claim construction positions, I'd object to that
19   and -- and have him not answer claim construction
20   questions.
21        MR. STEPHENS:  Well, let's -- let's address
22   that right now.  'Cause if you're going to direct him
23   not to answer anything about the claims, we should
24   call the Court right now.
25        MR. BECKER:  Under local rules, we don't have

Page 28

1   to -- to provide any contentions or positions on claim
2   constructions.
3        MR. STEPHENS:  I'm not asking for the claim
4   constructions you're going to submit to the Court, but
5   I intend to ask him about his understanding of the
6   claim language, as the inventor.
7        If you're going to direct him not to
8   answer that, we should call the Court now.
9        MR. BECKER:  I -- I will be instructing him
10   not to answer on the grounds of, if it elicits
11   attorney-client communications or if it violates the
12   local rules --
13        MR. STEPHENS:  Well, I'll ask him the
14   questions --
15        MR. BECKER:  -- specifically Rule 2.5.
16        MR. STEPHENS:  -- and when you direct him not
17   to answer, we'll call the Court.
18        MR. BECKER:  Okay.
19   BY MR. STEPHENS:
20        Q.  So Mr. Gottfurcht, how would I figure
21   out whether or not I'm practicing your invention if I
22   look at a device?
23        What would I look for to figure out
24   whether or not that device practices your invention?
25        MR. BECKER:  Same objection.

Page 29

1        THE WITNESS:  The information, the
2   understanding that I have pertaining to what you're
3   asking, would be an understanding that I have through
4   discussions with my attorney.
5   BY MR. STEPHENS:
6        Q.  So you, yourself, can't tell whether
7   somebody practices your invention without consulting a
8   lawyer.
9        Is that right?
10        A.  No.  I'm saying the question you asked,
11   that I wouldn't be able to answer that because it's
12   information that -- or it's an understanding of the
13   technology that I received from my attorney.
14        Q.  So you are able to tell whether or not
15   somebody is practicing your invention, yourself.
16        Correct?
17        MR. BECKER:  Object.  Form.
18        THE WITNESS:  You -- you'd have to explain in
19   detail what part of the invention that you're talking
20   about.
21   BY MR. STEPHENS:
22        Q.  Any part.  I'm asking what -- whether
23   you, yourself, are capable of telling whether somebody
24   practices your invention without consulting an
25   attorney.

1     A.   You'd have to clarify that question for
2  me.
3     Q.   What needs to be clarified?
4     A.   What you mean by "the invention."
5     Q.   Do you know your invention when you see
6  it?
7     MR. BECKER:  Object.  Form.
8     THE WITNESS:  I -- I -- I -- I know the
9  invention when I see it.
10 BY MR. STEPHENS:
11    Q.   Okay.
12    A.   Maybe --
13    Q.   Now, explain to me how --
14    A.   -- some --
15    Q.   Sorry.  I didn't mean to cut you off.
16    A.   Maybe some embodiments of that
17 invention.
18    Q.   Okay.  Explain to me how you know your
19 invention when you see it.
20    MR. BECKER:  Same objections.
21    THE WITNESS:  When I see a Web page that has
22 been -- and this is just an embodiment of the
23 invention, not all the embodiments -- when I see a Web
24 page that's displayed on a mobile device that has been
25 reformatted.

1  BY MR. STEPHENS:
2     Q.   Okay.  Go on.
3     A.   And again, I'll preface all these
4  comments to -- as one embodiment.
5          The Web page would be navigated with
6  unique inputs.
7     Q.   Okay.
8     A.   The Web page would be -- Web page or an
9  application would be a sister site.
10    Q.   Anything else?
11    A.   One could manipulate the screen with
12 a -- with a finger, a region of a screen for zooming
13 or scrolling.
14    Q.   Anything else?
15    A.   There would be a simplified navigation
16 interface.
17    Q.   Anything else?
18    A.   That's all I can think of at the moment.
19    Q.   Okay.  Did you invent multi-touch?
20    MR. BECKER:  Object.  Form.
21    THE WITNESS:  You'd have to define
22 multi-touch.
23 BY MR. STEPHENS:
24    Q.   It's a phrase you -- phrase you've used.
25         Right?

1     A.   In this deposition?
2     Q.   No, but before in real life.
3     A.   During 408 discussions.
4     Q.   Have you used it at any other times?
5     A.   I don't recall.
6     Q.   You have an iPhone.
7          Right?
8     A.   Yes, I do.
9     Q.   Do you know what multi-touch is in
10 connection with an iPhone?
11    A.   Yes, I do.
12    Q.   Did you invent that?
13    A.   On the iPhone?
14    Q.   Did you invent multi-touch?
15    A.   We invented multi-touch as a building
16 block for our invention; beyond that, I would have to
17 defer to my understanding with legal counsel on that
18 subject matter.
19    Q.   So in order to determine whether you
20 invented multi-touch, you'd have to talk to your
21 lawyer.
22         Right?
23    MR. BECKER:  Object.  Form.
24    THE WITNESS:  No, I -- I said that the
25 information I have was derived from discussions with

1  my attorney.
2  BY MR. STEPHENS:
3     Q.   Okay.  Just because information you have
4  was derived from your -- from an attorney doesn't make
5  it privileged.
6          What you can't -- what I would not ask
7  you to tell me is the contents of an actual discussion
8  you had with your attorney.
9          But facts are not privileged just
10 because your lawyer told -- told them to you once upon
11 a time.
12         So unless he directs you not to answer,
13 you should go ahead and answer my question.
14    MR. BECKER:  I will instruct you not to answer
15 any questions that will cause you to divulge the
16 advice that was given to you by your attorney.
17 BY MR. STEPHENS:
18    Q.   Okay.  So my question again is, do you
19 need to consult your lawyer to tell me whether you
20 invented multi-touch?
21    A.   The information I have for multi-touch,
22 my understanding of it was from my attorney.
23    Q.   That doesn't make it privileged.
24         Did you invent multi-touch?
25    A.   The information that I have pertaining

Page 34

1 to multi-touch is an understanding from my attorney.
2 Q. Okay. And I'm asking you to tell me
3 what that understanding is.
4 MR. BECKER: So I'm going to instruct him not
5 to answer based on attorney-client privilege.
6 BY MR. STEPHENS:
7 Q. Okay. So you don't have any
8 understanding of multi-touch other than what you
9 learned from your attorney.
10 Is that right?
11 A. At this moment, I cannot think of any.
12 Q. Even though you have an iPhone in your
13 pocket.
14 Right?
15 A. But prior to buying the iPhone, these
16 are discussions that I have had, understandings that I
17 have derived from discussions with my attorney on that
18 subject.
19 Q. I'm not asking about those discussions.
20 I'm asking whether you can tell me
21 whether you invented what you see when you use your
22 iPhone to do multi-touch.
23 A. And I'm saying that the information that
24 I have pertaining to multi-touch, my understanding
25 of that -- of multi-touch is a result of conversations

Page 35

1 that I've had with my attorney.
2 Q. Did your attorney give you the iPhone
3 that you have?
4 A. No.
5 Q. You bought it, yourself?
6 A. Yes.
7 Q. And you've used it at times when you're
8 not present -- when your attorney is not present.
9 Right?
10 A. Yes.
11 Q. Okay. So I'm asking you, based on your
12 experience with the iPhone when your attorney is not
13 present, did you invent multi-touch on the iPhone?
14 MR. BECKER: Same objection.
15 THE WITNESS: The information that I have, the
16 understanding that I have about that subject matter
17 was as a result of privileged conversations with my
18 attorney.
19 BY MR. STEPHENS:
20 Q. Okay. Well, I just want to make sure,
21 then.
22 You're not going to testify at trial
23 about you inventing iTouch -- or excuse me --
24 multi-touch.
25 Right?

Page 36

1 MR. BECKER: Object to form.
2 THE WITNESS: I don't understand your
3 question.
4 BY MR. STEPHENS:
5 Q. Well, I'm asking you, here, now, on --
6 in my opportunity to depose you whether you invented
7 multi-touch, and you're telling me you can't tell me
8 because it's privileged.
9 I'm going to take the position that you
10 cannot testify at trial on that topic because you're
11 claiming that it's privileged and you have no
12 understanding other than something that's privileged.
13 Do you agree with that?
14 A. Well, you said --
15 MR. BECKER: Object to form.
16 Go ahead.
17 THE WITNESS: You said it was invention.
18 What I testified to is that in July of
19 1999, multi-touch, as we know it today, I was not
20 aware the word was even used in 1999.
21 It was one of the building blocks of our
22 invention.
23 BY MR. STEPHENS:
24 Q. So you invented multi-touch.
25 Right?

Page 37

1 A. That's your conclusion.
2 Q. No, I'm asking you to answer the
3 question.
4 And if you're telling me you're not
5 going to answer the question, that's fine. But I want
6 you to understand, you will not be allowed to testify
7 to that effect at trial if you claim privilege in that
8 answer today.
9 A. That's not what I said.
10 I said --
11 Q. So will you answer question, sir?
12 Did you invent multi-touch?
13 A. In 1999 --
14 Q. "Yes" or "no," did you invent
15 multi-touch?
16 A. I'm unable to answer that question --
17 Q. Okay. Hold on.
18 Are you unable to answer because you're
19 claiming privilege, or you don't know the answer?
20 Which one?
21 A. I'm claiming privileged to the way you
22 phrase that question, but there's more to it than
23 that.
24 Q. So you -- you're claiming privilege in
25 the -- the answer to the question of, Did you invent

Page 38

1  multi-touch?
2      I just want to make sure that we have a
3  clear answer on that.
4      Right?
5      You're claiming privilege in the answer
6  to the question, Did you invent multi-touch?
7      A.   The record speaks for itself, what I've
8  said.
9      Q.   I'm asking you to repeat your answer, if
10 you gave me one.
11     The answer's "yes."
12     Right?
13     A.   No, my answer is that in July of 1999,
14 one of the building blocks for our invention was
15 manipulating a region of a screen for zooming and
16 scrolling, which many years later, I believe it was
17 trademarked by Apple, maybe eight years later, was
18 multi-touch.
19     So that word "multi-touch", I never knew
20 of.  I don't think many people knew of that because
21 Apple's trademark was many years later.
22     Q.   Okay.
23     A.   So I'm --
24     Q.   So your position is that in 1999, you
25 invented what is today called multi-touch?

Page 39

1      A.   No, I'm not saying that.
2      Q.   Well, what are you saying, then?
3      A.   I'm saying that in 1999, manipulating
4  with your finger a region of a screen for zooming and
5  scrolling was one of the building blocks for our
6  invention.
7      Q.   Okay.  And then you said something about
8  multi-touch.
9      A.   I said that today, people refer to that
10 as multi-touch.
11     And I don't believe it was until many
12 years later that that word was invented for the
13 building block that we incorporated in our invention
14 in July of 1999.
15     Q.   Okay.  So what you invented in July of
16 1999 is now referred to as multi-touch.
17     Right?
18     A.   I -- I -- my statement speaks for
19 itself.  That's your conclusion.  And I've said it
20 several times, so I stand on my record.
21     Q.   Now, did you make any written record in
22 July of 1999, or in 1999 at any time, of manipulating
23 a region of a screen with your finger?
24     A.   In 9 -- July of 1999, that was one of
25 the building blocks that we had included in our

Page 40

1  invention.
2      Q.   Did you make any record of that?
3      A.   The record would have been what I had
4  written down at that time in my notes until I engaged
5  Tom Coester to prepare the patent document.
6      Q.   Okay.  Now, your patent that was filed
7  in 1999 doesn't mention anything about that.
8      Right?
9      MR. BECKER:  Object.  Form.
10     THE WITNESS:  I -- again, the patent document
11 speaks for itself.
12 BY MR. STEPHENS:
13     Q.   Do you know whether or not it mentions
14 anything about it?
15     A.   I -- it speaks for itself.  It's a
16 legal --
17     Q.   I'm asking whether you know whether it
18 says anything about it.
19     Do you know whether it says anything
20 about it, sir?
21     A.   It's a legal document.  I'm not an
22 attorney.
23     Q.   So the answer is "no," you don't know
24 whether it says anything about it?
25     MR. BECKER:  Object.  Form.

Page 41

1      THE WITNESS:  I'm going to say my response,
2  this is a legal document, it speaks for itself, I'm
3  not an attorney.
4  BY MR. STEPHENS:
5      Q.   I'm not asking whether it's a legal
6  document, and I'm not asking whether you're an
7  attorney.
8      I'm asking whether you know whether it
9  says anything about what you call multi-touch?
10     A.   I have the same answer.
11     Q.   Okay.  You said that in order to tell
12 whether or not a device is practicing your invention,
13 you look and see whether it's displaying something on
14 a mobile device that's been reformatted.
15     Right?
16     A.   (No audible answer.)
17     Q.   What do you -- what do you mean when you
18 say you look to see that -- whether or not it's
19 displaying something that's been reformatted?
20     A.   In July of 1999, Grant and I envisioned
21 how the Internet would be displayed, what it would
22 look like, how it would be navigated on mobile devices
23 and television.
24     We developed some building blocks for
25 this invention.  So I would look at these building

Page 42

1  blocks to determine whether this vision that we had in
2  1999 was the same.
3       Q.  Are you finished?
4       A.  Yes.
5       Q.  Okay.  One of those building blocks was
6  reformatting.
7            Right?
8       A.  Yes.
9       Q.  And what do you mean by that?
10      A.  Well, when I -- 19 --
11      MR. BECKER:  Let me place an objection.
12           I object to form.
13           But also, to the extent you're asking
14  about our Claim Construction on reformatting, I'll
15  instruct him not to answer.
16      MR. STEPHENS:  I'm going to tell you right
17  now, I'm not asking about the claim constructions that
18  you're going to --
19      MR. BECKER:  Well, I --
20      MR. STEPHENS:  -- submit to the Court.
21      MR. BECKER:  I --
22      MR. STEPHENS:  I'm asking for his
23  understanding.
24           And I want you to stop interrupting my
25  questions.

Page 43

1       MR. BECKER:  This is --
2       MR. STEPHENS:  You can make your objections.
3       MR. BECKER:  In the local rules, I'm entitled
4  to make this very specific objection.  There's no --
5       MR. STEPHENS:  You are not.
6       MR. BECKER:  -- need to raise your voice at
7  me.
8            Yes, it's Rule 2.5.  I am entitled to
9  make it.
10      MR. STEPHENS:  You -- you are not entitled to
11  make it as an objection.
12           You are entitled to make the objection,
13  "form," and that's it.
14      MR. BECKER:  No, you're wrong about that.
15      MR. STEPHENS:  All right.  Well, we'll call
16  the Court.
17      MR. BECKER:  That's fine, but you don't need
18  to yell at me.
19           It's in the local rules.  I'm looking at
20  them right on my screen.
21      MR. STEPHENS:  Tell me where it says you're
22  entitled --
23      MR. BECKER:  One of your -- one of your guys
24  can give you the local rules at a break.  I don't need
25  to show you my computer which has all my notes on it.

Page 44

1       MR. STEPHENS:  Okay.  So what's your
2  objection?
3       MR. BECKER:  2.5 A.
4       MR. STEPHENS:  All right.
5       MR. BECKER:  I can -- I can instruct him not
6  to answer on the grounds that it's premature because
7  we have not gotten to the claim construction
8  proceedings yet.
9       MR. STEPHENS:  I'm not asking for your claim
10  construction position.
11      MR. BECKER:  Well --
12      MR. STEPHENS:  I made that clear, I am not
13  asking for your claim construction position.
14           I am asking for the inventor's
15  understanding of the claims.
16      MR. BECKER:  Right.  And you -- and -- and I
17  don't know how that's any different than a claim
18  construction position --
19      MR. STEPHENS:  Shall we call the Court now and
20  ask?
21      MR. BECKER:  If you would like to, yes,
22  because I'm going to instruct him not to answer on
23  those grounds.
24      MR. STEPHENS:  Okay.  Well, let's --
25      MR. LANE:  It says parties.  It says parties.

Page 45

1  It doesn't say persons.
2       MR. STEPHENS:  That's all right.
3            Okay.  Let me ask the question.  We'll
4  get an instruction not to answer, and we'll call the
5  Court.
6       MR. BECKER:  Okay.
7  BY MR. STEPHENS:
8       Q.  Mr. Gottfurcht, what do you mean by
9  "reformatting"?
10      MR. BECKER:  So I will say that if you are
11  going to divulge our claim constructions in response
12  to this question, then I instruct you not to answer.
13  BY MR. STEPHENS:
14      Q.  And I want to tell you, I'm not asking
15  for EMG's claim construction position.
16           I'm asking for your understanding of the
17  word that you used in testifying about your invention,
18  as the inventor.
19      MR. BECKER:  If you can answer that without
20  divulging attorney-client communications or our claim
21  construction position, then you're free to answer.
22      THE WITNESS:  I can answer the question of
23  what I meant by reformatting --
24  BY MR. STEPHENS:
25      Q.  Okay.

Page 46

1    A.  -- from July 1st to July 7th of 1999 --
2    Q.  Well, we'll start there.
3    A.  -- that period of time.
4    Q.  We'll start there.
5    A.  Okay.  If you were to look at the Yahoo
6  homepage or the AOL homepage in 1999, as I previous
7  testified, there would be many choices or links maybe
8  numbering over 100.
9        And in July of 1999, my interpretation,
10  thought behind reformatting, is that you would take
11  that Web page of over 100 links, you would reformat it
12  into a simplified page with many fewer links, and
13  possibly break it up into categories that could be
14  further drilled down to add more choices.
15        That was, I believe, one of my thoughts
16  in July of 1999.
17    Q.  Okay.  So from July 1st to July 7th of
18  1999, what you meant by "reformatting" was starting
19  with the Yahoo homepage with 100 links, or at least
20  many links, and changing it into a display with many
21  fewer links.
22        Is that right?
23    A.  I would think that that is one of the
24  thoughts that I had in 19 -- July of 1999.
25    Q.  Okay.  Has your understanding of what

Page 47

1  the word "reformatting" means changed?
2    MR. BECKER:  And again, same instruction.  I'm
3  instructing you not to divulge specifically any
4  attorney-client communications on this subject.
5    THE WITNESS:  After July 7th, approximately, I
6  engaged Tom Coester of Blakely Sokoloff to prepare the
7  patent document.
8        And I had further conversations and
9  understanding of the terms that -- on building blocks
10  that I had, with Grant, envisioned for the future of
11  displaying and navigating of the Internet on
12  television and mobile devices.
13        And my knowledge, my understanding of
14  these building blocks was further enhanced through my
15  discussions with Tom Coester.
16  BY MR. STEPHENS:
17    Q.  Okay.  How did your understanding of
18  what "reformatting" is change?
19    MR. BECKER:  Same objections.
20    THE WITNESS:  I would say that it's
21  privileged.
22  BY MR. STEPHENS:
23    Q.  Okay.  So you're going to claim
24  privilege in what you understand "reformatting" to
25  mean today, I take it?

Page 48

1    A.  No.  I think the record speaks for
2  itself, what I said.
3    Q.  Okay.  What does "reformatting" mean to
4  you today?
5    MR. BECKER:  Same objections.
6    THE WITNESS:  My understanding of reformatting
7  in July 1st to July 7th, I've testified to.
8  BY MR. STEPHENS:
9    Q.  I'm not asking about that.
10        I'm asking about it today.
11    A.  From July 7th forward, I have an
12  understanding of reformatting based upon confidential,
13  privileged communications with different attorneys.
14        And I'm unable to parse if I have any
15  other information other than from the attorneys, so I
16  will claim privilege.
17    Q.  Okay.  So you can't tell me what
18  reformatting in your invention means to you today
19  because it's privileged.
20        Right?
21    MR. BECKER:  Object.  Form.
22    THE WITNESS:  My understanding of reformatting
23  in 1999, which I've testified to, from the period in
24  July that I engaged legal counsel, over the past
25  sev -- ten years plus, my understanding I have on

Page 49

1  reformatting has developed through privileged
2  conversations with an attorney.
3  BY MR. STEPHENS:
4    Q.  And therefore, you will not tell me what
5  your new understanding of reformatting is.
6        Right?
7    A.  Not unless I were able to sit down with
8  an attorney and him -- the attorney telling me that
9  this much is privileged, and this little bit here, you
10  could parse out and say it's not privileged, because
11  at this moment, as I'm sitting here, I think it's
12  privileged.
13    Q.  All right.  Well, I'm asking you to tell
14  me everything that you believe about what the word
15  "reformatting" means.
16        And you're required to do that unless
17  your counsel tells you not to do that.
18    A.  And I'm telling you that it's
19  privileged.
20    Q.  So you're just not going to answer my
21  question because you've decided not to?
22        You're not acting on advice of counsel
23  at this point.
24        Right?
25    A.  Well, I --

13 (Pages 46 to 49)

Page 50

1      MR. BECKER:  I've advised him not to answer
2  that question on grounds of advice of counsel.
3      MR. STEPHENS:  Okay.  I just -- so you're
4  directing him not to answer that question.
5      Right?
6      MR. BECKER:  To the extent it would require
7  him to divulge our advice to him, yes.
8      MR. STEPHENS:  Okay.  Well, why don't you guys
9  confer for a second and see if there's anything else
10  you can say about what "reformatting" means, and if
11  there's not, then you can direct him not to answer and
12  we'll have a clear record.
13      Okay?
14      Take a moment and confer about it.
15      MR. BECKER:  Want to go off the record?
16      THE WITNESS:  Okay.
17      MR. STEPHENS:  We don't need to go off the
18  record.  You can just lean over --
19      MR. BECKER:  Well, I'm not going to confer
20  with the mics on, sitting here right --
21      MR. STEPHENS:  Well, take the mics off.
22      MR. BECKER:  We're going off the record.
23      MR. STEPHENS:  All right.  We'll go off the
24  record, then.  That's fine.
25      THE VIDEOGRAPHER:  Going off the record.

Page 51

1      The time is 11:00 a.m.
2      (Whereupon a recess was taken)
3      THE VIDEOGRAPHER:  Back on the record.
4      The time is 11:04 p.m. -- a.m.
5  BY MR. STEPHENS:
6      Q.  So Mr. Gottfurcht, is there anything you
7  can add to your understanding of what "reformatting"
8  is?
9      A.  No.
10      Q.  Okay.  That is, without revealing
11  privileged conversations?
12      A.  Yes.
13      MR. STEPHENS:  And I take it you're going to
14  direct him not to answer?
15      MR. BECKER:  Yes --
16      MR. STEPHENS:  Okay.
17      MR. BECKER:  -- based on the attorney-client
18  privilege.
19      MR. STEPHENS:  I understand.
20  BY MR. STEPHENS:
21      Q.  And Mr. Gottfurcht, you also mentioned
22  that the next element of what you invented in July of
23  1999 was a simplified interface.
24      Could you explain what that means?
25      MR. BECKER:  Object.  Form.

Page 52

1      And same instructions, but go ahead and
2  answer the question if you can.
3      THE WITNESS:  My thought of a simplified
4  interface prior to engaging Tom Coester was that it --
5  it was simpler than the way Web pages were navigated
6  on the PC.
7  BY MR. STEPHENS:
8      Q.  What do you mean by that, "simpler"?
9      A.  Easier, simpler.
10      Q.  How do I tell if it's simpler?
11      A.  Well, that -- that's in July 1st to
12  July 7, before I engaged Tom Coester, when I thought
13  of the invention, "simpler" meant simpler than
14  navigating a standard Web page on a PC.
15      Q.  Okay.  So, for example, you mentioned
16  having fewer links on a page.
17      Right?
18      A.  Yes.
19      Q.  Is that an example, a simpler interface?
20      A.  It could be.
21      Q.  Okay.  Anything else you can think of
22  that would be an example of a simpler interface?
23      A.  It could be one where there would be no
24  mouse, and there would be unique inputs, like you see
25  on the iPhone today.

Page 53

1      Q.  Okay.  Any other examples you can think
2  of that would be a simpler user interface?
3      A.  That's all I can think of at this
4  moment.
5      Q.  Okay.  Now, you mentioned navigation
6  with unique inputs.
7      What did you understand that to mean
8  back in July of 1999?
9      A.  Before engaging legal counsel, I meant
10  it to be that you would see a Web page, you would
11  decide what links that you wanted to navigate, and you
12  would have, for example, your finger touch a screen,
13  as one embodiment, without using a mouse, a one-to-one
14  relationship without a mouse.
15      It was one of the thoughts I had in July
16  before engaging Tom Coester.
17      Q.  Okay.  How is that different than an
18  ordinary touch screen at the time?
19      MR. BECKER:  Object.  Form.
20      THE WITNESS:  Anything beyond that
21  understanding, again, was with an understanding of
22  privileged conversation with Tom Coester.
23  BY MR. STEPHENS:
24      Q.  I'm not asking about that.
25      I'm asking about what happened before

Page 54

1  you started talking to
2  Tom Coester.
3      MR. STEPHENS:  And let -- let's just -- in
4  order to avoid a tremendous waste of time, let me just
5  get clear on the record, you're going to direct him
6  not to answer questions involving understandings that
7  he had at any time after he first talked to
8  Tom Coester?
9      Is that right?
10     MR. BECKER:  No.
11     MR. STEPHENS:  Okay.  Well, why don't you
12  guys, again, confer for a moment and figure that out,
13  because I'm not going to go through 15 minutes of
14  questions on every single thing that I ask him to
15  figure out whether or not he's going to tell me things
16  after Tom Coester talked to him July 7th.
17     MR. BECKER:  There's nothing for us to figure
18  out.  You ask your questions and we'll be object.  And
19  I -- I don't know --
20     MR. STEPHENS:  All right, if that's the way
21  you want to do it.
22     Q.  So Mr. Gottfurcht, is there anything you
23  can tell me about navigation using unique inputs,
24  after you first talked with Mr. Coester, that's not
25  privileged?

Page 55

1      A.  I cannot think of at this moment.
2      Q.  Okay.
3      MR. STEPHENS:  And you're going to direct him
4  not to answer any questions directed to that.
5      Is that right?
6      MR. BECKER:  Any -- I'm going to direct him
7  not to divulge the contents of any attorney-client
8  communications.
9      MR. STEPHENS:  Okay.
10     Q.  Tell me everything you know about
11  navigation using unique inputs, about what it means.
12     A.  I just testified as to what it is.
13     Q.  And you can't say anything more without
14  revealing privileged communications?
15     A.  I cannot think of anything more at this
16  moment --
17     Q.  Okay.
18     A.  -- without revealing privileged
19  communications.
20     Q.  Had you ever seen a touch screen before
21  you met Mr. Coester?
22     A.  I'm sure I have.
23     Q.  Do you know how you take an action with
24  a touch screen?
25     A.  Yes.

Page 56

1      Q.  How do you do it?
2      A.  You touch the screen.
3      Q.  And you touch the item that you're
4  trying to activate.
5      Right?
6      A.  That's correct.
7      Q.  You didn't invent that.
8      Right?
9      MR. BECKER:  Object.  Form.
10     THE WITNESS:  In what context?
11  BY MR. STEPHENS:
12     Q.  In the context of a touch screen.
13     A.  In the touch screen that -- that I would
14  see at a mall, that was not navigating Internet, if
15  you're referring to that kind of context, I was
16  familiar with a touch screen.
17     Q.  Okay.  And you didn't invent using a
18  link on a touch screen to take you to another page,
19  like you would see in a mall.
20     Right?
21     A.  Well, I'm unable to answer that 'cause
22  I'm -- I don't know what they were doing in the mall
23  with a touch screen.  So I'm unable to answer that
24  question.
25     Q.  You're the one who brought that up.

Page 57

1      What were you talking about?
2      A.  I just -- some -- I -- I -- I'm not even
3  sure it was prior to 1999, but I have seen a touch
4  screen in a mall.
5      Q.  Okay.  And did you invent what that
6  device that you're talking about did?
7      A.  I -- I don't know what the device did,
8  so I'm unable to -- to respond to that.
9      Q.  Well, okay.
10     So why did you bring it up?
11     A.  I have no reason.
12     Q.  Okay.  Do you recall ever seeing a touch
13  screen before July of 1999?
14     A.  I think you asked me that, and I said
15  "yes."
16     Q.  Okay.
17     A.  I think I did.
18     Q.  Okay.  So what did you see before July
19  of 1999 that included a touch screen?
20     A.  I think I just testified to that.
21     Could you read back my response, if
22  that's okay?
23     Q.  Well, I think you then changed your
24  testimony and said you didn't remember whether it was
25  before or after 1999, and you didn't remember what it

Page 58

1  was, so now I'm trying to clarify that.
2      A.  I see.
3          Okay.  I -- I don't remember the first
4  time I saw a touch screen.
5      Q.  So you don't know if you ever saw a
6  touch screen before 1999?
7      A.  That's correct.
8      Q.  Okay.  So it's possible that you'd never
9  seen a touch screen at the time you invented touch
10  screen navigation.
11         Right?
12     A.  It's possible.
13     Q.  Okay.  What's a sister site?
14     MR. BECKER:  And again, same objections.
15     THE WITNESS:  Sister site, on Jul -- what --
16  what I thought sister site would be, from July 1st to
17  July 7th -- 6th or 7th, in that area, was a site that
18  would be related to the standard Web page or website,
19  such as Yahoo or AOL, would be associated with that,
20  call it main site.
21  BY MR. STEPHENS:
22     Q.  Anything else?
23     A.  What I envisioned, which is just an
24  embodiment of sister site, was that it would be
25  associated to the -- with the main site, have a

Page 59

1  simplified navigation interface, could be navigated
2  with unique inputs, could be navigated by manipulating
3  a region of the screen with your finger for zooming
4  and scrolling.
5      Q.  Okay.  So you said that, as you
6  understood it, a sister site was a site that's related
7  to the -- a normal page on -- of a regular computer.
8          Right?
9      A.  Yes.
10     Q.  Related in what way?
11     A.  The -- the content.  Some of the content
12  would be the same, but it would be simplified and
13  reorganized into fewer options that could be displayed
14  on television and -- and mobile device.
15     Q.  Okay.  So a sister site, then, as you
16  understood it when you came up with the invention, was
17  a site that's related to a normal Web page because it
18  has some of the same content, but it's simplified.
19         Right?
20     A.  And I added more to it than that.
21     Q.  And having fewer options for navigation?
22     A.  I think I added more than that.
23     Q.  What did I miss?
24     A.  I -- could you read it back?
25     MR. STEPHENS:  Could you read it back, please?

Page 60

1      (Whereupon the record was read as follows:)
2      "QUESTION:  The -- the content.  Some of
3          the content would be the same, but it
4          would be simplified and reorganized into
5          fewer options that could be displayed on
6          television and -- and mobile device."
7  BY MR. STEPHENS:
8      Q.  So a sister site, then -- I just want to
9  make sure I understand what you believed it to be when
10  you came up with the invention -- the site that's
11  related to a normal website, in that, some of the
12  content would be the same, but it would be simplified
13  and reorganized into fewer navigation options.
14         Is that right?
15     A.  Yes, that was -- that's -- it was a
16  possibility.
17     Q.  Okay.
18     A.  I also mentioned that it could also be
19  navigated with unique inputs.
20     Q.  Meaning by a touch screen.
21         Right?
22     A.  That was -- that was a possibility.
23     Q.  Now, did you envision the unique input
24  would include a mouse click?
25     A.  I envisioned it to be one-on-one.  That

Page 61

1  could be a finger or it could be on a -- any other
2  device, any other mechanism.
3      Q.  Any pointing device?
4      A.  It could be a pointing device.
5      Q.  Like a mouse?
6      A.  It could -- if that were a pointing
7  device, it could be a pointing device but without
8  moving a mouse to your selection.  So in that sense,
9  it may not be a mouse.
10         In other words, you would look at a
11  page, you would decide, like you do on the iPhone, you
12  decide what your selection is going to be and you make
13  that selection on a one-to-one relationship.
14     Q.  By pointing at it.
15         Right?
16     A.  Any way that you could make that
17  selection.
18     Q.  Okay.  Any way you can point at it.
19         Right?
20     A.  Any way that you could make a selection.
21     Q.  Well, obviously you were able to select
22  navigation options before your invention.
23         Right?
24     MR. BECKER:  Object.  Form.
25     THE WITNESS:  Well, I --

16 (Pages 58 to 61)

BY MR. STEPHENS:

1  Q.  Let me -- let me ask it differently.

3  A.  Uh-huh.

4  Q.  Were you able to navigate the Yahoo page
5  that Grant demonstrated for you on the day you came up
6  with your invention?

7  A.  I did not navigate the page.

8  Q.  That was Grant?

9  A.  It was the fir -- it was the first --
10  Grant did.

11  Q.  Okay.  Grant was able to navigate.

12  Right?

13  A.  Yes.

14  Q.  And how did he do that?

15  A.  I don't recall.

16  Q.  Did he use a mouse?

17  A.  I don't recall.  I wasn't paying
18  attention to how he would be navigating.  It's the
19  first time I experienced this.

20  Q.  You're aware, though, that before your
21  invention, people were able to navigate the Web.

22  Right?

23  A.  Of course.

24  Q.  Okay.  And they were able to do it by
25  selecting navigation options using a pointing device.

1  Right?

2  A.  Well, I -- one -- one of the
3  distinctions at that time, one of them, was that you
4  would use a pointer device or a -- a mouse to move a
5  cursor on a page to the option that you wanted.

6  One of my distinctions at that time was
7  that that would not be required.  That, to me, is --
8  that would be two steps.  One step is to move the
9  cursor around to what you wanted and then click on it,
10  two steps.  And what I envisioned would be one-to-one
11  relationship, would be one step, so --

12  Q.  I -- I thought you said it was
13  navigation with unique inputs.

14  A.  That's what I -- at that time, that was
15  one of the embodiments that I defined as unique input.
16  Unique input, to me, is one-on-one.

17  Q.  Unique input, to you, is one step?

18  A.  No, it's -- it's -- it's one-to-one.

19  Q.  Okay.

20  A.  If you see something on a page, like you
21  see on the iPhone, on a -- on a mobile page on the
22  iPhone, there's no mouse.  You -- you look at that
23  page, you decide what you want, and in this case, you
24  take your finger and you activate the cell.

25  Q.  Okay.  But you'd never seen the iPhone

1  in July of 1999.

2  Right?

3  A.  No.

4  Q.  Okay.

5  A.  That's what I had envisioned in 1999.
6  We envisioned in 1999 what the iPhone is doing today.

7  Q.  Now, you also envisioned something
8  called ABC-123.

9  Right?

10  A.  I -- but that's familiar as something
11  that made it into our work product for -- I don't
12  recall the reason.

13  Q.  You don't remember what that was?

14  A.  No, but I did -- I recall that that --
15  that the -- that phrase, I think was a marketing idea
16  that we had.

17  Q.  Okay.  So just -- just to be sure I
18  understand, then, "navigation by unique inputs" meant
19  to you selecting a link with a touch screen.

20  Right?

21  A.  That was one of the embodiments.

22  Q.  What other embodiments did you have in
23  mind when you thought about navigating with unique
24  inputs?

25  A.  In -- in -- before I met with

1  Tom Coester, you could do it on a remote control and
2  any type of gadget that would afford you the ability
3  to a one-to-one relationship.

4  Q.  Okay.  What do you mean by "affording
5  you a one-to-one relationship"?

6  A.  That you would have a choice, as one
7  example, to activate a link via one-to-one
8  relationship.  That would be -- that would make --

9  Q.  I'm asking you to tell me what you meant
10  by "a one-to-one relationship."

11  A.  I -- I -- I -- that's what I meant.

12  Q.  But you just used the word to define it.
13  I don't -- that doesn't enlighten me very much.

14  A.  Doesn't do much for you, huh?

15  Q.  No.

16  Can you explain what you mean by
17  "selecting a link with a one-to-one relationship"?

18  A.  That's what I meant.

19  Q.  You meant selecting it by a one-to-one
20  relationship, and you can't say any more?

21  You meant selecting a link with a
22  one-to-one relationship and you can't tell me what
23  "selecting a link with a one-to-one relationship"
24  means?

25  A.  Well, I've done it, so I'll try to do it

Page 66

1  again.
2      Q.  Okay.  Try to do it again, please.
3      A.  One embodiment would be, you would see
4  an option on -- on a screen and you would be able to
5  touch it with your finger.  That's one-to-one, finger
6  to the option.
7          Another would be that you would see an
8  option on a screen, and they could be in the form of a
9  matrix, and the option you wanted was in a box of a
10 matrix, for example.  It was in Box 4.  You could push
11 4 on a remote control.
12         You could have a -- a -- a wand and
13 point to a particular option.
14     Q.  Okay.
15     A.  That's what I mean by one-to-one.
16     Q.  Okay.  Anything else?
17     A.  Other -- I can't think of anything else
18 right now.
19     Q.  What about using a button to scroll
20 through the links and then hitting "select"?
21         Would that qualify?
22     A.  I don't understand what you mean by
23 that.
24     Q.  Do you recall that in the patents in
25 this lawsuit, there's a description of scrolling

Page 67

1  through links using a button?
2          You know what I mean by that?
3      A.  Pardon me?
4      Q.  You don't recall a description in the
5  patents in this lawsuit, scrolling through links using
6  a scroll button?
7      A.  What was your question?
8      Q.  I'm asking you if you recall that.
9      A.  Oh, do I recall that?
10         I could not recall all the text in
11 the --
12     Q.  I'm not asking you if you recall --
13     A.  Oh, I don't recall --
14     Q.  I'm asking, do you recall that?
15     A.  It sounds familiar, but I -- until --
16 unless I would read it, I couldn't confirm that that's
17 what it says -- I could not confirm.  I'm sorry.
18     Q.  Well, let me ask you, if you have a
19 remote control with an arrow on it that allows you to
20 move from one link to the next, and when you move to a
21 link, it's highlighted, and when you push the select
22 button, that follows that link, would that be a unique
23 input?
24     A.  From the way you explained it to me and
25 the way I understand it, I don't think so.

Page 68

1      Q.  Okay.  Why not?
2      A.  Well, because it would be too --
3  I -- I -- first of all, I -- you'd have to demonstrate
4  it in front of me, so I'm just speculating.
5      Q.  Well, I'll show you the patent in a
6  little while --
7      A.  Okay.
8      Q.  -- because that's what it describes.
9      A.  Okay.
10     Q.  But since you don't remember it, we'll
11 just put it off until then.
12         All right.  Now, you've mentioned
13 manipulating a region of a screen for scrolling and
14 zooming.
15     A.  Yes.
16     Q.  What was your understanding of that at
17 the time you and Grant came up with the invention?
18     A.  Well, Grant mentioned it first.  And my
19 understanding of the definition of manipulating -- one
20 of the definitions of manipulating would be using your
21 finger, in this case, on a region of the screen for
22 zooming and scrolling.
23         When Grant mentioned that phrase, that's
24 what I envisioned.
25     Q.  What is it that you envisioned?

Page 69

1      THE WITNESS:  Could you repeat the answer,
2  please?
3      (Whereupon the record was read as follows:)
4      "ANSWER:  Well, Grant mentioned it first.
5      And my understanding of the definition of
6      manipulating -- one of the definitions of
7      manipulating would be using your finger,
8      in this case, on a region of the screen
9      for zooming and scrolling.
10         When Grant mentioned that phrase,
11     that's what I envisioned."
12 BY MR. STEPHENS:
13     Q.  What is the "that," that you're
14 referring to?
15     A.  Manipulating a region of the screen.
16     Q.  And that's what I'm trying to
17 understand, what that means.
18         Touching the screen?
19         Is that what it means?
20     A.  I just -- I'll stand by my answer.
21     Q.  Well, I'm trying to -- to understand
22 what your answer means.
23         What did you mean when you said
24 "manipulating the screen using a finger"?
25     A.  I'll try again.

18 (Pages 66 to 69)

Page 70

1    Q.  Okay, please do.
2    A.  When Grant mentioned manipulating a
3  region of the screen for zooming and scrolling, what I
4  understood that he meant was manipulating.
5        Manipulating -- the definition of
6  manipulating -- one of the definitions of manipulating
7  is using your finger, using your hand.
8        So when he said that, I envisioned you
9  would be using your finger on a region of the screen
10  for zooming and scrolling.
11    Q.  So your understanding of the phrase
12  "manipulating a region of the screen for zooming and
13  scrolling" is using your hand on a region of the
14  screen for zooming and scrolling.
15        Right?
16    A.  Well, hand or finger --
17    Q.  Okay.
18    A.  -- yes.
19    Q.  Okay.
20    A.  Yeah, that's -- that's what I
21  interpreted what he said at that time.
22    Q.  And he used that -- those exact words?
23    A.  Well, that's what I recall --
24    Q.  Okay.
25    A.  -- yes.

Page 71

1    Q.  How did you understand the manipulation
2  to occur?
3        In other words, you're going to use your
4  hand or finger on a region of the screen for scrolling
5  and zooming.
6        How would you use your hand or finger to
7  do that?
8        What did you understand it?
9    A.  Well, literally just what it says.  You
10  would take your finger, you would touch a screen --
11    Q.  Okay.
12    A.  -- for zooming and scrolling.
13    Q.  Okay.  What would you do to zoom?
14    A.  You can do anything.  I didn't limit my
15  thought of what he meant, by any limitation.  It could
16  be any touching of the screen for zooming or
17  scrolling.
18    Q.  Okay.  Well, so how would you -- what --
19  what specifically did you have in mind?
20        I understand you're saying you didn't
21  limit it.
22        Did you have anything specific in mind?
23    A.  It was very general interpretation.
24    Q.  Okay.  So you didn't have in mind doing
25  a double tap or using two fingers or anything like

Page 72

1  that?
2    A.  It could include that.
3    Q.  But you didn't have those specific
4  things in mind?
5    A.  I can't -- I don't recall.
6    Q.  You don't recall having anything
7  specific like that in mind?
8    A.  Well, I -- no, I just can't recall if I
9  had that in mind.  I took -- I interpreted it to be
10  general, touching a region of the screen for zooming
11  and scrolling.  It could mean anything.
12    Q.  Okay.  And you don't recall having any
13  more specific thoughts.
14        Right?
15    A.  I can't recall, no.
16    Q.  Okay.  What does zooming mean?
17    A.  Enlarging.
18    Q.  Okay.  And scrolling?
19    A.  Means moving the screen up and down.
20        Just like you could on a prior art
21  browser.
22        Right?
23    A.  Well, I --
24    Q.  You didn't know --
25    A.  Yeah.

Page 73

1    Q.  -- what you could in the prior art.
2        Is that Right?
3    A.  No, I didn't know at that time.
4    Q.  Okay.
5    A.  That's certainly one embodiment of what
6  that meant.
7    Q.  Did your understanding of manipulating a
8  region of the screen for scrolling and zooming include
9  using buttons to do that?
10    A.  I don't recall.
11    Q.  Now, you also mentioned content would be
12  organized into more general categories.
13        What did you mean by that?
14    A.  Well, I said it could -- it could do
15  that.  When I would look at the Yahoo or the AOL page,
16  and I saw, I believe over 100 links, I noticed that
17  some of them kind of were repeated, and that if you
18  had a category like entertainment, that may include
19  three links, just, you know, assuming that today.
20        So that could -- you could reduce your
21  options and categories by a third, just, you know, in
22  that particular exam.
23        That's what I meant.
24    Q.  You also mentioned content in a matrix
25  form.

Page 74

1 What did that -- what did you mean by
2 that?
3 A. I meant that would be one of the
4 interfaces that, to organize your content, could be
5 used, one example.
6 Q. Okay. What is a matrix form?
7 A. You're asking for the definition of
8 "matrix"?
9 Q. I'm asking what you understood it to be
10 at the time --
11 A. Oh.
12 Q. -- you invented it.
13 A. At -- at -at that time, I did not have
14 a definition.
15 After talking to legal counsel, I
16 became -- I became more aware of an understanding of
17 what a -- the legal definition of a matrix would be.
18 Q. Okay. Well, I'm trying to understand
19 now what it was you invented when you invented it.
20 So what did you have in mind when you
21 invented it?
22 MR. BECKER: Object. Form.
23 THE WITNESS: Well, from --
24 In the first week of July?
25 / / /

Page 75

1 BY MR. STEPHENS:
2 Q. Yes, of 1999.
3 A. '99.
4 The -- the matrix was just an
5 organizational configuration that could be within the
6 page. It could be the whole page. It could be part
7 of the page.
8 And a matrix could have the broadest
9 definition. It could be different sizes, different
10 shapes, whatever the maximum definition of a matrix
11 would be. And that was for organizing content.
12 Q. So if I understand right, then, as you
13 conceived it when you invented it, the matrix
14 organization was really any organizational
15 configuration.
16 Right?
17 A. Yes.
18 MR. BECKER: Object. Form.
19 BY MR. STEPHENS:
20 Q. Now, how did you conceive implementing
21 this invention that first week in July of 1999?
22 A. The -- the next morning, I decided that
23 I would find a patent attorney and file a patent on
24 the invention.
25 Q. Okay. I wasn't asking when you decided

Page 76

1 to file a patent.
2 I asked what you had in mind about how
3 to implement the invention.
4 A. I wanted to file a patent and have
5 further discussions with a -- with a patent attorney.
6 Q. Okay. But how did you expect to be able
7 to make your invention work?
8 What was your understanding about how
9 it --
10 A. I --
11 Q. -- would actually operate in the real
12 world?
13 A. I wanted some expertise, and I sought
14 out a patent attorney as my first step.
15 Q. Okay. Again, I'm not asking about the
16 patent.
17 I'm asking about how you would make your
18 invention work, what you had in mind for making it
19 actually function.
20 A. Okay. I -- my first step was to engage
21 a patent attorney, so I -- I have nothing more than
22 that.
23 Q. Okay. So you didn't have any idea other
24 than to call a patent attorney --
25 A. That would be my first step.

Page 77

1 Q. But I'm asking now if you had any idea,
2 other than calling a patent attorney, how to implement
3 your invention when you invented it.
4 A. The next morning, my --
5 Q. You said this again -- already.
6 I'm asking now, what, besides calling a
7 patent attorney, you had in mind, before you called
8 the patent attorney, as to how to implement your
9 invention.
10 Did you have anything in mind as to how
11 to implement your invention other than calling a
12 patent attorney?
13 MR. BECKER: Object. Form.
14 THE WITNESS: I can only recall that I called
15 a patent attorney. That's all I can recall.
16 BY MR. STEPHENS:
17 Q. Okay. And you don't remember any other
18 thoughts about how to implement it.
19 Right?
20 A. Not the next morning, other than to call
21 a patent attorney.
22 Q. But what about the day you invented it?
23 A. I -- I don't recall.
24 Q. Okay. Now, when you were talking about
25 reformatting with Grant on the day you came up with

Page 78

1   your invention, did you envision that reformatting to
2   be done by a machine or by people?
3       A.   I did not -- I don't recall any other
4   thought further on -- on how the process would be
5   done.
6       Q.   So you didn't anticipate that it would
7   be done by a machine.
8       Right?
9       A.   I -- I had no further thought on it that
10  day.
11      Q.   You had no further thought besides what?
12      Besides just the notion of reformatting?
13      A.   Correct --
14      Q.   Okay.
15      A.   -- that I can recall.
16      Q.   Did you have any thoughts about how you
17  would take the normal Web page and turn it into the
18  simplified user interface?
19      MR. BECKER:  Object.  Form.
20      THE WITNESS:  I don't recall.
21  BY MR. STEPHENS:
22      Q.   Did you have any thought about how you
23  would provide unique inputs for navigation?
24      A.   I don't recall.
25      Q.   Did you have any thought about how you

Page 79

1   would create a sister site?
2       A.   I don't recall.
3       Q.   Did you have any thought about how you
4   would manipulate a region of the screen for scrolling
5   and zooming?
6       A.   You're talking about the first day?
7       Q.   Yes.
8       A.   I do not recall.
9       Q.   Did you have any thought about how you
10  would organize the content from the page into more
11  general categories?
12      A.   I do not recall.
13      Q.   Did you have any thought at that time
14  about how you would organize the content from the Web
15  page into a matrix form?
16      A.   I do not recall.
17      Q.   Do you recall anything about any of
18  that, that you can share with me, that's not
19  privileged, at any time after you came up with your
20  invention?
21      A.   I do not recall.
22      Q.   Okay.  And just to be clear, by "any of
23  that," I meant how you would implement all of these
24  different things, reformatting, simplified interface,
25  navigation with unique inputs, all of way through to

Page 80

1   the matrix form.
2       That's what you were answering.
3       Right?
4       A.   That's correct --
5       Q.   Okay.
6       A.   -- without -- without divulging
7   privilege.
8       Q.   Okay.
9       MR. STEPHENS:  All right.  Let's take a short
10  break.
11      THE WITNESS:  Okay.
12      THE VIDEOGRAPHER:  Going off the record.
13      The time is 11:39 a.m.
14      (Whereupon a recess was taken)
15      THE VIDEOGRAPHER:  Back on the record.
16      The time is 11:53 a.m.
17  BY MR. STEPHENS:
18      Q.   Mr. Gottfurcht, before the break, we
19  talked at length about what you conceived in that
20  first week of July 1999, and you were -- I --
21  constrained by privilege in what you could tell me.
22      Is there anything else at all you'd like
23  to tell Judge Davis or the jurors in Tyler about what
24  you conceived on that day in July of 1999?
25      MR. BECKER:  Object.  Form.

Page 81

1       THE WITNESS:  I cannot think of anything more
2   at this moment.
3   BY MR. STEPHENS:
4       Q.   Okay.  Is there anything else at all
5   about how you had in mind implementing that invention
6   that you'd like to tell Judge Davis or the jurors in
7   Tyler?
8       A.   I cannot recall any more at this moment.
9       Q.   Okay.  Thank you.
10      Now, I'd just like to clear up a few
11  things.
12      You're not claiming that you invented
13  the Web.
14      Right?
15      A.   No.
16      Q.   And you're not claiming you invented
17  hypertext.
18      Right?
19      A.   No.
20      Q.   You're not claiming you invented the
21  hypertext transport protocol, HTTP.
22      Right?
23      A.   No.
24      Q.   You're not claiming you invented
25  extensible markup language, XML.

Page 82

1           Right?
2       A.  No.
3       Q.  You're not claiming you invented the
4   extensible stylesheet language, XSL.
5           Right?
6       A.  No.
7       Q.  You're not claiming you invented
8   cascading stylesheets.
9           Right?
10      A.  No.
11      Q.  You're not claiming you invented the
12  hypertext markup language, HTML.
13          Right?
14      A.  No.
15      Q.  And you're not claiming you invented the
16  extensible hypertext markup language, XHTML.
17          Right?
18      A.  No.
19          You're saying by themselves?
20          That's what you're referring to, just
21  not part of anything but by themselves?
22      Q.  Right.
23          You didn't --
24      A.  Okay.  You --
25      Q.  You didn't invent any of those

Page 83

1   technologies.
2           Right?
3       A.  That's correct.
4       Q.  You didn't invent the idea of a website
5   with a simple interface.
6           Right?
7       A.  I -- that would fall under the -- the
8   category of discussions with -- understandings with my
9   attorney.
10      Q.  Okay.  Well, Google existed before
11  July of 1999.
12          Right?
13      A.  Not much before, I don't believe.
14      Q.  But it did exist before July 1999?
15      A.  I -- I can't -- I can't --
16      MR. BECKER:  Object.  Form.
17      THE WITNESS:  I can't recall.
18  BY MR. STEPHENS:
19      Q.  You don't know, okay.
20          So you don't know whether you invented
21  the notion of -- or you can't tell me whether you
22  invented the notion of a simple website.
23          Right?
24      MR. BECKER:  Object.  Form.
25      THE WITNESS:  I -- I cannot, correct.

Page 84

1   BY MR. STEPHENS:
2       Q.  Okay.  Did you invent the notion of an
3   alternative Web page that's easier for some people to
4   use?
5       A.  I -- I -- I do not know.
6       Q.  Okay.  You didn't invent cell phones.
7           Right?
8       A.  No.
9       Q.  And you didn't invent browsing a Web on
10  cell phones.
11          Right?
12      MR. BECKER:  Object.  Form.
13      THE WITNESS:  I wasn't aware of browsing the
14  Web on cell phones in July of 1999.
15  BY MR. STEPHENS:
16      Q.  So did you invent it or not?
17      A.  I don't know.
18      Q.  You didn't invent viewing the Web on
19  television.
20          Right?
21      MR. BECKER:  Object.  Form.
22      THE WITNESS:  Could you -- clarify that --
23  that question.
24  BY MR. STEPHENS:
25      Q.  What part of it do you need clarifying?

Page 85

1       A.  Well, navigating the Web on television,
2   sure, that could break down into different ways of
3   doing that, back --
4       Q.  But I'm asking now very generally.
5           Did you invent navigating the Web on
6   television?
7       A.  I wouldn't be able to answer that
8   without you clarifying the question.
9       Q.  Again, what is it that you need
10  clarified?
11      A.  Well, navigating the Web on television
12  could mean being done by a number of different ways.
13      Q.  Right.
14          And I'm asking you if you invented --
15      A.  One of the ways?
16      Q.  -- the basic idea -- not -- not a
17  specific way, but did you invent the basic idea of
18  navigating the Web on a television?
19      A.  I'm unable to answer that question.
20      Q.  Okay.  You did not invent the iPod.
21          Right?
22      A.  No.
23      Q.  And you did not invent the iPhone.
24          Right?
25      MR. BECKER:  Object.  Form.

22 (Pages 82 to 85)

1  THE WITNESS:  Well, again, the same thing.
2  You'd have to let me know what you define as the
3  iPhone.
4  BY MR. STEPHENS:
5  Q.  The device that you have in your pocket.
6  You didn't invent that.
7  Right?
8  A.  Well, there -- there's -- there's parts
9  to it.  So in other words --
10  Q.  You invented parts of it, you're saying?
11  Is that what you're saying?
12  A.  Yes, I would say that.
13  Q.  You didn't invent the whole thing?
14  A.  The whole thing, no.
15  Q.  Okay.  And, in fact, your allegations --
16  or EMG's allegations of infringement in this case are
17  limited to the Safari browser, the surfing simplified
18  websites, and the iTunes Store client on the iPhone.
19  Correct?
20  A.  Let me go back to a question that you
21  just said before.
22  You said did I invent the iPod.
23  Do you mean that to be the iPod and the
24  iPod Touch, or just the iPod when you asked the
25  question?

1  Q.  We can separate those, if you like.
2  A.  Okay.  Okay.
3  Q.  Did you invent the iPod?
4  A.  No.
5  Q.  Okay.  Did you invent the iPod Touch?
6  A.  Some of the technology that's used on
7  the iPod Touch, I believe so.  And -- and I -- I
8  really can't answer that question more than that
9  because I'm not an expert.
10  Q.  But you didn't invent the device as a
11  whole.
12  Correct?
13  A.  The whole thing, everything involved,
14  that is correct.
15  Q.  Okay.
16  A.  100 percent, no.
17  Q.  And, in fact, again, your al -- EMG's
18  allegations against Apple in this case are limited to
19  the Safari browser, viewing simplified websites, and
20  the iTunes Store client, and some apps like the Yahoo
21  app for the iPod Touch and the iPhone.
22  Correct?
23  MR. BECKER:  Object.  Form.
24  THE WITNESS:  I'm unable to answer that
25  question.  That's a question which I would have

1  reviewed with legal counsel.
2  BY MR. STEPHENS:
3  Q.  Okay.  So you can't tell me -- okay.
4  Fair enough.
5  You didn't invent the telephone portion
6  of the iPhone.
7  Right?
8  A.  That's correct.
9  Q.  And you didn't invent the music-playing
10  portion of the iPhone.
11  Correct?
12  A.  That is correct.
13  Q.  And you didn't invent the e-mail portion
14  of the iPhone.
15  Right?
16  A.  That's correct.
17  Q.  And you didn't invent the music-playing
18  part of the iPod Touch.
19  Right?
20  A.  That's correct.
21  Q.  Or the video-playing part of the iPod
22  Touch.
23  Right?
24  A.  That is correct.
25  Q.  Or the video-playing part of the iPhone.

1  Right?
2  A.  That is correct.
3  Q.  Or the weather application on the
4  iPhone.
5  Right?
6  A.  I -- I don't know the application.
7  Q.  Okay.
8  A.  So I'm unable to answer that question.
9  Q.  Fair enough.
10  The calendar application, you didn't
11  invent that.
12  Right?
13  A.  I don't -- again, I've never used it.  I
14  don't recall.  I mean, I've never used it.
15  Q.  Okay.  So you don't know whether you
16  invented that --
17  A.  That's correct.
18  Q.  -- because you've never used it?
19  A.  Right.
20  Q.  Okay.  Can you tell me what aspects of
21  the iPhone you did invent?
22  MR. BECKER:  Object.  Form.
23  THE WITNESS:  That would be privileged.
24  BY MR. STEPHENS:
25  Q.  Is that true for all the other Apple

1  products involved in this lawsuit?
2      A.  Yes.
3      Q.  You didn't invent iTunes.
4      Right?
5      A.  Well, could you elaborate on -- does
6  iTunes include the iTunes Store, as is displayed on
7  the -- on Apple devices or --
8      Q.  Well, let's --
9      A.  -- or --
10     Q.  Let's break it apart.
11         You didn't invent iTunes on a laptop or
12 desktop.
13         Right?
14     A.  That's correct.
15     Q.  And you didn't invent the iTunes Store
16 on a laptop or desktop.
17         Right?
18     A.  That is correct.
19     Q.  Did you invent the idea of displaying a
20 two-dimensional matrix of cells?
21     A.  That, again, would be privileged.
22     Q.  So I guess you also can't tell me if you
23 invented the notion of displaying a two-dimensional
24 matrix of cells displaying hypertext links.
25         Right?

1      A.  That would be privileged, yes.
2      Q.  Did you invent the idea of providing a
3  website organized by a hierarchy of categories?
4      A.  That would be privileged.
5      Q.  Did you invent transcoding?
6      A.  I do not believe so.
7      Q.  What is transcoding?
8      MR. BECKER:  Object.  Form.
9      THE WITNESS:  The understanding that I have of
10 transco -- coding, and I do have an understanding of
11 it, was derived from legal counsel.
12 BY MR. STEPHENS:
13     Q.  So you can't tell me about it?
14     A.  I'd love to tell you about it, but I'm
15 not able to tell you about it.
16     Q.  Your counsel won't let you?
17     A.  I -- I think so, yes.  I learned it from
18 counsel.
19     MR. STEPHENS:  You're going to direct him not
20 to --
21     MR. BECKER:  I direct him not to answer
22 anything that would divulge the contents of
23 attorney-client communication.
24 BY MR. STEPHENS:
25     Q.  You didn't invent the idea of displaying

1  Web advertisements.
2      Right?
3      A.  I -- I -- I'm unable to answer that
4  question.  It's too broad.
5      If you could break it down.
6      Q.  Okay.  You didn't invent the idea of
7  displaying a Web page with advertisements on it.
8      Right?
9      A.  It depends on the format of the
10 advertisements and the format of the Web page.
11     Q.  So you don't know whether you invented
12 it or not?
13     A.  Well, it would depend on what format.
14     Q.  I'm asking now about the broad notion of
15 a Web page --
16     A.  The broad notion of it, I -- I would --
17 my -- I -- I would not be able to respond to that
18 question.
19     Q.  Because it's privileged?
20     A.  Privileged, and I -- and I -- and I
21 think that there's some areas in there, which may be
22 privileged, that the patents did invent.
23     Q.  And you can't be more specific than that
24 without waiving privilege.
25     Right?

1      A.  That's correct.
2      Q.  You didn't invent the notion of
3  scrolling a Web page.
4      Right?
5      A.  Well, can you define what you mean by
6  "scrolling a Web page"?
7      Q.  Well, you could scroll a Web page before
8  July of 1999.
9      Right?
10     A.  Well, are you talking about a mobile Web
11 page or a standard Web page?
12     Q.  A standard Web page.
13     A.  No, I did not.
14     Q.  And you could scroll Web pages on mobile
15 devices before July of 1999, as well.
16     Right?
17     A.  I wasn't aware.
18     Q.  Okay.  So you may have invented that
19 notion?
20     A.  I -- I -- I'm not aware of how that was
21 done before that, and the answer is it's possible.
22     Q.  Okay.  And you didn't invent the idea of
23 zooming a Web page.
24     Right?
25     A.  A Web page on a --

Page 94

1          Could you clarify more --
2     Q.   I mean, the broad notion of zooming a
3 Web page.
4     A.   On a PC?
5     Q.   On any kind of browser.
6     A.   I do not recall before 1999 ever seeing
7 a Web page -- a mobile Web page that would zoom.
8     Q.   Okay.  So you may have invented the
9 notion of zooming on a mobile device?
10     A.   That's possible.
11     Q.   Okay.  But you didn't invent the notion
12 of zooming a Web page on a desktop PC --
13     A.   That's --
14     Q.   -- for example --
15     A.   That's --
16     Q.   -- right?
17     A.   That's correct.
18     MR. STEPHENS:  Okay.  Mark that, please.
19     (Whereupon E. Gottfurcht Exhibit 1 was
20     marked for identification)
21 BY MR. STEPHENS:
22     Q.   Mr. Gottfurcht, do you recognize the
23 Exhibit E. Gottfurcht 1?
24     A.   If you represent that it is the patent
25 for the -- of the 845 --

Page 95

1     Q.   I believe it is a complete and accurate
2 copy of U.S. Patent Number 7,020,845.
3     A.   If it is, I do.
4     Q.   Okay.  And this is one of the patents in
5 this lawsuit.
6          Right?
7     A.   That is correct.
8     Q.   And you are an inventor listed on the
9 face of this patent.
10          Right?
11     A.   Yes.
12     Q.   Along with your son, Grant.
13          Right?
14     A.   Yes.
15     Q.   And this patent relates to the invention
16 that you've testified about this morning that you and
17 Grant came up with in July of 1999.
18          Right?
19     MR. BECKER:  Object.  Form.
20     THE WITNESS:  Could you repeat the question?
21 BY MR. STEPHENS:
22     Q.   This patent relates to the invention
23 that you've been testifying about here today that you
24 and Grant came up with in July of 1999.
25          Right?

Page 96

1     A.   One of the patents, yes.
2     Q.   Okay.  And when you -- when this
3 application was filed, you read the application and
4 the claims that were filed.
5          Right?
6     A.   Yes.
7     Q.   And you signed a declaration saying that
8 you had read and understood the application and
9 claims.
10          Right?
11     A.   Yes.
12     Q.   And you have an understanding of the
13 claims of this patent.
14          Right?
15     A.   I have an understanding based on my
16 attorney-client discussions.
17     Q.   Okay.  If you would turn to Claim 6 in
18 Column 10.
19     A.   Okay.
20     Q.   Are you with me?
21     A.   Yes.
22     Q.   Take a moment to read the claim and then
23 tell me, if you would, what is the relationship
24 between the Web page and the sister site that is
25 required by the claim?

Page 97

1     MR. BECKER:  I'm going to object under local
2 rule 2. -- 2.5, that this is premature, and instruct
3 him not to answer to the extent it calls for divulging
4 attorney-client communications.
5 BY MR. STEPHENS:
6     Q.   Okay.  I'm asking for your
7 understanding, not for the construction that EMG is
8 going to propose to the Court.
9     A.   My understanding is based upon my
10 attorney-client discussions.
11     Q.   And you have no understanding other than
12 what you learned from counsel?
13     A.   Not that I can recall.
14     Q.   Okay.  Is that true for all of the
15 claims of this patent?
16     A.   Yes.
17     Q.   Okay.  So you will be unable to testify
18 at trial about the claims of the 845 patent without
19 waiving privilege.
20          Is that correct?
21     MR. BECKER:  Object.  Form.
22     THE WITNESS:  I'm not an attorney, so --
23 that's a legal question.
24 BY MR. STEPHENS:
25     Q.   Okay.  Well, let me ask it differently.

1    That's a fair point.
2        You will be unable to testify about the
3  claims of the 845 patent at trial without divulging
4  information that you learned in a conversation with
5  your counsel.
6        Is that right?
7    A.  Unless I remember otherwise.
8    Q.  Okay.  Do you remember anything else?
9    A.  Not right now, not today.
10    Q.  Is there anything I could do to reflesh
11  your -- refresh your recollection about things you may
12  know about the claims of the 845 patent that you did
13  not learn from counsel?
14    A.  I can't think of anything.
15    Q.  Okay.  Do you have any reason to believe
16  that there is anything that you can tell me about the
17  claims of the 845 patent that you did not learn from
18  counsel?
19    A.  If you were to parse out what I've
20  testified to and how that relates to -- to the claims
21  prior to hiring legal counsel, that answer would be
22  what I've already testified to.
23    Q.  So --
24    A.  But if you're asking me post hiring
25  legal counsel, I cannot recall any information that

1  would be different than what I've learned from legal
2  counsel.
3    Q.  Okay.  So in other words, what you've
4  told me already today about the conception of the
5  invention is all you can say without divulging
6  privileged information about the claims of the 845
7  patent.
8        Is that right?
9    A.  As I can think about today, as of this
10  moment, yes.
11    Q.  Okay.  And again, you have no reason to
12  think that there is anything else that you'll think of
13  later.
14        Right?
15    A.  There might be.
16    Q.  Okay.  What might it be?
17    A.  I -- I -- I don't know.  It's just
18  something that's unknown.
19    Q.  Well, that's why I'm trying to probe
20  it --
21    A.  I know.
22    Q.  -- because --
23    A.  I know.
24    Q.  -- people have a way of remembering --
25    A.  I know.  I know.

1    Q.  -- things after their deposition.
2    A.  I know.  So far, I'm unable to think of
3  anything more.
4    Q.  Okay.  And you also can't think of
5  anything that I might do to refresh your recollection.
6        Right?
7    A.  I don't think so.
8    Q.  Okay.  And you don't have any reason to
9  believe that there are such things.
10        Is that right?
11    A.  There may be.
12    Q.  Okay.
13    A.  There might be.  But there's -- but
14  there -- there may be.  I just can't think of anything
15  at this time.
16    Q.  Okay.  What leads you to believe that
17  there may be?
18    A.  Well, you have to always keep the door
19  open.  Nothing -- nothing is perfect.
20    Q.  Okay.  But there's nothing specific that
21  leads you to think there may be.
22        Right?
23    A.  I just at this moment can't think of
24  anything.
25    Q.  Okay.  Fair enough.

1        Could you take look at Figure 1?
2    A.  (Complying.)
3    Q.  Can you describe for me how your
4  invention works in conjunction with Figure 1, please?
5    A.  That, again, would fall under my
6  attorney-client privilege.
7    Q.  So you can't say anything about
8  Figure 1?
9    A.  Not that I learned prior to hiring
10  Tom Coester, approximately July 7th, 1999.
11    Q.  And it's your sworn testimony here today
12  that you can't testify about anything at all in
13  connection with your invention that happened after you
14  first talked about it with Mr. Coester that would not
15  reveal privileged information.
16        Is that right?
17    A.  No, that's --
18  MR. BECKER:  Object.  Form.
19  THE WITNESS:  -- that's not correct.
20  BY MR. STEPHENS:
21    Q.  Okay.  Well --
22    A.  Just, I cannot think of anything at this
23  moment.
24    Q.  Yeah, well, that's what I'm asking.
25        You can't think of anything at this

Page 102

1  moment about your invention that happened or that
2  you -- that involved anything that occurred after
3  July 7th, 1999, that would not require you to disclose
4  privileged information?
5      A.   Not on Figure 1.
6      Q.   How about anything else in the patent?
7      A.   I -- I don't know.  I --
8      Q.   Take a minute and look through, because
9  I'm not going to go through and ask you about every
10 single sentence if --
11     A.   You want me to take the time and read
12 the patent and go through each word of the patent?
13     Q.   Well, why don't we start with looking at
14 all the figures.
15          So take your time, look through the
16 figures, and if you see one you can tell me something
17 about that you believe is not privileged, then say so.
18     MR. BECKER:  Object to form.
19          You can go on.  I just needed to get my
20 objection in.
21     THE WITNESS:  Figure 2-A may be a page, except
22 for the sister site insert, which I may have seen
23 prior to engaging Tom Coester, Figure 2-A.
24 BY MR. STEPHENS:
25     Q.   Okay.  So you -- you may have seen the

Page 103

1  AOL.com page we see in Figure 2-A before you engaged
2  Mr. Coester?
3      A.   I don't know if it's the exact page, but
4  I did see the AOL.com page, I believe I did, prior to
5  engaging Tom Coester.
6      Q.   Okay.
7      A.   This page has a sister site designation
8  in the upper right-hand corner which would not have
9  been on the page that I would have seen prior to
10 engaging Tom Coester.
11     Q.   Okay.  How about Figure 2-B?
12     A.   I cannot recall whether this page was
13 prior to engaging Tom Coester or after engaging
14 Tom Coester.
15     Q.   Okay.  So does that mean you're not
16 going to tell me anything about it?
17     A.   No, I --
18     MR. BECKER:  Object.  Form.
19     THE WITNESS:  You can ask me questions about
20 it, but I -- I -- I'm -- I don't know if it was prior
21 or after --
22 BY MR. STEPHENS:
23     Q.   Okay.
24     A.   -- at this moment.
25     Q.   How did you get from Figure 2-A to

Page 104

1  Figure 2-B?
2      A.   Well, that would be an example of
3  reformatting, which I mentioned earlier.
4      Q.   Okay.  How do you do that reformatting?
5      A.   You mean technically, how it's done?
6      Q.   Yeah.
7      A.   That would -- that would be an
8  understanding of information that I learned from
9  Tom Coester.
10     Q.   Okay.  So you learned how -- how to go
11 from Figure 2-A to Figure 2-B from Tom Coester?
12     A.   Or other attorneys along the way.
13     MR. STEPHENS:  Okay.  Let's go a couple more
14 minutes, and then we'll take a break for lunch, if
15 that's okay with you guys.
16     MR. BECKER:  Sure.
17     MR. STEPHENS:  We have five more minutes on
18 the tape.
19     Q.   How about Figure 2-C?
20     MR. BECKER:  Object.  Form.
21     THE WITNESS:  Figure 2-C is a -- the homepage
22 of Yahoo, I believe, and I believe that I had seen
23 this page prior to engaging Tom Coester, maybe not
24 this exact page but the Yahoo homepage.
25     / / /

Page 105

1  BY MR. STEPHENS:
2      Q.   Okay.  You see the dotted lines on
3  Figure 2-C?
4      A.   Yes.
5      Q.   What are those?
6      A.   Those are -- represent -- they represent
7  knowledge that I received from Tom Coester.
8      Q.   So you can't testify about it without
9  revealing privileged information?
10     A.   Not at this time.  That's my
11 recollection at this time.
12     Q.   Apart from the dots, is Figure 2-C
13 representative of the Yahoo pages that existed before
14 you came up with your invention, as you understand it?
15     A.   It may not have been this exact page.
16     Q.   I understand some of the details may
17 have changed.
18          But otherwise, it looks the same.
19          Is that right?
20     A.   To the best of my recollection.  I don't
21 know if it's the full Yahoo page, it's -- or a
22 condensed Yahoo page, but it looks similar to this.
23     Q.   Is that true for Figure 2-A, as well,
24 the AOL page?
25     A.   Yes, I -- it looks familiar to what I

27 (Pages 102 to 105)

Page 106

1  would have seen -- I believe what I would have seen
2  prior to hiring Tom Coester.
3      Q.   So is it fair to say that what you see
4  in Figure 2-A, apart from the sister site link, is
5  representative of the prior art before you came up
6  with your invention?
7      MR. BECKER:  Object.  Form.
8      THE WITNESS:  I think so.
9  BY MR. STEPHENS:
10     Q.   Is that true also for Figure 2-C, other
11 than the dotted lines?
12     A.   I think so.
13          Did I -- was -- did this page exist, is,
14 I think what you're -- is the way I'm answering the
15 question, prior to July 1st of 1999.
16     Q.   Yes, that's my question.
17     A.   Yes.
18     Q.   Meaning "yes," it did exist?
19     A.   I believe so, yes.
20     Q.   Okay.
21     MR. STEPHENS:  All right.  Let's break for
22 lunch, shall we?
23     MR. BECKER:  Okay.
24     THE VIDEOGRAPHER:  This marks the end of tape
25 Number 1 in the deposition of Elliot Gottfurcht.

Page 107

1          Going off the record.
2          The time is 12:18 p.m.
3          (Whereupon a lunch recess was taken
4          from 12:18 p.m. to 1:17 p.m.)
5      THE VIDEOGRAPHER:  Back on the record.
6          Here marks the beginning of tape
7  Number 2 in the deposition of Elliot Gottfurcht.
8          The time is 1:17 p.m.
9  BY MR. STEPHENS:
10     Q.   Mr. Gottfurcht, looking back at the 845
11 patent, I see there's a third inventor named
12 Albert-Michel Long.
13          Have I pronounced that correctly?
14     A.   I think so.
15     Q.   Who is he?
16     A.   He was a co-inventor on -- on both
17 the 1 -- the 845 and the 196 patent.
18     Q.   And how did he come to be a co-inventor?
19     A.   He was engaged through a third party.
20     Q.   Who is the third party?
21     A.   I think it was called Online Labs.
22     Q.   What did he contribute to the invention?
23     A.   He contributed -- well, he worked as a
24 co-inventor with the other co-inventors and
25 contributed a document that they prepared.  He

Page 108

1  contributed -- that was on the first patent.
2          And on the second patent, his
3  contribution involved working on the interface and
4  advertising.
5      Q.   When you say the other patent, you mean
6  the 497 patent that's referenced there in the related
7  U.S. application data on the first page of the 845
8  patent?
9      A.   Yes.
10     Q.   And so he worked with the other
11 co-inventors on that patent to contribute a written
12 document.
13          Is that what you meant?
14     A.   Yes.
15     Q.   Why are not those other inventors on the
16 497 patent also inventors on the 845 patent?
17     MR. BECKER:  Object.  Form.
18          And to the extent it requires you to
19 divulge legal advice from counsel, I'll instruct you
20 not to answer that.
21     THE WITNESS:  It was --
22 BY MR. STEPHENS:
23     Q.   Go ahead.
24     A.   It was advised by legal counsel.
25     Q.   So you can't answer that question

Page 109

1  without divulging attorney-client privileged material
2  or --
3      A.   They -- yes, I think that's the correct
4  answer.
5      Q.   Okay.  Let me ask it differently.
6          Without telling me the reason, do you
7  know the reason why they are not listed as inventors
8  on the 845 patent?
9      A.   I believe I do.
10     Q.   But you can't tell me without revealing
11 privileged information.
12          Right?
13     A.   I think so.
14     Q.   So what was Mr. Long's contribution to
15 the 845 patent?
16     MR. BECKER:  Object.  Form.
17     THE WITNESS:  I -- I just answered the
18 question.
19          Would you like me to answer it again?
20 BY MR. STEPHENS:
21     Q.   Sure.
22     A.   Okay.  He worked on the interface.  He
23 worked on advertising.  Advertising component and the
24 interface component is all I can recall at this time.
25     Q.   Okay.  And when you say the interface

28 (Pages 106 to 109)

Page 110

1  component, what are you referring to?
2      A.   The simplified interface.
3      Q.   As shown in Figure 2-B, or something
4  else?
5      A.   Well, it's shown throughout the patent.
6           And a lot -- and several of these
7  figures, I believe he prepared.
8      Q.   Okay.  Which ones?
9      A.   This is a guesstimate, but I -- it would
10  be Figure 8; Figure 9-A; Figure 9-B, I believe;
11  Figure 9-C; Figure 9-D; Figure 10-A; Figure 10-B;
12  Figure 10-C; Figure 10-D; Figure 10-E; Figure 10-F;
13  Figure 10-G; Figure 11; 12-A; Figure 12-B; Figure 13;
14  Figure 14.
15      Q.   Any others?
16      A.   In figures?
17      Q.   Yes.
18      A.   Well, I believe he did the -- the figure
19  on the AOL on Page 1.
20      Q.   Sorry.  You mean the -- the figure on
21  the front page of the patent?
22      A.   Yes.
23      Q.   That's the same as Figure 2-B, I
24  believe.
25           Right?

Page 111

1      A.   I think you're right.
2      Q.   Okay.
3      A.   I think that's it.
4      Q.   So he created Figure 2-B, also?
5      A.   I think I already mentioned it, but the
6  answer is yes.
7      Q.   Okay.
8      A.   I believe so.
9      Q.   Any others?
10      A.   I believe -- I believe that would have
11  been it.
12           He may have inserted the sister site
13  link on 2-A.
14      Q.   What's Mr. Long's background?
15           Do you know?
16      A.   I do not recall.
17      Q.   Is he an engineer?
18      A.   I think he was more a graphic designer,
19  but I -- I -- I don't recall.
20      Q.   Do you know who created Figure 1?
21      A.   It was either in the co-inventors
22  report -- I'm not sure, but it may have come from the
23  co-inventor's report.
24      Q.   Okay.  Anywhere else you think it might
25  have come from, or is that --

Page 112

1      A.   Well, it could have been from
2  Tom Coester, review of the co-inventor's report.  I'm
3  not sure.
4      Q.   Okay.  And Figure 2-A, you thought that
5  Mr. Long might have inserted the sister site link.
6           Right?
7      A.   Yes.
8      Q.   Would he have created the rest of that
9  or captured it from the Internet?
10      MR. BECKER:  Object.  Form.
11      THE WITNESS:  He may have done that, also.
12  BY MR. STEPHENS:
13      Q.   Okay.  What about Figure 2-C?
14           Do you know who created that?
15      A.   I do not recall.
16      Q.   How about Figure 3?
17      A.   I'm not -- it -- it would have come, I
18  would guess, from the co-inventor's report or
19  Tom Coester.
20      Q.   Figure 4?
21      A.   I would guess from the co-inventor's
22  report or Tom Coester.
23      Q.   Figure 5-A?
24      A.   Co-inventor's report or Tom Coester.
25      Q.   5-B?

Page 113

1      A.   Co-inventor's report or Tom Coester.
2      Q.   5-C?
3      A.   I think from Tom Coester.
4           Excuse me, when I say Tom Coester, it
5  could be from someone in his office, either himself or
6  someone he directed.
7      Q.   Okay.  So 5-C, you thought came from him
8  or someone he directed?
9      A.   Yes.
10      Q.   Figure 6?
11      A.   Again, since I didn't re -- prepare the
12  report, I wouldn't -- this should only be a guess, but
13  I would think this either came from the co-inventor's
14  report or Tom Coester, or a combination thereof.
15      Q.   Figure 7?
16      A.   The same.
17      Q.   What's your understanding of Figure 5-C?
18      MR. BECKER:  Object.  Form.
19      THE WITNESS:  I did not prepare this figure.
20  I'm not an expert in the area.
21  BY MR. STEPHENS:
22      Q.   Do you have an understanding of it?
23      A.   Well, I think I had -- probably had some
24  understanding ten years ago.  I haven't looked at it
25  for ten years, and so right at this moment, I don't

Page 114

1  have an understanding of it.
2      Q.  Can you tell me anything about it?
3      A.  No, not at this moment.
4      Q.  Why don't you take a minute and refresh
5  your recollection about looking at the patent, and
6  then tell me if you can remember anything about it.
7      A.  I just don't recall.
8      Q.  If you look at Column 5 of the patent,
9  near the bottom, you'll see a description of it.
10         Can you take a minute and look at that
11  and see if that refreshes your recollection?
12      A.  Column 5 at the bottom?
13      Q.  Yeah, about Line 59.
14      A.  Okay.
15      Q.  Does that refresh your recollection?
16      A.  Not very much.  It's been ten years
17  since I have reviewed that, and so it doesn't refresh
18  my recollection.
19      Q.  You can't tell me what Figure 5-C is
20  about?
21      A.  I --
22      MR. BECKER:  Object.  Form.
23      THE WITNESS:  It would be -- I'm not able to,
24  no.
25         / / /

Page 115

1  BY MR. STEPHENS:
2      Q.  Okay.  So it's been ten years since
3  you've read the 845 patent?
4      A.  In its entirety, yes.
5      Q.  When's the last time you read part of
6  it, before a few minutes ago, that is?
7      A.  I don't recall.
8      Q.  Did you read it when it issued in 2006?
9      A.  I -- I do not recall.
10      Q.  You read it when it was filed in 2000.
11  Right?
12      A.  Yes.
13      Q.  So you -- by ten years, you really meant
14  March of 2000?
15      A.  No, no, no, it was -- it was filed in --
16  in -- this is a continuation.
17      Q.  I don't think so.
18      A.  It's not a continuation?
19      Q.  A continuation in part.
20      A.  Excuse me, continuation in part, which
21  was filed -- I'm sorry, it was a continuation in part
22  that was filed in March of 2000, so it's been almost
23  ten years.
24      Q.  Yeah, but not ten years?
25      A.  No, sorry.  It was a couple months

Page 116

1  later.
2      Q.  That's what you meant, though.  That's
3  why I was asking.
4      A.  Oh, I'm sorry, yes, that's what I meant.
5  I meant it's a little shy of ten years.
6      Q.  Okay.  And you didn't read it when it
7  was issued in 2006?
8         Did you read it --
9      A.  I don't recall that I read it in 2006.
10      Q.  Okay.  And you just don't remember,
11  other than when it was filed in 2000, the last time
12  that you read any part of it before today.
13         Right?
14      A.  Well, I may have read a part of it since
15  March of 2000.  I don't -- I don't recall.  I did read
16  it very carefully in March of 2000.
17      Q.  Okay.  Did you read any part of it in
18  connection with this case at any time?
19      A.  No.
20      Q.  So you didn't read it -- you didn't read
21  the claims to try to figure out whether Apple
22  infringed and you should bring the lawsuit?
23      MR. BECKER:  Object.  Form.
24      THE WITNESS:  That would be privileged.
25         / / /

Page 117

1  BY MR. STEPHENS:
2      Q.  The act of reading is not --
3      A.  No, I did not -- I did not read it for
4  that purpose.  I relied on --
5      Q.  My question is, did you read it at all
6  in connection with this lawsuit?
7      A.  In con -- oh, since the lawsuit?
8         I do not recall.  I relied on legal
9  counsel.
10      Q.  Okay.  Did you read it at all since you
11  first considered filing a lawsuit against Apple?
12      A.  I do not recall.
13      Q.  When did you make the decision to sue
14  Apple?
15      A.  After the 916 was issued.
16      Q.  What's the 916?
17      A.  196.
18      Q.  Oh, okay.  So that was -- you mean
19  U.S. Patent 7,441,196 that you, Grant, and Mr. Long
20  are also inventors on?
21      A.  Yes.  And I think that was --
22      Q.  October 2008?
23      A.  May have been a little bit prior to
24  that.  The process of the patent office, seems that
25  you're likely to have -- a patent would be, between

30 (Pages 114 to 117)

Page 118

1 allowed and being issued, kind of an optimistic period
2 that that will happen.
3 Q. So you made a decision, after the claims
4 were allowed but before the patent issued, that you
5 were going to sue --
6 A. I think I made the official decision
7 after they were issued.
8 Q. But you had considered it --
9 A. I thought about it.
10 Q. Okay. When did you first think about
11 suing Apple?
12 A. Well, I wasn't -- I would say when it
13 was issued.
14 Q. That's the first time you thought about
15 it?
16 A. Well, I may have considered it between
17 when it was allowed and when it was -- when it was
18 issued.
19 Q. Okay. So you never thought about suing
20 Apple before the claims of the 196 patent were
21 allowed.
22 Is that right?
23 A. No, not that I recall.
24 Q. Okay. And you never thought about suing
25 Apple on the 845 patent between the time it issued in

Page 119

1 March of 2006 and the time the claims of the 196 were
2 allowed?
3 A. I believe so.
4 Q. You mean you believe you -- so --
5 A. I hadn't thought about it.
6 Q. Okay. Thank you.
7 Take a look at Figure 3 of the 845
8 patent, please.
9 A. (Complying.)
10 Q. Can you tell me what's described there?
11 A. I'm not an expert, so -- and I didn't
12 prepare the document, so the information that I would
13 have at the time that this continuation in part were
14 filed, I had reviewed with legal counsel. So that
15 would -- that part would be privileged.
16 Q. Do you understand what's displayed -- or
17 what's described there?
18 A. I -- I have some understanding.
19 Q. Okay. Can you explain it, please?
20 A. Well, it comes from information -- comes
21 from -- my understanding comes from my attorney.
22 Q. Okay. So other than what your attorney
23 told you, you have no understanding of what's in
24 Figure 3.
25 Is that right?

Page 120

1 A. I can -- I -- I'm unable to parse
2 whether I learned anything other than from my lawyer,
3 so I --
4 I do know that I reviewed this with
5 Tom Coester on more than one occasion.
6 Q. It's not enough to have reviewed a
7 document with a lawyer to then not ever have to
8 testify about it.
9 If you have -- if you have any
10 independent understanding of it, you need to tell me
11 about it.
12 And what you're saying is, you don't
13 have any independent understanding.
14 Is that right?
15 A. Not that I can recall.
16 Q. Okay. How about Figure 4?
17 Can you tell me what Figure 4 is?
18 A. On Figure 4, I did not prepare Figure 4,
19 I do not have the expertise to understand Figure 4. I
20 reviewed Figure 4 before the patent -- the
21 continuation in part were filed.
22 And I have no recollection of any
23 information other than my understanding from legal
24 counsel.
25 Q. Okay. Did you ever attempt to build any

Page 121

1 hardware in connection with your inventions?
2 A. I don't believe so.
3 Q. How about Figure 5-A?
4 Can you explain what that is?
5 A. I don't know. I do not have the
6 expertise to explain Figure 5-A.
7 Q. How about Figure 5-B?
8 A. The same answer.
9 Q. 5-C, we've talked about.
10 Figure 6?
11 A. The same answer.
12 Q. 7?
13 A. Same answer.
14 Q. When you came up with your invention,
15 did you have in mind a way to transmit the simplified
16 interface over a network to the device that you'd view
17 it on?
18 MR. BECKER: Object. Form.
19 THE WITNESS: I don't believe so.
20 BY MR. STEPHENS:
21 Q. Did you subsequently come up with an
22 understanding of how that would happen?
23 MR. BECKER: Object. Form.
24 THE WITNESS: Could you please repeat the
25 question?

31 (Pages 118 to 121)

1  BY MR. STEPHENS:
2      Q.  Yeah, I'll just rephrase it.
3          Did you, after your initial conception,
4  come up with an idea for how to transmit the
5  simplified matrix interface over a network to a device
6  that would be used to view it?
7      A.  If I did, it would have been through
8  consulting with my attorney, and that would be my
9  understanding.  Other than that, I don't recall.
10     Q.  Okay.  So you can't tell me anything
11 about how you would transmit the simplified interface,
12 for example, that we see in Figure 2-B, over a
13 network.
14         Right?
15     A.  I just don't recall at this moment.
16     Q.  Is that because you don't remember
17 whether you ever came up with a solution or that you
18 don't remember anything that's not privileged, or
19 something else?
20     A.  I don't remember that's anything
21 that's -- wouldn't be privileged.
22     Q.  Okay.  And that's because anything you
23 know about how to transmit Figure 2-B over a network,
24 you learned from an attorney.
25         Is that right?

1      A.  No, I may have learned from another
2  source, but I can't recall at this time.
3      Q.  Okay.  So as far as you know --
4      A.  Did you say 2-B?
5      Q.  Yes.
6      A.  Okay.
7      Q.  As far as you know sitting here today,
8  anything you know about how to transmit Figure 2-B
9  over a network, you learned from an attorney?
10         MR. BECKER:  Object.  Form.
11         THE WITNESS:  No, I'm saying that I may have
12 learned it through other sources, I just can't recall
13 at this time.
14 BY MR. STEPHENS:
15     Q.  Right.
16         So therefore, you don't know of learning
17 anything about how to transmit Figure 2-B over a
18 network, other than what you learned from an attorney.
19         Right?
20     A.  I can't recall.
21     Q.  Okay.  If you'll turn to Column 2 --
22         Actually, before we do that, if you
23 could turn to Figure 14.
24     A.  (Complying.)
25     Q.  Can you tell me what Figure 14 is once

1  you've gotten there and had a chance to look at it?
2      A.  I did not prepare the document, so it
3  would be difficult for me to guess the context of what
4  Figure 14 is.
5      Q.  So you don't know what it is?
6      A.  Well, I -- outside of the document, it
7  looks to me to be an example of a matrix interface.
8      Q.  Okay.  And is the entire display a
9  matrix?
10     A.  Well, it -- it could be.
11     Q.  Okay.  But it doesn't have to be?
12     A.  I would -- I would classify that as a
13 matrix --
14     Q.  Okay.
15     A.  -- an example of a matrix.
16     Q.  If you turn now to Column 2.
17     A.  Okay.
18     Q.  It's referring to Figure 1.
19         Do you see that in the "Detailed
20 Description"?
21     A.  I do.
22     Q.  And it says, "Figure 1 is a block
23 diagram of a system employing one embodiment of the
24 invention.  A wide-area network 10, such as the
25 Internet, couples together plurality of communication

1  nodes.  Some nodes, such as node 12, may be a standard
2  prior art PC executing any conventional Web browser.
3  Alternatively, note 12 might be a set top box or
4  television, or an Internet appliance, or a wireless
5  device, such as a Web-enabled cell phone."
6          Do you see that?
7      A.  Yes.
8      Q.  And it goes on to say, "Additionally,
9  there are server nodes connected to WAN [sic], such as
10 server node 16, which may be any conventional Web
11 server."
12         And then it says, "Also, coupled to
13 WAN 10 are browser nodes [sic] running a custom
14 browser that facilitate access to information and
15 services provided by [sic] the custom browser
16 node 22."
17         Do you see that?
18     A.  Yes.
19     Q.  Did you ever, in your efforts to make
20 prototypes of your invention, develop a custom
21 browser?
22     A.  I don't recall.
23     Q.  What would you look at to try to figure
24 that out, if you were going to go research the
25 question?

Page 126

1    A.   What would I -- my process be?
2    Q.   Yes.
3    A.   Well, first process would be -- is to
4  call Tom Coester --
5    Q.   Okay.
6    A.   -- and review it with him, to explain
7  what this means.
8    Q.   So you'd ask Mr. Coester to explain what
9  the patent means?
10    A.   No, no -- well, yes.  Again, I haven't
11  looked at this for ten years.
12    Q.   Okay.  And then what?
13    A.   I would review it with him to refresh my
14  recollection, and then I would be better equipped to
15  answer your question.
16    Q.   Okay.
17    A.   I'm sorry.  We had this review with --
18    Q.   So --
19    A.   -- Tom.
20    Q.   -- is it possible you did try to develop
21  a custom browser and you just don't remember?
22    A.   I -- I don't understand what this
23  language means, so I -- I'm unable to answer your
24  question.
25    Q.   Okay.  You understood it when you filed

Page 127

1  the patent application?
2    A.   Yeah, I -- I read the document several
3  times and had -- in meetings with Tom Coester, and I
4  had a lot of questions and he explained them to me.
5    Q.   Okay.  But you don't understand it
6  today?
7    A.   That's correct.
8    Q.   Okay.
9    A.   Can't recall ten years later.
10    Q.   In that same place in Column 2, just a
11  little bit further on, it says, "Content partners,
12  such as content partner node 14 provide content in a
13  special -- specified format that facilitates its use
14  by the client nodes."
15       Do you see that?
16    A.   Yes.
17    Q.   What format was that?
18    A.   Again, I'm not an expert, and I would
19  have to rely on a review with Tom Coester.
20    Q.   Okay.  So you just don't know?
21    A.   I just -- I don't remember.  I'm not an
22  expert.
23    Q.   When you say you're not an expert, what
24  are you not an expert in?
25    A.   I'm not a expert in the -- in the field

Page 128

1  that would give me information explained here.
2    Q.   Okay.
3    A.   I'm not an engineer.
4    Q.   Can you show me where in this patent it
5  talks about scrolling or zooming with a finger?
6    A.   I believe the language is, "manipulating
7  region of the screen."
8    Q.   Okay.
9    A.   And I'd have to read the whole patent to
10  remember where that is.
11       But I re -- my recollection is that the
12  patent talked about manipulating a region of the
13  screen for zooming and scrolling.
14    Q.   Okay.  Other than the word "manipulate,"
15  are you aware of any disclosure in this patent that
16  describes using a finger to scroll or zoom?
17    A.   Understanding that my definition of
18  "manipulation" includes a finger.
19    Q.   I --
20    A.   Are you saying other than using the word
21  "manipulation"?
22    Q.   Yes.
23       Other than that one word, are you aware
24  of anything in the patent that discloses using a
25  finger to scroll --

Page 129

1    A.   I would have to take some time and read
2  this.
3    Q.   Go ahead.
4    A.   It could take an hour.
5       You want me to do it?
6       Okay.
7       Can I mark on this exhibit?
8    Q.   Sure.
9    A.   Okay.  All right.
10    Q.   If it helps, Column 5, it's talking
11  about Figure 5-B being a flow diagram of client side
12  manipulation of a segmented page.
13    A.   So you're referring me to Column 5?
14    Q.   I am --
15    A.   Okay.
16    Q.   -- Line 5.
17    A.   Line 5.
18       You said I couldn't -- I could mark on
19  this?
20    Q.   You can, yes.
21    A.   Okay.  You're asking me to find the word
22  "manipulation"?
23    Q.   No, I'm asking you to point to me where
24  it discloses using a finger to scroll or zoom.
25    A.   The word "finger", you're asking me if

Page 130

1   the word "finger" --
2      Q.  No. But if you see that, obviously,
3   that would be that kind of disclosure.
4         I'm asking for any disclosure of any
5   kind, whether it's the word "manipulation" or anything
6   else.
7      A.  Oh, you -- so "manipulation" or "finger"
8   is what I'm looking for?
9      Q.  No, I'm asking you for any disclosure of
10  using a finger to scroll or zoom.
11       Whatever you think that disclosure is, I
12  want you to identify it for me.
13     A.  Okay.
14     Q.  Doesn't have to be the word "finger."
15  It could be --
16     A.  I understand.
17     Q.  Okay.
18     A.  I'm not quite finished, but --
19     Q.  All right.
20     A.  Okay. Go ahead.
21     Q.  So now, if you could just identify for
22  me each place where you found disclosure of scrolling
23  or zooming using a finger.
24     A.  Well, you know, I -- I was looking for
25  the word "finger." I could not find "finger."

Page 131

1        I did find "manipulation."
2       I'd have to reread it for -- for the
3  words "zooming" and "scrolling."
4     Q.  Well, no, I'm not asking you to do that.
5     A.  We'll you're --
6     Q.  So --
7     A.  I'll read it again to look for those
8  words or --
9     Q.  No.
10     Well, what were you looking for?
11  Why don't you tell me that.
12     A.  I was looking for "finger."
13     Q.  Okay. And you didn't find that?
14     A.  I found "manipulating" --
15     Q.  Okay.
16     A.  -- "manipulation."
17     Q.  Anything else?
18     A.  Well, I was only looking for "finger"
19  and "manipulation," but I can read it again.
20     Q.  Well, I asked you specifically to look
21  for anything that disclosed using a finger for
22  scrolling or zooming.
23       And you didn't find the word "finger";
24  you did find the word "manipulation."
25     A.  Right.

Page 132

1     Q.  Did you find anything else?
2     A.  Scrolling and zooming, I did find.
3     Q.  Okay. I'm asking about using a finger
4  to scroll or zoom.
5       Other than the word "manipulate," did
6  you find anything?
7     A.  I could not find the word "finger."
8     Q.  Did you find anything other than the
9  word "manipulate" that you believe --
10     A.  I mean --
11     Q.  -- discloses using a finger to scroll or
12  zoom?
13     A.  I -- I didn't prepare the document, so I
14  could only let you know from a -- you know, a lay
15  person reading it to interpret what you mean by that.
16       But I saw "manipulation," I saw
17  "zooming," I saw "scrolling."
18       I did not see "finger."
19     Q.  Okay. And you didn't see anything other
20  than the word "manipulation" that supports the view
21  that the patent discloses using a finger to scroll or
22  zoom.
23       Right?
24     A.  I -- I wouldn't be -- well, I didn't
25  prepare the doc -- the document, so I'm not prepared

Page 133

1   to --
2     Q.  Take -- take as long as -- if you want
3  to --
4     A.  I don't think I'm qualified because I
5  didn't prepare the document. I could spend another
6  couple hours --
7     Q.  But in the time that you took, you were
8  unable to find anything.
9       Right?
10     A.  No, I was unable to find the word
11  "finger."
12     Q.  I asked you something broader than that.
13       If you need more time to answer my
14  broader question, take it.
15     A.  Give me the keywords.
16       One of them is "manipulation" --
17     Q.  I'm not asking for keywords.
18       I'm asking for anything, any disclosure
19  whatsoever of any kind in the patent that you believe
20  supports the idea of scrolling with a finger or
21  zooming with a finger.
22     A.  Scrolling --
23       Well, I would say "manipulating."
24     Q.  Anything else?
25     A.  Anything that means finger or

1 manipulation?
2          My answer to that would be, not in this
3 reading.  And I did not write the document, so I
4 wouldn't be qualified to interpret the language in
5 here at this time, ten years since I've reviewed it
6 with counsel.
7          So as a lay person, I would say
8 "manipulating" would be a word that I understand, and
9 I did see it in here.
10          Of course, I saw "zooming" and
11 "scrolling," and I understand that.
12          But there's a lot of words in here I do
13 not understand, so I could not give you 100 percent
14 answer.
15      Q.  Okay.  But on this reading, you didn't
16 find anything other than the word "manipulate," which,
17 to you, discloses --
18      A.  There are a lot of words I didn't
19 understand, so I'm unable to tell you whether or not
20 they had meanings to mean finger or manipulating or
21 something like that.
22      Q.  I understand that.
23          All I'm asking are for the ones you did
24 understand.
25      A.  The ones that I did understand, I found

1 the word "manipulate" and "manipulation."
2      Q.  And nothing else.
3          Right?
4      A.  Nothing else that -- in this reading --
5 I may miss something -- that would mean -- that would
6 be "finger" or "manipulating" or "manipulation."
7      Q.  But --
8      A.  There could be other words in here that
9 could legally be interpreted by an expert.
10      Q.  But you didn't see anything else that
11 you interpreted --
12      A.  That I -- that I could interpret, I did
13 not see anything else that I could interpret to mean
14 that.
15      Q.  Okay.  Did you look at the figures,
16 also?
17      A.  No.
18      Q.  Okay.  Why don't you take a minute and
19 look through the figures and see if you see anything
20 in there that shows the use of a finger to scroll or
21 zoom.
22      A.  Well, again, I'm not -- I didn't write
23 the document.  I'm not an expert.  So there could be
24 words and meanings here that I would -- wouldn't be
25 qualified to -- to interpret.

1          What was your question again?
2      Q.  Is there anything that you understand in
3 the figures to show the use of a finger to scroll or
4 to zoom?
5      A.  Finger, so I -- I didn't see the word
6 "finger."  I'm not -- just to sum up, I didn't see the
7 word "finger."  I saw the word "manipulation," that
8 means finger.
9          There were many words that I did not
10 understand, that could mean finger or could mean
11 manipulation.
12      Q.  But nothing that you understand to mean
13 finger, as you sit here today.
14          Right?
15      A.  Nothing that I understand -- that I
16 could understand to mean finger, other than
17 manipulation, in this reading that I did, which isn't
18 perfect, today.
19      Q.  Okay.  And that includes the figures
20 now.
21          Right?
22      A.  Well, again, the fig -- figures, I
23 didn't prepare the figures, I'm not an expert on the
24 figures, so I -- I would be unable to conclude whether
25 the figures have that meaning or not.

1      Q.  Well, take a look, and if there's
2 anything in there that you can conclude shows the use
3 of a finger to scroll or to zoom, just point it out
4 for us, please.
5      A.  Well, the -- the problem here is, the
6 figures have to be read in context with the
7 specifications --
8      Q.  Okay.
9      A.  -- the description of the figures.
10          And I'm not -- I didn't prepare the
11 document, so I'm not -- it's not possible for me not
12 to be an expert, to take figures that are described by
13 specifications, which I did not understand, and to
14 conclude whether or not they mean finger or
15 manipulation for scrolling and zooming.
16      Q.  Now, you understood it when it was
17 filed.
18          Right?
19      A.  At the time it was filed, I -- I -- I
20 read these doc -- this document and the other patent a
21 few times.  I had a number of questions.
22          I went to see Tom Coester, and he
23 answered the questions for me.
24      Q.  Okay.  And so you understood it, and you
25 signed a declaration --

Page 138

1    A.   That's correct.
2    Q.   -- confirming that you understood it?
3    A.   That's correct, after I asked him these
4  questions.
5    Q.   And that's true for the 196 patent, as
6  well.
7         Right?
8    A.   Yes.
9    Q.   And you understand that the
10 specification and figures are identical in the 196
11 patent to the 845.
12        Right?
13   A.   I believe so, yes, yes.
14   Q.   And that was filed in March of 2006.
15        Right?
16   A.   The 845?
17   Q.   No, the 196.
18   A.   If that's what it says, yes.
19   Q.   It says that on the front, I'll tell you
20 that.
21   A.   Okay.
22   Q.   And at that point, you read the 196
23 application before it was filed --
24   A.   Correct.
25   Q.   -- and you understood it?

Page 139

1    A.   Correct.
2    Q.   And you affirmed as much under
3  penalty of perjury in a declaration filed with the
4  Patent Office.
5         Right?
6    A.   Correct.
7    Q.   So at least as of March of 2006, you
8  understood the contents of the specification and
9  figures in the 845 patent, right, because they're the
10 same as the 196?
11   A.   I -- yeah, I think that the -- the
12 filing was a continuation.
13   Q.   That's right.
14   A.   So I read the original, okay, and asked
15 ques -- questions on the original.  That's when I
16 filed under penalty of perjury.
17        I think when you file a continuation,
18 you don't make a statement.
19   Q.   That's not true.  And I -- if you'd
20 like, I'll get you the declaration.
21   A.   I don't know.  If -- if it's true that I
22 filed under penalty of perjury, then I guess I read it
23 and asked the questions.
24   Q.   Yeah, we have the declaration.  I'd just
25 as soon not mark a 300-page document, but --

Page 140

1    A.   Okay.
2    Q.   -- you did, in fact, sign a declaration,
3  swearing that you read and understood the application
4  and claims --
5    A.   Then I did read it, that's correct.
6    Q.   -- in 2006?
7    A.   That's correct.
8    Q.   Less than ten years ago?
9    A.   Less than ten years ago.
10   Q.   But you forgot that understanding in the
11 three years since then.
12        Right?
13   A.   That's correct.
14   Q.   Okay.  And again, if you just take a
15 look through the figures, if you can't understand the
16 figures and can't identify anything that -- that shows
17 a finger for scrolling or zooming, just say so.
18        But if you do see anything that, in your
19 understanding, supports the view that this patent
20 discloses a finger for scrolling or zooming, identify
21 it for me, please.
22   A.   Okay.  In my review -- I could review it
23 again -- my expertise -- I was unable -- I'm unable to
24 answer your question because I don't have the
25 expertise to understand all the language.

Page 141

1    Q.   Okay.  So you can't point to anything?
2    A.   Well, I pointed -- there -- there are a
3  couple places where manipulation is mentioned.  I may
4  have missed some.  There are places where scrolling is
5  mentioned.  There's places where zooming is mentioned.
6    Q.   Okay.  And did you mark the places where
7  manipulation was mentioned?
8    A.   I -- I -- there are two places that I
9  saw.  There may have been others that I missed.
10   Q.   Okay.  If you could just read into the
11 record the column and line number.  I know you've
12 marked them and that's an exhibit, which the court
13 reporter will keep, but if you could just read them
14 in -- the locations into the record.
15   A.   And again, I'm reading in the word
16 "manipulation" but not including any other references
17 which I did not understand.
18   Q.   Okay.
19   A.   I'm reading Column 3, Line 14, through
20 segmentation.  The page is divided into regions.
21 "Individual regions may then be brought into focus,
22 permitting simplified navigation interface and
23 manipulation of the data within that region."
24   Q.   Okay.  And where else did you see the
25 word "manipulate"?

36 (Pages 138 to 141)

Page 142

1      A.   This would be Column 5, Line 5.  Figure
2  5-B is a flow diagram of client side manipulation of a
3  segmented page in one embodiment of the invention.
4      Q.   Okay.  Did you see the word "manipulate"
5  anywhere else?
6      A.   I could not find it, but I would not say
7  that it's not in here.  But in the reading that I just
8  completed, I could not find --
9      Q.   Okay.
10      A.   -- another example, as I understand.
11      Q.   Understood.
12          Take a look at Figure 9-B, please.
13      A.   9-B?
14      Q.   Yeah.
15          Can you tell me what that is?
16      A.   9-B?
17      Q.   Yeah.
18      A.   Could you please repeat your question?
19      Q.   Yeah.
20          Can you tell me what Figure 9-B is?
21      A.   According to the specifications, Figure
22  9-B, "The contents of the focus window have been in
23  larger zoom such that only four advertisements are
24  displayed in ad cell 900."
25      Q.   Okay.  And that -- if you compare it to

Page 143

1  Figure 9-A, you can see that the words Guess,
2  Banana Republic, Patagonia, and Nordstrom.com are
3  bigger, right, in Figure 9-B?
4      A.   Than in 9-A?
5      Q.   Yes.
6      A.   Correct.
7      Q.   What's your understanding of how, in the
8  preferred embodiment described in the patent, the
9  system determined how much to enlarge the contents of
10  900?
11      MR. BECKER:  Object.  Form.
12      THE WITNESS:  I -- I'm not an expert, and it's
13  been a number of years since I've read and understood
14  that portion of the specifications.
15  BY MR. STEPHENS:
16      Q.   So you don't know?
17      A.   Well, at this moment, I don't know.  I
18  don't remember.
19      Q.   Do you recall what you had in mind when
20  you came up with the invention?
21      MR. BECKER:  Object.  Form.
22      THE WITNESS:  What I had in mind for zooming
23  and scrolling?
24  BY MR. STEPHENS:
25      Q.   How -- how the system would figure out

Page 144

1  how much to increase the size in zooming.
2      A.   Well, when we came up --
3          You're talking about the July --
4      Q.   Yes.
5      A.   -- timeframe?
6          Again, the manipulation of a region of a
7  screen, or finger manipulating or touching a region of
8  a screen for zooming and scrolling, was very broad.
9  It's the broadest interpretation that you could have
10  with that.
11      Q.   So you didn't -- you did not have in
12  mind a specific way of doing it.
13          Is that right?
14      A.   Well, I had in mind a way where you
15  would touch a screen, a region of a screen, for
16  zooming and scrolling --
17      Q.   And how would --
18      A.   -- yes.
19      Q.   How would the system figure out whether
20  you wanted to zoom or to scroll or to follow a link
21  when you touched the screen?
22      A.   Well, one embodiment it would be,
23  what -- whatever the user was doing in the
24  manipulation.
25      Q.   I don't understand.

Page 145

1      A.   Well, the -- the broadest definition of
2  manipulating a region of the screen for zooming and
3  scrolling, and it would include all the embodiments
4  within that definition.
5      Q.   So how would the system know when you
6  touched the screen whether you wanted it to zoom or to
7  scroll or to following a link instead?
8      A.   It would be the broadest
9  interpretation --
10      Q.   Okay.  So under --
11      A.   -- which would mean --
12      Q.   -- that broadest interpretation, how
13  would the machine --
14      A.   -- one embodi --
15      Q.   -- distinguish between those three
16  desires of the user when you touch the screen?
17      A.   You would -- you would touch the screen.
18  One embodiment would be how much you touched it, the
19  direction you touched it, for zooming and scrolling,
20  any embodiment.
21      Q.   And --
22      A.   There is any definition.
23      Q.   And you thought specifically about that,
24  about how you would distinguish between those three
25  kinds of touches?

37 (Pages 142 to 145)

1     A.   I don't recall what I thought.  That was
2   ten years ago.  I don't recall ten years ago.
3     Q.   Are you aware of any documents
4   whatsoever that record in any form, your conception of
5   manipulating a screen to zoom or scroll in July of
6   1999?
7     A.   No, I'm not.
8     Q.   Have you done anything to prepare for
9   this deposition today?
10    MR. BECKER:  I caution you not to disclose the
11  contents of any attorney-client communications on that
12  subject.
13    THE WITNESS:  I met with Rob for a couple of
14  hours yesterday.
15  BY MR. STEPHENS:
16    Q.   Is that all?
17    A.   Yes.
18    Q.   Okay.  Did you review any documents?
19    A.   No.
20    Q.   Okay.  Have you ever looked at the
21  documents that were produced in this case by EMG?
22    A.   Yes, I -- I have -- my general practice
23  is to review -- try to review all the documents.
24    Q.   Okay.  And when did you do that?
25    A.   As they were -- along the way --

1     Q.   Okay.
2     A.   -- when a document was prepared, I
3   would, in most cases, receive it, and I would, in most
4   cases, review it.
5     Q.   And you're not aware of any of those
6   documents that corroborate the conception of
7   manipulating a region of the screen for scrolling and
8   zooming in July of 1999.
9          Right?
10    A.   I cannot recall.  I've read -- I've read
11  a lot of documents in the last year.
12    Q.   And you don't remember ever seeing any
13  that disclosed that, other than the patents,
14  themselves?
15    A.   I -- I don't recall.
16    Q.   Okay.
17    A.   I mean, it's a lot of documents that I
18  reviewed.
19    Q.   Did you keep any records of that
20  conception in July?
21         You said you wrote it down.
22         Did you keep that?
23    A.   The records that I've kept, I produced.
24  So all the records that I would have in July would be
25  what I produced to you or would be what I produced to

1   Tom Coester.
2     Q.   Okay.  So if there was any corroboration
3   of --
4     A.   To my best belief.
5     Q.   If there was any corroborating evidence
6   of your conception of manipulating a region of the
7   screen for scrolling and zooming, it would be in those
8   documents?
9     A.   It would be in Tom -- given to
10  Tom Coester, given to you for the production of
11  documents.
12         And I believe we've done a thorough
13  search, not perfect, but I would believe they would be
14  in one of those two documents.
15    Q.   You asked Mr. Coester for his documents
16  in connection with this case?
17    A.   The attorney -- the -- I think the law
18  firm has done that.
19    Q.   Okay.  Is Mr. Coester involved in this
20  case at all?
21    A.   No.
22    Q.   He's not representing you today?
23    A.   No.
24    Q.   In any matter, is he representing you?
25    A.   Yes, there's an unrelated patent that

1   he's prosecuting for me.
2     Q.   Okay.  When was the last time you
3   communicated with Albert-Michel Long?
4     A.   Let me shut this off.  Sorry about that.
5   It won't happen again.
6          The last time, Albert called Grant,
7   maybe four months ago, five months ago, asked Grant
8   that he wanted to be in touch with me.
9          I don't remember whether he called me or
10  e-mailed me.  I did talk to him.  We arranged to have
11  a lunch shortly after that conversation.
12    Q.   So you had lunch with him four or
13  five months ago?
14    A.   I -- I think it was three, four,
15  five months ago.
16    Q.   Was that here in Los Angeles?
17    A.   Yes.
18    Q.   What did you talk about?
19    A.   I had not seen him for -- for many years
20  and -- or talked to him, probably since mid-2000.
21         He said to me that he had been solicited
22  by Fish & Richardson.  He said to me that he had
23  talked to two attorneys at Fish & Richardson, that
24  they wanted to engage him as a consultant.
25         He said that they were concerned that

38 (Pages 146 to 149)

Page 150

1　they did not have any 102 prior art; that they had one
2　piece of prior art which I think was in January of '99
3　that related to IBM and the invention of HTML, XML.
4　　　　　He told me the patent was very valuable,
5　and he gave an estimate of $250 million for the value
6　of the patents.
7　　　　　He said that their defense was going to
8　be just small things that they would throw up against
9　the wall to see what would stick.
10　　　　　And he asked me for some money and a
11　percentage of the -- of the profits.
12　Q.　Anything else?
13　A.　That's all I can recall at the moment.
14　　　　　Oh, he did say to me -- he called me
15　afterwards and said to me on the phone that he had had
16　several conversations with people at Apple.
17　Q.　Okay.　Anything else?
18　A.　I think that's all I can recall.
19　Q.　So let me make sure I got the timing
20　right, here.
21　　　　　Four to five months ago, he called
22　Grant, who asked -- and asked Grant to put him in
23　touch with you, and then they arranged to have lunch.
24　　　　　How did that arrangement happen?
25　A.　I -- I -- I testified that I think he

Page 151

1　called me or e-mailed me or texted me, and I think we
2　talked and we arranged to have lunch at Houston's in
3　Santa Monica.
4　Q.　So you had e-mails or calls with him
5　directly?
6　A.　I think -- I think so.　We arranged to
7　have this lunch.
8　Q.　I'm sorry.　Where was the place again?
9　A.　Houston's Restaurant on 2nd Street and
10　Wilshire.
11　Q.　Okay.　Do you remember anything else
12　from those e-mails or calls other than just saying,
13　Let's have lunch at Houston's?
14　A.　I think that's all I recall.
15　Q.　Okay.　Have you given those e-mails to
16　your attorneys?
17　A.　You know, I don't -- I don't -- I don't
18　think so.
19　Q.　Okay.
20　A.　And again, it may have been text
21　messages or phone calls.
22　Q.　Did you preserve those e-mails, if they
23　were e-mails?
24　A.　I -- I think I have them -- or text
25　messages.　If they were text messages, I wouldn't have

Page 152

1　them.
2　Q.　Why not?
3　A.　My phone crashed the other day.
4　Q.　Okay.
5　A.　And I had to buy a new iPhone.
6　Q.　And you didn't tell your lawyers about
7　those text messages before your phone crashed?
8　A.　Oh, I -- I think I may have.　I may
9　have -- I -- I've told him the story that I'm telling
10　you about Albert.
11　Q.　Okay.　And did they do anything to
12　collect those text messages before your phone crashed?
13　A.　I don't recall.
14　Q.　Okay.
15　A.　But the text messages would only be, you
16　know -- you know, See you at Houston's at 2:00, or
17　whatever it was.
18　　　　　It wasn't anything more than just
19　confirming that we were to have --
20　　　　　Now, I know he said to me, "I texted
21　you."
22　　　　　And I said, "I didn't get your text".
23　　　　　Or, "I e-mailed you."
24　　　　　"I didn't get your e-mail."
25　　　　　And I think I went back to check, and I

Page 153

1　think that it was -- it was gone to the junk mail, for
2　some reason.
3　Q.　Okay.　And did --
4　A.　I don't know if I -- I don't know if I
5　have those.　Some -- some of those in the junk mail, I
6　delete.
7　Q.　So you deleted them after you found
8　them?
9　A.　I -- I don't know.　I can't recall.　I
10　do delete my junk mail.
11　　　　　And I remember him saying, Well, I sent
12　you something.　And I went back to my computer and I
13　couldn't find anything.
14　　　　　So I checked, as I do periodically when
15　someone says they sent something.　And I remember that
16　it was -- I think there was some -- the confirmation
17　was in the junk mail.　And I do delete my junk mail.
18　Q.　So you deleted that message?
19　A.　I don't know.　I'd have to go back and
20　check.
21　Q.　All right.　Well, I'd ask you to go back
22　and check, and provide whatever communications you
23　had --
24　A.　Sure.
25　Q.　-- with Mr. Long to your lawyers.

1     A.   Uh-huh.
2     Q.   So you hadn't had any contact with him
3  at all since mid-2000, prior to this arrangement for
4  lunch.
5          Right?
6     A.   That's correct.
7          He also said something else.  He said
8  that Apple had been looking for him for some time and
9  had hired a private detective to track him down, and
10  that he -- this was all a recent -- they found him
11  recently.
12     Q.   Now, he said that to you when you were
13  arranging to have lunch or at lunch?
14     A.   I don't know if it was -- I think it was
15  at lunch.
16     Q.   Did you have any communication with
17  Mr. Long in connection with the filing of the 196
18  patent --
19     A.   196 patent --
20     Q.   -- that was filed in March of 2006?
21     A.   Well, I had not --
22          It was a continuation?
23     Q.   Yes.
24     A.   And I had not -- I had not had contact
25  with Albert Long from about mid-2000, when he left my

1  employment, until a few months ago.
2     Q.   Okay.  So you did not communicate with
3  him in connection with filing the 196 patent?
4     A.   That's correct.
5     Q.   Okay.  And then -- so other than
6  arranging to have lunch, you didn't have any
7  substantive communications with him until you had
8  lunch with him.
9          Is that right?
10     A.   That's correct.
11     Q.   Did he tell you why he wanted to have
12  lunch, before you had lunch?
13     A.   I don't recall.
14     Q.   Okay.  Now, you said he asked for money
15  and a percentage of the profits?
16     A.   Correct.
17     Q.   How much money did he ask for?
18     A.   He didn't specify.
19     Q.   What percentage of profits did he ask
20  for?
21     A.   He did not specify.
22     Q.   How did you respond?
23     A.   I turned him down.
24     Q.   Okay.  So you're not -- you didn't give
25  him any money?

1     A.   I gave no money, gave no percentage of
2  the profits.
3     Q.   Did you have any financial arrangement
4  with him, whatsoever?
5     A.   No.  None, whatsoever.
6     Q.   Is he being represented by your lawyers?
7     A.   No.
8     Q.   Okay.
9     A.   He intimated that -- that he was on your
10  payroll.
11     Q.   So he said he had been contacted by two
12  attorneys at Fish & Richardson.
13          Did he say who they were?
14     A.   No, but he -- he indicated that he had a
15  few phone calls with these attorneys from
16  Fish & Richardson.
17     Q.   Okay.  Did he say when those calls
18  happened?
19     A.   I -- I -- I would think it was recent,
20  because he -- he said that they had taken all this
21  time to find him with a private detective.  And so
22  I -- he didn't give me a date, but I would think it
23  was recent.
24     Q.   Okay.  Did you take any notes of your
25  call -- or excuse me -- your lunch --

1     A.   No.
2     Q.   -- discussion?
3     A.   No.
4     Q.   Did you record it in any fashion?
5     A.   No.
6     Q.   Now, you said that he said the patent
7  was valuable.
8          Was -- did you intend to say that he
9  said that Fish & Richardson lawyers said the patent
10  was valu -- valuable or that he was saying --
11     A.   He said.  He said the Fish & Richardson
12  lawyers seemed concerned.  He was a little concerned
13  or worried, and that -- as I testified before.
14     Q.   Well, no, that's what I'm trying to find
15  out, 'cause your testimony wasn't very clear.
16     A.   Okay.
17     Q.   Did he say that the Fish & Richardson
18  lawyers told him the patents were valuable or --
19     A.   No, he did not.  He said -- he valued
20  the patents at $250 million.
21     Q.   Did he explain anything about how he got
22  to that number?
23     A.   I did not ask him, he did not explain,
24  except he did say that it was valuable technology,
25  something like that.

Page 158

1    Q.   Okay.  So let me just recap what I think
2  you've told me he said and ask if you remember
3  anything else.
4    A.   Okay.
5    Q.   So he said he had been solicited by
6  Fish & Richardson, had talked to two attorneys at
7  Fish & Richardson that wanted to engage him as a
8  consultant.
9        He said that the Fish & Richardson
10  lawyers were concerned that they had no 102 art,
11  they had one patent by IBM, and that he --
12  Albert-Michel Long thought that the patent was
13  valuable, and that he thought it was worth
14  $250 million.
15        Then you said that he said the defense
16  was small things to throw up against the wall and see
17  what would stick.
18        Now, did Mr. Long tell you that the
19  Fish & Richardson lawyers told him that, or something
20  else?
21    A.   I believe he said the Fish & Richardson
22  lawyers told him that.
23    Q.   But again, he didn't say who they were?
24    A.   No, he did not.
25    Q.   And you don't know when that

Page 159

1  conversation occurred?
2    A.   I did ask them if it was you --
3    Q.   Yeah, and what did he say?
4    A.   "No" -- and Healey.
5    Q.   Did you ask him about anybody else?
6    A.   No.
7    Q.   You didn't ask about Mr. Lane?
8    A.   Did not.
9    Q.   Now, after you had lunch four or
10  five months ago --
11        Can you place -- actually, before I go
12  on, can you place it any more accurately than that,
13  four to five months ago?
14        Is there any event or anything else that
15  allows you to place it in time?
16    A.   Grant may remember, but you can ask him
17  tomorrow.
18    Q.   Sure.
19        Nothing else comes to your mind?
20    A.   Nothing else comes to my mind.
21    Q.   Okay.  Now, you had a phone call after
22  that.
23        How long after?
24    A.   I would, guess again, a couple of weeks.
25    Q.   What was the reason for that call?

Page 160

1    A.   He wanted to know if I thought about it
2  and changed my mind.
3    Q.   What did you tell him?
4    A.   "No."
5    Q.   And you said that Mr. Long told you in
6  that subsequent phone call, that he had had several
7  conversations with people at Apple.
8        Right?
9    A.   I believe it was in that phone call.
10    Q.   Okay.  Did he say who those people were?
11    A.   No.
12    Q.   Did he say when those conversations
13  occurred?
14    A.   No.
15    Q.   Did you infer that they had occurred
16  after the time you had lunch with him?
17    A.   I -- I -- I don't know if it was after
18  or before.
19    Q.   Did you understand him to be referring
20  to different conversations than the ones he had had
21  with the Fish & Richardson attorneys?
22    A.   I would guess and say, I think they were
23  separate, but he said there were several.
24    Q.   Okay.  Anything else that he said to you
25  on that call?

Page 161

1    A.   I do recall that I had asked him, I
2  think at lunch or somewhere there, that that -- was he
3  engaged by Fish & Richardson, or Apple.
4        And he told me "no."
5    Q.   I thought you said that he had intimated
6  that he was on the Fish & Richardson payroll.
7    A.   He did, but that was my conclusion.  But
8  I asked him, and he said "no."
9    Q.   Did he say why?
10    A.   I didn't ask him.
11    Q.   Did he say anything else about any
12  potential engagement with Apple or Fish & Richardson?
13    A.   No, but I -- I had asked him if he
14  wanted to be a consultant to us, and he said he'd
15  think about it.
16    Q.   Was that on the phone call after the
17  lunch or --
18    A.   I don't recall.
19    Q.   Do you remember anything else about
20  those conversations?
21    A.   No, I do not.
22    Q.   Have you had any other communications
23  with Mr. Long?
24    A.   No.
25    MR. STEPHENS:  Could you mark that, please,

41 (Pages 158 to 161)

Page 162

1  as --
2      THE WITNESS:  Do you want me to hold this
3  or --
4  BY MR. STEPHENS:
5      Q.  You can hold it.
6      MR. STEPHENS:  -- as E. Gottfurcht 2.
7      (Whereupon E. Gottfurcht Exhibit 2 was
8      marked for identification)
9  BY MR. STEPHENS:
10     Q.  Mr. Gottfurcht, you're an inventor on
11 this patent, as well.
12         Right?
13     A.  Correct.
14     Q.  And this patent, as we've discussed
15 already, is a continuation of the 845 patent.
16         Right?
17     A.  Yes.
18     Q.  And just for the record, this is
19 Exhibit E. Gottfurcht 2, which is U.S. patent
20 7,441,196.
21         Right?
22     A.  Yes.
23     Q.  Okay.  It says that it was assigned to
24 you and to the Grant Gottfurcht 2003 Irrevocable Trust
25 into the Marlo Longstreet 2003 Irrevocable Trust.

Page 163

1          Do you see that?
2      A.  Yes.
3      Q.  What's the Grant Gottfurcht 2003
4  Irrevocable Trust?
5      A.  Just what it says.  It's a
6  Grant Gottfurcht 2003 Irrevocable Trust.
7      Q.  Okay.  But I don't know what that means.
8          What is it?
9      A.  It's the trust that Grant has.
10     Q.  What's the purpose of the trust?
11     A.  It's Grant's trust.
12     Q.  What's the purpose of it?
13     A.  I -- I wouldn't know unless I read the
14 document, so --
15     Q.  Did you set it up?
16     A.  I was involved in setting it up, and
17 it's been, what, about seven years since that was set
18 up.
19     Q.  Was it set up specifically in connection
20 with this patent?
21     A.  I don't recall.
22     Q.  Does the Grant Gottfurcht 2003
23 Irrevocable Trust have any money in it?
24     A.  I -- you'd have to ask Grant.
25     Q.  Does it have --

Page 164

1          Have you ever contributed any assets to
2  it, money or otherwise?
3      A.  Well, there's the asset from -- the
4  patent asset.
5      Q.  Anything else?
6      A.  No.
7      Q.  Now, the patent asset has been
8  transferred from the Grant Gottfurcht Irrevocable
9  Trust.
10         Right?
11     A.  Yes.
12     Q.  Who did that?
13     A.  A law firm.
14     Q.  Are you a trustee?
15     A.  Of the trust?
16         No.
17     Q.  Who are the trustees?
18     A.  I -- I think now -- I haven't read it,
19 but I think it's -- Grant is a trustee of his and
20 Marlo is a trustee of hers, but I don't recall.
21     Q.  And who is Marlo?
22     A.  My daughter.
23     Q.  Just to be clear, are there any -- are
24 you aware of any assets that have ever been
25 transferred to either the Marlo Longstreet 2003

Page 165

1  Irrevocable Trust or the Grant Gottfurcht 2003
2  Irrevocable Trust, other than an interest in the
3  196 patent?
4      A.  And the 845 and other patents.
5      Q.  Okay.  Are you aware of any assets,
6  money or otherwise, that have ever been transferred to
7  those trusts, other than the patents?
8      A.  No.
9      Q.  Do those trusts have any financial
10 interest in the outcome of this lawsuit?
11     A.  They're members -- I believe they're
12 members of EMG.
13     Q.  What other members are there of EMG?
14     A.  It's -- it's -- the members of EMG
15 include myself in a revokable trust, Marlo and Grant
16 in their irrevocable trusts.
17     Q.  Any others?
18     A.  No.
19     Q.  Were those trusts set up for tax
20 reasons?
21     MR. BECKER:  To the extent that this requires
22 you to divulge advice from your attorneys, I'll
23 instruct you not to answer.
24     THE WITNESS:  Okay.
25     / / /

42 (Pages 162 to 165)

Page 166

```
1   BY MR. STEPHENS:
2        Q.   Were they set up for tax reasons?
3        A.   I will abide by what Mr. Becker said,
4   and it would be attorney-client privilege.
5        Q.   So you won't discuss your reasons for
6   being involved in setting up trusts for yourself and
7   your children.
8             Is that right?
9        MR. BECKER:  Same objection.
10       THE WITNESS:  Well, I'm not sure that was an
11  accurate description of what happened.
12  BY MR. STEPHENS:
13       Q.   I'm not understanding.
14       I -- I -- if you read the question back,
15  I -- maybe it needs to be rephrased.
16       Q.   Okay.  You said -- you testified that
17  you were involved in setting up the trusts for Marlo
18  and Grant.
19            Right?
20       A.   Involved in a -- you know, in a minor
21  way.
22       Q.   What was the way?
23       A.   I don't recall.  But I wasn't involved
24  in preparing the trusts, reviewing the trusts.
25       Q.   So you weren't involved in creating the
```

Page 167

```
1   trusts or reviewing the trusts?
2            You were not?
3        A.   I did not review the trusts.  I did not
4   prepare the trusts.
5        Q.   Well, you're not a lawyer.
6            Right?
7        A.   That's correct.
8        Q.   A lawyer prepared the trust.
9            Right?
10       A.   Yes.
11       Q.   And did you instruct the lawyer to
12  prepare the trust?
13       A.   I don't know who instructed the lawyer
14  to prepare the trust, whether it was Marlo, Grant, or
15  myself.
16       Q.   That's true for your trust, as well?
17            You don't know who --
18       A.   Well, my trust is different.  Mine's a
19  revokable trust, and I was -- I was 100 percent
20  involved --
21       Q.   Okay.
22       A.   -- in setting up that.
23       Q.   And why did you set up that trust?
24       MR. BECKER:  Same objection.  If it calls for
25  the advice of counsel to respond to that question, I
```

Page 168

```
1   would instruct you not to answer it.
2        THE WITNESS:  That's -- I will not answer it
3   because it's privileged, from my advice of my
4   attorney.
5   BY MR. STEPHENS:
6        Q.   Okay.  So there's -- you can't disclose
7   anything about why you set up the trust without
8   disclosing advice of counsel.
9             Is that right?
10       A.   Yes.
11       Q.   Okay.  Now, if you would turn to
12  claim 58 of Exhibit E. Gottfurcht 2, which is the 196
13  patent.
14            Could you explain for me, please, your
15  understanding of that claim?
16       MR. BECKER:  I'll caution you, if that
17  requires you to divulge the advice you received from
18  counsel, I'll instruct you not to answer it, to that
19  extent.
20       THE WITNESS:  It would require advice I
21  received from counsel.
22  BY MR. STEPHENS:
23       Q.   So you can't tell me anything about your
24  understanding of Claim 58 of the 196 patent without
25  divulging advice of counsel?
```

Page 169

```
1        A.   I believe so.
2        Q.   Is that true for all the other claims?
3        A.   Yes.
4        Q.   If you would take a look at --
5        MR. BECKER:  Just for the record, I also
6   object under Rule 2.5, but it appears that that's not
7   necessary.
8        MR. STEPHENS:  Okay.
9   BY MR. STEPHENS:
10       Q.   If you would look at Claim 66.  It's on
11  the very last page.
12       A.   Uh-huh.
13       Q.   It refers to a primary navigation
14  option -- or rather, primary navigation options.
15            Do you see that?
16       A.   Claim 66?
17       Q.   Yes.
18       A.   Yes.
19       Q.   What's your understanding of a primary
20  navigation option?
21       MR. BECKER:  Same objections.
22       THE WITNESS:  It's defined in the patent.
23  BY MR. STEPHENS:
24       Q.   Okay.  Can you point me to where?
25       A.   Sure.  It's on Column 7, Line 47 -- 46.
```

1    Q.   "Primary navigation options as used
2  herein are those navigation options that necessarily
3  change between successive matrix layers changing from
4  general to more specific with increases in depth in
5  the matrix."
6         Is that what you're referring to?
7    A.   Yes.
8    Q.   What does that mean, an option that
9  necessarily changes between successive matrix layers?
10       MR. BECKER:   Same objections.
11       THE WITNESS:   And that would be
12  attorney-client privilege.
13  BY MR. STEPHENS:
14   Q.   So you can't tell me anything about your
15  understanding of that phrase without revealing
16  attorney-client privileged information.
17       Is that right?
18   A.   I do not believe so.   I -- I -- I
19  believe that that's something which I had reviewed
20  early on with Tom Coester.
21   Q.   That same quote that I read refers to
22  increases in depth in the matrix.
23       What does -- what does the depth of the
24  matrix mean?
25   A.   Well, I'll go to, from July 1st to

1  July 7, what I would think about at that time.
2    Q.   Okay.
3    A.   And at that time, one of the embodiments
4  would be that there would be a drill-down from general
5  to more specific.
6    Q.   Kind of like Yahoo had at the time?
7    A.   Pardon me?
8    Q.   Like Yahoo had at the time --
9         MR. BECKER:  Object to form.
10  BY MR. STEPHENS:
11   Q.   -- where you have categories and you can
12  get more specific?
13   A.   Right.
14   Q.   Okay.
15   A.   It would be like that.
16   Q.   And depth refers to how many links in a
17  hierarchy of categories, something like that?
18   A.   At that particular moment in time, I
19  would think that -- probably thought that that was an
20  embodiment that I had thought about during the period
21  of July 1st to July 7, 1999.
22   Q.   Okay.  And that -- that's what you meant
23  when you said, in some of your documents in that
24  period, that you were working on a filtered Yahoo.
25       Is that right?

1    A.   I don't recall that.
2    Q.   You don't remember that?
3         Okay.  We'll get to that.
4         Now, earlier, you mentioned Online Labs
5  and that that was where Albert-Michel Long was
6  employed.
7         Is that right?
8    A.   I don't know what his relationship with
9  Online was, whether it was an employee or consultant.
10   Q.   What was Online Labs' role in connection
11  with your invention?
12   A.   They were referred to me by legal
13  counsel.
14   Q.   Mr. Coester?
15   A.   No, by Jill Pitrini at -- at Manatt.
16   Q.   How do you spell that name?
17   A.   G -- G -- J-i-l-l.
18   Q.   J-i-l-l?
19   A.   Yeah.
20   Q.   What's the last name?
21   A.   P-i-t-r-i-n-i, I believe.
22   Q.   Jill Pitrini?
23   A.   Yes.
24   Q.   Okay.  And how did that happen?
25       How did Jill Pitrini happen to refer

1  Online Labs to you?
2    A.   I decided sometime, I think in July,
3  that I would need to engage experts, for them to
4  prepare their component, another component of the
5  invention, other than what Grant and I had supplied to
6  Tom Coester.
7         So I wanted to engage consultants,
8  experts that could work on preparing a document for
9  Tom Coester pertaining to some of the components of
10  the invention.
11   Q.   What components are you referring to?
12   A.   It was ten years ago, and I was guessing
13  that it was -- would have to do with some of the
14  technology, the HTML, XML technology.
15   Q.   Did you have any understanding of HTML
16  prior to your interaction with Online Labs?
17   A.   I did not have any knowledge of it prior
18  to meeting Tom Coester.  So my knowledge of it would
19  have been from Tom Coester.  My understanding would
20  have been from Tom Coester prior to hiring
21  Online Labs.
22       And I don't recall what that -- what --
23  that knowledge I would have had or understanding I
24  would have had during that period of time in 1999.
25   Q.   What was Manatt's role in your

Page 174

1  invention?
2     MR. BECKER:  I'll instruct you, to the extent
3  it requires you to divulge any privileged
4  conversations or advice, I instruct you not to answer.
5     THE WITNESS:  I don't believe they were
6  involved in the invention at all other than a
7  referral.
8  BY MR. STEPHENS:
9     Q.  And how did you happen to get the
10 referral from Manatt?
11    MR. BECKER:  Same instruction.
12    THE WITNESS:  Can I answer that?
13    MR. BECKER:  As long as you don't divulge the
14 contents of our privileged conversation.
15    THE WITNESS:  Jill recommended Tom Coester and
16 recommended Online Labs, and I had been a client of
17 Manatt for many years.
18 BY MR. STEPHENS:
19    Q.  In patent matters or other things?
20    A.  No, real estate matters.
21    Q.  So what happened next after you were
22 introduced to Online Labs?
23    A.  I asked them to assemble a group of
24 experts that I could work with, that Tom Coester could
25 work with, to prepare a component which -- of the

Page 175

1  invention, write a report, and to give that
2  information to Tom Coester, who would write the patent
3  document.
4     Q.  And when did you ask him to do that?
5     A.  I'm guessing it was in July or early
6  August of 1999.
7     Q.  Okay.  Who wrote the application that
8  led to the 845 patent?
9     A.  The application?
10    Q.  Yeah.
11    A.  Tom Coester would have written the -- he
12 would have prepared the patent document.
13    Q.  Now, was Tom Coester at
14 Morrison & Foerster at the time?
15    A.  No, Blakely Sokoloff.
16    Q.  Did you change law firms during the
17 course of prosecution of the 845 patent?
18    A.  I think the prosecution was over with.
19 I believe it was over with.  And I -- I believe that
20 the board had written its report, its brief, reversing
21 the examiner's decision.
22       It was on that process, several-month
23 process where it goes back to the examiner.
24    Q.  And that's when you changed law firms?
25    A.  I believe so.

Page 176

1     Q.  And why did you change?
2     A.  That's attorney-client privilege.
3     Q.  So you -- you changed on advice of
4  counsel?
5     A.  No, I'm saying that it was
6  attorney-client privilege.
7     Q.  Well, your decision to change counsel is
8  not attorney-client privileged unless you did it
9  because an attorney advised you to do it.
10    A.  It --
11    Q.  If you made up -- if you made up your
12 own mind to do, it's not privileged.
13    A.  Okay.  I -- it was in conversation with
14 Tom Coester.
15    Q.  And you can't tell me what the reason
16 was without revealing --
17    A.  Well, I -- I may be able to, if I can go
18 off record and speak to --
19    Q.  Sure.
20    A.  Because I don't mind telling you.  It's
21 just, I want to make sure I do it right.
22    Q.  Okay.
23    MR. BECKER:  Is this a good time for a break,
24 anyways?
25    MR. STEPHENS:  Sure.

Page 177

1     THE VIDEOGRAPHER:  This marks the end of tape
2  Number 2 in the deposition of Elliot Gottfurcht.
3       Going off the record.
4       The time is 3:02 p.m.
5       (Whereupon a recess was taken)
6     THE VIDEOGRAPHER:  Back on the record.
7       Here marks the beginning of tape
8  Number 3 in the deposition of Elliot Gottfurcht.
9       The time is 3:32 p.m.
10 BY MR. STEPHENS:
11    Q.  Mr. Gottfurcht, before the break, we
12 were talking about Online Labs, and you mentioned that
13 you had asked them to assemble some experts to put
14 together a report that would then work -- Mr. Coester
15 would then use, in part, to draft the patent document.
16       Right?
17    A.  Yes.
18    Q.  And Online Labs did that.
19       Right?
20    A.  Yes, they did.
21    Q.  And that report was dated sometime in
22 October.
23       Does that sound right?
24    A.  That sounds about right.
25    Q.  Did they have an ongoing involvement

Page 178

1 after that?
2      A.   No, after they -- the co-inventors
3 signed off on the patent application, that terminated
4 their engagement, and I continued to engage
5 Albert Long.
6      Q.   So Online --
7           Well, I guess -- let me -- let me back
8 up.
9           Did Online Labs ever try to actually
10 implement anything for you?
11     A.   No.
12     Q.   Did Mr. Long separate from whatever
13 relationship he had with Online Labs at that point?
14     A.   Yes, I believe so.
15     Q.   And he worked directly for you at that
16 point?
17     A.   Yes.
18     Q.   And how long did he continue to work for
19 you?
20     A.   This would have been from approximately
21 November 1999, approximately May of 2000.
22     Q.   So Mr. Long worked directly for you from
23 November '99 to about May of 2000?
24     A.   Correct.
25     Q.   About six months?

Page 179

1      A.   That would be correct.
2      Q.   And what did Mr. Long do for you in that
3 period?
4      A.   He worked on the -- the 845 patent and
5 another patent that we had filed where Mr. Long was a
6 co-inventor.
7      Q.   What was that other patent?
8      A.   I think it was "Make My Tune" patent.
9      Q.   What was that about?
10     A.   That was about converting a photograph
11 on the fly into a cartoon.
12     Q.   Did you get a patent on that?
13     A.   No.
14     Q.   How many other patents do you have
15 that -- or sorry, let me ask it differently.
16          How many patent applications have you
17 filed that claim priority to the parent of the patents
18 in this lawsuit, in other words, the 497 that was
19 filed in November 1999?
20     A.   Can you rephrase the question?
21     Q.   Yeah.
22          How many applications have you filed
23 that are based in any way on the 497 patent that was
24 originally filed in November of 1999?
25     A.   I don't recall.

Page 180

1      Q.   More than three?
2      A.   Yes.
3      Q.   More than five?
4      A.   Yes.
5      Q.   More than ten?
6      A.   I don't recall.
7      Q.   How many patents have issued in that
8 family?
9      A.   Four.
10     Q.   So at least some have gone abandoned.
11 Right?
12     A.   Yes.
13     Q.   Have you instructed your lawyers to turn
14 those documents over, the -- the patent filings and
15 the -- file histories for those abandoned
16 applications in this litigation?
17     A.   I don't believe so.
18     Q.   Okay.
19     MR. STEPHENS:  We need those, Rob.  We should
20 have had those before this deposition.
21     THE WITNESS:  Are -- are you -- let me just
22 clarify something.
23          Are you talking about new -- new
24 specifications or off the same original
25 specifications?

Page 181

1 BY MR. STEPHENS:
2      Q.   I'm talking about anything that claims
3 any benefit of any kind from the original filing of
4 the 497, whether it's a continuation in part or merely
5 a related application that says, This is a related
6 application.
7      A.   Or a continuation?
8      Q.   Or a continuation.
9      A.   So you're talking about any continuation
10 of the 845?
11     Q.   For the 497.
12     A.   For the 497?
13     Q.   Yes.
14     A.   Okay.
15     Q.   So between five and ten is your best of
16 how many applications --
17     A.   I -- I -- I can't recall how many.  I
18 think there may have been more than ten.
19     Q.   I've seen a document, and we'll probably
20 look at it here in a minute, that said you had 30
21 patent applications pending.
22          Does that ring a bell?
23     A.   I don't call -- recall how many, but
24 there were a number of applications that were pending.
25     Q.   Could there have been 30 applications?

46 (Pages 178 to 181)

Page 182

1      A.   There could have been.
2      Q.   Could there have been 30 relating to the
3   497 family?
4      A.   There could have been.
5      Q.   So four have issued.
6           Do you know how many remain pending?
7      A.   I -- I think the two continuations.
8   There are two continuations pending.
9      Q.   So it's possible that dozens of
10  applications relating to the 497 patent have gone
11  abandoned.
12          Is that right?
13     A.   I don't know dozens, but there are a
14  number of them.
15     Q.   Potentially more than 20.
16          Right?
17     A.   There -- it could be.
18     Q.   And did you make the decision to abandon
19  the applications that went abandoned?
20     A.   That would have been attorney-client
21  privilege.
22     Q.   No, I don't think so.  Whether or not
23  you're the person that makes the decision is not
24  attorney-client privilege.
25     A.   Well --

Page 183

1      Q.   I'm not asking what the decision was or
2   the basis for it.  I'm asking whether you made that
3   decision.
4      A.   Oh, did I make the decision to abandon
5   them based upon --
6      Q.   I'm not asking what it was based on.
7      A.   Oh.
8      Q.   I'm just asking whether you made the
9   decision at all.
10     A.   Did I make the -- yes, I did.
11     Q.   And I think you already testified that
12  after May of 2000, Albert-Michel Long didn't have any
13  contact with you -- is that right -- until --
14     A.   Approximately, that's correct.
15     Q.   Did you make any efforts to build your
16  invention --
17          I guess maybe I -- let me ask it
18  differently.
19          When did you first start making efforts
20  to build your invention?
21          MR. BECKER:  Object.  Form.
22          THE WITNESS:  I'm not qualified to -- I'm not
23  an expert.  I'm not qualified to answer that question.
24  BY MR. STEPHENS:
25     Q.   When did you first start efforts to make

Page 184

1   any sort of prototype?
2      A.   I think it would have been approximately
3   2000.
4      Q.   And how did you do that?
5      A.   It -- it would have been part of the
6   documents that we produced to you.  So I would have
7   engaged experts to put together the prototypes.
8      Q.   And who did you engage?
9      A.   I don't remember the first expert.  But
10  there were different editions of what I later called
11  MallTV.
12          And I don't recall who I used for the
13  first edition, but I have used Rick Soss for many
14  years, that would have done other editions.
15     Q.   When did you first engage Mr. Soss?
16     A.   I do not recall, but it's been a number
17  of years.
18     Q.   And what kinds of things has Mr. Soss
19  done for you?
20     A.   He did Flash.  I believe that his work
21  product was produced to you in a DVD.
22     Q.   Is that work product that was produced
23  to us the only things he's ever done for you?
24     A.   I -- I don't recall, but it was the bulk
25  of what he has performed.

Page 185

1      Q.   And has he -- when you say he did Flash,
2   you mean the Adobe animation product?
3      A.   Yes.
4      Q.   And what was he using Flash to do?
5      A.   The -- the prototype.  He was developing
6   a prototype.
7      Q.   Is Mr. Soss involved in this litigation?
8      A.   No.
9      Q.   Has he done any work for your lawyers?
10     A.   No, not that -- not that I believe so.
11     Q.   Has he done any work, either directly or
12  indirectly, at the direction of your lawyers?
13     A.   I don't believe so.
14     Q.   And he's not a lawyer, himself?
15     A.   No.
16     Q.   Now, you mentioned the first edition of
17  the prototype.  That was Fogie & Jack.
18          Is that right?
19     A.   I don't recall if it was Fogie & Jack,
20  or if it was MallTV.  I don't recall.  It would have
21  been done nine or ten years ago.
22     Q.   Can you tell us what Fogie & Jack was?
23     A.   It was just two animated characters that
24  would demonstrate the displaying of the reformatted
25  Web pages on television and wireless devices.

Page 186

1    Q.   And you were going to try and hire
2  Jack Nicholson or Jack Lemon to play the role of Jack.
3        Is that right?
4    A.   You know, there may have been a
5  conversation like that.  It was more of a marketing
6  discussion.
7    Q.   Did you ever approach either of them?
8    A.   No.
9    Q.   Did you approach any other actors to
10 play any roles in connection with your invention?
11   A.   No.
12   Q.   Did you ever discuss the details of your
13 patents with Mr. Soss?
14   A.   I don't recall.
15   Q.   Did you ever discuss the claims with
16 him?
17   A.   I don't recall.
18   Q.   How do you normally communicate with
19 Mr. Soss?
20   A.   Telephone calls and e-mails.
21   Q.   How many e-mail accounts do you use?
22   A.   One.
23   Q.   What's the e-mail address?
24   A.   Elliot@MallTV.com.
25   Q.   Have you ever used any other e-mail

Page 187

1  addresses?
2    A.   I -- I think so.
3    Q.   What other ones?
4    A.   I -- I don't recall.
5    Q.   When's the last time that you used an
6  e-mail address other than Elliott@MallTV.com?
7    A.   Several years.
8    Q.   When you say several --
9    A.   Several years ago.
10   Q.   -- more than two?
11   A.   Oh, yes.
12   Q.   Okay.  More than four?
13   A.   Yeah, I believe so.
14   Q.   Do you communicate with Mr. Soss using
15 your iPhone?
16   A.   I don't recall having done that, but
17 it's possible.
18   Q.   Do you communicate with Mr. Soss using
19 voicemail?
20   A.   If he has a voicemail on his -- on his
21 line, which I think he does, I would have left
22 messages for him.
23   Q.   And do you recall what e-mail address
24 you used for Mr. Soss in your e-mailing him?
25   A.   No, I do not.

Page 188

1    Q.   Do you know if it's more than one?
2    A.   I think it's just one e-mail.
3    Q.   Did you have any conversations with
4  Mr. Soss about preserving evidence in connection with
5  this case?
6    A.   I asked him to prepare a DVD of all his
7  work product that we have produced for you.
8    Q.   Did you ask him to prepare a DVD
9  including his e-mails with you?
10   A.   I think I've submitted the e-mails I've
11 had with him.
12   Q.   But I'm asking whether you collected
13 e-mails from him.
14   A.   No.
15   MR. STEPHENS:  Rob, I'd ask you to do that.
16   MR. BECKER:  From Mr. Soss?
17   MR. STEPHENS:  Yeah.
18       You don't have to if you don't want
19 to --
20   MR. BECKER:  No, I --
21   MR. STEPHENS:  -- but we'll certainly subpoena
22 him.
23   MR. BECKER:  I can do that.
24 BY MR. STEPHENS:
25   Q.   So you didn't -- you didn't tell

Page 189

1  Mr. Soss he needed to pre -- preserve his e-mails?
2    A.   No, I did not.
3    Q.   Okay.  But you did tell him to collect
4  his Flash work product?
5    A.   His work product.
6    Q.   Okay.  Did you tell him to preserve his
7  work product?
8    A.   I told him to put his work product on a
9  DVD, which we, I believe, delivered to you.
10   Q.   And that only goes back to about 2006.
11       Is that as long as he's been working for
12 you?
13   A.   I don't recall.
14   Q.   So there may be work product from before
15 that time?
16   A.   There may be work product, but I --
17       I asked him to put together his Flash
18 work product because it was difficult for us to do
19 that.
20       But I produced work product from him
21 that you would have in our work product, and I don't
22 know if that goes back before.
23   Q.   Okay.
24   A.   But -- but I did ask Mr. Soss to prepare
25 his work -- his Flash work product in particular.

48 (Pages 186 to 189)

1    Q.   Has he been continuing to develop the
2  MallTV.com website during the course of this
3  litigation?
4    A.   No, we have -- we've put it on hold.
5    Q.   When did you put it on hold?
6    A.   I would say about the time that the
7  litigation commenced.
8    Q.   What did you tell Mr. Soss about that?
9    A.   I don't recall if I told him anything.
10    Q.   How did it get put on hold?
11    A.   I just didn't call him to do additional
12  work.
13    Q.   I see.
14         And he didn't have any projects
15  outstanding?
16    A.   He didn't -- pardon me?
17    Q.   He did not have any projects outstanding
18  at the time the litigation commenced?
19    A.   Any projects?
20    Q.   Changes to the MallTV.com site?
21    A.   I -- I think that we didn't change the
22  MallTV.com site except that -- at the bottom of it
23  where it says "copyright," we added 2009, at the
24  bottom of the web page.
25         I don't know if he did it for the mobile

1  site.  He may have made that change for the mobile
2  site.
3    Q.   When did the iPhone version of MallTV go
4  online?
5    MR. BECKER:  Object.  Form.
6    THE WITNESS:  I don't recall.
7  BY MR. STEPHENS:
8    Q.   Was it 2008?
9    A.   It's possible 2008.
10    Q.   2007?
11    A.   It's possible.
12    Q.   2009?
13    A.   No, I think it was 2007, 2008.
14    Q.   Okay.  Who else has been involved in
15  constructing prototypes of your invention for you?
16    A.   Bob Bajor -- Bajaris at Art & Logic.
17    Q.   How do you spell his last name?
18    A.   I -- I don't recall.
19    Q.   Okay.  B-a-j-a-r-i-s or something like
20  that?
21    A.   Something like that.
22    Q.   Now, did you say that Mr. Soss is at
23  Protovu?
24         Was that the name?
25    A.   Protovu is his company.

1    Q.   Anyone else besides Mr. Soss and
2  Mr. Bajaris that was -- has been involved in creating
3  prototypes for you?
4    A.   I think that was -- that was -- it was
5  just those two.
6    Q.   Who is Angel Gulermovich?
7    A.   She works for Art & Logic.  She was a
8  consultant for Art & Logic.
9    Q.   And who is Daisy Trayham?
10    A.   She is also a consultant for
11  Art & Logic.
12    Q.   Are there any other people that have
13  been involved in creating prototypes for you?
14    A.   I think that Angel's -- was not involved
15  in prototypes.  I think that Daisy was involved in the
16  mobile site, working under the direction of -- of Bob.
17    Q.   What was Angel's role?
18    A.   She was a -- a consultant for
19  Art & Logic.
20    Q.   But what was her role in connection with
21  any project for you?
22    A.   I think she was just someone that Bob
23  had said had some knowledge, may have wanted to talk
24  to her.
25    Q.   And did you talk to her?

1    A.   I did.
2    Q.   And what was the nature of that
3  conversation?
4    A.   I discussed certain components of the --
5  that were on my mind.
6    Q.   What components?
7    A.   I don't recall.  I think one had to do
8  with transcoding.
9    Q.   Anything else?
10    A.   I don't recall.  There may have been
11  something else.
12    Q.   And how did you come to talk to Angel
13  about transcoding?
14    A.   Bob had recommended that if I wanted to
15  have discussions, that she was a knowledgeable person
16  and she's located in Los Angeles, and that I could
17  have some conversation with her.
18    Q.   About transcoding specifically?
19    A.   No, just about whatever, generally, that
20  I -- you know, would come to my mind.
21    Q.   What's -- what kind of work has
22  Art & Logic, generally speaking, done for you?
23    A.   They've done -- the bulk of the work was
24  that they had prepared the -- the mobile website,
25  MallTV mobile website.

Page 194

1  Q. That includes the iPhone portion?
2  A. Yes.
3  Q. And there are other portions, as well?
4  A. I think so. I think it could be
5  accessed from a BlackBerry.
6  Q. So Mr. Soss did the Flash prototype, and
7  Art & Logic did the mobile por -- version.
8  Is that right?
9  A. Art -- they may have worked together on
10 some of the layout, put them in touch with each other.
11 Q. Now, Flash is not XML.
12 Right?
13 A. I -- I don't believe so.
14 Q. How many discussions did you have with
15 Angel?
16 A. A guess, a half a dozen.
17 Q. And when did those -- what period did
18 those take place?
19 A. I think they took place in 19 -- 2008.
20 Q. All of them in 2008?
21 A. I believe so.
22 Q. You talked to her about transcoding.
23 Do you remember any -- anything else
24 that you talked to her about?
25 A. I do not recall. I may have talked to

Page 195

1  her about some other things. I just don't recall.
2  Q. So what do you remember about your
3  discussions with her?
4  A. I wanted to ask her just -- I'm very
5  curious about -- about mobile websites and -- and
6  things like that, and I -- if I had a question during
7  that period of time, I'd call her up and I would ask
8  her.
9  Q. Did Angel do any work for your lawyers?
10 A. No, I don't believe so.
11 Q. Did she do any work directly or
12 indirectly under their direction or control?
13 A. No, not -- not that I can recall. I
14 don't believe so.
15 Q. Did Mr. Bajaris do any work for your
16 lawyers?
17 A. No, I don't believe so.
18 Q. Did anyone at Art & Logic do any work
19 for your lawyers?
20 A. I do not believe so.
21 Q. Is that also true for the people at
22 Protovu?
23 A. Yes.
24 Q. So they really had no involvement in
25 this lawsuit?

Page 196

1  A. That's correct.
2  Q. Or any other lawsuit.
3  Is that right?
4  A. Any other lawsuit?
5  Q. Yeah.
6  A. Any other lawsuit --
7  Q. Involving you, I should say.
8  A. No.
9  Q. Okay.
10 MR. STEPHENS: Rob, I was asking you about
11 preserving Mr. Soss' e-mails, and you -- you said you
12 don't have any obligation to do that.
13 Do I understand that right?
14 MR. BECKER: I just --
15 The question is to me?
16 MR. STEPHENS: Yeah.
17 MR. BECKER: That's what I think I said.
18 MR. STEPHENS: Well, do you have an ob -- do
19 you believe that --
20 MR. BECKER: I have --
21 MR. STEPHENS: -- you or Mr. Gottfurcht have
22 an obligation to preserve?
23 MR. BECKER: I -- I don't know. I -- I
24 wouldn't -- I haven't been handling that, so I would
25 have to consult with the others.

Page 197

1  But I -- I don't think he's an employee
2  of Elliot's. He's a consultant that works for another
3  firm.
4  COURT REPORTER: I don't think he's an
5  employee of what?
6  MR. BECKER: He's an employee of
7  Mr. Gottfurcht's, but rather, a consultant that
8  works for someone else.
9  BY MR. STEPHENS:
10 Q. Is he an employee of EMG, Mr. Soss?
11 A. Oh, no.
12 Q. Okay. Have you ever corresponded with
13 Mr. Soss at the request of Manatt?
14 A. Request of who?
15 Q. Your lawyers.
16 A. No.
17 MR. STEPHENS: Rob, is Manatt representing
18 Mr. Soss?
19 THE WITNESS: No.
20 MR. BECKER: No.
21 BY MR. STEPHENS:
22 Q. Okay. Is Manatt representing any of the
23 folks at Protovu?
24 A. No.
25 Q. Are they representing any of the people

50 (Pages 194 to 197)

Page 198

1  at Art & Logic?
2      A.   No.
3      Q.   Did you ask any of the people at
4  Art & Logic to preserve their documents?
5      A.   No.
6      Q.   Have you collected any documents from
7  the people at Art & Logic?
8      A.   I think I produced them.
9      Q.   What did you produce?
10     A.   Well, it would be in my production of
11  documents, so I -- I don't recall.  There were, I
12  think, thousands of pages.
13     Q.   So your recollection is that you
14  collected and produced thousands of pages from the
15  people at Art & Logic?
16     A.   No, not thousands of pages from them,
17  but I -- my recollection is that we produced our
18  documents from Art & Logic.
19          I'm not sure the -- the mobile website,
20  I'm not sure that we produced that in a DVD.
21     Q.   Okay.  So you have not -- let me -- you
22  have not, as you understand it, produced the mobile
23  website in code form.
24          Is that right?
25     A.   I believe that's correct.

Page 199

1      Q.   Okay.  Have you collected it from
2  Art & Logic?
3      A.   No.
4      Q.   Who actually operates the MallTV.com
5  server?
6      A.   I do not know.
7      Q.   Who do you talk to when you want to have
8  changes made to it?
9      A.   I -- I talk to Bob.
10     Q.   Who actually owns the MallTV.com site?
11     A.   I would think that -- that -- that I own
12  it.  That's my guess.
13     Q.   You, Mr. Gottfurcht, personally?
14     A.   Well, I -- I never thought about it, but
15  I would assume that I do.
16     Q.   Okay.  It's not the property of EMG?
17     A.   Well, it -- it -- it -- it may be but it
18  may not be.  I'd have to go check the records, whether
19  it was assigned over to them or not.
20     Q.   If you asked Mr. Bajaris to collect the
21  code from MallTV.com and give it to you, he would do
22  that, though.
23          Right?
24     A.   I would think so, yes.
25     Q.   You just haven't done that?

Page 200

1      A.   Correct.
2      Q.   And you mentioned that you use
3  Elliott@MallTV.com as your -- your only e-mail.
4          Is that right?
5      A.   That's correct.
6      Q.   What steps have you taken to preserve
7  e-mails?
8      A.   Over what period of time?
9      Q.   Since you first contemplated this
10  litigation.
11     A.   Oh, I -- I -- I would have -- I believe
12  I would have them all.
13     Q.   Well, you testified earlier that you
14  delete e-mails.
15          Right?
16     A.   No, no, I was talking about deleted
17  e-mails.  I was talking about junk e-mails, deleted
18  e-mails.
19     Q.   But you were talking --
20     A.   Those, I delete.
21     Q.   You deleted junk e-mails that included
22  e-mails from Mr. Long.
23          Right?
24     MR. BECKER:  Object.  Form.
25     THE WITNESS:  No, I'm -- I -- I -- if I did,

Page 201

1  that was inadvertent.
2  BY MR. STEPHENS:
3      Q.   Okay.  Now I'm asking you what steps
4  you've taken to prevent that kind of inadvertent
5  deleting of relevant e-mails from happening.
6      A.   Oh, well, I have them on my computer.
7      Q.   Except the ones you've deleted.
8          Right?
9      A.   That's correct.  That's the only --
10     Q.   Okay.  What -- what -- what changes did
11  you make in your normal activities with respect to
12  e-mail after you contemplated litigation in this case?
13     A.   I haven't made any changes.
14     Q.   Okay.  So you've continued to delete
15  e-mails --
16     A.   No, no, no.  Well, I -- I have the
17  e-mails.  I -- I -- from my recollection, I have
18  reserved all the e-mails.
19     Q.   Except the ones from Mr. Long that went
20  into your junk e-mail folder.
21          Right?
22     A.   I said I may have -- I do delete e-mails
23  that go into -- to the -- the junk e-mail.
24     Q.   Okay.
25     A.   And so I -- I don't know if the one that

51 (Pages 198 to 201)

Page 202

1  he sent was one that I had deleted.
2      Q.   Okay.  But he told you he sent some
3  e-mails --
4      A.   He said, "I sent you an e-mail."
5          And I said -- I said, "Oh, I didn't
6  receive an e-mail."
7          But then I went back and I looked, and
8  it was in my junk e-mail.
9          Now, I thought that his e-mail would be
10  Albert Long, so that's what I looked for, but it
11  wasn't.  It was some initials.
12         And so it's possible it went in there
13  automatically or it's possible that when I delete junk
14  e-mails, that I wasn't familiar with it and I would
15  have deleted it.
16     Q.   Did you or -- see an e-mail from him or
17  not in your junk e-mail?
18     A.   Yeah, I did.  I went back to junk e-mail
19  and it was, like, confirmed for Hous --
20         Oh, I think he -- he may have asked,
21  "Are you talking about the Houston's in Century City
22  or the Houston's in Santa Monica?"
23         I think -- I remember getting something
24  like that.
25     Q.   Okay.  And then you think you may have

Page 203

1  deleted it?
2      A.   I may or may not have deleted it.
3      Q.   Okay.  Have you taken any steps to
4  preserve voicemails?
5      A.   No, but I seldom receive messages by
6  voicemail.
7      Q.   Have you taken any steps to preserve
8  text messages?
9      A.   No.
10     Q.   And you did receive some from Mr. Long
11  that you deleted, right, or they --
12     A.   If there were text messages on my phone,
13  whatever he sent me on my phone, I lost because my
14  battery went dead and I had to go buy a new iPhone.
15     Q.   Okay.  And you didn't take any steps to
16  preserve those.
17         Right?
18     A.   Oh, in between?
19     Q.   Yes.
20     A.   No, I did not.
21     Q.   Okay.  And you're not taking any steps
22  now to preserve text messages or voicemail messages.
23         Right?
24     A.   That's correct.
25     MR. STEPHENS:  I'd like that marked, please.

Page 204

1      (Whereupon E. Gottfurcht Exhibit 3 was
2      marked for identification)
3      THE WITNESS:  Do you want me to keep those,
4  still?
5  BY MR. STEPHENS:
6      Q.   Yes, you can keep those.
7          The court reporter has handed you the
8  exhibit marked E. Gottfurcht 3, and that's
9  U.S. Patent 6,604,97.
10         Right?
11     A.   That's correct.
12     Q.   And you're an inventor on that patent.
13         Right?
14     A.   Yes.
15     Q.   And that's the parent to the two patents
16  in this lawsuit.
17         Is that right?
18     A.   Yes.
19     Q.   I'm reminded that we took a break
20  sometime earlier today so you guys could consult and
21  figure out whether you could tell me why you decided
22  to change law firms.
23     A.   Uh-huh.
24     Q.   And what did you determine?
25     A.   That I could tell you.

Page 205

1      Q.   Okay.  Go ahead and tell me, please.
2      A.   Could you repeat the question?
3      Q.   Yeah.
4          Why did you decide to switch from
5  Blakely Sokoloff Taylor & Zafman to
6  Morrison & Foerster when prosecuting the 845 patent?
7      A.   Well, I don't believe it was for
8  prosecuting of the 845.  I think that it had been
9  fully prosecuted and was in that period between the
10  appeal board sending its decision reversing the
11  examiner's decision back to the examiner.
12         So I don't think there was any
13  prosecution.
14         At that particular time, Tom Coester was
15  going on I believe a four-month sabbatical that his
16  firm offers I think every eight years.
17         And Jonathan Miller, who did the bulk of
18  the work at that time, was leaving the firm.
19         That left me without my two attorneys
20  that I had worked with, and so that is the reason why
21  I left the firm.
22     Q.   Okay.  Looking at the 497 patent,
23  there's a number of inventors there.
24         Can you tell me which of those inventors
25  were associated with Online Labs?

1    A.   Yes, Manuel Beltran, Steven Woesner,
2  John Marinuzzi, Albert Long, Donald Dukeshire.
3    Q.   And who is Teague McKnight?
4    A.   Teague McKnight?  I hired Teague I think
5  starting in July of 1999 to work on the graphics of
6  the interface and the advertising, part of those
7  graphics.
8    Q.   Uh-huh.  And how did you come to hire
9  Mr. McKnight?
10    A.   He was a friend of a friend.
11    Q.   And who was the friend he was a friend
12  of?
13    A.   I don't remember his name, because he
14  was a friend of another friend.
15    Q.   Okay.  What was Mr. McKnight's
16  background?
17    A.   He -- graphics, graphic design, the
18  Internet, computers.  He had graduated college, I
19  believe, and was in that period before going to
20  business school.
21    Q.   So can you just run through the
22  inventors, here, and tell me what they contributed
23  to of the invention?
24    A.   Well, I'm not able to tell you
25  specifically, because there were times when we all met

1  together and everybody threw out a contribution.
2    But the report was prepared by
3  Manuel Beltran.  He was the leader of the group.  And
4  Steven -- Steven Woesner, John Marinuzzi, and
5  Albert Long and Donald Dukeshire, they worked on the
6  report.
7    Q.   Did they provide contributions to the
8  invention other than the things that are described in
9  the report?
10    A.   Not that I recall.
11    Q.   Could you just leaf through the figures
12  of the 497 patent and tell me what, if anything, you
13  can identify as a contribution of Mr. McKnight?
14    A.   He may have worked on Figure 5; 4-B is questionable;
15  may have worked on Figure 5; 4-B is questionable;
16  Figure 8; Figure 9-A, is my recollection; Figure 9-B;
17  Figure 9-C; Figure 9-D; Figure 10-A; 10-B; 10-C; 10-D;
18  10-E; 10-F; 10-G; 11; 12-A; 12-B; 13.
19    That's the best of my recollection.
20    Q.   Now, Figure 8 is the same as Figure 8 in
21  the later patents.
22    Right?
23    A.   Figure what?
24    Q.   Figure 8?
25    A.   8?

1    What figure?  Figure 8?
2    Q.   Figure 8, yeah.
3    A.   Just some slight changes.
4    Q.   Not in the 845, is there?
5    A.   Between the 845 and the --
6    Q.   Figure 8 in the -- Figure 8 in the 497,
7  and Figure 8 in the 845 -- oh, I see.  The F and J
8  changed --
9    A.   Correct.
10    Q.   -- in this.  Yeah, you're right.
11    I think you mentioned that
12  Alber-Michel Long contributed Figure 8 in the 845
13  patent.
14    Did he also contribute part of Figure 8
15  in the 497?
16    A.   He may have.
17    Q.   Was his contributions to the 497 patent
18  primarily graphical?
19    A.   He worked with the team, so they -- they
20  were a team and they worked together.  And so I was
21  not privy to all their conversations and meetings.
22  They did write a report.
23    I'm able to -- I'm unable to distinguish
24  what part of that report was contributed to each
25  co-inventor.

1    Q.   Okay.  So you don't really know exactly
2  who contributed what to the 497 invention.
3    Right?
4    A.   That would be generally correct.
5    Q.   Okay.  Is there anything that you can
6  specifically identify with any of the individual
7  inventors?
8    A.   Well, I remember going to a meeting.  We
9  had a -- I think the co-inventors had day jobs, and
10  they worked at night and the weekends.  And I recall a
11  couple times I reserved a room at a hotel in
12  Orange County.
13    I thought during that meeting -- I could
14  be wrong, here -- that Manuel Beltran, being the
15  leader of the team, said to Albert, Did you complete
16  the history portion of Figure 11?
17    That's my recollection.
18    Q.   Okay.  Is there any other individual
19  contribution of any inventor that you can recall?
20    A.   No, I -- individually, no.  It was the
21  report that they all worked on collectively.
22    MR. STEPHENS:  Mark that, please.
23    (Whereupon E. Gottfurcht Exhibit 4 was
24  marked for identification)
25    MR. STEPHENS:  This is Number 4.

1          Right?
2          COURT REPORTER:  Yes.
3    BY MR. STEPHENS:
4          Q.   Do you have Exhibit E. Gottfurcht
5    Number 4?
6          A.   Yes.
7          Q.   Can you tell me what that is?
8          A.   This is a -- a print of an envelope that
9    I sent to myself registered mail.  That's the first
10   page, on August 2nd, 1999.  And then there's some
11   pages that were inside this envelope.
12         Q.   Okay.  Is that a complete collection of
13   the pages that were in the envelope?
14         A.   I cannot remember.  But I gave this
15   envelope to my attorney and asked them to include it
16   in our production of documents.
17         Q.   Okay.  So as far as you know, this would
18   be a complete set?
19         A.   Yes.
20         Q.   You didn't hold anything back?
21         A.   No.
22         Q.   Okay.
23         A.   In fact, they opened the envelope.  I
24   brought them the envelope sealed.
25         Q.   Okay.  And why did you send this to

1    yourself on August 2nd?
2          A.   I was just trying to establish a record
3    as to some dates when certain things -- you know, that
4    I had thought about.
5          Q.   Why were you trying to do that?
6          A.   Just to keep a -- a record of dates.
7          Q.   And why were you trying to keep a record
8    of dates?
9          A.   Well, I was planning to file a patent.
10   I thought that may be handy one day.
11         Q.   Okay.  So you were trying to keep a
12   record of what you had thought about on that date?
13         A.   Or, you know, a week before.
14         Q.   Okay.  Is this August 2nd mailed to
15   yourself a record of what you invented in July?
16         MR. BECKER:  Object.  Form.
17         THE WITNESS:  I don't -- I don't really know
18   if -- you know, what part this played in the
19   invention, but it was ideas that I had, visions that I
20   had, about August 2nd.
21   BY MR. STEPHENS:
22         Q.   How does it relate to what you invented
23   in July?
24         A.   I don't have any idea.  I haven't read
25   it.

1          Q.   Well, take a minute and read it, and
2    tell me how it relates to your invention.
3          A.   Okay.
4          Q.   How does it relate to your invention?
5          A.   I don't recall.
6          Q.   So you can't tell from looking at it how
7    it relates to your invention?
8          A.   It -- my guess would be that it was some
9    thoughts for a prototype.
10         Q.   That's just a guess?
11         A.   Yes.
12         Q.   Can you tell anything else about it?
13         A.   No.
14         Q.   Is there anything in here about
15   scrolling or zooming?
16         A.   I don't recall.
17         Q.   And you can't tell -- see anything
18   looking at it.
19              Right?
20         A.   Well, I -- this has been ten years ago.
21         Q.   Okay.
22         A.   And I -- I cannot recall.
23         Q.   Again, I'm not asking about what you
24   recall.  I'm asking about what you can tell from
25   looking at it.

1              You don't see anything about scrolling
2    and zooming from looking at it?
3          A.   I don't recall.  I don't recall in my
4    mind at that -- ten years ago whether some of what's
5    in this document related to zooming and scrolling.  I
6    don't know.  I don't remember.
7          Q.   There's nothing you can point to now
8    that shows scrolling or --
9          A.   I cannot recall now what I thought about
10   ten years ago when I prepared this document.
11         Q.   Okay.  So -- so as a result, there's
12   nothing you can point to here now today and say, This
13   is about scrolling and zooming --
14         MR. BECKER:  Object.  Form.
15   BY MR. STEPHENS:
16         Q.   -- right?
17         A.   I do not recall my mind set ten years
18   ago when I prepared this document --
19         Q.   Right.
20         A.   -- if I had zooming and scrolling in my
21   mind at that time.
22         Q.   I'm not asking about what you had in
23   your mind.  I'm asking about what's in the document.
24              Is there anything in the document about
25   scrolling or zooming?

Page 214

1      A.   I'm unable to tell you that when I
2  prepared this document, that I -- that I -- whether I
3  had scrolling and zooming in my mind --
4      Q.   I'm not asking what you had in your
5  mind.
6           I'm asking whether there's anything in
7  this document about scrolling or zooming.
8           Is there?
9      A.   I -- I cannot recall.
10     Q.   You cannot answer is what you mean?
11          I'm not asking about your recollection.
12          I'm asking about what's in the document.
13          Is there anything in the document about
14  scrolling or zooming that you can point to, sitting
15  here today?
16     A.   I prepared the document ten years ago.
17  I do not recall when I prepared the document if I had
18  in my mind --
19     Q.   I'm not asking what was in your mind.
20     A.   Today --
21     Q.   Is there anything you can point to today
22  about scrolling or zooming in the document?
23     A.   I cannot recall ten years ago when I
24  prepared this document if it had anything to do with
25  scrolling or zooming.

Page 215

1      Q.   So you're not going to answer my
2  question?
3      A.   That's my answer.
4      Q.   Sir, one more time.
5      MR. STEPHENS:  Could you read the question
6  back, please?
7      (Whereupon the record was read as follows:)
8      "QUESTION:  I'm not asking what was in
9          your mind.
10          Is there anything you can point to
11          today about scrolling or zooming in the
12          document?"
13     THE WITNESS:  I stand on my answer.
14  BY MR. STEPHENS:
15     Q.   Okay.  Actually, before we go on, if you
16  can look at the last page, Number 1327 in the lower
17  right corner, can you tell me what that is?
18     A.   EMG 0 -- 001327?
19     Q.   That's right.
20     A.   I would assume when these documents were
21  prepared for you by the attorney, that that's --
22     Q.   I'm not asking about the Bates number.
23  I'm asking what's on the page.
24          I'm sorry.  I may not be clear.
25     A.   Okay.  What was your question again?

Page 216

1      Q.   What's shown on that page?
2      A.   It looks like a -- hardware.
3      Q.   Okay.  And what kind of hardware?
4      A.   I -- I don't recall ten years ago what
5  kind of hardware this would have been.
6      Q.   Okay.  So you can't tell what it is
7  today.
8           Right?
9      A.   No.
10     Q.   Okay.
11     MR. STEPHENS:  Mark this, please.
12     (Whereupon E. Gottfurcht Exhibit 5 was
13          marked for identification)
14  BY MR. STEPHENS:
15     Q.   The court reporter has handed you a
16  document marked E. Gottfurcht 5.  It has the Bates
17  numbers EMG 001402 through 001428.
18          Can you tell me what that document is?
19     A.   The cover is a copy of a manila envelope
20  which I mailed to myself, I think on August 13 -- it's
21  two dates.  It's August 13, 1999 and August 16th,
22  1999.
23     Q.   Why are there two dates?
24     A.   I don't know.
25     Q.   Why did you mail this to yourself?

Page 217

1      A.   There's some -- the same reason I
2  mentioned before.  These are some ideas which -- which
3  I had, that I reduced to writing and wanted to keep a
4  record.
5      Q.   So you wanted to establish a date for
6  these ideas?
7      A.   Yes.
8      Q.   And that's because you were thinking
9  about filing a patent application?
10     A.   Yes.
11     Q.   Okay.  Can you tell me what's disclosed
12  in here?
13     A.   You want me to go page by page?
14     Q.   Sure.
15     A.   Okay.  First page, it says, Fogies.com.
16     Q.   I don't want you to read it to me.  You
17  can just tell me generally.
18     A.   Okay.  Well, it's entitled,
19  "Mission Statement," then there's certain -- then
20  three points pertaining, I assume, to this mission
21  statement.
22     Q.   Okay.  Can you tell generally what this
23  document is about?
24          While you're looking through it page by
25  page, please make sure to point out anything you see

1   that talks about scrolling or zooming.
2       A.   You want me to start over again?
3       Q.   Sure.
4       A.   Is there anything else you want me to
5   look at?
6       Q.   Yeah, if there's anything that describes
7   a sister site.
8       A.   Okay.  So you want a sister site,
9   zooming and scrolling, anything that describes sister
10  site, zooming and scrolling?
11      Q.   Yeah, and also anything that describes
12  zooming or scrolling with a finger.
13      A.   A finger?
14      Q.   Yeah.
15      A.   Okay.  Okay.
16      Q.   Okay.  Did you find anything relating to
17  scrolling or zooming?
18      A.   This document was prepared ten years
19  ago, and any time that there is a -- a page here, in
20  my mind at the time, this could have been -- page
21  could be manip -- manipulated by zooming and
22  scrolling, and it could be -- could have been a sister
23  site that I had in mind.
24      Q.   Okay.  Could you show me where the
25  scrolling or zooming is?

1       A.   Well, it could be on any one of
2   these proposed pages.
3       Q.   I'm not asking where it could be.  I'm
4   asking where it is.
5           Show me exactly the disclosure you're
6   talking about.
7       A.   Well, I -- as I say, it's ten years ago,
8   and I don't recall each one of -- each part of this
9   document --
10      Q.   Well --
11      A.   -- that I had in mind when I prepared
12  it.
13      Q.   If there's anything you can point to
14  that you recall that discloses scrolling or zooming,
15  please identify it.
16      A.   I cannot recall.
17      Q.   Okay.
18      A.   It may be in here, but I cannot recall.
19      Q.   Okay.  So you're unable to point to
20  anything that you know discloses scrolling or zooming.
21          Right?
22      A.   No, I just can't recall ten years later
23  what I meant when I prepared this document.
24      Q.   Okay.  If you can -- you told me no,
25  that I was wrong when I said, you can't.

1           Go ahead and do it.  Identify it for me,
2   please.
3       A.   I'm saying that I -- when this -- I
4   prepared this ten years ago.
5       Q.   I know that.
6       A.   I'm not sure what I had in my mind
7   pertaining to zooming and scrolling and sister site.
8       Q.   So can you identify anything in
9   here that --
10      A.   Well, it's possible that there's a
11  number of sister sites in here.  It's possible that
12  these pages could be navigated with zooming and
13  scrolling.
14      Q.   Okay.  So show me the sister sites --
15      A.   Well --
16      Q.   -- right now.
17  MR. BECKER:  Object.  Form.
18  THE WITNESS:  Well, let's start with this page
19  right here.
20  BY MR. STEPHENS:
21      Q.   Okay.  And what's that a sister site of?
22      A.   Could be a sister site of Yahoo or
23  AOL --
24      Q.   Okay.
25      A.   -- or a number of sites.  It could be a

1   sister site.
2       Q.   Okay.  Where does it say that?
3       A.   It doesn't say.  It could have been in
4   my mind when I prepared it.
5       Q.   But you don't recall?
6       A.   I don't recall which sister site this
7   may be, but this could -- this could be a sister site.
8       Q.   Okay.  But is it a sister site?
9       A.   It could be.
10      Q.   I'm not asking whether it could be.
11          Is it, was it?
12      A.   I don't -- it may have been.
13      Q.   Okay.
14      A.   It may have been a sister site for a
15  prototype of a sister site, an example of a sister
16  site for AOL or Yahoo or others.
17      Q.   Okay.  But you don't know?
18          You don't recall.
19          Right?
20      A.   That's what I said.  I don't recall.
21      Q.   Okay.
22      A.   But it could have been.
23      Q.   Now, did you see anything about
24  scrolling or zooming with a finger?
25      A.   Well, this -- this could -- again, any

Page 222

1  of these pages, you could scroll and zoom with a
2  finger.
3      Q.  Is there anything in here that says
4  that?
5      A.  Well, when -- ten years ago, this may be
6  what I had in mind when I prepared this, that
7  navigation could be zooming or scrolling a sister site
8  with a finger.
9      Q.  Okay.  What in here tells you that
10 that's what you had in your mind?
11     A.  Well, I prepared it ten years ago and
12 the invention was in my mind, so I could have --
13     Q.  That --
14     A.  -- had that in my mind when I prepared
15 this.
16     Q.  That's what I'm trying to establish,
17 sir.
18        How do you know the invention was in
19 your mind?
20        What is it that you are referring to
21 that tells you that on the first week of July 1999,
22 you and Grant discussed scrolling and zooming by
23 manipulating a region on a screen?
24     A.  Would you repeat the question, please?
25     Q.  What is it that you are relying on to

Page 223

1  date your invention with respect to scrolling and
2  zooming with a finger?
3      A.  My memory.
4      Q.  And nothing else?
5      A.  I don't know.  There -- as I say,
6  there's a number of documents which I've given to
7  Tom Coester, a number of documents which I've given to
8  you.
9      Q.  And you've not reviewed any of those
10 before today, right, and recently?
11     A.  I've not reviewed any of the documents
12 I've given you or Tom Coester prior to --
13     Q.  So you're not relying on any of those
14 today?
15     A.  I'm not relying that I've read those
16 recently.
17     Q.  Okay.  So you're relying solely on your
18 memory for the specifics of what you invented on that
19 day in July of 1999.
20        Right?
21     MR. BECKER:  Object.  Form.
22     THE WITNESS:  That's correct.
23 BY MR. STEPHENS:
24     Q.  Okay.  Even though you can't remember
25 anything else about your invention when we've looked

Page 224

1  at the disclosures.
2      Right?
3      A.  No, I remembered quite a bit about
4  the --
5      Q.  Okay.  But there are many things --
6  you'd agree with me, there are many things you don't
7  remember from ten years ago.
8      Right?
9      A.  There are many things I do not remember
10 from ten years ago.
11     Q.  Okay.  But it's purely from recollection
12 and not any contemporaneous record, that you remember
13 that you invented scrolling and zooming with a
14 finger --
15     A.  Well, the record would have been
16 documents and conversations I had with Tom Coester.
17     Q.  But you're not relying on any of those
18 documents.
19        Right?
20        You haven't looked at any of those to
21 reflesh your -- refresh your recollection?
22        Right?
23     A.  That's correct.
24     Q.  Okay.
25     A.  But that's my -- my recollection, that

Page 225

1  there are documents back in January -- excuse me, July
2  of 1999 pertaining to the invention.
3      Q.  Okay.  If you'll turn to the page with
4  Bates number ending in 1412.
5      A.  Okay.
6      Q.  In the upper right corner, there's some
7  names.
8        One of those is Tom Coester?
9      A.  Yes.
10     Q.  Is that the lawyer you've been referring
11 to?
12     A.  Yes.
13     Q.  And there's some other names there.
14        Can you tell me who those people are?
15     A.  I don't recall those names.
16     Q.  Okay.  You don't know who they are?
17     A.  Well, I don't recall them now.
18     Q.  Think they worked with Mr. Coester at
19 the time?
20     A.  I don't recall them as -- as working
21 with Mr. Coester, but I could be wrong.
22     Q.  Okay.  What do you remember about this
23 document?
24     A.  Well, I don't remember the document
25 specifically, but I remember that during this period

57 (Pages 222 to 225)

Page 226

1  of time, every few days, a period of time, I would jot
2  down some of what we were working on and then mail it
3  to myself --
4      Q.  Okay.  Why --
5      A.  -- to --
6      Q.  Why is Mr. Coester's name on this
7  document?
8      A.  I -- I don't have any idea.
9      Q.  So your best recollection is that this
10 is some notes that you jotted down about what you were
11 working on that you mailed to yourself, and you can't
12 remember anything else about it?
13     A.  Other than the words on the page, that
14 speak for itself, I cannot recall quite a bit of this
15 document.
16     Q.  Do you remember anything about it?
17     A.  Well, let's go through word by word and
18 I can tell you what I do recall.
19     Q.  I don't want to do that.
20     A.  Okay.
21     Q.  Is there anything you can point to
22 specifically that you remember?
23     A.  Well, I -- I remember that we were --
24 these inter -- interfaces, sister site interfaces.
25 These are just examples.  I would assume that's what I

Page 227

1  was thinking about at the time.
2          There were -- I mentioned to you that
3  one of the components back in early July was
4  categories, summaries of -- of content.  I see some of
5  that here.
6      Q.  Looking back at the page with Bates
7  number ending 1412, it talks about Fogie ABC-123.
8          Do you see that?
9      A.  Yes.
10     Q.  What is that?
11     A.  I remember that we thought that it was a
12 catchy phrase, "ABC 123," it rhymed, and it would be
13 something that -- for marketing purposes that we
14 should consider.
15     Q.  And what did it refer to?
16     A.  It referred to how we should probably
17 market our prototype.
18     Q.  In fact, it referred to selecting cells
19 in the user interface that you see, like the page you
20 held up earlier, by pressing the corresponding number
21 on a keypad.
22          Right?
23     A.  I don't think so.
24     Q.  No?
25     A.  My -- my recollection was that we

Page 228

1  thought that ABC 123 rhymed and that it would be a
2  catch phrase to describe the simplified navigation
3  interface.
4          That's my best recollection.
5      Q.  Okay.  And the simplified navigation
6  interface was shown on the page just before it,
7  Fogies.com.
8          That's the page with Bates number ending
9  in 1411.
10         Is that right?
11     A.  No, I don't think so.  I think 1411 was
12 a -- a hardware device.  I think that was a hardware
13 device.
14     Q.  Okay.  And -- and how did that relate to
15 the rest of the disclosure?
16         Is that the device you would display
17 your simplified user interface on?
18     A.  That's -- that's a possibility that
19 could be a mobile device.
20     Q.  Okay.  So is it the case that you would
21 display the user interface, for example, on Page 1405,
22 on the display shown in Page 1411?
23     A.  Well, it doesn't necessarily have to be
24 on that device.  It could be on any device, on 1405.
25     Q.  Okay.  But you could display it on 1411.

Page 229

1          Right?
2      A.  I think so.
3      Q.  And how would you select the various
4  options that you see in the display on Page 1405 when
5  it was displayed on the device in -- on Page 1411?
6      A.  If it were on this particular device,
7  you would do it by unique inputting numbers and
8  letters.
9      Q.  So you press the number on the keypad?
10     A.  Which would be corresponding with the
11 numbers on the interface.
12     Q.  Okay.  So it would be a unique
13 correspondence, a one-to-one correspondence between
14 the number on the keypad and the number that you see
15 in the cells on the display.
16         Right?
17     A.  I think that was one embodiment.
18     Q.  Okay.  So for the cells in 1, 2, or 3,
19 you would press the corresponding Number 1, 2, or 3 to
20 select that option.
21         Right?
22     A.  I think that was one embodiment.
23     Q.  The same would be true for cells labeled
24 A, B, or C.
25         Right?

58 (Pages 226 to 229)

1    A.   I believe so.
2    Q.   Okay.  Does the document that you see on
3 Page 1412 reflect notes of a conversation you had with
4 Mr. Coester?
5    A.   I don't believe so.
6    Q.   Why do you say that?
7    A.   I don't recall taking notes of a
8 conversation I've had with Tom Coester.
9    Q.   Ever?
10    A.   No, not -- not in this document, and --
11 and -- so I don't recall that that would have been
12 notes from conversations with Tom Coester.
13    Q.   Okay.  But it's ten years ago.
14        It could have happened.
15        Right?
16        You just don't remember?
17    A.   I don't think so.
18    MR. BECKER:  I'll object to form.
19 BY MR. STEPHENS:
20    Q.   How are you so sure?
21    A.   Because I don't recall it.
22    Q.   Okay.  But there's a lot of things you
23 don't recall.
24    A.   I understand.
25    Q.   There's a lot of things you don't recall

1 from ten years ago.
2        Right?
3    A.   That's correct.
4    Q.   But you do recall that this is not notes
5 from a conversation with Tom Coester.
6        Right?
7    A.   I do not -- I do not recall.  I do not
8 believe that it is.
9    Q.   But you don't know why you read his name
10 on the page, either.
11        Right?
12    A.   That's correct.
13    Q.   Okay.  If you turn to Page 1424, it
14 says, "Fogies.com, enjoying a longer life."
15        Do you see that?
16    A.   Yes.
17    Q.   And then to the left of that, there's
18 some words that are written down, "Jill and Tom," and
19 then there's letter -- words to the left of that.
20        Can you read those?
21    A.   Looks like "trademark" next to Jill, and
22 Tom -- portal?  I can't -- I don't know what that
23 says.
24    Q.   And who was Jill?
25    A.   I don't recall.

1    Q.   And who was Tom?
2    A.   I don't recall.
3    Q.   Is that Tom Coester?
4    A.   I don't recall.
5    Q.   And if you'll turn to Page 1428, the top
6 of that page says, "Business Plan"?
7    A.   Yes.
8    Q.   Did you develop a business plan around
9 your invention?
10    A.   I don't recall.
11    Q.   How much money have you spent trying to
12 exploit your invention?
13    MR. BECKER:  Object to form.
14    THE WITNESS:  From 1999?
15 BY MR. STEPHENS:
16    Q.   Yes.
17    A.   A guess?
18    Q.   Your best guess, sure.
19    A.   About $2 million or more.
20    Q.   And how much of that is -- was spent on
21 patent filings and prosecuting?
22    A.   Well, that would be included as part of
23 that.
24    Q.   Well, no, I'm asking you to break it
25 down.

1    A.   I don't know how -- I couldn't break
2 that down.
3    Q.   You spent more than a million on
4 patents?
5    A.   No, I think I -- I -- I think that it
6 was about $2 million for patent prosecution,
7 prototypes, and any other related expenses.
8    Q.   Has that all been your own money?
9    A.   Yes.
10    Q.   No investors?
11    A.   No.
12    Q.   Do you have records of what you've
13 spent?
14    A.   I don't recall.
15    Q.   You don't have anybody in charge of
16 keeping records?
17    A.   Well, I'd have to go see if I could find
18 records pertaining to that.
19        That go back ten years?
20    Q.   Any period of time.
21    A.   Yeah, I'd have to check to see if I have
22 those records.
23    Q.   You didn't check to see if you have
24 those records in connection with this lawsuit already?
25    A.   No.

59 (Pages 230 to 233)

Page 234

1  Q.  Well, I'd ask you to do that and produce
2  them.
3       Do you know if patent prosecution made
4  up for more than half of that two million?
5  A.  I don't recall.
6  Q.  How much money do you have?
7  How wealthy are you?
8  MR. BECKER:  Object.  There's a --
9  MR. STEPHENS:  You want me to explain why
10  that's relevant?
11  MR. BECKER:  Yeah.  'Cause there's -- there's
12  a -- there's a constitutional right in California as
13  to privacy, and so --
14  MR. STEPHENS:  But the suit was brought in
15  Texas.
16  MR. BECKER:  But you're deposing a California
17  resident in California.
18  But go ahead.  You were going to tell us
19  why that's relevant.
20  BY MR. STEPHENS:
21  Q.  It's relevant because I want to
22  establish that you have the resources to exploit your
23  invention.
24  How much money do you have, sir?
25  MR. BECKER:  I don't see how that's relevant.

Page 235

1  You're talking about the past.  He has exploited it.
2  MR. STEPHENS:  Are you going to direct him not
3  to answer?
4  MR. BECKER:  I'll see what he's willing to do.
5  THE WITNESS:  I'm not going to answer the
6  question.
7  BY MR. STEPHENS:
8  Q.  Why not?
9  A.  Because I think I have a constitutional
10  right in California not to disclose that information.
11  Q.  Okay.  Well, we'll take it up with the
12  Court, and we will get you back to answer that
13  question.
14  MR. BECKER:  We're happy to talk to the
15  referee on that issue.
16  MR. STEPHENS:  Well, let's call him up right
17  now.
18  MR. BECKER:  Okay.
19  COURT REPORTER:  Off the record?
20  MR. STEPHENS:  It's closed in Texas.  We can't
21  do it.
22  We're just going to have to have him
23  back.
24  Q.  You can either answer the question now
25  or we're going to have you back to answer it later.

Page 236

1  MR. BECKER:  Wait.  Are we back on the record?
2  COURT REPORTER:  We didn't go off.
3  THE WITNESS:  I thought you were calling a
4  referee.
5  BY MR. STEPHENS:
6  Q.  We can't, because the court's closed.
7  A.  Oh.
8  Q.  It's after 5 o'clock.  That's what
9  happens when you start late.
10  All right.  Well, you're refusing to
11  answer.
12  Right?
13  A.  Yes.
14  Q.  Okay.  Has there been any -- well, leave
15  it at that.
16  COURT REPORTER:  I'm sorry.  I need to call my
17  office.
18  MR. STEPHENS:  Oh, I'm sorry.  Okay.  Yeah,
19  we'll take a break.
20  THE VIDEOGRAPHER:  Going off the record.
21  The time is 4:56 p.m.
22  (Whereupon a recess was taken)
23  (Whereupon Grant Gottfurcht departed the
24  deposition)
25  THE VIDEOGRAPHER:  Back on the record.

Page 237

1  The time is 5:20 p.m.
2  THE WITNESS:  I have -- I have just a general
3  question.
4  BY MR. STEPHENS:
5  Q.  Sure.
6  A.  How much time are you going to have
7  before you finish?  It's getting late.  And also, how
8  much time will be allocated to American Airlines?
9  BY MR. STEPHENS:
10  Q.  Well, we have seven hours on the record
11  that we're entitled to take.  It's pretty clear that
12  we're going to need more time, given your refusal to
13  answer some questions and -- and your -- and the claim
14  of privilege, which I think will be disputed.
15  But, yeah, we have seven hours.  And he
16  has some questions he'd like to ask.
17  I'm going to try to make as much
18  progress as I can, and we'll give him some time.  But
19  we'll go seven hours on the record today.
20  A.  Okay.  And how much time have we gone so
21  far?
22  Q.  Five hours, I think.  We have about two
23  hours left.
24  A.  So we have two hours left, and you're
25  going to give American Airlines some time?

1    Q.  Yeah.

2    A.  Okay.

3    MR. LANE:  Apple -- Apple noticed the

4  deposition.

5    MR. STEPHENS:  Yeah, but out of -- out of

6  courtesy, we'll let them have some time.

7    THE WITNESS:  Is it seven hours for both of

8  you or seven hours --

9  BY MR. STEPHENS:

10    Q.  Well, like I said, we're going to need

11  more time.  And we'll go to the Court if we have to

12  get it, given your refusal to answer some questions

13  and the privilege issues that we see here.

14    But, yes, the normal rule is seven hours

15  per witness on the record.

16    A.  So it's around 5:20, so it's around

17  8 o'clock we'll finish?

18    Q.  I think that's reasonable.

19    Yeah, we'll break for today.  And that's

20  the one problem with starting late.  Seven hours is a

21  long day even if you start early.

22    MR. STEPHENS:  So -- okay.  Ready when

23  you guys are.

24    THE VIDEOGRAPHER:  We're on the record.

25    COURT REPORTER:  We are on the record.

1    MR. STEPHENS:  Oh, we are, sorry.  Didn't

2  realize that.

3    (Whereupon E. Gottfurcht Exhibit 6 was

4    marked for identification)

5    (Whereupon E. Gottfurcht Exhibit 7 was

6    marked for identification)

7    (Whereupon E. Gottfurcht Exhibit 8 was

8    marked for identification)

9    (Whereupon E. Gottfurcht Exhibit 9 was

10    marked for identification)

11    (Whereupon E. Gottfurcht Exhibit 10 was

12    marked for identification)

13    (Whereupon E. Gottfurcht Exhibit 11 was

14    marked for identification)

15  BY MR. STEPHENS:

16    Q.  Okay.  I'm handing you what's been

17  marked E. Gottfurcht 6 through 11.

18    And given the length of time that you

19  took to answer simple questions about the previous

20  letters that you mailed to yourself, at this point, I

21  just want to ask you to look through those and tell me

22  if those are all letters that you mailed to yourself

23  in order to preserve the dates in connection with the

24  ideas you were having relating to the invention in

25  this case?

1    A.  Do you want me to answer each exhibit

2  individually, or wait until I finish reading them all?

3    Q.  However you want to do it.

4    A.  Okay.

5    Q.  I just want to make sure the record's

6  clear for each exhibit that it's --

7    A.  Okay.

8    Q.  -- something you mailed to yourself to

9  preserve the dates for ideas relating to your

10  invention.

11    A.  I'm first reviewing Exhibit 6.

12    Q.  Okay.

13    MR. STEPHENS:  And just for the record,

14  Exhibit 6 has Bates numbers EMG 001328 through 1350.

15    I'll tell you what.  Why don't we do it

16  this way.  Let's go off the record.  You can review

17  the whole pile, and then when you're done, we'll go

18  back on the record and you can tell us your answers.

19    MR. BECKER:  We can do that, but we're not

20  going to deduct that from our -- it will keep the

21  clock running.

22    MR. STEPHENS:  No, it won't.

23    MR. BECKER:  Yeah, we will.

24    MR. STEPHENS:  No, we won't.

25    MR. BECKER:  And why is that?

1    MR. STEPHENS:  Let's go off the record.

2    Because it's taken a ridiculous amount

3  of time to review these documents.

4    MR. BECKER:  Well, you're asking him --

5    MR. STEPHENS:  I asked him a simple question:

6  Are these documents that you mailed to yourself in

7  connection with the invention?

8    You don't have to read the entire

9  document page for page to make that answer.  If that's

10  what he's going to do, it's out of your time.

11    MR. BECKER:  Well, I disagree.  This whole

12  thing is your time.  It's your deposition.  I'm not

13  going to tell you --

14    MR. STEPHENS:  Well, okay.  So we'll be asking

15  for more.  That's fine.

16    If you want to do it on the record,

17  we'll do it on the record, and we'll just point out to

18  the judge that he took an hour to answer a very simple

19  question.

20    MR. BECKER:  Okay.  I doubt -- seriously doubt

21  that's going to happen, but go ahead.

22    MR. STEPHENS:  You can doubt it.

23    COURT REPORTER:  So we're staying on the

24  record?

25    MR. STEPHENS:  We can go off the record, and

Page 242

1   then you'll just tell us when you're ready.  And then
2   the record will reflect the amount of time you took to
3   answer the question.
4          MR. BECKER:  No, it won't reflect it, because
5   we're off the record.
6          MR. STEPHENS:  The record tells you what time
7   we go on and off.
8          COURT REPORTER:  So do all counsel stipulate
9   to go off the record?
10         MR. BECKER:  Just stay on.
11         MR. STEPHENS:  No, we don't.  I think we
12  should go off.  But if he's going to insist that we're
13  going to go on, then -- it seems a little silly to
14  fight about it -- we'll stay on the record.
15         The main thing is, we need to know how
16  long he's taking to answer this simple question,
17  whether these are documents that he mailed to himself
18  that relate to the invention.
19         So 5:26 now.  I guess I should say that
20  it's 5:26 by my clock.  The record will reflect what
21  it is.
22         THE WITNESS:  What was your question?
23  BY MR. STEPHENS:
24     Q.  Are Exhibits 6 through 11 documents that
25  you've mailed to yourself in order to preserve the

Page 243

1   date in connection with ideas that you had relating to
2   the invention?
3      A.  Exhibit 6 seems to be that.
4      Q.  Okay.
5      A.  Okay.  I'm going to read Exhibit 7.
6      Q.  Okay.
7      A.  Exhibit 7 also seems to be a document
8   that I sent to myself.
9      Q.  And it relates to ideas in connection
10  with this invention?
11     A.  Yes.
12     Q.  Okay.
13     A.  I believe so.
14         Exhibit 8 seems to be a document that I
15  sent to myself.
16     Q.  In connection with ideas you were trying
17  to date related to this invention?
18     A.  Marketing -- some of it were marketing
19  ideas, so they were mixed up between marketing ideas
20  and -- and the invention ideas.
21     Q.  Okay.  But the marketing was also about
22  marketing the invention?
23     A.  Yes.
24     Q.  Okay.
25     A.  Exhibit 9, I've reviewed, and it -- it

Page 244

1   looks like a document that I sent to myself.
2      Q.  Okay.  And that -- again, that document
3   relates to ideas you were trying to date in connection
4   with the invention?
5      A.  It included games and other ideas for
6   navigating the Internet --
7      Q.  Okay.
8      A.  -- on a simplified navigation interface.
9          I've reviewed Exhibit 10.
10     Q.  Okay.  And does it -- is it a document
11  that you sent to yourself in order to date ideas
12  relating to the invention?
13     A.  Yes, and marketing, marketing and games
14  and other ideas.
15     Q.  Okay.  This is Exhibit 11.
16     A.  Exhibit 11, I've reviewed.
17     Q.  And is it also a document you mailed to
18  yourself in order to date ideas in connection with the
19  invention?
20     A.  Yes, I believe so.
21         MR. STEPHENS:  Mark that, please.
22         MR. BECKER:  What is this one?
23         MR. STEPHENS:  12.
24         (Whereupon E. Gottfurcht Exhibit 12 was
25         marked for identification)

Page 245

1   BY MR. STEPHENS:
2      Q.  Mr. Gottfurcht, do you have Exhibit
3   EG -- or E. Gottfurcht 12, which has Bates numbers
4   EMG 002099 through 2127?
5      A.  Yes.
6      Q.  Can you tell me what that is?
7      A.  This appears to be the document prepared
8   by the co-inventors that was presented to Tom Coester.
9      Q.  And the co-inventors are the ones named
10  on the document, itself?
11     A.  Yes, yes.
12         Well, it also has my name, and it does
13  not have one of the co-inventors.
14     Q.  And that's Teague McKnight?
15     A.  That's Teague McKnight, right, and
16  Grant.
17     Q.  And Grant.
18         And is it your understanding that this
19  document reflects the contribution of those
20  co-inventors other than Grant, and Teague McKnight?
21     A.  Well, I don't know if it's the actual
22  document, so -- but I know that these co-inventors did
23  prepare a document, and I do not know if this is the
24  document.
25     Q.  Okay.

Page 246

1      A.   But I would say that the co-inventors
2   submitted a document to Tom Coester, which
3   incorporated their component that they worked on of
4   the invention.  I can't verify that this is the
5   document.
6      Q.   Okay.  This was sent from Manuel Beltran
7   to you.
8           Right?
9      A.   That's correct.
10     Q.   On October 15th, 1999.
11          Is that right?
12     A.   I -- I would -- it looks that way.  It
13  looks like his fax number.  It doesn't have my fax
14  number.  It has my name at the top.
15     Q.   Do you have any reason to think you did
16  not receive this document on or about October 15th of
17  1999?
18     A.   No, if it's a complete document, that's
19  probably how I received it.
20     Q.   Okay.  Are you aware of any other
21  document that might be the report that you've
22  testified about that the co-inventors prepared,
23  reflecting their contribution to the invention?
24     A.   No, I believe they prepared one report.
25  I just cannot verify that this is their complete

Page 247

1   report.
2      Q.   Well, that's what I'm trying to
3   establish.
4           Do you have any reason to think it's
5   not?
6      A.   I -- I -- couldn't respond to that.  I
7   haven't --
8      Q.   Okay.  We got it from you, and we don't
9   know anything about it other than we got it from you.
10          So I'm depending on you to tell me
11  whatever you can about it.
12     A.   Well, I -- I haven't looked at it for
13  ten years, so I cannot recall whether or not this is
14  the exact document or not.
15     Q.   Okay.  Is there some other document that
16  you think would be it instead?
17     A.   Pardon me?
18     Q.   Are you aware of some other document
19  that you think would be --
20     A.   No, I --
21     Q.   -- the report that you --
22     A.   My recollection is that they prepared
23  one document.
24     Q.   Okay.
25     A.   And this seems similar to the cover

Page 248

1   page.  I don't know if all the other pages are
2   included.
3      Q.   What do you mean by that?
4      A.   Well, my recollection, ten years ago,
5   that this looked like the cover page of the document,
6   but I can't verify that this is the complete document.
7      Q.   In other words, you can't verify that
8   it's all here.
9           Right?
10     A.   Correct.
11     Q.   Okay.
12     A.   This looks very similar to the cover
13  page I saw ten years ago.
14     Q.   Okay.  And looking through it, do the
15  contents of it also appear similar to the report that
16  you saw ten years ago?
17     A.   I wouldn't be able to recall what the
18  document --
19     Q.   Okay.
20     A.   -- the complete document included ten
21  years ago.
22     Q.   Do you have any reason to believe this
23  is not the report that you've testified about?
24     A.   If you -- if you say that is the report,
25  then I would believe it's the report.

Page 249

1      Q.   I don't know.  I got it from you.  I
2   know nothing about it other --
3      A.   Well --
4      Q.   -- than I got it from you and what it
5   says on it.
6      A.   I stand by my response.
7      Q.   So you just don't know whether this is
8   the report or not?
9      A.   The complete report.  It looks like the
10  report.  The cover page looks like the cover page of
11  the report.  I cannot verify that all the other pages
12  were the pages of the report.
13     Q.   Okay.  Thank you.
14          So you believe that the pages that are
15  here are pages from the report.
16          You just can't be sure whether or not
17  there was something else?
18     A.   Yeah, I believe the cover page is --
19  is -- looks like the cover page I received ten years
20  ago.
21     Q.   Do you have any reason to think that any
22  of the other pages are not the report?
23     A.   I do not have any reason, because I
24  haven't read it.
25     Q.   Okay.  Well, take a minute and look

Page 250

1  through it, and tell me if you think it's the report
2  or not.
3      A.  Well, I looked at this report ten years
4  ago, so I wouldn't be able, even looking at it, to
5  determine whether or not it was the report.
6          I don't think I'm able to give you any
7  more information, after quickly reviewing the report,
8  other than what I've already testified.
9      Q.  Okay.  Well, let's take this a piece at
10  a time.
11         You testified that the people who are
12  listed here, other than yourself, prepared a report
13  that was the basis of their contribution to the
14  invention.
15         Right?
16     A.  That's correct.
17     Q.  And you've testified that they only
18  prepared one report.
19         Right?
20     A.  That's my recollection.
21     Q.  And you don't recall ever seeing any
22  other document other than the one report.
23         Right?
24     A.  That's correct.
25     Q.  Okay.  So if this document is not the

Page 251

1  report, then you never saw this document before.
2          Is that right?
3      A.  Well, the first page looks like it's the
4  first page of the report.
5      Q.  Okay.  So --
6      A.  I --
7      Q.  -- what else could it be?
8      A.  I -- I would assume it is, but in order
9  to testify that it is the report that was given to me
10  ten years ago, I'm unable to do that.
11     Q.  Okay.  But you received this from the
12  people who wrote it.
13         Right?
14     A.  I received a report from the people who
15  wrote it, yes.
16     Q.  And you received this document from the
17  people who wrote the report?
18     A.  No, that's what I'm trying to say.
19         I received a document from the people --
20  these co-inventors mentioned in this report, and the
21  front page looks like the front page of the report
22  that I received ten years ago.
23     Q.  Okay.
24     A.  But I'm unable to verify whether the
25  other pages were exactly what the pages of the

Page 252

1  original report consisted of.
2      Q.  Is that what you're going to tell the
3  jury when you're asked about this document in court?
4      A.  Yes.
5      Q.  Okay.  That you can't tell what it is?
6      A.  No, I didn't say I can't tell what it
7  is.
8          You -- you asked me if this was a
9  document that was prepared by these co-inventors.
10     Q.  Okay.
11     A.  And my answer was that the front page --
12  I haven't read it for ten years, and the front page
13  looks like the front page of the document that I
14  received ten years ago.
15         But I cannot verify whether the pages
16  after the front page were all the pages in the
17  document that I received ten years ago.
18     Q.  And that's what you're going to testify
19  at trial?
20     A.  I believe so.
21     Q.  Okay.
22     MR. STEPHENS:  Mark that, please.
23     (Whereupon E. Gottfurcht Exhibit 13 was
24     marked for identification)
25     / / /

Page 253

1  BY MR. STEPHENS:
2      Q.  Mr. Gottfurcht, the court reporter has
3  handed you E. Gottfurcht Exhibit 13 bearing Bates
4  numbers EMG 002599.
5          That's an e-mail from you to
6  aditya@yahoo-inc.com.
7          Right?
8      A.  Yes.
9      Q.  And you sent that Tuesday, May 4th,
10  2004.
11         Right?
12     A.  Yes.
13     Q.  Who is aditya@yahoo-inc.com?
14     A.  He was, I believe, one that was going to
15  review our patents to determine if Yahoo had interest
16  in launching MallTV -- that's what I believe -- six
17  years ago, over six years ago.  But I believe that's
18  what it was about.
19     Q.  And then you had spoken to him that day.
20         Is that right?
21     A.  Yes.
22     Q.  And in the e-mail, in the second
23  paragraph, you're saying, "The television user selects
24  the desired services from a set of displayed options
25  using a remote control by pressing one-click on a

Page 254

1 corresponding key."
2        Do you see that?
3    A.  Yes.
4    Q.  And then you say, "Our patent
5 Number 6,600,497 covers the full operation of the
6 MallTV/Yahoo cable channel, including all Web content,
7 shopping, games and entertainment, on a simplified
8 matrix interface navigated with single clicks (unique
9 inputs) on a remote control."
10        Do you see that?
11    A.  Yes.
12    Q.  Those are your words.
13        Right?
14    A.  Yes.
15    Q.  And you're describing what the claims of
16 the 497 patent cover to Mr. Aditya.
17        Correct?
18    A.  I -- I was describing -- it was quite
19 some time ago, but I believe I was describing what the
20 prototype could do.
21    Q.  You were describing specifically what
22 the 497 patent covers?
23    A.  I -- I -- I understand what it says
24 there, but in my mind, I was relating to a cable
25 channel that would be navigated in this fashion.

Page 255

1    Q.  Could you read the next paragraph out
2 loud, please?
3    A.  "In addition, if either patent
4 application outlined in BST&Z's intellectual property
5 report listed as B-1, apparatus and method for
6 simplified wide-area network navigation, (all Web
7 content reconfigured for simplified navigation on any
8 system including scrolling), or B-2, quote, 'method to
9 advertise and search on television for Web content
10 using a simplified interface', close quote, were
11 issued.  Others attempting to offer similar services
12 would most likely infringe on these patents."
13    Q.  Okay.  Did you provide BST&Z's
14 intellectual property report to Aditya at Yahoo?
15    A.  I don't recall.
16    Q.  What's the relationship between B-1 and
17 B-2 in the patents in this lawsuit?
18    A.  I don't recall.
19    Q.  They're -- they're the applications that
20 resulted in the patents in this lawsuit.
21        Right?
22    A.  No, I don't recall.
23    Q.  Okay.  You just don't know one way or
24 other?
25    A.  Yeah, I don't know.

Page 256

1    Q.  Okay.  Do you have a copy of BST&Z's
2 intellectual property report?
3    A.  Only what I have supplied to you in the
4 production of documents.
5    Q.  Did you request -- did you request a
6 copy of it from Blakely Sokoloff?
7    A.  I do not recall.
8    MR. STEPHENS:  Well, we don't have one, so we
9 need it.
10        Also, it's our position that this letter
11 waives any privilege that Mr. Gottfurcht has been
12 asserting in the coverage of the patents and refusing
13 to answer on that basis.
14        So we will be asking for Mr. Gottfurcht
15 to return and testify pursuant to that waiver,
16 assuming you're not going to just agree that there's a
17 waiver --
18    MR. BECKER:  I do not agree.
19    MR. STEPHENS:  Okay.
20        Okay.  We need to take a short break
21 just to change the tape.  We don't really have to
22 leave the room or anything unless you guys need to.
23    THE VIDEOGRAPHER:  This marks the end of tape
24 Number 3 in the deposition of Elliot Gottfurcht.
25        Going off the record.

Page 257

1        The time is 5:49 p.m.
2        (Whereupon E. Gottfurcht Exhibit 14 was
3        marked for identification)
4    THE VIDEOGRAPHER:  Back on the record.
5        Here marks the beginning of tape
6 Number 4 in the deposition of Elliot Gottfurcht.
7        The time is 5:55 p.m.
8 BY MR. STEPHENS:
9    Q.  Mr. Gottfurcht, do you have
10 E. Gottfurcht 14, which has Bates numbers EMG 00613
11 through 617?
12    A.  Yes.
13    Q.  Can you tell me what that is?
14    A.  This is an e-mail from my daughter to me
15 on May 21st, 2008, 8:20 p.m.
16    Q.  2004.
17    A.  Excuse me, 2004.  Thank you.
18    Q.  And what's it about?
19    A.  I cannot recall exactly what it was
20 about, but I have a recollection that Yahoo asked for
21 certain information, and I think this was some of the
22 information that they had requested.
23    Q.  Did you provide this information to
24 Yahoo?
25    A.  I don't know if I provided it in this

65 (Pages 254 to 257)

Page 258

1  form and I don't know if we provided all this
2  information, but I think some of this information, I
3  recall, is what Yahoo requested for their review.
4      Q.   Okay.  And -- and some of it, you
5  provided to them?
6      A.   I -- I think some of it looks familiar.
7      Q.   Okay.  Did you ever do a deal with
8  Yahoo?
9      A.   No.
10      Q.   Does Yahoo infringe your patents?
11      MR. BECKER:  I'll instruct you not to answer
12  that if it requires you to divulge attorney-client
13  communications.
14      THE WITNESS:  Okay.
15  BY MR. STEPHENS:
16      Q.   Is it your belief that Yahoo infringes
17  your patent?
18      A.   It would -- it would reveal
19  attorney-client privilege.
20      Q.   Okay.  Did you believe at the time that
21  your daughter and you compiled the information in
22  E. Gottfurcht Exhibit 14, that Yahoo was infringing
23  your patents at the time?
24      A.   I do not believe so.
25      Q.   You did not think they were infringing?

Page 259

1      A.   I -- I do not believe so.  I don't
2  recall, but I -- it's something that I don't re --
3      Q.   Okay.
4      A.   -- I remembered.
5      Q.   Now, there's a discussion of prior art
6  in here.
7          Right?
8      A.   Reference patent -- where would that be?
9      Q.   So, for example, on the Page 2615,
10  there's a discussion of a bunch of patents.
11      A.   So the three patents under "A"?
12      Q.   Yeah.  So the -- the top of that page,
13  it says, "MallTV's patent claims differ from all prior
14  art, primarily in four areas."
15          Do you see that?
16      A.   Yes, I do see that.
17      Q.   It says, "Web content on simplified
18  interface"?
19      A.   Right.
20      Q.   On -- why don't -- let me ask him to
21  read it, actually.
22          Could you just read those --
23      A.   Yes.
24      Q.   -- four words into the record?
25      A.   "Web" --

Page 260

1      Q.   Let me -- let me just ask you to start
2  with "MallTV's patent claims," and read through there
3  to the --
4      A.   "MallTV's pat --
5      Q.   Go ahead.
6      A.   "MallTV's patent claims differ from all
7  prior art, primarily in four areas:  Web content on
8  simplified interface, easy one-click navigation,
9  reconfigured Web content on simplified interface,
10  advertise and search for Web content on simplified
11  interface."
12      Q.   And you shared that information with
13  Yahoo?
14      A.   I don't recall.
15      Q.   Okay.  And then it discusses quite a bit
16  of prior art following that.
17          Right?
18      A.   There are three references, I believe,
19  to prior art.
20      Q.   Did you, yourself, compare MallTV's
21  patented claims with that prior art?
22      A.   I don't recall.
23          I know that Yahoo requested certain
24  information, and I don't know if this was part of
25  their request.  I just don't recall.

Page 261

1      Q.   I'm not asking about their request.  I'm
2  asking whether you, yourself, compare the claims in
3  your patents with the prior art that's listed here.
4      A.   I don't recall.
5      Q.   Okay.  Now, it mentions on Page 2616,
6  "WebTV, among other things."
7          Do you see that?
8      A.   Yes.
9      Q.   Did you ever own a WebTV?
10      A.   I don't recall.  I don't believe so.
11      Q.   Now, Apple sent a collection of prior
12  art to your counsel some weeks ago.
13          You're aware of that.
14          Right?
15      A.   Yes, I am.
16      Q.   Did you look at any of that art?
17      A.   I did.
18      Q.   And did you look at the WebTV art in
19  particular?
20      A.   I don't -- I don't recall.  I think I
21  saw it.  I'm not sure I read it in detail.
22      Q.   How do your patented claims differ from
23  WebTV?
24      MR. BECKER:  And if that requires you to
25  divulge attorney advice on that issue, I instruct you

66 (Pages 258 to 261)

Page 262

1   not to answer.
2         THE WITNESS:  Well, I don't own a WebTV, so I
3   wouldn't be able to answer that question.  I'm not
4   familiar with WebTV.
5   BY MR. STEPHENS:
6         Q.  Okay.  Did you look at the World Wide
7   Web Consortium art that we provided?
8         A.  I looked at the cover page.  I did not
9   read it in detail.
10        Q.  How do your patented claims differ from
11  the World Wide Web Consortium prior part that we
12  provided?
13        MR. BECKER:  Same objection.
14        MR. STEPHENS:  Okay.
15        Q.  And what's your answer, sir?
16        A.  My answer is, I don't have the
17  expertise, and I did not read the W3C report.
18        Q.  Okay.  Did you do enough analysis of any
19  of the art that we provided to make a determination as
20  to whether or not your claims are invalid with respect
21  to that art?
22        MR. BECKER:  Same objection.
23  BY MR. STEPHENS:
24        Q.  I'm asking about what you, yourself,
25  did; not what you were informed by your lawyers.

Page 263

1         A.  No, I -- I reviewed the patents, and in
2   my review, I was unable to see -- in my limited
3   review, I was unable to see how they were prior art.
4         Q.  What do you mean?
5         That they were not prior art, in other
6   words, they were dated after your --
7         A.  Some -- my recollection is that -- and
8   this is just guessing now, as to my memory -- that
9   there were 15 patent references.
10        Q.  I'm not asking about those.  I'm asking
11  about the World Wide Web Consortium references.
12        A.  Oh, that one?
13        I did not read that document.
14        Q.  Okay.  But that was prior art.
15        Right?
16        You could tell that from the cover page?
17        MR. BECKER:  Object.  Form.
18        THE WITNESS:  I saw it in the document.  I --
19  I -- that's all I can say, that it was part of the
20  documents that you supplied.
21  BY MR. STEPHENS:
22        Q.  Okay.  And you don't know anything more
23  about it?
24        A.  No.
25        Q.  And the same thing's true with the WebTV

Page 264

1   references we provided?
2         A.  That's correct.
3         Q.  Okay.  Other than --
4         A.  Other than what my -- attorney-client
5   privilege.
6         Q.  Now, we also made available to your
7   counsel a WebEX presentation online last Friday.
8         Did you view that?
9         A.  No.
10        Q.  Did -- have you seen any of the results
11  from it?
12        In other words, have you seen any
13  information derived from that WebEX display?
14        MR. BECKER:  Object.  If that -- if that
15  information is advice from your counsel or counseling
16  from your counsel, then I would instruct you not to
17  answer with respect to that.
18  BY MR. STEPHENS:
19        Q.  Okay.  So just to be clear, your counsel
20  sat and watched it for four hours, took detailed notes
21  and provided those to you, and you're not going to
22  testify about it.
23        Right?
24        MR. BECKER:  Object to form.
25        / / /

Page 265

1   BY MR. STEPHENS:
2         Q.  Is that what happened?
3         A.  I don't know how many hours they looked
4   at it.
5         Q.  I do.  They spent four hours looking at
6   it.
7         A.  Okay.  But I -- I didn't look at it --
8         Q.  Okay.
9         A.  -- for four hours.
10        Q.  And they provided you information about
11  it.
12        Right?
13        MR. BECKER:  And any communication from your
14  attorneys and/or advice from your attorneys on the
15  subject, I instruct you not to answer that.
16  BY MR. STEPHENS:
17        Q.  And are you going to --
18        A.  That's correct.
19        Q.  Okay.  You're not going to answer that
20  question?
21        A.  That's true.
22        Q.  What makes you think that Apple
23  infringes your patents, other than advice of counsel?
24        MR. BECKER:  Same objection.
25        THE WITNESS:  Are you instructing me not to

67 (Pages 262 to 265)

Page 266

1  answer?
2      MR. BECKER:  To the extent that your answer
3  will divulge attorney-client communications or advice
4  on this.
5  BY MR. STEPHENS:
6      Q.  I'm not asking for advice.
7      A.  I -- I understand.
8          I'll go back to July 1st to July 7th,
9  and if I just focus on that period of time before I
10 hired any counsel, I'd be able to have the privilege,
11 if it was before counsel was hired.
12         I see on the -- on the iPhone, the iPod
13 Touch, sister sites in the form of applications, in
14 the form of reformatted Web pages that are very
15 similar to what the invention was in July of 1999.
16         I see on Apple devices, I see that on
17 reformatted Web pages, I see navigation -- simplified
18 navigation interfaces, I see unique input navigation,
19 I said -- I see sister sites, and I see manipulating a
20 screen for zooming and scrolling.
21         So what I have seen on Apple's devices
22 looks the same as what I envisioned in July of 1999
23 for displaying Internet content on cell phones and
24 wireless devices.
25         I see them displayed on the iPhone and

Page 267

1  on the iPod Touch, what I had -- we had invented in
2  1999.
3      Q.  Okay.  And that's the basis of your
4  belief that Apple infringes.
5          Is that right?
6      MR. BECKER:  Same instruction.
7      THE WITNESS:  Well, that's separate from --
8  BY MR. STEPHENS:
9      Q.  Advice of counsel?
10     A.  -- advice of counsel.  That's -- that --
11 well, that's part of it.  There may be more.
12         The iTunes mobile page seems to me to be
13 a reformatted page, similar to the inventions in 1999.
14     Q.  Now, you understand with respect to the
15 iPhone reformatted Web pages, that Apple doesn't do
16 that reformatting.
17         Correct?
18     MR. BECKER:  Object.  Form.
19         And again, if it would require you to
20 divulge advice of counsel, I would instruct --
21     THE WITNESS:  Yeah, I think that --
22     MR. BECKER:  -- instruct you not to divulge
23 that.
24     THE WITNESS:  I think that would --
25     / / /

Page 268

1  BY MR. STEPHENS:
2      Q.  Let's -- let's put that to one side and
3  say, I'm going to ask you to assume and I'm going to
4  represent to you that Apple does not do the
5  reformatting of websites that's been accused in this
6  case.
7          Does that affect your view of whether or
8  not Apple infringes --
9      A.  You mean including the iTunes site?
10     COURT REPORTER:  Does that affect your view --
11 BY MR. STEPHENS:
12     Q.  -- of whether Apple infringes in this
13 case?
14     A.  No, that's --
15     MR. BECKER:  Same instruction.
16     THE WITNESS:  That would not -- that's --
17 BY MR. STEPHENS:
18     Q.  So it doesn't matter whether or not
19 Apple does the reformatting.
20         Apple infringes just because they can
21 display the reformatted Web page --
22     MR. BECKER:  Wait, wait, wait.
23 BY MR. STEPHENS:
24     Q.  -- is that --
25     MR. BECKER:  Do not divulge the contents of

Page 269

1  any --
2      MR. STEPHENS:  Stop coaching him.
3      MR. BECKER:  -- attorney-client privilege.
4      MR. STEPHENS:  I don't -- I don't want you
5  to -- I'm not asking for --
6      MR. BECKER:  I'm entitled to make my
7  objections.
8      MR. STEPHENS:  You're not entitled to coach
9  the witness.
10     MR. BECKER:  I'm entitled to make an
11 attorney-client objection.
12     THE WITNESS:  Well, let me give my answer.
13     MR. BECKER:  I'm entitled to make an
14 attorney-client objection.  I'm instructing my witness
15 not to answer the question if it divulges
16 attorney-client communications.
17     MR. STEPHENS:  He's a smart guy; he knows
18 that.
19 BY MR. STEPHENS:
20     Q.  Go ahead.
21     A.  It would divulge attorney-client
22 privilege.
23     Q.  So you can't tell me whether or not the
24 fact that Apple doesn't reformat the Web pages has any
25 effect on your view of whether or not Apple practices

Page 270

1    the invention, as you understood it back in 1999 --
2         MR. BECKER:  Same instruction.
3    BY MR. STEPHENS:
4         Q.   -- right?
5         A.   I will go with counsel.
6
7
8
9              **REDACTED**
10
11
12
13
14
15
16         Q.   And you believe that Apple should pay
17   also for displays of Bloomberg websites on the iPhone.
18              Right?
19         MR. BECKER:  Object.  Form.
20         THE WITNESS:  Do I believe that -- that would
21   be a legal document, would be interpretation of a
22   legal document, which I'm not qualified to make.
23   BY MR. STEPHENS:
24         Q.   No, I'm just asking for your belief that
25   Apple owes you money for the use of the Bloomberg

Page 271

1    website on iPhones.
2         A.   Well, that would -- that would -- to me,
3    that would go to the license with Bloomberg.
4         Q.   And do you believe you've licensed
5    Bloomberg in such a way that Apple also has to pay for
6    the display --
7         A.   That's a legal question I'm unable --
8    that's a legal question and I'm not able to answer
9    that.
10        Q.   So you don't have an opinion?
11        A.   No.
12        Q.   You, in fact, are seeking money from
13   Apple, though, on that.
14             Right?
15        MR. BECKER:  Object.  Form.
16        THE WITNESS:  And again, that's -- that would
17   be a legal --
18   BY MR. STEPHENS:
19        Q.   It's not a legal question.  It depends
20   on interpretation.  It's a fact.
21             Your counsel has sent us an e-mail
22   saying that they are continuing to assert infringement
23   against Apple based on the Bloomberg Web pages and
24   application.
25             You're aware of that.

Page 272

1              Right?
2         MR. BECKER:  Object.  Form.
3         THE WITNESS:  I don't -- if they sent it to me
4    and it happened and I've read that particular e-mail,
5    I would be aware of it.
6    BY MR. STEPHENS:
7         Q.   And you control this litigation.
8              Right?
9              If you told them to stop asserting that,
10   they would stop.
11             Right?
12        MR. BECKER:  Object.  Form.
13        THE WITNESS:  Well, if they told me to stop,
14   it would be my decision whether I would stop.
15   BY MR. STEPHENS:
16        Q.   I'm not asking whether they told you to
17   stop.
18             I'm saying, if you decided to stop
19   making the assertion that Apple should pay you for
20   displaying Bloomberg Web pages by its customers, you
21   could tell them to stop and they would.
22             Right?
23        A.   Yes.
24        Q.   Okay.  So it's your decision that
25   Apple -- you believe that Apple should pay for Apple

Page 273

1    customers displaying Bloomberg websites.
2              Right?
3         MR. BECKER:  Object.  Form.
4         THE WITNESS:  I -- again, that's a le -- that
5    goes into a legal interpretation of the agreement.
6    BY MR. STEPHENS:
7         Q.   Okay.  So do you believe today that
8    Yahoo infringes your invention, as you understood it
9    in 1999?
10        MR. BECKER:  Again, I'm just cautioning you
11   not to divulge attorney-client communications.  I'm
12   not sure --
13        MR. STEPHENS:  Maybe -- let me rephrase it.
14        MR. BECKER:  -- if he needs to rephrase it.
15   BY MR. STEPHENS:
16        Q.   Do you believe today that Yahoo is
17   practicing your invention that you conceived of back
18   in 1999?
19        MR. BECKER:  Same instructions.
20        THE WITNESS:  That would be advice of counsel.
21   BY MR. STEPHENS:
22        Q.   You don't have a view other than what
23   counsel has told you?
24        MR. BECKER:  Same instruction.
25        THE WITNESS:  If you ask -- if you ask me

69 (Pages 270 to 273)

Page 274

1  something more specific, maybe I can give you a more
2  specific response.
3  BY MR. STEPHENS:
4      Q.  I'm not sure how to ask it more
5  specifically.
6          Do you believe that -- that Yahoo
7  performs the elements that you conceived of back in
8  July of 1999?
9      MR. BECKER:  Same objection.
10      THE WITNESS:  And that would be a legal
11  question.
12  BY MR. STEPHENS:
13      Q.  I'm not --
14      A.  I --
15      Q.  I'm not asking for claim construction.
16          I'm just asking whether they practiced
17  your invention.
18          You've looked at their website.
19          Right?
20      A.  Their mobile website.
21      Q.  On -- on the iPhone?
22      A.  Yes, I have.
23      Q.  And do you believe that Yahoo was
24  practicing what you conceived of back in July of 1999?
25      MR. BECKER:  Same objection.

Page 275

1      THE WITNESS:  I believe that I should listen
2  to my attorney because that's a legal question.
3  BY MR. STEPHENS:
4      Q.  And you're not going to answer --
5      A.  I'm not going to answer a legal
6  question --
7      Q.  Okay.
8      A.  -- unless my attorney says it's okay.
9      Q.  And he's not -- he's not telling you
10  it's okay, so you're not going it answer it.
11          Right?
12      A.  (No audible response.)
13      Q.  Okay.  Well, we'll just -- we'll deal
14  with it.
15          Now, did your invention, as you
16  conceived it back in July of 1999, encompass the
17  notion of two completely separate people developing
18  completely separate websites but sharing content, one
19  being simpler than the other?
20      MR. BECKER:  Object.  Form.
21      THE WITNESS:  Well, there were several
22  embodiments I had in mind, if that -- during the
23  six-day period before I -- it was flushed out, further
24  developed, more embodiments were added.
25          And during that particular time, I

Page 276

1  thought that the -- the sister site would be related
2  to the main site, so they would be related.  It could
3  be a separate site, as long as it related and some of
4  the content were the same content.
5  BY MR. STEPHENS:
6      Q.  So how would they need to be related
7  other than having the same content, some of the same
8  content?
9      A.  They would -- at that time -- I'm
10  talking about during those six days, if -- that -- if
11  the content were on a standard site and the sister
12  sate would have some of that same content, fewer
13  options, different layout, that there would have to be
14  a relationship between the two in order for that
15  content to be -- some of the content to be identical,
16  as it would be on the sister site.
17      Q.  And I -- that's what -- that's what I'm
18  trying to understand.
19          What is the relationship?
20          Is it just that they have some of the
21  same content?
22      A.  No, there must be a relationship beyond
23  that.  I don't think that people can just access
24  randomly other people's database and -- and -- and
25  prepare these sites.  There has to be a relationship.

Page 277

1      Q.  And what's that -- what -- what does
2  that relationship have to be?
3      A.  Well, it could take many forms.
4      Q.  Can you give me some examples?
5      A.  Well, it could be the same owner.  It
6  could be like -- like one was preparing -- Yahoo
7  prepared a standard site and they would have other
8  people that would prepare the mobile site.  They could
9  hire somebody to do that.  But they'd have to be
10  related.
11      Q.  So as long as --
12      A.  They'd have to be associated.
13      Q.  So as long as the two websites were
14  owned by the same company and they had some content in
15  common, that's all that's required?
16      A.  No, no, I said -- no, not at all.
17      Q.  Okay.
18      A.  I said, first of all, that was just
19  during those six days.  It could be done either way.
20  It could be done where they hired an outside person
21  that said, Come on, here's access to our database.
22          We want to have a reformatted mobile
23  site, to be on a simplified navigation interface or an
24  application or sister site.  But they would have to in
25  some way have an arrangement, relationship.

Page 278

1    Q.   So I'm just trying to understand an
2  example of where that relationship would hold.
3        So if you have two websites designed by
4  different people, they have some content in common,
5  one is simpler than the other, and they're both owned
6  by the same company, would that satisfy the
7  relationship that you're talking about?
8    A.   Could you repeat that?
9    MR. BECKER:  Object to form.
10 BY MR. STEPHENS:
11   Q.   Two separate websites --
12   A.   Please repeat the question.
13   (Whereupon the record was read as follows:)
14   "QUESTION:  So I'm just trying to
15   understand an example of where that
16   relationship would hold.
17       So if you have two websites
18   designed by different people, they have
19   some content in common, one is simpler
20   than the other, and they're both owned by
21   the same company, would that satisfy the
22   relationship that you're talking about?
23   MR. BECKER:  Object to form."
24   THE WITNESS:  Could you break the question
25 down?  I saw two different items in there that seemed

Page 279

1  to conflict with each other.
2        If you can break it down, I could
3  certainly --
4  BY MR. STEPHENS:
5    Q.   Okay.  Well, I thought you said that it
6  wasn't enough for there to be content in common.
7        Right?
8        That's not your invention, just to have
9  the same content -- some of the same content on one
10 site that's simpler than another site?
11   A.   That would be -- that would be -- in
12 July, that would be one of the criteria, to have some
13 of the content be the same.
14   Q.   Okay.  And I'm just trying to understand
15 what else is required.
16       Is it enough that it's owned by the same
17 people?
18   MR. BECKER:  Object.  Form.
19   THE WITNESS:  Well, the content -- some of the
20 content would be the same.  It would have to be on a
21 simplified navigation interface versus a standard Web
22 page interface.  It would be called a sister site.
23       Navigation, it would be a different type
24 of navigation.  It would be navigation with unique
25 inputs, whether with the mouse and so forth.  It would

Page 280

1  be touching, for example, a region of the screen for
2  zooming and scrolling.
3        So those are all different things.
4    MR. STEPHENS:  Would you mark that, please.
5    (Whereupon E. Gottfurcht Exhibit 15 was
6    marked for identification)
7  BY MR. STEPHENS:
8    Q.   Mr. Gottfurcht, you have E. Gottfurcht
9  Exhibit 15, which has Bates numbers EMG 004482 through
10 4490?
11   A.   Yes.
12   Q.   Can you take a look at that and tell me
13 what it is?
14   A.   Yes.
15       The -- the first page is what I believe
16 I sent to Rick Soss in order to develop a document.
17       This court claim construction is -- is
18 what he prepared.  He just did this on his own.  He
19 does a lot of patent work.
20       I did not instruct him to do what he
21 calls the court's claim construction.  He interpreted
22 what I was looking for to be that.
23       That's not what I was looking for at
24 all.  He did this on his own.  We never used it.  He
25 was just -- does this frequently and just went on his

Page 281

1  own to do this page.
2        The first part, what I believe I
3  requested was, was a presentation that I made to
4  you -- it's part of his documents that he requested.
5        It was a presentation I made during
6  mediation, where I had -- part of it was, I had the
7  claim -- the 196 claim on the left side, and on the
8  right side, I had the NBC sister site and the NBC
9  standard site.
10       And that was the presentation that I
11 made to you that you have a copy of, that I requested.
12       Instead, he went ahead and did this on
13 his own.
14   Q.   Okay.  So these are his interpretations?
15   A.   I -- I don't know what he even did here.
16 I didn't pay attention to it.  I didn't read it.  And
17 I called him up --
18       Rick did a lot of legal work for these
19 kinds of things, and I -- I said I didn't want that at
20 all.
21       And I explained to him what I wanted.
22 This one page is some of what I wanted and is part of
23 my production of documents that leads into where you
24 go through sentence-by-sentence of animation of the
25 196 claim.

1    Q.   Okay.  So the first page is the cover
2  e-mail, the second page is the document that you sent
3  to him asking him to do the work, and then the
4  attachments are what he sent you back.
5        Right?
6    A.   He went solo on this, and I have no idea
7  why he did it.  And I -- and I said -- notified him
8  this is not what I wanted and explained to him what I
9  wanted.
10   Q.   Okay.  Did you keep any record of
11 telling him that?
12   A.   I told him that he didn't do the right
13 thing and that -- ignore it, and -- and it had no use
14 for me.
15        And -- he does this all the time, so I
16 think that's -- he -- he interpreted this to mean what
17 I was describing, but it wasn't at all.
18   Q.   Again, did you keep any record of
19 telling him that it wasn't what you wanted?
20   A.   I may have it in an e-mail to him, but I
21 probably -- something like this, I would call him up
22 and say, Rick, this is not what I had in mind.
23   MR. STEPHENS:  Okay.  Mark this, please.
24   (Whereupon E. Gottfurcht Exhibit 16 was
25        marked for identification)

1    MR. BECKER:  Could I have a copy of that,
2  Garland?
3    MR. STEPHENS:  Didn't I hand it to you?
4        I guess I didn't.
5    MR. LANE:  Here you go.
6    MR. BECKER:  Thank you.
7  BY MR. STEPHENS:
8    Q.   Do you have E. Gottfurcht Exhibit 16,
9  which is Bates numbers EMG 004720 and 4721?
10   A.   Yes.
11   Q.   Tell me what that is.
12   A.   This is an e-mail that I sent to Angel
13 when we were having this discussion on transcoding.
14 This is what I sent to her.
15   Q.   And could you just read into the record
16 the -- the stuff that you sent to her on the second
17 page of this exhibit?
18   A.   Yes.
19        The title is "Reformatting Content Via
20 Transcoding."
21        "1, It is inherent that there must be an
22 intermediate step required.
23        2, Figure 2-A content reformatted into
24 Figure 2-B must include an intermediate step of a
25 human designing, laying out, and organizing the

1  content of Figure 2-B.  It is impossible to do this
2  solely with a transcoder.
3        3, The correct drill-down sequence to
4  purchase the Technic receiver would be impossible by
5  solely using a transcoder which requires an order --
6  which requires, in order:
7        Figure 10-A, (shopping and products);
8  10-B, (electronics); 10-C, (audio); 10-D, (receivers);
9  10-E, (stereo only); 10-F, (Technics); 10-G,
10 (purchasing Technics)."
11   Q.   And those are all your words?
12   A.   Yes.
13   Q.   And why did you send that to Angel?
14   A.   I think in a discussion I had with
15 Angel, she had said something different about this.
16        I then looked it up in Wikipedia, and
17 this is the definition that I derived at, inserting
18 different figures that were in the -- in the patent.
19   Q.   You looked up "transcoding" in Wik --
20 Wikipedia?
21   A.   That's correct.
22   Q.   Okay.  And your analysis of -- after
23 looking up the meaning of transcoding was that you
24 can't go from Figure 2-A to Figure 2-B in your patent
25 using a transcoder.

1        Right?
2    A.   That's correct.  It's a process.
3    Q.   Okay.
4    A.   And that's the definition that -- that I
5  looked up in Wikipedia.
6    Q.   Okay.  How do you go from Figure 2-A to
7  Figure 2-B?
8    A.   Well, my original knowledge of that was
9  with -- with counsel, so -- I think I answered this
10 before, that there's a line there.  It's hard for me
11 to parse what counsel told me years ago and anything I
12 would learn in the future that may differ from what
13 counsel told me years ago.
14   Q.   And, in fact, you refused to answer my
15 questions earlier today about how you get from
16 Figure 2-A to Figure 2-B.
17   A.   That's correct.  And -- and here, I
18 looked it up in Wikipedia and reported it back to her.
19   Q.   And you didn't -- it didn't stop you
20 from telling her about how you'd get from Figure 2-A
21 to 2-B.
22        Right?
23   A.   Well, we were having this conversation
24 back and forth, and I was -- that was what came to me,
25 to mind --

1    Q.   Okay.
2    A.   -- is to look it up in Wikipedia and
3  deliver it back to her.
4    Q.   So Figure 3 of the 845 patent wouldn't
5  allow you to get from Figure 2-A to Figure 2-B by
6  itself.
7       Right?
8    MR. BECKER:  Object.  Form.
9    THE WITNESS:  I don't -- I don't have those --
10 BY MR. STEPHENS:
11   Q.   That's the figure that shows the
12 transcoder?
13   A.   Oh, that's Figure --
14   Q.   3.
15   A.   -- 3, okay.
16      And the information I learned about
17 Figure 3 was from counsel.
18      Okay.  This is later, almost ten years
19 later, when I looked it up in Wikipedia.
20   Q.   Do you think -- well, let me ask it
21 differently.
22      Do you have any reason to think that
23 Apple copied anything you did?
24   A.   I have no reason to believe that they
25 copied anything that I did.  I have no evidence that

1  they were privy to my patent documents or any of the
2  information that I supplied to others.
3    Q.   Now, other than the licenses in this
4  lawsuit with Bloomberg, UPS, and Continental, have you
5  ever derived any revenue from your inventions?
6    A.   No.
7    Q.   So you haven't been able to license it
8  to anybody else outside the litigation.
9       Right?
10   A.   As of today?
11   Q.   Yes.
12   A.   No.
13   Q.   And you haven't been able to derive any
14 revenue from the MallTV.com site.
15      Right?
16   A.   I have not derived any income from the
17 MallTV.com site.
18   Q.   And it's not for want of trying.
19      Correct?
20   A.   I don't know what it's -- well, I -- I
21 think there's much more to it than that.
22   Q.   Well, explain, then.
23   A.   Yes.
24      During the several years, I met with
25 several potential partners to launch MallTV.

1    Q.   Okay.  Go ahead.
2    A.   And I found that until I had a meeting
3  with NBC right after the iPhone came out, I don't
4  think any of them ever understood how -- because I was
5  describing -- I -- I learned later, I was describing
6  the iPhone for many years.  And -- and these different
7  companies never understood what I was saying.
8       Finally, in a meeting with NBC -- I
9  think it was the president of NBC.com.  I don't
10 remember his name -- he's the first person that really
11 understood what I was talking about.
12   Q.   You don't remember who that was?
13   A.   No, I do not.
14   Q.   What did he say?
15   A.   He was fascinated by it, and he -- he
16 said -- I showed him that Disney.com had been
17 reformatted into a sister site, M.disney.com, for the
18 iPhone.
19      And he was absolutely -- he had never
20 heard it before.  He -- he had never realized that on
21 a mobile device, that you would need to reformat your
22 content, as he was in charge of, as I understood, at
23 NBC, into this simplified navigation interface.
24   Q.   So he was in charge of reformatting
25 Disney?

1    A.   No, he was -- no, he -- he was in charge
2  of, I believe, NBC.com.
3       And when I went to see him and I -- and
4  I showed him the demo, and had other information that
5  I showed him, he was fascinated that he had not
6  thought of -- he had not thought of how NBC, which I
7  think was his responsibility, would be displayed on a
8  mobile device.
9    Q.   When did this meeting happen?
10   A.   I think it was shortly after the iPhone
11 came out.
12   Q.   If you invented this user interface back
13 in 1999, why didn't you build it sooner?
14   MR. BECKER:  Object.  Form.
15   THE WITNESS:  It -- it wasn't necessarily my
16 plan to build it.  My plan was -- well, one of my
17 plans was to joint venture.
18 BY MR. STEPHENS:
19   Q.   But you couldn't get anybody interested
20 in doing a joint venture.
21      Right?
22   A.   What I was saying is, the reason is,
23 that -- that -- that I would -- in 1999 and 2000,
24 2001, so forth, every single year, as I've evidenced
25 to you in my documents, I tried.

73 (Pages 286 to 289)

Page 290

1    And no one understood -- I was
2  demonstrating the iPhone, how it would navigate the
3  Internet, not the iPhone for music, not the iPhone for
4  telephone, but the -- what the iPhone does and other
5  smart phones do today for navigating Web pages and
6  applications.
7    Q.  So every year since 2000, you've
8  demonstrated the simplified user interface that you
9  came up with in 1999 to large companies.
10    Right?
11    A.  Yes.
12    Q.  And none of them ever wanted to do a
13  joint venture with you.
14    Right?
15    A.  They didn't understand it.  I -- I think
16  that's why Apple ended up coming into first place,
17  because I think the industry was asleep.
18    Q.  Now, why didn't you just develop it
19  yourself?
20    A.  That wasn't my plan.
21    Q.  But why didn't you plan to do that?
22    A.  Because in this world, it takes a
23  substantial amount of -- of wherewithal and -- and --
24  and resources, which I -- which I did not choose to
25  pursue.

Page 291

1    Q.  Is it because you did not have enough
2  resources and money to do it?
3    A.  I probably did not have enough.  I
4  didn't have the interest.  It wasn't something that
5  I --
6    I needed a partner.
7    Q.  What was the date you met with this
8  person at NBC?
9    A.  I think that a lot of these -- these
10  documents were in production to you.
11    Q.  But I'm asking you for your
12  recollection.
13    A.  Yeah, I -- I think it was shortly after
14  the iPhone was dis -- was released.
15    Q.  But I'm asking you when it was --
16    A.  Oh.
17    Q.  -- not -- not with reference to when the
18  iPhone was released.
19    A.  Well, the iPhone was 2007, so it would
20  have been sometime in 2007, I believe.
21    Q.  How long after the iPhone was released?
22    A.  I think pretty short period after the
23  iPhone --
24    My recollection, there weren't many
25  reformatted websites.  And at the beginning, since I

Page 292

1  followed them, the first one that I was aware of was
2  the Disney.
3    Q.  So you went -- you went to the NBC and
4  you showed them Disney on the iPhone, and you said, I
5  invented that?
6    Is that what you did?
7    A.  No.
8    Q.  What did you do, then?
9    A.  I -- I showed them how Disney.com
10  reformatted their content into a simplified navigation
11  interface with unique inputs, sister site,
12  manipulating a region of a screen for zooming and
13  scrolling.
14    And this gentleman was absolutely
15  fascinated.  He indicated he'd never heard about this,
16  he had never seen this before.
17    Q.  Is it your understanding that the iPhone
18  was the first mobile device to use reformatted
19  websites?
20    A.  It -- it was -- it was the first phone
21  that I had seen to utilize the building blocks of the
22  invention.
23    Q.  Is it the first phone -- or first mobile
24  device that you're aware of that did reformatting of
25  websites?

Page 293

1    A.  It --
2    MR. BECKER:  Object.  Form.
3    THE WITNESS:  It was the -- again --
4  BY MR. STEPHENS:
5    Q.  I'm not asking what you're about to
6  answer.
7    I'm asking, in that period --
8    A.  Oh, I don't -- I don't have an answer.
9  I don't know.
10    Q.  You don't know, okay.
11    So it's possible that other phones did
12  it before the iPhone, in other words, reformatted
13  websites?
14    A.  I don't know.
15    MR. BECKER:  Object.  Form.
16  BY MR. STEPHENS:
17    Q.  You don't know, okay.
18    A.  So he asked me at that time --
19    Q.  I -- I -- I'm done with that question.
20    A.  Okay.
21    Q.  What other companies did you make your
22  pitch to?
23    A.  Over the whole period of time?
24    Q.  Yeah.
25    A.  And again, I think we provided these

Page 294

1  documents. But to my memory, at Time Warner, AT&T,
2  Fox, Yahoo, Comcast, I think Microsoft, Cisco. Those
3  are some of the companies I believe that I talked to.
4      Q.  And which of those companies did you
5  have meetings with?
6      A.  Time Warner, Fox, NBC, AT&T.
7          That's all I can think of then.
8      Q.  So you didn't meet with Yahoo?
9      A.  I -- I spoke to them on the phone.
10     Q.  You didn't meet with Comcast?
11     A.  I spoke to them on the phone.
12     Q.  You didn't meet with Microsoft?
13     A.  I spoke to them on the phone.
14     Q.  And you didn't meet with Cisco?
15     A.  I talked to them on the phone.
16     Q.  Okay.  Does EMG have any employees?
17     A.  No.
18     Q.  Where is its office?
19     A.  The office is at my residence, and we
20  have an office in Tyler, Texas.
21     Q.  And is the office in Tyler, Texas, the
22  office operated by your lawyer, local counsel?
23     MR. BECKER:  Object.  Form.
24     THE WITNESS:  It's an office where we have our
25  original documents stored.

Page 295

1  BY MR. STEPHENS:
2      Q.  Anything else happen there?
3      A.  I think we have a computer, telephone
4  service, I think maybe a safe for the documents.
5      Q.  Is that -- was that office arranged for
6  by your lawyer in Tyler?
7      MR. BECKER:  And I'll instruct you not to
8  answer, to the extent that you have to divulge
9  attorney-client advice --
10     MR. STEPHENS:  Right.
11     MR. BECKER:  -- or communication.
12     MR. STEPHENS:  It's got to be legal advice.
13  Renting a space for him does not qualify as legal
14  advice.
15     MR. BECKER:  I didn't tell him that.
16  BY MR. STEPHENS:
17     Q.  Okay.  Did the lawyer arrange for your
18  space in Tyler?
19     A.  Did he arrange for the space in Tyler?
20         I think I did.
21     Q.  And who did you call?
22     A.  I called Charlie Ainsworth's office, our
23  local counsel.
24     Q.  And you talked to Charlie and said, I
25  want some space?

Page 296

1      A.  I can't recall who I talked to.
2          I said, "We're sending documents to you.
3  We'd like you to arrange for a space and we'll pay
4  rent to store the documents -- the original
5  documents."
6      Q.  You paid your rent to
7  Parker Bunt & Ainsworth?
8      A.  No.  No, no, no.
9      Q.  Who do you pay your rent to?
10     A.  I don't know who it is, but it's the
11  landlord of the building.
12     Q.  Okay.  But Mr. Ainsworth arranged for
13  the --
14     A.  I'm not sure whether he did.  I -- I'm
15  not testifying to that.
16     Q.  Okay.  But he's the one you talked to,
17  to make that happen --
18     A.  I can't -- I'm not -- somebody --
19     Q.  -- that you talked to, to get the space?
20     A.  I don't recall.
21     Q.  Do you write a check every month for
22  that rent?
23     A.  Does EMG write a check?
24     Q.  Yes.
25     A.  Yes.

Page 297

1      Q.  And who does that check -- who is that
2  paid to?
3      A.  I don't recall the name.
4      Q.  Okay.  It doesn't show up on your legal
5  bill?
6      A.  No, no, not at all.
7      Q.  Is there any activity that occurs there
8  other than storing documents?
9      A.  As far as activity that I know of?
10     Q.  Yeah.
11     A.  No.
12     Q.  Have you ever been there?
13     A.  No.
14     Q.  Do you know anyone who has ever been in
15  that space?
16     A.  Well, I would think that there's
17  somebody from the local counsel's office that had been
18  there to arrange our original documents.
19     Q.  But do you know of anyone who's ever
20  been there, specific person?
21     A.  No.
22     Q.  Okay.  Now, tell me about your
23  education, please.
24     A.  I graduated from University of
25  Southern California, I think in 1962.

Page 298

1    Q.   And what kind of degree did you have?
2    A.   I think it was a Bachelor of Science,
3  majoring in English.
4    Q.   Did you study any technical subjects?
5    A.   No.
6    Q.   Any other education after college?
7    A.   Other than real estate broker, some
8  real estate.
9    Q.   Okay.  And now could you describe your
10  employment history?
11    A.   I've been self-employed, doing --
12    Q.   Your entire career?
13    A.   My entire career.
14    Q.   Doing real estate the entire time?
15    A.   Doing real estate most of the time.
16    Q.   What else have you done?
17    A.   Well, in 1999, I invented technology and
18  filed patents.  In the last ten years, I've been
19  focused on the prosecution of the patents.
20    Q.   Okay.  Other than real estate and the
21  patents in this lawsuit, anything else?
22    A.   Not -- not -- that's it.
23    Q.   How did you get into the real estate
24  business?
25    A.   I started developing projects.

Page 299

1    Q.   Was -- was your family in the
2  real estate business?
3    A.   No.
4    Q.   Your father do any real estate, himself?
5    A.   No, he was a jeweler, and then he was a
6  lender of money.
7    Q.   Did you use any money -- family money in
8  getting started in real estate?
9    A.   No.
10    Q.   Could you describe for us the biggest
11  projects that you've done, briefly?
12    A.   Probably Beverly Park.
13    Q.   And what's Beverly Park?
14    A.   Beverly Park is 350 acres above the
15  Beverly Hills Hotel.
16    Q.   What was the magnitude, dollar-wise, of
17  that project?
18    A.   Well, there's approximately 80
19  properties.  There's three gate houses.  Their gate
20  houses are about 4,000 square foot each.
21       The properties which -- that particular
22  project, I did -- did the planning, the zoning, the
23  off-site improvements.
24    Q.   That -- that's -- I'm not asking about
25  everything you did.

Page 300

1    I'm asking about the dollar magnitude of
2  the project, if you can estimate.
3    A.   Well, these -- these -- these were homes
4  that we sold lots, and the lots sold from 2- to
5  $4.5 million, and the homes are 20-, $30 million,
6  maybe even more on these properties.  They're
7  generally an acre and a half level or larger.
8    Q.   Were you involved in the actual building
9  of the houses?
10    A.   No.
11    Q.   So just the sale of the lots?
12    A.   The development and the sales of the
13  lots --
14    Q.   Okay.  So, in other words --
15    A.   -- the development, the improvements,
16  the off-sites, the infrastructure.
17    Q.   Understand.
18       So the zoning and the sewer and stuff
19  like that?
20    A.   Sewers, storm drains, grading,
21  sidewalks, curbs, gutter, streets, gate houses.
22    Q.   Any other major projects that you want
23  to mention?
24    A.   I developed Beverly Glen Park, which is
25  300 acres above Holmby Hills, approximately 900 homes

Page 301

1  and a shopping center.
2    Q.   Anything else?
3    A.   The -- what's -- the W Hotel in
4  Westwood, which was originally a student dormitory --
5  the W Hotel in Westwood Village.  It was originally a
6  student dormitory, which I redeveloped into a hotel.
7    MR. STEPHENS:  Why don't we take a break.
8    THE VIDEOGRAPHER:  Going off the record.
9       The time is 6:44 p.m.
10       (Whereupon a recess was taken)
11    THE VIDEOGRAPHER:  Back on the record.
12       The time is 6:56 p.m.
13  BY MR. STEPHENS:
14    Q.   Have you or EMG been irreparably harmed
15  by Apple?
16    A.   That would be a legal --
17    MR. BECKER:  Object -- object as to form.
18       And I instruct you not to answer with
19  resp -- if -- if it would require you to -- to
20  divulge, excuse me, advice of counsel.
21    THE WITNESS:  I'm unable to respond.
22  BY MR. STEPHENS:
23    Q.   Can you look the camera in the eye and
24  tell Judge Davis and the jury that you don't know,
25  other than what your lawyers tell you, whether you've

1  been irreparably harmed by Apple?
2      MR. BECKER:  Same instruction.
3  BY MR. STEPHENS:
4      Q.  Would you do that?
5      A.  Would you rephrase your question?
6      Q.  Yeah.
7          Would you look the camera -- look at the
8  camera, tell Judge Davis and the jury that you don't
9  know whether you've been irreparably harmed by Apple
10 other than what your lawyers tell you?
11     MR. BECKER:  So I'm going to instruct you not
12 to answer if the question is simply -- would require
13 you to divulge the contents of advice of counsel.
14     THE WITNESS:  I'm unable to answer that
15 question.
16 BY MR. STEPHENS:
17     Q.  Now, you've already told me that you
18 haven't licensed the patent, other than in settling
19 with some of the defendants in this case.
20         Right?
21     A.  (No audible answer.)
22     Q.  Have you -- I'm sorry.
23         Yeah, you need to answer "yes" or "no,"
24 or at least verbally.
25     A.  Answer?

1      Q.  The question.
2          I said, you've already told me that you
3  have not licensed the patents other than settling with
4  some of the defendants in this case.
5          Right?
6      A.  That's correct.
7      Q.  Okay.  Have you attempted to license the
8  patents other than with those defendants?
9      A.  Yeah.
10     MR. BECKER:  Object to form.
11         Go ahead.
12     THE WITNESS:  Yes.
13 BY MR. STEPHENS:
14     Q.  Have you made offers to license them?
15     A.  (No audible answer.)
16     Q.  All right.  Let me put it differently.
17         Have you attached dollar amounts to
18 those attempts?
19     A.  That would be attorney-client privilege.
20     Q.  I don't understand how that could be.
21 It's not advice of counsel.
22     A.  It was in the presence of counsel.
23     Q.  That isn't enough.
24     A.  I know, but it was with their advice.
25     Q.  That is not enough, either.

1          Have you --
2      MR. BECKER:  I can instruct him.
3          I don't -- I didn't understand exactly
4  your question.  I didn't know who "them" was and "the
5  defendants," so --
6      MR. STEPHENS:  I'm asking very general.
7      MR. BECKER:  -- I can -- I can clarify.
8      MR. STEPHENS:  Okay.  Go ahead.
9      MR. BECKER:  No, if you ask -- if you restate
10 your question or something, I can clarify.
11     MR. STEPHENS:  Fair enough.
12     MR. BECKER:  I'm not sure where we are.
13     MR. STEPHENS:  Fair enough.
14 BY MR. STEPHENS:
15     Q.  I'd like for you to tell me who you've
16 tried to license the patents to first -- let's do
17 that -- beyond the defendants that you've actually
18 settled with.
19     A.  Are you talking about me, personally, or
20 that my attorney?
21     Q.  Well, any that you're aware of.
22     A.  Well, I certainly cannot speak for what
23 my attorney has done.
24     Q.  Well, you can if you know about it, and
25 I'd like for you to.

1      THE WITNESS:  Am I able to convey what you
2  have --
3      MR. BECKER:  He's just asking you for -- right
4  now, for what knowledge you have of licensing
5  attempts, not the contents of any conversation.
6      THE WITNESS:  I do have knowledge.
7  BY MR. STEPHENS:
8      Q.  Okay.  And -- and who have you or your
9  attorneys or anyone connected with the patents
10 attempted to license the patents in this lawsuit to?
11     MR. BECKER:  You can identify the names of
12 parties, but with respect to any discussions, we'll
13 have to go one-by-one because some are privileged and
14 some are potential --
15     THE WITNESS:  I can name names?
16     MR. BECKER:  They're --
17         Can we go off the record for one minute.
18     MR. STEPHENS:  Sure.
19     THE VIDEOGRAPHER:  One moment.
20         Going off the record.
21         The time is 7:00 p.m.
22 (Whereupon a discussion was held off the record)
23         (Whereupon a recess was taken)
24 (Whereupon Jeff Risher exited the
25 deposition room)

Page 306

```
1       THE VIDEOGRAPHER:  Back on the record.
2            The time is 7:07 p.m.
3       (The following pages 307 through 311 are
4       Confidential - Attorneys' Eyes Only:)
5       / / /
6       / / /
7       / / /
8       / / /
9       / / /
10      / / /
11      / / /
12      / / /
13      / / /
14      / / /
15      / / /
16      / / /
17      / / /
18      / / /
19      / / /
20      / / /
21      / / /
22      / / /
23      / / /
24      / / /
25      / / /
```

Page 308

Page 307

Page 309

**REDACTED**

Page 310

Page 312

Page 311

Page 313

Merrill Legal Solutions - Houston

**REDACTED**

Page 314

Page 316

Page 315

Page 317

REDACTED

Page 318

Page 320

Page 319

Page 321

**REDACTED**

Page 322

Page 324

Page 323

Page 325

Merrill Legal Solutions - Houston

**REDACTED**

Page 326

Page 328

Page 327

Page 329

**REDACTED**

Page 330

Page 332

Page 331

Page 333



Page 334

Page 336

Page 335

Page 337

**REDACTED**

Page 338

Page 340

Page 339

Page 341

Page 342

Page 344

Page 343

Page 345

```
22        (This concludes the Confidential section,
23        and the Nonconfidential section resumes
24        at page 346)
25        / / /
```

Page 346

1     MR. LANE:  Let me just add -- I just want to
2  add one thing on the record for American, since we
3  haven't -- I think that we have been prejudiced by the
4  deposition, given the number of questions the witness
5  hasn't been able to answer.
6         It's caused the deposition to take an
7  inordinate amount of time, the amount of time it took
8  to review documents, as well as now, we found out a
9  lot of documents haven't been produced.
10        So just for American Airlines, we will
11  need to seek additional time to depose Mr. Gottfurcht.
12        Thank you.
13     MR. BECKER:  And we disagree with that
14  characterization.
15     MR. STEPHENS:  Okay.
16     THE WITNESS:  Thank you very much.
17     THE VIDEOGRAPHER:  This concludes Volume I in
18  the deposition of Elliot Gottfurcht.
19        The number of tapes used was four.  The
20  original videotapes will be retained by Merrill Legal
21  Solutions, Woodland Hills, California.
22        Going off the record.
23        The time is 7:51 p.m.
24     COURT REPORTER:  Okay.  And you both wanted
25  roughs?

Page 347

1     MR. STEPHENS:  Yes.
2     MR. BECKER:  Yes.
3     MR. GENET:  And I'll just take a copy.
4     COURT REPORTER:  Okay.  Did you need the
5  roughs tonight, or is it okay for the morning?
6     MR. STEPHENS:  Tomorrow is fine.
7     MR. BECKER:  That's fine.
8     (Whereupon the deposition was concluded
9       at 7:52 p.m.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 348

1              PENALTY OF PERJURY
2
3
4
5         I hereby declare I am the deponent in the
6  within matter; that I have read the foregoing
7  proceeding and know the contents thereof and I declare
8  that the same is true of my knowledge except as to the
9  matters which are therein stated upon my information
10  or belief, and as to those matters I believe it to be
11  true.
12        I declare under penalty of perjury that the
13  foregoing is true and correct.
14        Executed on the _____ day of
15  _____, 2009, at _____,
16  California.
17
18
19
20
21              _____
                    ELLIOT GOTTFURCHT
22
23
24
25

Page 349

1  STATE OF CALIFORNIA   )
2                        )
                         )  ss.
   COUNTY OF LOS ANGELES )
3
4         I, SUSAN LYNN POBOR, Certified Shorthand
5  Reporter No. 5132 for the State of California, do
6  hereby certify:
7         That prior to being examined, the witness
8  named in the foregoing deposition, was duly sworn to
9  testify the truth, the whole truth, and nothing but
10  the truth;
11        That said deposition was taken down by me in
12  shorthand at the time and place therein named and
13  thereafter reduced by me to typewritten form and that
14  the same is a true, correct, and complete transcript
15  of said proceedings.
16        Before completion of the deposition, review of
17  the transcript [X] was [ ] was not requested.  If
18  requested, any changes made by the deponent (and
19  provided to the reporter) during the period allowed
20  are appended hereto.
21        I further certify that I am not interested in
22  the outcome of the action.
23        Witness my hand this _____ day of
24  _____, 2009.
25              _____
                    Susan Lynn Pobor, CSR No. 5132