**Exhibit P**

Dockets.Justia.com

Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT
 2                  EASTERN DISTRICT OF TEXAS
 3                       TYLER DIVISION
 4
 5   EMG TECHNOLOGY, LLC,                  )
                                          )
 6                   Plaintiff,           )
                                          )
 7              vs.                       )Case No.
                                          )6:08-cv-447(LED)
 8   APPLE, INC., AMERICAN AIRLINES,      )
     INC., DELL, INC., HYATT             )VOLUME I
 9   CORPORATION, MARRIOTT                )
     INTERNATIONAL, INC. & BARNES &       )
10   NOBLE, INC.,                         )
                                          )
11                   Defendants.          )
12
13
14
15
16   DEPOSITION OF:
17              GRANT GOTTFURCHT
18              WEDNESDAY, DECEMBER 16, 2009
19              10:19 A.M.
20
21
22
23
24   Reported by:   SUSAN LYNN POBOR
25                  CSR No. 5132
```

Page 2

1    Deposition of ELLIOT GOTTFURCHT, the witness,
2  taken on behalf of the Defendant, APPLE, INC., on
3  Wednesday, December 16, 2009, 10:19 a.m., at
4  555 West 5th Street, Suite 3500, Los Angeles,
5  California, before SUSAN LYNN POBOR, CSR No. 5132,
6  pursuant to Notice.
7
8  APPEARANCES OF COUNSEL:
9  For Plaintiff:
10    MANATT PHELPS & PHILLIPS
      BY:  ROBERT BECKER, ESQ.
11    1001 Page Mill Road
      Building 2
12    Palo Alto, California  94304
      (650) 812-1300
13
   For Defendant, APPLE, INC.:
14
      FISH & RICHARDSON, P.C.
15    BY:  GARLAND STEPHENS, ESQ.
          JOHN R. LANE, ESQ.
16    1221 McKinney
      28th Floor
17    Houston, Texas  77010
      (713) 652-0109
18
   For Defendant, AMERICAN AIRLINES, INC.:
19
      NIXON PEABODY, LLP
20    BY:  RUSSELL J. GENET, ESQ.
      300 South Riverside Plaza
21    16th Floor
      Chicago, Illinois  60606
22    (312) 425-8516
23
   VIDEOGRAPHER:  DANIEL ROCCO
24
   ALSO PRESENT:  JEFF RISH: ELLIOT GOTTFURCHT
25

Page 3

1          I N D E X
2  WITNESS      EXAMINATION      PAGE
3  GRANT GOTTFURCHT    BY MR. STEPHENS       5
4
5         E X H I B I T S
6          (NONE)
7
8       INFORMATION REQUESTED
9          (NONE)
10
   QUESTIONS INSTRUCTED NOT TO ANSWER
11
        PAGE    LINE
12
          26     7
13        26     21
          29     6
14        29     22
          39     22
15        42     2
          94     12
16
17
18
19
20
21
22
23
24
25

Page 4

1       WEDNESDAY, DECEMBER 16, 2009
2       LOS ANGELES, CALIFORNIA
3          10:19 A.M.
4          ---oOo---
5       THE VIDEOGRAPHER:  Here begins Volume I,
6  videotape Number 1, in the deposition of
7  Grant Gottfurcht, in the matter of EMG Technology, LLC
8  versus Apple, Inc., et al., filed in the United States
9  District Court, Eastern -- Eastern District of Texas.
10  Case number is 6:08-cv-447 (LED).
11       Today's date is Wednesday, December 16,
12  2009.  The time on the video monitor is 10:19 hours.
13       The video operator today is
14  Daniel Rocco, contracted by Merrill Legal Solutions.
15       This video deposition is taking place at
16  555 West 5th Street, Suite 3500, Los Angeles,
17  California.
18       Counsel, please identify yourselves and
19  state whom you represent.
20       MR. STEPHENS:  Garland Stephens of
21  Fish & Richardson representing Apple.
22       Also with me today is John Lane of
23  Fish & Richardson.  And also attending for Apple is
24  Jeff Risher, in-house counsel for Apple.
25       MR. BECKER:  And this is Robert Becker from

Page 5

1  Manatt Phelps & Phillips representing the witness.
2       MR. GENET:  And this is -- this is Russ Genet
3  representing American Airlines, from Nixon Peabody.
4       And for the record, I'm here for
5  American Airlines and not for any of the other newly
6  added defendants, including Hyatt and Dell.
7       THE VIDEOGRAPHER:  The court reporter today is
8  Susan Pobor of Merrill Legal Solutions.
9       Will the reporter please swear in the
10  witness.
11
12       GRANT GOTTFURCHT,
13  having been first duly sworn, was
14  examined and testified as follows:
15
16          EXAMINATION
17  BY MR. STEPHENS:
18  Q.   Good morning, Mr. Gottfurcht.
19  A.   Good morning.
20  Q.   Could you please state and spell your
21  name for the record.
22  A.   It's Grant, G-r-a-n-t; middle name,
23  Eric, E-r-i-c; last name, Gottfurcht,
24  G-o-t-t-f-u-r-c-h-t.
25  Q.   And what's your home address?

Page 6

1     A.   15271 Via De Las Olas,
2   Pacific Palisades, California, 90272.
3     Q.   You were here for the deposition of your
4   father yesterday.
5         Is that right?
6     A.   Yes, that's correct.
7     Q.   And were you taking notes?
8     A.   Not on the deposition, no.
9     Q.   You -- the notes that you were taking
10  didn't have anything to do with the deposition?
11    A.   No, they did not.
12    Q.   Did you bring those notes with you
13  today?
14    A.   No, I did not.
15    Q.   What -- what did they relate to?
16    A.   Some scheduling stuff for my work.
17    Q.   What's your work?
18    A.   I own a yoga studio.
19    Q.   So the notes that you were taking during
20  the deposition yesterday were about scheduling your
21  yoga studio, only, or were they concerning anything
22  else?
23    A.   Just scheduling my yoga studio.
24    Q.   So it's your sworn testimony here today
25  that you took no notes, whatsoever, concerning the

Page 7

1   deposition yesterday?
2     A.   100 percent no.
3     Q.   Okay.  Do you have any documents of any
4   kind relating to the inventions at issue in this suit?
5     A.   Not that I'm aware of or that I can
6   recall.
7     Q.   And let me make sure I'm clear.
8         I don't mean with you right now, but I
9   mean anywhere in your place of business, your home,
10  anywhere else, on a computer?
11    A.   I don't think so.
12    Q.   No e-mails?
13    A.   No.
14    Q.   Okay.  Could you describe your
15  education, please.
16    A.   I was high school graduated, didn't go
17  to college, took some extension courses in college.  I
18  went straight to work out of school, became a young
19  father around 20 years old.
20        So I just worked various jobs.  I worked
21  in a -- you just asked for my education, so sorry.  So
22  just completed high school.
23    Q.   Okay.  And when did you graduate from
24  high school?
25    A.   1991.

Page 8

1     Q.   You said you took some extension
2   courses.
3         When did you do that?
4     A.   Probably 1992.
5     Q.   And what are extension courses?
6     A.   They're courses that are offered at
7   UCLA.  Without having to apply to get into school,
8   they offer night courses that count as college
9   credits, so --
10    Q.   And what kind of courses did you take?
11    A.   They were mostly music-related.
12    Q.   You said mostly.
13        Were -- was there anything else besides
14  music courses?
15    A.   I believe that was it.
16    Q.   Do you have any other education besides
17  grade school and high school, and these extension
18  courses?
19    A.   Formal ed -- like other college
20  education?  No.
21    Q.   Okay.  And now if you could just
22  describe your work experience, please.
23    A.   I worked in restaurants, all kinds of
24  jobs in restaurants.
25    Q.   Okay.  Could you just take me through

Page 9

1   that from the time you graduated from high school?
2     A.   Yeah, yeah.  I've bussed tables.  I
3   waited tables.  I worked behind the counters.  I
4   started working in kitchens.  I delivered food.
5     Q.   I guess I'm asking for something more
6   specific.
7         If we could just go through restaurant
8   by restaurant, whatever positions you held from the
9   time you graduated from high school.
10    A.   My -- one of my early jobs was at
11  Domino's.
12    Q.   Was that in --
13    A.   I was a delivery driver, also.  I
14  answered phones and cleaned and did various jobs,
15  whatever they needed me to do.
16    Q.   Was that in 1991?
17    A.   I don't recall.  It was -- it was early
18  on.  It could have been even during high school or
19  maybe right after high school.
20    Q.   So I'd ask you to search your memory a
21  little bit.
22        Was it while you were in high school or
23  was it afterwards?
24    A.   I don't recall.
25    Q.   Okay.  And how long were you with

3 (Pages 6 to 9)

1  Domino's?
2      A.  I don't recall.
3      Q.  Was it a year, two years, three years?
4      A.  It was probably under a year.
5      Q.  What next?
6      A.  I worked at a restaurant called
7  Louise's.
8      Q.  And when was that?
9      A.  Again, it was after high school.
10     Q.  Was it immediately after you left
11  Domino's or --
12     A.  I might have been doing both jobs at the
13  same time for awhile.
14     Q.  You said might have been.
15         Do you recall whether you were or
16  not?
17     A.  I -- I don't recall.
18     Q.  And how long did you work at Louise's?
19     A.  I don't recall.  It was over a year for
20  sure, I believe.
21     Q.  More than two years?
22     A.  Could have been.
23     Q.  More than three years?
24     A.  It's possible.  I don't recall exactly.
25     Q.  More than four years?

1      A.  Again, it's possible.  I don't think it
2  was more than four years, but --
3      Q.  So you graduated high school in 1991,
4  worked at Domino's for less than a year, perhaps
5  overlapping with high school, and then Louise's
6  restaurant for some period between one and four years.
7          What did you do next?
8      A.  Well, I worked at other jobs.  I worked
9  at a restaurant -- I think it was called The Revival
10  Cafe at one point.  I don't -- I'm not sure if that
11  was the name exactly.
12     Q.  And when was that?
13     A.  Also, I worked at other Louise's
14  restaurant.  They have a chain of restaurants.  So
15  there was a few different restaurants that I worked
16  at, a few different Louise's.
17     Q.  And so did you work for Louise's
18  restaurants, meaning the group of them, in a
19  consecutive stretch or at different times?
20     A.  I don't recall.
21     Q.  Okay.  Would all of your stints at
22  Louise's restaurants be within the one- to four-year
23  period you were talking about?
24     A.  I don't recall specifically, but it
25  could have been.

1      Q.  Okay.  Was there a gap between the time
2  you stopped working at Louise's restaurants and
3  started working at Revival Cafe?
4      A.  I don't recall.
5      Q.  How long did you work at Revival Cafe?
6      A.  I don't recall exactly.
7      Q.  Was it one year, two years, five years?
8      A.  Less than five years.
9      Q.  More than two years?
10     A.  I think it was less than two years, but
11  I don't recall exactly.
12     Q.  Was it more than one year?
13     A.  I believe it was more than one year, but
14  I don't recall.
15     Q.  So probably more than one year?
16     A.  Different jobs.
17     Q.  Sorry.  Didn't mean to cut you off.
18     A.  It could have been.  I really don't
19  recall.  It could have been around a year, could have
20  been a little more, a little less.  I -- I really
21  don't recall exactly.
22         I -- I'd worked -- I believe I was
23  working while I was working at Louise's.  I could have
24  been working there at the same time, working two jobs,
25  overlapping sometimes, so --

1      Q.  Now, you said you became a father when
2  you were 20 years old.
3          Where were you working at that time?
4      A.  Well, for the record, I wasn't 20.  I
5  was -- my son was born four days after my 21st
6  birthday.
7      Q.  Okay.
8      A.  When I say be a father at 20, it's close
9  to 20 --
10     Q.  Okay.
11     A.  -- and, you know, had the
12  responsibilities of being a father, to prepare for a
13  child.
14         During that time, I was -- I think I was
15  working two jobs during that time.
16     Q.  Do you remember where you were working?
17     A.  I believe I was working at Louise's at
18  that time, as well, so --
19     Q.  So you were --
20     A.  -- so it might have been, yeah, during
21  that time.
22         And I think I had another job also at
23  another restaurant in Century City.  I forget the
24  name.  I believe it was a restaurant Stephen Spielberg
25  opened.  It had a submarine type theme to it, I

Page 14
1 believe.
2     Q. And this was --
3     A. It might have been -- it might have even
4 been called The Dive, but I'm not -- not 100 percent
5 sure.
6     Q. And that was while you were working at
7 Louise's?
8     A. Yeah, I -- I believe I was working two
9 jobs at the time.
10     Q. Okay. And what year was your first
11 child born?
12     A. 1995.
13     Q. Okay. So after working at Louise's,
14 you're not sure if there was a gap before you started
15 at the Revival Cafe. You were there for one to
16 two years.
17     What next?
18     A. When I worked at Louise's for awhile and
19 different restaurants, and I worked at -- I remember
20 working at -- I became a chef, started doing chef
21 work. I worked at a restaurant in the Valley, I
22 remember, at one time --
23     Q. What -- what rest --
24     A. -- called Pinot -- called Pinot Bistro.
25     Q. Now, where does that fit in time?

Page 15
1     A. It was after my child was born, sometime
2 after. I don't know if it was within the first year,
3 within the first two years. I just remember working
4 there for awhile.
5     Q. And the Revival Cafe was in between
6 working at Louise's and working at Pinot Bistro as a
7 chef?
8     A. I don't recall. It was before working
9 as a chef at Pinot Bistro.
10     Q. Okay.
11     A. I don't know if it was -- overlapped
12 working at Louise's or before. It might have been at
13 the same time, too, could have.
14     Q. And how long did you work at
15 Pinot Bistro?
16     A. I don't recall exactly.
17     Q. More than a year?
18     A. Could have been.
19     Q. More than two?
20     A. I don't believe it was more than two.
21     Q. What did you do after leaving
22 Pinot Bistro?
23     A. And I worked at another restaurant after
24 that. I forget the name. It was in a hotel, though,
25 I think -- or it was in a hotel.

Page 16
1     Q. Do you remember what the hotel's name
2 was?
3     A. I believe it was the Loews Hotel.
4     Q. And how long did you work there?
5     A. I don't recall exactly.
6     Q. And you have three children.
7     Is that right?
8     A. I'm a stepfather to two and then my own
9 biological child.
10     Q. I see.
11     A. We have full custody all the time.
12     Q. I'm just trying to help that -- figure
13 out the timing, here.
14     When did you get married to -- to the
15 mother of your stepchildren?
16     A. We've been together for about five
17 years.
18     Q. Are you married?
19     A. We are, yes.
20     Q. When did you get married?
21     A. Last summer.
22     Q. Were you working at Loews before you got
23 together with your wife?
24     A. Yes.
25     Q. So that was more than five years ago,

Page 17
1 then, I guess.
2     Right?
3     A. Yes.
4     Q. And how long were you with Loews?
5     A. I don't recall.
6     Q. Was it more than a year?
7     A. I don't recall.
8     Q. More than five years?
9     A. No, it was not.
10     Q. More than two years?
11     A. I don't believe so.
12     Q. Was it more -- more than six months?
13     A. I believe -- I don't recall exactly.
14     Q. Something like between six months and
15 two years.
16     Is that --
17     A. That would be fair, but I don't recall
18 exactly.
19     Q. Okay. And what did you do after you
20 left working for Loews?
21     A. I got into -- I started doing some
22 real estate. I got my real estate license.
23     Q. Do you remember when you got your
24 license?
25     A. I think it was -- I think it was issued

Page 18

1  in '98, but I don't know if I started practicing at
2  that time.
3      Q.  Do you remember what you were doing at
4  the time you got your real estate license?
5      A.  I could have been still working as a
6  chef.  I don't recall exactly.  It would be a guess.
7      Q.  Would that have been at Loews?
8      A.  It could have been.  I don't recall.
9      Q.  So after Loews, or either during or
10  after the time you were working at Loews, you got your
11  real estate license.  That was in 1998.
12          What did you do next for employment?
13     A.  I might have worked at another
14  restaurant before that or after that.
15     Q.  What restaurant was that?
16     A.  Called Barnaby's.  It was in the
17  Miracle Mile district.  But I don't -- it might have
18  been before Loews.  I don't -- timeline's going back a
19  little while.  I don't recall exactly.
20     Q.  How long were you at Barnaby's?
21     A.  Might have been -- I don't recall
22  exactly.
23     Q.  More than a year?
24     A.  Could have been.
25     Q.  More than two years?

Page 19

1      A.  I don't think it was more than two
2  years.
3      Q.  And what's next that you can recall?
4      A.  I started working on some real estate.
5      Q.  Like what kind of work did you do in
6  real estate?
7      A.  I had my broker's license.
8      Q.  Okay.  And what kind of --
9      A.  Or I had a -- got a salesperson's
10  license.
11     Q.  Okay.  And what kind of work did you do?
12     A.  Well, I was trying to get clients, to
13  buy and sell homes.
14     Q.  So you were doing residential
15  real estate?
16     A.  Some residential real estate, yes.
17     Q.  And you were -- you were just acting as
18  a broker or were you doing development?
19     A.  As a salesperson.
20     Q.  How long did you do that?
21     A.  The last house -- home I sold might have
22  been last year or two years ago.  So I've been doing
23  it for ten years, maybe, or I've had my license for
24  over ten years, I think.
25     Q.  So when you say you got your sales

Page 20

1  license, that's the license you got in 1998?
2      A.  Yeah, yeah.
3      Q.  Do you have any other real estate
4  licenses?
5      A.  No, I do not.
6      Q.  Did you do anything else in that period
7  from '98 to -- within the last two years other than
8  selling residential real estate?
9      A.  I spec'd some homes, as well.
10     Q.  What does that mean?
11     A.  I bought a home and fixed it up,
12  remodeled it and sold it for profits.
13     Q.  How many of those did you do?
14     A.  I don't recall exactly.
15     Q.  More than five?
16     A.  Could have been.
17     Q.  More than ten?
18     A.  Not more than ten.
19     Q.  Were you affiliated with any kind of
20  real estate agency?
21     A.  Yes, I guess so.
22     Q.  Who was that?
23     A.  Well, it was a dba, Westside Realty.
24     Q.  Any other agencies?
25     A.  No.

Page 21

1      Q.  Are you still affiliated with dba
2  Westside?
3      A.  I believe so.
4      Q.  When did you first become affiliated
5  with them?
6      A.  I should say dba Westside Realty is a
7  dba of my father's, as well.  He's -- he's the broker
8  of record of Westside Realty.
9          And I do not recall exactly when that
10  dba was formed, so I don't remember how long I've been
11  associated with them exactly.
12     Q.  Okay.  Were you affiliated with dba
13  Westside, your father's firm, when you sold your first
14  home --
15     A.  I --
16     Q.  -- or brokered your first home, I should
17  say?
18     A.  I don't recall.  I was always -- as a
19  salesperson, you need to have a -- a broker that
20  you're working under.
21         So it -- it would have been under my
22  father as the broker of record.  I just don't recall
23  when the dba Westside Realty was actually put under
24  his name for -- for broker.
25     Q.  I see.

1 So all of your real estate work has been
2 done with your father as the broker of record, but the
3 agency name that was associated with that changed at
4 some point.
5 Is that right?
6 A. Yes.
7 Q. You said you've sold a home sometime
8 within the last two years and that was your last sale.
9 Is that right?
10 A. Well, whatever my last sale was, was my
11 last sale.
12 Q. I'm asking when that was, I guess.
13 A. You said within the last two years. I
14 mean, it was definitely within the last two years, to
15 the best of my recollection.
16 Q. Was it more recent than that?
17 A. Yeah, I'd just have to go back in my
18 records and look at it. It could have been within the
19 last year, but I don't recall specifically.
20 Q. Okay. What -- what are you doing for
21 work today?
22 A. I own a yoga studio and I'm a yoga
23 teacher.
24 Q. When did you open the yoga studio?
25 A. In August of this year.

1 Q. So sometime around 1998, then, I take
2 it, you stopped working in the restaurant business.
3 Is that right?
4 A. I don't recall.
5 Q. Did you -- when's the last time,
6 roughly, that you held any job in the real -- in the
7 restaurant business?
8 A. I don't recall specifically.
9 Q. Generally?
10 A. Maybe '98, maybe '99. I don't recall
11 specifically. And I don't -- I be -- almost sure my
12 license was issued in '98, but didn't mean I went
13 straight and started selling homes.
14 So I might have overlapped that date and
15 still worked in the restaurant business for a little
16 while longer.
17 Q. Okay.
18 A. I don't recall, though.
19 Q. So sometime around '98 or '99 or 2000,
20 you stopped working in the restaurant business.
21 And were you exclusively in real estate
22 from that time until you opened your yoga studio?
23 A. Yes.
24 Q. And today, are you exclusively a -- a
25 yoga instructor?

1 A. I'm a yoga studio owner, as well.
2 Q. Okay.
3 A. I still have my real estate license, so
4 if the opportunities come up, I would still practice
5 real estate, as well.
6 Q. Are you actively trying to sell houses
7 today?
8 A. I had a listing six months ago, but it
9 expired. So when the opportunity comes around, I'll
10 take advantage of it, still.
11 Q. Did you -- during the time -- from the
12 time you graduated from high school till today, have
13 you supported yourself through work or did you have
14 other means of support?
15 A. From high school on?
16 Q. Yeah.
17 A. Pretty much through work, yeah.
18 Q. So you don't have any other sources of
19 income other than your jobs?
20 A. No, I do not.
21 Q. On the face of one of the patents
22 in the suit, it shows that it was assigned to the
23 Grant Gottfurcht 2003 Irrevocable Trust.
24 Are you aware of that?
25 A. Yes.

1 Q. What is the Grant Gottfurcht 2003
2 Irrevocable Trust?
3 A. It's a trust.
4 Q. What's the purpose?
5 A. That's something I discussed with my
6 lawyer, set it up, so it would be attorney-client
7 privilege, I guess.
8 MR. STEPHENS: Are you directing him not to
9 answer?
10 MR. BECKER: Well, I'll direct you not to
11 divulge any advice that your attorney gave you
12 regarding the setup of that trust.
13 MR. STEPHENS: Why don't you guys consult --
14 we don't have to go off the record -- and figure out
15 whether or not the purpose of the trust is actually
16 attorney-client privilege, because I don't see how it
17 could be.
18 Go ahead. And then you -- you can
19 direct him not to answer, you can do that, but I want
20 it clear that you're directing him not to answer
21 rather than him just speculating that it might have
22 something to do with attorney-client privilege.
23 MR. BECKER: Okay. But we're not doing it on
24 the record.
25 MR. STEPHENS: Okay. Go off the record, then.

Page 26

1     THE VIDEOGRAPHER:  Going off the record.
2         The time is 10:43 a.m.
3         (Whereupon a recess was taken)
4     THE VIDEOGRAPHER:  Back on the record.
5         The time is 10:45 a.m.
6  BY MR. STEPHENS:
7     Q.   So Mr. Gottfurcht, I'll just ask the
8  question again.
9         What was the purpose of the
10 Grant Gottfurcht 2003 Irrevocable Trust?
11    MR. BECKER:  After discussing that with
12 Mr. Gottfurcht, I'm instructing him not to answer
13 based on attorney-client privilege.  It was set up
14 with the advice of counsel.
15 BY MR. STEPHENS:
16    Q.   Okay.  Do you have any other trusts?
17    A.   No.
18    Q.   Are you a trustee of the
19 Grant Gottfurcht 2003 Irrevocable Trust?
20    A.   Yes, I am.
21    Q.   What assets does that trust have?
22    A.   It's confidential.
23    Q.   Okay.  There's a confidentiality
24 provision in the local rules, so you need to go ahead
25 and answer.

Page 27

1     MR. BECKER:  So same as yesterday, there's a
2  constitutional protection of privacy of privilege in
3  California, Article I of the California Constitution.
4         So if he wants to exercise his
5  constitutional right in California, I will instruct
6  him not to answer with respect to what he wants to
7  remain private.
8     MR. STEPHENS:  Okay.  Well, we're going to get
9  a con --
10    MR. BECKER:  That's fine.
11    MR. STEPHENS:  -- a conference call with the
12 judge on that.
13        John, why don't you go ahead and find
14 out what the judge's availability is.
15    MR. LANE:  Sure.
16    MR. STEPHENS:  I also want to tee up the
17 privilege issue on the invention.
18        So if you're going to take the same
19 position, that he can't testify about the meaning of
20 the claims or anything that happened after the first
21 week in July of 1999, we're going to raise that.
22        So is that your intention?
23    MR. BECKER:  I'm not taking any positions.
24 I'm just instructing as we go.  So you'll have to ask
25 your question and we'll see.  He may have different --

Page 28

1  a different situation.
2     MR. STEPHENS:  Well, that's a little bit
3  problematic because I don't want to wait until the
4  court closes to -- to address this issue since we're
5  going to set up a call, anyway.
6         So let me see if I can figure out how to
7  answer that question.
8         Let's see.  Do we have the Exhibit 1
9  from yesterday?
10    COURT REPORTER:  Yes.
11    MR. STEPHENS:  Thanks.
12        Actually, let's do this differently.
13    Q.   Mr. Gottfurcht, I'm handing you
14 E. Gottfurcht Exhibit 2.  That was marked as Exhibit 2
15 in your father's deposition yesterday.
16        Do you recognize that?
17    A.   It looks like United States patent
18 Number 7,441,196.
19    Q.   And you're an inventor on that patent.
20 Right?
21    A.   Yes, I am.
22    Q.   If you turn to Claim 58 -- I believe
23 it's the last page, and then -- actually, the claim
24 continues on to the next page in column 15.
25        The very last element of the claim says,

Page 29

1  "Manipulating a region of the screen for viewing and
2  zooming and/or scrolling of the displayed online
3  content."
4         Do you see that?
5     A.   Yes, I do.
6     Q.   Can you tell me your understanding of
7  that?
8     MR. BECKER:  So that violates Rule 2.5 of the
9  local rules.
10        And also, to the extent your
11 understanding is based on advice that's been given to
12 you by counsel, I would instruct you not to divulge
13 that advice.
14    THE WITNESS:  This is -- these were discussed
15 with my counsel and this is the understanding I got
16 from privileged conversations with my attorney, so --
17 BY MR. STEPHENS:
18    Q.   Okay.  So you can't tell me your
19 understanding of that element.
20        Right?
21    A.   Correct.
22    Q.   Okay.  What's your net worth?
23    MR. BECKER:  Same objection, under the
24 California Constitution.
25    THE WITNESS:  Under my California

Page 30

1 constitutional rights, I believe it's privileged
2 information, confidential information.
3 BY MR. STEPHENS:
4     Q.  Okay.  Now, you were -- you've already
5 told me you were here for your father's deposition
6 yesterday.
7         Did you hear anything that you disagreed
8 with?
9     MR. BECKER:  Object.  Form.
10 BY MR. STEPHENS:
11     Q.  Let me ask -- phrase it a little bit
12 differently.
13         Did you -- did your father testify to
14 anything that you did not agree with?
15     MR. BECKER:  Object.  Form.
16     THE WITNESS:  I don't recall.
17 BY MR. STEPHENS:
18     Q.  So you don't remember hearing anything
19 and thinking it was wrong?
20     A.  I don't recall.
21     Q.  Okay.  Could you describe for me your
22 involvement in the conception and/or implementation of
23 the inventions that are involved in this lawsuit?
24     A.  Yes.
25     Q.  Go ahead, please.

Page 31

1     A.  Well, I went to my father's house.  He
2 was moving into his new residence in July of 1999, on
3 or about the 1st.
4         And we sat down together, and we had a
5 computer out and he had his big screen installed on
6 the wall and he had his cell phone next to him.  And
7 we were looking at the Internet.  I believe it was the
8 Yahoo or AOL.com, which was the two most visited sites
9 at that time.
10         And we were going through it, and he
11 looked at the computer and he looked up at the TV and
12 his cell phone, and he said, "One day, this is going
13 to be available on a TV monitor and on a cell phone
14 device."
15         And he started getting some ideas, and
16 pad and paper, and started writing down how he
17 envisioned this invention would have to take place in
18 the future.
19         And he came up with a simplified
20 interface or simplified navigational page.  He came up
21 with having one-to-one inputs, or unique inputs.  He
22 had a concept of a sister site, which would be a
23 simpler page to navigate.
24         And I came up with, that in order to
25 scroll around this page or move around and bring

Page 32

1 things into focus, you would need to be able to
2 manipulate with your hands some kind of region or a
3 part of the screen for zooming and scrolling.
4     Q.  Anything else?
5     A.  That's all I could recall at this time.
6     Q.  What happened next in connection with
7 the invention?
8     A.  Well, a meeting was set up with the
9 attorney, Tom Coester, and we spoke to him.
10     Q.  Okay.  When did that happen?
11     A.  About five or six days later, I believe.
12     Q.  And you were at that meeting?
13     A.  I was a part of it, yes, to the best of
14 my recollection.
15     Q.  And where did that meeting take place?
16     A.  I believe in his offices, but I do not
17 recall exactly.
18     Q.  I'd like to look back at the 196 patent,
19 Claim 58.
20         Could you just read through that claim
21 and describe for me what you contributed to the
22 invention as claimed there?
23     A.  Well, these claims were put together by
24 my attorney, and based on the understanding we had
25 together, this is my understanding of what I

Page 33

1 contributed or what the other inventors contributed,
2 was discussed, and the attorney submitted the
3 application, and it's an attorney-client privilege.
4     Q.  So it's your -- your understanding of
5 what you contributed to the claimed invention, you
6 learned only through your conversations with the
7 attorney.
8         Is that right?
9     A.  No, that's not what I meant.
10     Q.  Well, then tell me -- then tell me what
11 your contribution to the claim was.
12     A.  When we sat down on July -- on or about
13 July 1st, my contribution to the invention was that
14 you would have to have the ability to manipulate a
15 region of the screen for zooming or scrolling using
16 your hands.
17     Q.  Okay.  Did you ever make any other
18 contribution to the invention that's claimed in the
19 196 patent?
20     A.  I worked --
21     MR. BECKER:  Object.  Form.
22         Go ahead.
23     THE WITNESS:  I worked on some of the
24 interface work, some of the advertisement aspects.
25     / / /

Page 34

BY MR. STEPHENS:

1  Q.   Okay.  What -- what interface work did
2  you do?
3
4      A.   Well, we had a -- we just designed some
5  Web pages, I believe, put some advertising in there,
6  so --
7          I didn't -- that's, to the best of my
8  recollection, is what I remember.
9      Q.   Okay.  Let's take a look at the 196
10 patent again, and turn to Figure 5-C.
11     A.   (Witness complies.)
12     Q.   Can you explain Figure 5-C, please.
13     MR. BECKER:  Object.  Form.
14     THE WITNESS:  I can't.  This is --
15 BY MR. STEPHENS:
16     Q.   Why can't you?
17     A.   Well, again, this has been 10, 11 years.
18 This is the first time I'm seeing this in this time.
19     Q.   I'm sorry --
20     A.   And this is --
21     Q.   -- say that again.  I -- I just missed
22 what you were saying.  I'm sorry.
23     A.   Well, it's been awhile --
24     Q.   Okay.
25     A.   -- since this original patent was --

Page 35

1  since I even looked at this.
2          So you're just telling me to come here
3  and explain it.  At this time right now, I can't
4  explain it.
5      Q.   Why not?
6      A.   Because it's not my -- I haven't studied
7  this material.  I haven't looked at it.
8      Q.   Take whatever time you need to study it.
9  Go ahead.
10     A.   I don't recall if this was something --
11 I don't even, you know, remember if I -- this was
12 something I did, this part of the patent.
13     Q.   Well, that's what I'd like to find out.
14         So take your time, take a look at it,
15 and tell me whether you understand what's described in
16 Figure 5-C and the accompanying text.
17     MR. BECKER:  Object.  Form.
18     THE WITNESS:  I don't recall.  This is
19 something that we had put together with the attorney
20 and my understanding came from conversations with my
21 attorney.
22 BY MR. STEPHENS:
23     Q.   Okay.  Go ahead and explain that
24 understanding.
25     A.   It's under attorney-client privilege,

Page 36

1  so --
2      MR. STEPHENS:  Are you directing him not to
3  answer what he understands about the patent?
4      MR. BECKER:  Any advice that your attorney has
5  given you about what the patent means, yes.
6  BY MR. STEPHENS:
7      Q.   I'm not asking for your advice.  I'm
8  asking for your understanding of what the patent
9  discloses.
10     A.   My -- all my understanding is -- comes
11 from conversations with my attorney, and so it would
12 all fall under attorney-client privilege.
13     Q.   So you have no understanding of what's
14 in the 196 patent except what your attorney told you.
15         Is that right?
16     A.   Except what I was told --
17         Well, no.
18     Q.   Okay.  Well, explain to me what you
19 understand about the patent that your attorney did not
20 tell you.
21     A.   We sat down on or about July 1st, and I
22 already told you what -- the inventions, the visions,
23 that we had come up with on that day.
24     Q.   Okay.
25     A.   And --

Page 37

1      Q.   Now I'm asking about what's described in
2  this patent, not what you did on the first day of
3  July.
4      A.   Well, what's described in this patent
5  was everything I read and -- at the time was with my
6  attorney, and understandings I got, and had some
7  questions that were answered, were all through my
8  attorney.
9          And so my understanding of what the
10 patent was at this time when we filed the application
11 was based on conversations with my attorney.
12     Q.   I just want to be completely clear.
13         You have no understanding of what's
14 shown in Figure 5-C other than what you learned from
15 your attorney.
16         Is that right?
17     A.   Not correct.  But everything I -- all
18 the conversations I had regarding this were with my
19 attorney.
20     Q.   Okay.  They don't become privileged just
21 because you discussed them with your attorney.
22         I'm entitled to your understanding of
23 what's described in the patent, and I want you to tell
24 me about it now.
25         Explain to me your understanding of

1  Figure 5-C.
2       A.   I've already given my answer.
3       Q.   You haven't given me an answer.  All you
4  told me is that you talked about it with your lawyer.
5       And you -- you haven't told me that
6  you're claiming privilege in your understanding of
7  Figure 5-C.
8       Is that what you're doing?
9       A.   I'm claiming privilege, yes.  Everything
10  in here, I discussed with my attorney, everything in
11  the patent, claims, the charge, the description.
12       And based on my understanding with my
13  attorney, I'm claiming client privilege.
14       Q.   So -- so you're saying that you can't
15  testify about anything in the 196 patent because your
16  understanding came from discussions with your
17  attorney.
18       Is that right?
19       MR. BECKER:  Object.  Form.
20  BY MR. STEPHENS:
21       Q.   I'm just trying to understand.
22       A.   Yes.
23       Q.   That's your position?
24       A.   Yes.
25       Q.   Are you directing him not to answer my

1  questions about the 196 patent --
2       MR. BECKER:  No --
3       MR. STEPHENS:  -- on that basis?
4       MR. BECKER:  -- only if the answer to your
5  question would require him to divulge advice of
6  counsel.
7       MR. STEPHENS:  Okay.  Well, why don't you
8  guys, again, caucus -- we'll go off the record -- talk
9  about it, and you decide whether or not you can answer
10  any questions about this patent.
11       Because I intend to -- if you can't
12  answer them without your attorney telling you that you
13  should assert the attorney-client privilege, them I'm
14  entitled to answers and I want them.
15       So let's go off the record --
16       MR. BECKER:  I don't know why we need to go
17  off the record.  You have to ask your question; if
18  it's one he can answer, he can answer.
19       MR. STEPHENS:  I've asked a question.
20       MR. BECKER:  And he can't answer it.
21  BY MR. STEPHENS:
22       Q.   Explain to me Figure 5-C.
23       A.   I can't explain it without divulging
24  attorney-client privilege.
25       MR. STEPHENS:  Are you directing him not to

1  answer the question?
2       MR. BECKER:  If that's -- if that's his
3  answer, then yes.
4       MR. STEPHENS:  Okay.  So you -- I just want to
5  make clear, are you directing him not to answer?
6       MR. BECKER:  Yes.
7       MR. STEPHENS:  Okay.
8       MR. BECKER:  He just said he can't answer
9  without divulging attorney-client communications --
10       MR. STEPHENS:  Okay.
11       MR. BECKER:  -- or advice.
12       MR. STEPHENS:  Fair enough.
13       MR. BECKER:  Okay.  But there may be other
14  questions that he can answer.  I don't know.
15  BY MR. STEPHENS:
16       Q.   Okay.  Are there any other questions
17  about the patent at all that I could ask you that you
18  would be willing to answer because you could do so
19  without revealing attorney-client privilege?
20       MR. BECKER:  Object.  Form.
21       THE WITNESS:  I don't know.
22  BY MR. STEPHENS:
23       Q.   Well, let's keep going, then.
24       Look through the figures and tell me if
25  there's any figure that you can explain to me your

1  understanding without revealing attorney-client
2  privilege.
3       A.   Maybe Figure 2-A, looks like a --
4       Q.   Wait a minute.  Let's start with
5  Figure 1.
6       Can you explain your understanding of
7  Figure 1 without revealing attorney-client privilege?
8       A.   No, I cannot.
9       Q.   Okay.  Figure 2-A, then.
10       A.   The only reason why I say this page, it
11  looks like an old AOL page that we -- it looks like it
12  might have been one of their pages at the time with
13  some other stuff put in there --
14       Q.   Okay.
15       A.   -- the sister site emblem.
16       Q.   How did the sister site emblem get
17  there?
18       A.   I don't recall.
19       Q.   What is the sister site link?
20       MR. BECKER:  Object.  Form.
21       THE WITNESS:  I don't know.  I don't recall.
22  BY MR. STEPHENS:
23       Q.   You don't remember what the --
24       A.   I don't remember what the purpose is
25  for -- on this specific page, what it was for, if it

Page 42

```
 1   was -- I don't recall exactly.
 2        Q.   Okay.  Does this -- how does this relate
 3   to the invention?
 4             I mean, how does Figure A -- well,
 5   Figure 2-A --
 6             Let me start again.
 7             How does Figure 2-A relate to the
 8   invention?
 9        A.   I would say my understanding of that is
10   under attorney-client privilege, and these are all
11   conversations I had with my attorney at the time.
12             And I haven't even looked at this in --
13   since, you know, we filed it, signed off on it.
14             So all my understanding from here was
15   based on conversations I had with my attorney at the
16   time.
17        MR. STEPHENS:  Are you directing him not to
18   answer?
19        MR. BECKER:  If he can't answer it without
20   divulging advice of counsel, then yes.
21   BY MR. STEPHENS:
22        Q.   Can you answer without divulging advice
23   of counsel?
24        A.   No, I cannot.
25        MR. STEPHENS:  Are you directing him not to
```

Page 43

```
 1   answer?
 2        MR. BECKER:  I already did.
 3   BY MR. STEPHENS:
 4        Q.   All right.  Figure 2-B, can you explain
 5   your understanding of that without divulging advice of
 6   counsel?
 7        A.   No, I cannot.
 8        Q.   Figure 2-C, can you explain that without
 9   divulging advice of counsel?
10        A.   It looks like a standard Yahoo homepage.
11        Q.   What about the dotted lines?
12             What are those?
13        A.   I don't recall exactly.
14        Q.   Okay.  Look at the description of
15   Figure 2-C in Column 1 under the brief description of
16   the drawings.
17             It says, "Figure 2-C is a Web page
18   having irregular segmentation."
19             Can you explain that?
20        A.   I cannot, without divulging
21   attorney-client privilege.
22             Everything, again, in this application,
23   my understanding regarding the claims, the
24   descriptions and the sheets that were put together
25   came through conversations with my attorney.
```

Page 44

```
 1        Q.   So is it fair to say, then, that you
 2   can't testify to your understanding about anything in
 3   this patent, meaning 7,441,196, without divulging
 4   advice of counsel?
 5        A.   Yes, that would be correct.
 6        MR. STEPHENS:  So Rob, then, will you direct
 7   him not to answer any of those kinds of questions?
 8        MR. BECKER:  No, I can't do that.  I have to
 9   hear a specific question and then give him the
10   instruction.
11             Because he's already testified about
12   some understandings, you know, the couple figures
13   so --
14   BY MR. STEPHENS:
15        Q.   Okay.  Well, look -- look through the
16   patent and tell me if there's anything else that you
17   can testify about your understanding of without
18   divulging advice of counsel.
19             Because if there is, I want you to
20   testify to your understanding, and if there's not, I
21   want you to say so and have a direction not to answer
22   from your counsel.
23        A.   Again, everything in here was -- my
24   understanding of everything in this patent was all
25   obtained from meetings with my attorney, and without
```

Page 45

```
 1   divulging attorney-client privileges, I wouldn't be
 2   able to answer questions regarding --
 3        Q.   Okay.  So just to be clear, then, my
 4   question is, would you please explain to me everything
 5   that you can about your understanding of the 196
 6   patent?
 7             And your answer is?
 8        A.   My understanding is, before I met with
 9   my counsel and --
10             That's all I can give you and that's
11   what I've explained to you already.
12        Q.   So you're saying that you can't answer
13   because to do so would divulge advice of counsel.
14             Is that right?
15        A.   Any -- any understandings I got from my
16   conversations with my counsel, yes.
17        Q.   Okay.
18        MR. STEPHENS:  Are you directing him not to
19   answer, Rob?
20        MR. BECKER:  Not on a -- on a blanket; on a
21   question-by-question basis, I am.
22        MR. STEPHENS:  There's a question pending.  It
23   is, would you please explain for me your understanding
24   of the 196 patent?
25             And he said that he can't do that
```

Page 46

1  without divulging advice of counsel.
2          Are you going to direct him not to
3  answer?
4          MR. BECKER:  Well, he has explained some
5  understanding, so there's a little disconnect between
6  the two.  So there is some things he can talk about.
7          I don't know if there's anything else.
8  That's not for me to testify.
9          MR. STEPHENS:  All right.  Well, let's -- we
10  can get very pedantic here, if that's what you want.
11      Q.  You've told me that the AOL page in
12  Figure 2-A looks like an existing AOL page at the
13  time.  And you've told me that the Yahoo page in
14  Figure 2-C looks like an existing Yahoo page at the
15  time.
16          Is that right?
17      A.  Hold on.  I got to get to --
18          What figure was that?
19      Q.  2-A and 2-C.  They're near the beginning
20  of the patent.
21      A.  They look like they could be.  Again,
22  it's been awhile, so --
23      Q.  Okay.
24          MR. STEPHENS:  We need to go off the record
25  because we have to call the Court.

Page 47

1          THE VIDEOGRAPHER:  Going off the record.
2          The time is 11:08 a.m.
3          (Whereupon a recess was taken)
4          THE VIDEOGRAPHER:  Back on the record.
5          The time is 11:44 a.m.
6  BY MR. STEPHENS:
7      Q.  Mr. Gottfurcht, do you have an iPhone?
8      A.  No, I do not.
9      Q.  Have you seen one?
10      A.  Yes, I have.
11      Q.  Do you believe that Apple infringes the
12  patents in this lawsuit?
13          MR. BECKER:  Object.  Form.
14          And also, if you have a belief, you're
15  certainly entitled to give it to him, but I instruct
16  you not to divulge any advice I've given you on that
17  subject.
18          THE WITNESS:  So in conversations I've had
19  with my attorney.
20  BY MR. STEPHENS:
21      Q.  So you can't tell me whether or not
22  you believe Apple infringes without waiving
23  attorney-client privilege.
24          Is that right?
25      A.  Through conversations I've had with my

Page 48

1  attorney, yes, at this time.
2      Q.  I'm just trying to understand.
3          You're -- you're declining --
4      A.  My --
5      Q.  -- to answer on the grounds --
6      A.  My understanding of those based on
7  conversations I've had with my attorney, so yeah, I
8  would decline to answer under attorney-client
9  privilege.
10      Q.  Okay.
11          MR. STEPHENS:  And you're directing him to do
12  that, John -- Rob?
13          MR. BECKER:  I'm instructing him not to give
14  any advice I've given.
15          MR. STEPHENS:  Well, if you need to consult to
16  work out whether or not he can tell me whether or not
17  he believes Apple infringes, go ahead, because I think
18  he needs advice from counsel to make that
19  determination.
20          So I'm asking you to consult on that.
21          Will you do it?
22          MR. BECKER:  I -- I don't think we need to
23  consult on this.
24          MR. STEPHENS:  Okay.
25          / / /

Page 49

1  BY MR. STEPHENS:
2      Q.  But you're not going to answer?
3      A.  All my understanding is based on
4  conversations with my attorney.
5      Q.  You can just tell me.
6          You're not going to answer.
7          Right?
8      A.  Based on attorney-client privilege.
9      Q.  Please say the words, "I'm not going to
10  answer" or something similar.
11          Okay?
12      A.  I -- I've already spoken.
13      Q.  So are you going to answer my question
14  or not?
15      A.  I -- I answered it, yes.
16      Q.  You answered that you -- your
17  understanding came from your discussions with the
18  attorney.
19          I want to know what the understanding
20  is.
21      A.  Based on attorney-client privileges,
22  I don't want to divulge that information.
23      Q.  I know you don't want to, but you're
24  required to unless you're entitled to withhold it
25  under attorney-client privilege.

Page 50

```
 1          Are you refusing to answer the question
 2   on the basis of attorney-client --
 3          A.   I believe I am, yes.  I'm entitled to
 4   withhold under attorney-client privileges.
 5          Q.   Okay.  And you're not going to answer
 6   the question.
 7              Right?
 8          A.   Based on attorney-client privileges.
 9          Q.   Okay.  Now, looking back at the 196
10   patent --
11          MR. LANE:  You want to just go off for a
12   second?
13          MR. STEPHENS:  Well, I can just say on the
14   record that --
15              Why don't you say it, John.
16          MR. LANE:  Yeah, that was the clerk.  She says
17   Judge Bush went out to lunch before she could catch
18   him.  He'll be back after and she'll talk to him then.
19          MR. BECKER:  Okay.
20          MR. LANE:  So she's going to call back.  She
21   just didn't want us hanging or waiting, not knowing
22   what's going on.
23          MR. BECKER:  Okay.
24   BY MR. STEPHENS:
25          Q.   Mr. Gottfurcht, going back to the 196
```

Page 51

```
 1   patent, you explained to me before the break that
 2   Figure 2-A looked like a AOL Web page that existed at
 3   the time you came up with your invention.
 4              Right?
 5          A.   It could have been something similar to
 6   it.  I don't recall exactly.
 7          Q.   And you explained that Figure 2-C could
 8   have been a Web page that existed at the time you came
 9   up with your invention.
10              Right?
11          A.   Something similar to it, yes.
12          Q.   And you told me that you can't explain
13   your understanding of anything else in the patent
14   without divulging advice of attorneys.
15              Right?
16          A.   If you ask me specific questions, I can
17   answer specific answers.
18          Q.   Okay.  I'm asking you a specific
19   question.
20              Explain to me your understanding of the
21   196 patent.
22              You don't have to go back over
23   Figures 2-A or 2-C, but just explain --
24          MR. BECKER:  What was the question?
25          / / /
```

Page 52

```
 1   BY MR. STEPHENS:
 2          Q.   Let me ask the question.
 3              Would you please explain to me your
 4   understanding of the 196 patent without going back
 5   over Figures 2-A and 2-C?
 6          MR. BECKER:  Object.  Form.
 7          THE WITNESS:  My overall understanding of the
 8   196 patent was from conversations I've had with my
 9   attorney on the overall understanding.
10              There's a lot of information in here.
11   Some of it -- a lot of it, I was a co-inventor, so I
12   didn't come up with everything in here.
13              My attorney -- we had conversations and
14   explained certain things.  And if I had questions, he
15   answered certain questions.  And my understanding at
16   the time was through conversations with my attorney.
17   BY MR. STEPHENS:
18          Q.   Okay.  Take a minute and look through
19   it, and tell me if there's anything specific that you
20   can explain your understanding of without divulging
21   attorney-client privilege.
22              Let me stop you there.
23              You've looked through Page 1 pretty
24   carefully.
25              Right?
```

Page 53

```
 1          A.   Uh-huh.
 2          Q.   Can you explain your understanding of
 3   anything on Page 1?
 4          A.   I can read to you what was -- what's on
 5   here.
 6          Q.   I don't want you to do that.
 7              I want you to tell me your understanding
 8   of anything on the page that you can without asserting
 9   attorney-client privilege.
10          A.   Well, it says, "Inventors, Elliott A.
11   Gottfurcht, Pacific Palisades, California, U.S.;
12   Grant E. Gottfurcht, Pacific Palisades, California,
13   U.S.; Albert-Michel C. Long, Irvine, California, U.S."
14              Those are the inventors --
15          Q.   Okay.
16          A.    -- listed.
17              There's something that says,
18   "Assignees."
19              I mean, you can read it here for
20   yourself, but this is -- this page was, again -- sat
21   down with my attorney and he drafted the application.
22   I looked over it, some questions, and he had answered
23   my questions at the time.
24              I had an understanding based on
25   conversations with my attorney.  So to go through it
```

Page 54

1  now, without -- I haven't looked at it since --
2  without divulging information I learned from
3  conversations with my attorney, it would be in
4  violation of client-attorney privileges.
5      Q.  So --
6      A.  I mean, I can see the inventors,
7  obviously, and the assignees.
8      Everything else on the first page is, my
9  understanding of it, would be from conversations I had
10  with my attorney.
11     Q.  So you won't answer?
12     A.  Based on attorney-client privileges.
13     Q.  Okay.  Let's move, then, to Figure 3.
14  Can you explain your understanding of
15  that page, please?
16     A.  I cannot.
17     Q.  Do you have an understanding of it?
18     A.  It's beyond my technical -- it's beyond
19  my expertise.  I didn't create this page.  So my
20  understanding would just be from conversations I had
21  with my attorney.
22     Q.  So you can't answer any questions about
23  Figure 3 without violating attorney-client privilege.
24     Is that right?
25     A.  That's correct.

Page 55

1      Q.  Okay.  Figure 4, explain your
2  understanding of that.
3      A.  I don't really have an understanding of
4  it.  This is not my expertise.  To the best of my
5  recollection, I didn't contribute anything on this
6  page.
7      So everything -- any understanding I
8  received at the time was through conversations with my
9  attorney.
10     Q.  So you can't tell me anything about
11  Figure 4 without violating attorney-client privilege?
12     MR. BECKER:  Object.  Form.
13     THE WITNESS:  Well, that's not exactly what I
14  said.
15  BY MR. STEPHENS:
16     Q.  That's what I'm asking you, though.
17     A.  I can tell you, if -- if I knew things
18  outside conversations with my attorney.
19     Based on looking at it, I cannot explain
20  it.
21     Q.  So you don't know anything other than
22  what you learned from your attorney about Figure 4?
23     A.  Well, there's -- there's some things I
24  can look at and -- and put together, but I did not put
25  this page together.  This is -- wasn't my contribution

Page 56

1  to the inventions.
2      Q.  Okay.  Well, explain it to me, please.
3      MR. BECKER:  Object.  Form.
4  BY MR. STEPHENS:
5      Q.  Read it now and explain it to me.
6      A.  I can't explain it.
7      Q.  You don't understand it?
8      A.  Again, it's not my expertise, so I did
9  not put it together.
10     Q.  Do you understand it?
11     A.  The person who put it together would
12  have a better understanding of it.  I have not looked
13  at it.
14     Q.  Do you understand it?
15     A.  Without divulging attorney-client
16  privileges, everything I learned about this page was
17  through conversations with my attorney, my
18  understanding of it.
19     Q.  So you do have an understanding of it,
20  but that understanding is privileged.
21     Is that what you're saying?
22     A.  What I obtained, understanding, was
23  through conversations with my counsel.
24     Q.  Do you understand it?
25     Do you understand what's shown in Figure

Page 57

1  4?
2      You don't have to tell me what your
3  understanding is right now.  I'm just asking if you
4  understand it.
5      A.  I would have to -- you know, there's
6  some things I can look at and I can put -- put some of
7  it together in my head, but this is not -- the whole
8  chart here is not something I put together, so --
9      Q.  I'm not asking whether you put it
10  together.  I'm asking whether you understand it.
11     Do you understand it?
12     MR. BECKER:  Object.  Form.
13     THE WITNESS:  My understanding would be from
14  conversations I had with my attorney.  Might be some
15  things I do understand of it, yes.
16  BY MR. STEPHENS:
17     Q.  Okay.  So you do have some understanding
18  of it, but you can't tell me what that understanding
19  is without violating attorney-client privilege.
20     Is that right?
21     A.  That's correct.
22     Q.  Okay.  Figure 5-A, could you explain
23  your understanding of Figure 5-A, please?
24     A.  Again, I did not contribute this page,
25  and any understanding I got would have been through

Page 58

1 conversations with my attorney.
2        Q.   Do you have an understanding of
3 Figure 5-A?
4        MR. BECKER:  Object.  Form.
5        THE WITNESS:  Through conversations with my
6 attorney at the time when we had put this together and
7 reviewed it, I did, based on conversations with my
8 attorney.
9 BY MR. STEPHENS:
10       Q.   And you can't tell me your understanding
11 of Figure 5-A without revealing attorney-client
12 privileged information.
13            Is that right?
14       A.   That's correct.
15       Q.   Figure 5-B, do you have an understanding
16 of what's shown in Figure 5-B?
17       A.   Again, through conversations with my
18 attorney at the time, I had some understanding.  And
19 without divulging those conversations at the time, I
20 would retain my client -- attorney-client privileges.
21       Q.   So you are refusing to answer my
22 question based on attorney-client privilege.
23            Is that right?
24       MR. BECKER:  Object.  Form.
25       THE WITNESS:  I'm not refusing to answer any

Page 59

1 question.  I answered it -- your question.
2 BY MR. STEPHENS:
3        Q.   Okay.  Then explain your understanding
4 of Figure 5-B, please.
5        A.   Any understanding I received was from
6 conversations with my attorney at the time, and
7 without divulging those conversations, without
8 divulging attorney-client conversations, I would not
9 be able to go into detail.
10       Q.   Okay.  Then tell me what you can.
11            You don't need to go into detail.
12            Tell me -- tell me everything you
13 understand about Figure 5-B that you can without
14 revealing attorney-client privilege.
15       A.   There's nothing I can explain without
16 revealing attorney-client privilege.
17       Q.   Okay.  Figure 5-C, do you have an
18 understanding of what's shown in Figure 5-C?
19       A.   Again, without giving attorney-client
20 privileges from -- my understanding is from
21 conversations I had with my attorney at the time.
22       Q.   So you can't tell me any understanding
23 you have of Figure 5-C without revealing
24 attorney-client privilege.
25            Right?

Page 60

1        A.   That's correct.
2        Q.   Figure 5-C reflects your invention of
3 scrolling and zooming, right -- or I should say your
4 contribution to the invention?
5        A.   I do not know.
6        Q.   Okay.
7        A.   It might have -- might have been part of
8 it.
9        Q.   Do you see the word "scroll" there?
10       A.   Yes.
11       Q.   Your contribution was scrolling.
12            Right?
13       A.   It was manipulating a region of a screen
14 with your hands for zooming and scrolling --
15       Q.   Okay.
16       A.   -- using your fingers and hands.
17       Q.   Can you explain to me whether this
18 Figure 5-C reflects your contribution in any way?
19       A.   I don't recall.  And if it was, there
20 was -- it was conversations with my attorney at the
21 time.
22       Q.   So you can't explain any understanding
23 you have of Figure 5-C without revealing
24 attorney-client privileged information.
25            Is that right?

Page 61

1        A.   That's correct.
2        Q.   Figure 6, can you explain your
3 understanding of Figure 6, please?
4        A.   Same answer:  At the time I had
5 conversations with my attorney, he explained this.  I
6 had an understanding at the time based on
7 conversations with my attorney.
8        Q.   So you can't tell me any understanding
9 you have of Figure 6 without revealing attorney-client
10 privileged information.
11            Is that right?
12       A.   That's correct.
13       Q.   Can you explain your understanding of
14 Figure 7 without revealing attorney-client privileged
15 information?
16       A.   No.
17       Q.   Figure 8?
18       A.   Looks like it might have been a sample
19 page of -- of a page, a simplified navigation page.
20       Q.   Okay.  Can you explain what that means?
21       A.   A simpler page.
22       Q.   Okay.  Simpler than what?
23       A.   Simpler than the average search engine
24 website like Yahoo or AOL, I guess, just a simplified,
25 easier way to navigate a page.

1-888-513-9800                Merrill Legal Solutions - Houston                www.merrillcorp.com/law

Page 62

1     Q.  How does it work?
2     How does Figure 8 work?
3    MR. BECKER: Object. Form.
4    THE WITNESS: I don't recall.
5 BY MR. STEPHENS:
6     Q.  So you don't remember how the simplified
7 user interface in Figure 8 would work?
8     A.  I do not recall at this time, no.
9     Q.  Is there anything you could do to
10 refresh your recollection?
11     Let me ask you to take a minute and look
12 at the text associated with Figure 8, read it, tell me
13 if that refreshes your recollection about how the
14 invention works.
15     A.  What page would that be on?
16     Q.  I'm looking, and when I find it, I'll
17 tell you.
18     It's at the bottom of Column 7.
19     A.  Okay.
20     Q.  Can you go ahead and explain your
21 understanding of Figure 8, please?
22     A.  Again, any understanding would be
23 through discussions with my attorney.
24     Reading this description, it looks like
25 this is a navigational page and one embodiment, or one

Page 63

1 example, of the navigational page, simplified
2 navigational page.
3     Q.  And you can't tell me anything more than
4 that without revealing attorney-client privileged
5 information.
6     Is that right?
7     A.  I mean, there's -- in Figure 8, there's,
8 you know, a lot of verbiage regarding the figure, so
9 beyond that --
10     Q.  I'm just asking for you to explain your
11 understanding of Figure 8.
12     And if you can't do that without
13 revealing attorney-client privilege, just say so.
14     A.  Beyond what I just said, there's no more
15 for me to -- I -- I don't recall anything else beyond
16 that.
17     Q.  I'm not asking you about recollection.
18 I'm asking about understanding.
19     And you did read the description of
20 Figure 8 in the patent.
21     Right?
22     A.  I just skimmed through it just now, yes.
23     Q.  Okay. Do you have any understanding of
24 the invention that's shown in Figure 8?
25     A.  Based on what it says here, it would be

Page 64

1 my understanding.
2     Q.  Okay. Well, explain it to me, then,
3 please.
4    MR. BECKER: Object. Form.
5    THE WITNESS: I can --
6 BY MR. STEPHENS:
7     Q.  Explain to me how the invention in
8 Figure 8 works.
9     A.  Well, you can just read it. And that's
10 as much as I can explain at this time without
11 divulging confidential information --
12     Q.  So the only --
13     A.  -- except through my lawyer.
14     Q.  So the only explanation you can give to
15 me of the operation of what's shown in Figure 8 would
16 be to read the text in the bottom of Column 7 and the
17 top of Column 8.
18     Is that right?
19     A.  That would be the best way.
20     Q.  And other than that, you can't tell me
21 anything without revealing attorney-client privileged
22 information.
23     Is that right?
24     A.  I -- well, I told you before, you asked,
25 and I told you it looked like a simplified page to me,

Page 65

1 a simplified navigation page.
2     Q.  Okay. And beyond that, you can't tell
3 me anything without revealing attorney-client
4 privileged information.
5     Is that right?
6     A.  No, not that I could recall, no.
7     Q.  Sorry?
8     A.  Not that I could recall, no.
9     Q.  Okay. Figure 9-A, can you explain your
10 understanding of that, please?
11     A.  Looks like an example of a simplified
12 navigation page, as well.
13     Q.  Okay. Can you explain how it works?
14     A.  I -- beyond my understanding of the
15 conversations with my attorney, I would not divulge
16 anything under attorney-client privilege.
17     Q.  So you can't tell me anything more
18 about Figure 9-A, other than it's a simplified page,
19 without --
20     A.  I mean, there's a --
21     Q.  -- revealing attorney-client privilege?
22     A.  There's a description here. I could
23 read you the description.
24     Q.  Okay. So other than telling me it's a
25 simplified page and reading the words of the patent,

Page 66

1  itself, out loud, you can't tell me anything about
2  what's shown in Figure 9-A without revealing
3  attorney-client privileged information.
4        Is that right?
5     A.  No.
6     Q.  It's not right?
7     A.  It's not right.
8     Q.  Okay.  So then tell me what you can
9  without revealing attorney-client privileged
10  information.
11     A.  It looks like a simplified navigational
12  page to me.
13     Q.  Okay.  Yeah, I -- I know that.  You said
14  that several times.
15        And is there anything you can tell me,
16  other than the fact that it's a simplified
17  navigational page and simply reading out loud the text
18  of the patent, about Figure 9-A without revealing
19  attorney-client privileged information?
20     A.  No.
21     Q.  Okay.  Is your answer the same for
22  Figure 9-B?
23     A.  What's the question?
24     Q.  Tell me what you understand about
25  Figure 9-B.

Page 67

1     A.  Figure 9-B looks like a simplified
2  navigation page to me.
3     Q.  Okay.  Can you tell me anything other --
4  anything else about what's shown in Figure 9-B other
5  than the fact that it's a simplified navigation page
6  and simply reading out loud what's in the patent
7  without revealing attorney-client privileged
8  information?
9     A.  Not that I could recall at this time.
10     Q.  Okay.  Is your answer the same for
11  Figure 9-C?
12     A.  Yes.
13     Q.  Figure 9-D?
14     A.  Yes.
15     Q.  And Figure 10-A?
16     A.  It's a little hard to see it, so -- it's
17  a little dark on my copy here.
18     Q.  Yeah, it's that way in the original,
19  unfortunately.
20     A.  Oh, it is?
21        It looks like another simplified
22  navigational page.
23     Q.  And again, you can't tell me anything
24  about Figure 10-A other than it looks like a
25  simplified navigational page and simply reading out

Page 68

1  loud what's in the patent without revealing
2  attorney-client privileged information.
3        Correct?
4     A.  I mean, it's a different simplified
5  navigation page than 9-D.  There's different options
6  on it, I guess.
7     Q.  Okay.  Anything else you can tell me
8  without revealing attorney-client privileged
9  information?
10     A.  No, not that I could recall at this
11  time.
12     Q.  Is that also true for Figure 10-B?
13     A.  Generally, yes.
14     Q.  Figure 10-C?
15     A.  There are different pages, but yes.
16     Q.  Figure 10-D?
17     A.  Looks like another simplified navigation
18  page to me.
19     Q.  Can you tell me anything else about it
20  other than it's a simplified navigation page and
21  simply reading out loud the text of the patent without
22  revealing attorney-client privileged information?
23     A.  No.
24     Q.  Is your answer the same for Figure 10-F?
25     A.  What's the question?

Page 69

1     Q.  Can you tell me anything about this page
2  other than, it's a simplified navigation page and
3  simply reading out loud the text of the patent without
4  revealing attorney-client privileged information?
5     A.  Without reading everything on the page,
6  no.
7     Q.  I'm sorry.  What do you mean?
8     A.  Well, just reading what's -- what's
9  written on the page.
10     Q.  You mean you could read that aloud into
11  the record.
12        Right?
13        Is that what you mean?
14     A.  Yeah, I mean, there's a simplified page.
15  There's a box that says, "Features," a box that says,
16  "Specifications," and it has different boxes with
17  words in it.
18     Q.  But you can't tell me, for example, how
19  it works without revealing --
20     A.  No, not without revealing
21  attorney-client privileges.
22     Q.  Okay.  Is that true for Figure 10-G, as
23  well?
24     A.  Yes.
25     Q.  Figure 11, is it true, as well?

18 (Pages 66 to 69)

Page 70

1    A.   Yes.
2    Q.   Figure 12-A?
3    A.   Yes.
4    Q.   Figure 12-B?
5    A.   Yes.
6    Q.   Figure 13?
7    A.   Again, it's a simplified navigation
8  page.
9         What's the specific question again?
10   Q.   Okay.  The question is, can you tell me
11 anything about what's shown in Figure 13 other than
12 the fact that it shows a simplified navigation page
13 and otherwise reading the text of the patent aloud
14 without revealing attorney-client privileged
15 information?
16   A.   Without reading just what's on the page
17 and describing that, no.
18   Q.   Okay.  Is that true for Figure 14, as
19 well?
20   A.   Yes.
21   Q.   Okay.  Are you aware of any documents
22 that pre-date the filing date of the 196 patent, which
23 is shown on the front page, March 13, 2006, that show
24 manipulating a region of a screen for scrolling and
25 zooming?

Page 71

1    A.   Am I aware of any documents?
2         Back in July of 1999, it was -- it was
3  written on a piece of paper.  It was brought to our
4  attorney.
5         And so I imagine there are some
6  documents, something written on a piece of paper at
7  the time.  I don't know if it still exists.
8    Q.   So it's your understanding that the
9  notes that your father took on that date that -- that
10 you and he conceived of the invention were given to
11 Tom Coester?
12   A.   I don't know if he actually handed it to
13 him or if he just verbally read off, read it to him.
14   Q.   Do you know what happened to that piece
15 of paper?
16   A.   I have no idea.
17   Q.   Have you seen it since --
18   A.   No.
19   Q.   -- July 1999?
20   A.   No.
21   Q.   I can tell you, we haven't seen it,
22 either.  And I personally have not seen a scrap of
23 paper or any other evidence that shows manipulating a
24 region of a screen for scrolling and zooming that
25 appears to be dated prior to March 13, 2006.

Page 72

1         And I'm asking if you're aware of
2  anything like that.
3         MR. BECKER:  Object.  Form.
4         THE WITNESS:  We'd written something at the
5  time and given it to our lawyer either verbally or --
6  it was probably verbal, maybe it was handed to him.  I
7  don't recall.  And he put it together and -- to draft
8  the application.
9  BY MR. STEPHENS:
10   Q.   Now, you're aware of the 497 patent?
11        That's the one that's the parent of the
12 196 and 845 patents.
13   A.   I'm aware of it, yes.
14   Q.   That patent doesn't have disclosure of
15 manipulating a screen for scrolling and zooming.
16        Right?
17        MR. BECKER:  Object.  Form.
18        THE WITNESS:  I don't know.
19 BY MR. STEPHENS:
20   Q.   Do you want to take a look at it?
21        It's right here.
22        This is E. Gottfurcht Exhibit 3, which
23 is the 497 patent.
24        Have you seen that before?
25   A.   I'd have to look through it, but I

Page 73

1  assume if this is a true and valid copy of the patent,
2  then, yes.
3    Q.   I believe it is.
4         Can you show me where in the 497 patent
5  it shows manipulating a region of a screen for
6  scrolling and zooming?
7    A.   I'd have to take a little time and go
8  through it.
9    Q.   Go ahead.
10        Did you see anything in the figures that
11 disclosed manipulating a region of the screen for
12 scrolling and/or zooming?
13   A.   You know, I just browsed through some of
14 these figures.  I didn't put together without the
15 understanding.
16        Based on conversations with my attorney,
17 I would not be able to answer that definitively --
18   Q.   Can you answer it --
19   A.   -- without divulging attorney-client
20 privileges.
21   Q.   Can you answer it in any way,
22 definitively or not?
23   A.   Well, I got to read the descriptions
24 based with the figures.
25   Q.   Okay.  But so far, you haven't seen

19 (Pages 70 to 73)

Page 74

1  anything that you can point to that discloses
2  manipulating a region of the screen for scrolling
3  and/or zooming.
4        Right?
5     A.  No, I did not say that.
6     Q.  Okay.  Well, I'm asking --
7        Okay.  So you have seen something like
8  that?
9     A.  Again, without disclosing
10  attorney-client privileges, I don't want to divulge
11  information that I've received from my attorney.
12     Q.  So you may or may not have seen
13  something that discloses in the figures of the 497
14  patent manipulating a region of the screen for
15  scrolling and/or zooming, but you can't tell me --
16     A.  Without --
17     Q.  -- whether you did or not without
18  revealing attorney-client privileged information.
19        Right?
20     A.  That's correct, yes.
21     Q.  Thank you.
22     MR. BECKER:  Can you read back that last
23  question and answer?
24     (Whereupon the record was read as follows:)
25     "QUESTION:  So you may or may not have

Page 75

1        seen something that discloses in the
2        figures of the 497 patent manipulating a
3        region of the screen for scrolling and/or
4        zooming, but you can't tell me whether
5        you did or not without revealing
6        attorney-client privileged information.
7        Right?
8        "ANSWER:  That's correct, yes."
9  BY MR. STEPHENS:
10     Q.  And now just so the record is clear,
11  you're looking at the descriptions of the figures to
12  figure out whether or not --
13     A.  I'm trying to --
14     Q.  -- the 497 patent discloses --
15     A.  I'm trying to read through the whole
16  patent because you asked if there's anything in the
17  patent.
18        So I'm just trying to read through the
19  whole thing.
20     Q.  Okay.  And please be sure to --
21        Well, I guess I should -- let me ask for
22  a second before you spend a great deal of time on the
23  record doing that.
24        Is there any possibility that you will
25  point to some information that you believe discloses

Page 76

1  manipulating a region of the screen for scrolling
2  and/or zooming, or that you will tell me that you
3  haven't seen that, without claiming privilege?
4        In other words, what I don't want to do
5  is have you spend the next hour reading the patent and
6  then tell me, like you just told me with the figures,
7  that you can't answer the question.
8     A.  I would not be able to answer that
9  without reading it in detail, and I haven't read this
10  in ten years.
11     Q.  Well -- okay.  So what you're saying is,
12  you need whatever time it will take you to read it in
13  order to tell me whether or not you're going to claim
14  privilege in the answer.
15        Right?
16     A.  No.
17     Q.  Okay.  What -- what are you saying,
18  then?
19     A.  I said in order for me to answer your
20  question, I need to take the time to read this
21  thoroughly and -- so I can give you an answer.
22     Q.  Well, I'm willing to give you that time
23  to read it if you think there's some possibility you
24  won't just claim privilege.
25        But since I'm nearly certain you're

Page 77

1  going to just claim privilege, I'm reluctant to do
2  that.
3     A.  Well, there's -- without reading it, I
4  can't tell you what my answer is going to be.
5     Q.  Okay.  Go ahead and read it, then.
6     A.  Okay.
7     Q.  Mr. Gottfurcht, we're going to have to
8  go off the record to call in to the Court's
9  conference.
10     MR. LANE:  They're going to call the Court
11  right now.
12  BY MR. STEPHENS:
13     Q.  So maybe you want to mark where you are.
14     MR. LANE:  Hold on a second.
15     THE WITNESS:  No, I can remember where I'm at.
16     MR. STEPHENS:  Okay.  We should stay on the
17  record for the call, I think, actually.
18        That will make it hard for you to --
19  yeah, that won't work because you've got to read back
20  from the record.
21        We're going off the record.
22     THE VIDEOGRAPHER:  Going off the record.
23        The time is 12:29 p.m.
24     (Whereupon a recess was taken)
25        / / /

20 (Pages 74 to 77)

Page 78

1    (Whereupon a conference call was
2    conducted via speakerphone with
3    Judge Don Bush)
4    THE VIDEOGRAPHER:  Back on the record.
5    The time is 2:01 p.m.
6    MR. STEPHENS:  Could you read back the last
7    question?
8    (Whereupon the record was read as follows:)
9    QUESTION:  Okay.  So what you're saying
10    is, you need whatever time it will take
11    you to read it in order to tell me
12    whether or not you're going to claim
13    privilege in the answer.
14    Right?
15    "ANSWER:  No."
16    COURT REPORTER:  Oh, I'll go back.
17    "QUESTION:  Let me ask for a second
18    before you spend a great deal of time on
19    the record doing that.
20    Is there any possibility that you
21    will point to some information that you
22    believe discloses manipulating a region
23    of the screen for scrolling and/or
24    zooming, or that you will tell me that
25    you haven't seen that, without claiming

Page 79

1    privilege?
2    In other words, what I don't want
3    to do is have you spend the next hour
4    reading the patent and then tell me, like
5    you just told me with the figures, that
6    you can't answer the question.
7    "ANSWER:  I would not be able to answer
8    that without reading it in detail, and I
9    haven't read this in ten years."
10    BY MR. STEPHENS:
11    Q.  Okay.  Do you understand what the
12    pending question is?
13    A.  Can you rephrase it?
14    Q.  All right.  Well -- okay.  Let's --
15    we're on the record.
16    Mr. Gottfurcht, the pending question is,
17    can you identify for us where, if anywhere, in the 497
18    patent it discloses manipulating a region of the
19    screen for scrolling and/or zooming?
20    And you had been reading through the
21    patent when we had to take a break for the call with
22    the Court.
23    Could you please continue?
24    A.  Sure.
25    You're looking just for the word

Page 80

1    "manipulation of the screen"?
2    I just want to -- yeah.
3    Q.  No, what I'm asking --
4    A.  Just so when I read it, I know
5    exactly --
6    Q.  Yeah, well, exactly what I'm looking for
7    is any disclosure of what you contributed to the
8    invention.
9    MR. BECKER:  Object to form.
10    THE WITNESS:  So is that the same question you
11    asked before --
12    BY MR. STEPHENS:
13    Q.  Yes.
14    A.  -- or is it a little different?
15    Q.  No, I'm asking for any disclo --
16    You told me, right, that your
17    contribution to the invention was manipulating a
18    region of the screen for scrolling and/or zooming.
19    Correct?
20    A.  One, one of my contributions, yes.
21    Q.  Okay.  So what's what I'm -- if there's
22    any disclosure of that contribution.
23    A.  Okay.
24    Q.  Did you make any other contribution to
25    the 497 patent?

Page 81

1    A.  I worked on some of the -- some of the
2    interfaces and advertising.
3    Q.  What interfaces?
4    A.  The simplified menus.
5    Q.  Okay.  And -- well, at any rate, could
6    you just continue, and if you see any disclosure of
7    your contribution with respect to manipulating a
8    region of the screen for scrolling and/or zooming,
9    identify it for me, please.
10    A.  (Witness complies.)
11    Q.  Mr. Gottfurcht, we're going to go off
12    the record briefly so the videographer can change the
13    tape, but why don't you keep reading, and when we come
14    back on, you can answer the question.
15    A.  Okay.
16    THE VIDEOGRAPHER:  This marks the end of tape
17    Number 1 in the deposition of Grant Gottfurcht.
18    Going off the record.
19    The time is 2:16 p.m.
20    (Whereupon a recess was taken)
21    THE VIDEOGRAPHER:  Back on the record.
22    Here marks the beginning of tape
23    Number 2 in the deposition of Grant Gottfurcht.
24    The time is 2:21 p.m.
25    ///

Page 82

1  BY MR. STEPHENS:
2      Q.  Mr. Gottfurcht, just so we're clear,
3  you're still reading to figure out whether there's any
4  disclosure of your contribution of manipulating a
5  region of the screen for scrolling and/or zooming.
6          Right?
7      A.  Was that your original question?
8      Q.  Yes.
9      A.  I've just been looking for the word
10 "manipulation," 'cause your first question --
11     Q.  Mr. Gottfurcht, I was extremely clear in
12 my question, that I wanted any disclosure of your
13 contribution of --
14         Well, why don't we read the question
15 back.  Let's find out exactly what --
16     A.  Read the original question before I
17 first started reading.
18     MR. STEPHENS:  Would you just read the last
19 question back?
20         Not the one I just asked, but before the
21 break.
22     (Whereupon the record was read as follows:)
23     "QUESTION:  Well, at any rate, could you
24     just continue, and if you see any
25     disclosure of your contribution with

Page 83

1      respect to manipulating a region of the
2      screen for scrolling and/or zooming,
3      identify it for me, please."
4      THE WITNESS:  Okay.  Was that the original
5  question you asked --
6  BY MR. STEPHENS:
7      Q.  Yes.
8      A.  -- before -- before the break, before I
9  started reading?  Okay.
10         I couldn't find the word "manipulation"
11 in here, and that's what I was looking for originally
12 from when I first started reading.
13     Q.  Okay.  Go ahead and reread the entire
14 patent and look for the contribution.
15     A.  Okay.
16     Q.  Can you tell me why, despite my explicit
17 request, that you've not just looked for the word
18 "manipulate," that's what you did?
19     MR. BECKER:  Object.  Form.
20     THE WITNESS:  I thought that's what your
21 original question was.
22 BY MR. STEPHENS:
23     Q.  No, you asked me that before, whether
24 you should just look for the word "manipulate," and I
25 said, no, I would like for you to find where there's

Page 84

1  any disclosure of the contribution of your invention.
2          That's what I -- the record will show
3  that?
4      A.  Well, there's -- there is --
5      Q.  Can you tell me why you decided not to
6  do that?
7      A.  No, I -- I told you there were some -- I
8  worked on some of the navigational pages, the
9  advertisement, which I pointed out to you.
10         So, yes, for my contribution and the
11 semi-contribution --
12     Q.  Okay.  I have a question.
13         Please look through the patent and show
14 me where it discloses your contribution of
15 manipulating a region of the screen for scrolling
16 and/or zooming.
17     A.  Okay.  That part, I went through.  Based
18 on glancing through it, I do not see those words in
19 here.  There might be some things --
20     Q.  I'm not asking about those words.
21         I'm asking about any disclosure that you
22 see that discloses your contribution of manipulating a
23 region of the screen for scrolling and/or zooming,
24 whether it's in those words or other words, or if it's
25 in pictures, I'd like to know about it.

Page 85

1          So please point it out to me if you see
2  it.
3      A.  Yeah, I mean --
4      MR. BECKER:  Object.  Form.
5      THE WITNESS:  It's been ten years.  So this is
6  my first glance over this document, to read it
7  thoroughly, since signing off on it ten years ago.
8          So glancing over it again, I don't see
9  the word "manipulation" in here.
10 BY MR. STEPHENS:
11     Q.  Do you see any other disclosure of that
12 contribution whether it's using the word "manipulate"
13 or any other words or figures?
14     A.  Again, at first glancing it over, I did
15 not -- I did not catch it.  There could be something
16 in here that has something along those lines.  But
17 running over it, I did not see it.
18     Q.  Okay.  And you were -- that's what you
19 just spent the last few minutes that we have on video
20 doing.
21         Right?
22     A.  Yes.
23     Q.  Okay.  Were you in the room when we had
24 the call with the judge a little while ago?
25     A.  Yes, I was.

Page 86

1     Q.   And you heard your lawyer, Mr. Becker,
2  tell the judge that you and your father were
3  unsophisticated with respect to technology.
4          Right?
5     A.   I don't recall if those were his exact
6  words.
7     Q.   Is that an accurate statement?
8     A.   I don't -- I don't recall.
9     Q.   I'm not asking whether those were the
10  exact words.
11         Is it an accurate statement that you and
12  your father are unsophisticated with respect to
13  technology?
14     A.   You'd have to define "unsophisticated."
15     Q.   As you would normally understand that
16  word.
17     MR. BECKER:  Object.  Form.
18     THE WITNESS:  I think there's different
19  degrees of being unsophisticated.  You would have to
20  be specific.
21  BY MR. STEPHENS:
22     Q.   Okay.  So you disagree?
23         You'd say that you are not
24  unsophisticated with respect to technology.
25         Is that right?

Page 87

1     A.   I'm not a programmer, I'm not an
2  engineer.  If that's your definition of being
3  sophisticated, then I'm unsophisticated in that aspect
4  of technology.
5     Q.   I don't have a definition.  I'm asking
6  the way you interpreted what Mr. Becker told the
7  judge.
8     MR. BECKER:  Object.  Form.
9  BY MR. STEPHENS:
10     Q.   Do you agree what he told the judge was
11  true with respect to you and your father's level of
12  sophistication regarding the technology?
13     A.   It's a broad statement, so I would
14  not -- I would not be able to answer as to Mr. -- my
15  attorney, what he was inferring.
16     Q.   So you don't know whether what he told
17  the judge was true or not?
18     MR. BECKER:  Object.  Form.
19     THE WITNESS:  I don't know what he was
20  thinking when he used the word "unsophisticated."
21     Q.   Well, neither did the judge.
22         Right?
23     MR. BECKER:  Object.  Form.
24  BY MR. STEPHENS:
25     Q.   Right?

Page 88

1     A.   I don't know.  Maybe he had an
2  understanding of what he was telling him.
3     Q.   So you didn't understand what Mr. Becker
4  meant when he said to the judge that you and your
5  father are unsophisticated with respect to technology.
6          Is that right?
7     A.   No.
8     Q.   Okay.  What --
9     A.   I just -- I didn't think about it at the
10  time.
11     Q.   Okay.
12     A.   I didn't even know -- I don't even know
13  if those were the exact words he used.
14         I would have to -- you know, maybe if
15  there's a transcript and I could read it back and then
16  I could hypothetically --
17     Q.   Are you denying that he used those
18  words?
19     A.   I don't recall, I really don't.
20     Q.   Okay.  Do you think they're accurate or
21  not?
22     MR. BECKER:  Object.  Form.
23     THE WITNESS:  Again, I don't know.
24  BY MR. STEPHENS:
25     Q.   Okay.  Now, he also told the judge that

Page 89

1  you're not experts in the field.
2          Is that accurate?
3     A.   Could be.
4     Q.   "Yes" or "no"?
5          Is it?
6     A.   If experts are defined as programmers
7  and -- and, you know, people who are -- work daily in
8  the field of engineering or programming or have
9  degrees, then that would be accurate.
10     Q.   Is that what you understood Mr. Becker
11  to mean when he told the judge you were not experts in
12  the field?
13     A.   No.
14     Q.   What did you understand it to mean?
15     A.   I didn't even think about it.  There was
16  a conversation, there was a lot of people on the
17  phone.  There was, I think, ten people in conference,
18  and things were going back and forth, and I didn't
19  really understand it to mean anything --
20     Q.   Okay.
21     A.   -- at the time.
22     Q.   He also -- Mr. Becker also told the
23  judge that you and your father had helped capturing
24  the inventions you conceived.
25          Do you remember that?

23 (Pages 86 to 89)

Page 90

```
 1        A.  No, I do not.
 2        Q.  Do you think that's an accurate
 3   statement?
 4        MR. BECKER:  Object.  Form.
 5        THE WITNESS:  I -- I don't -- I don't even
 6   know if he said it.  I don't -- I really don't
 7   understand what --
 8   BY MR. STEPHENS:
 9        Q.  I'm representing to you that he said it.
10           Do you think it's an accurate statement?
11        MR. BECKER:  Object.  Form.
12        THE WITNESS:  That we had --
13   BY MR. STEPHENS:
14        Q.  That you and your father had helped
15   capturing the inventions you conceived.
16        A.  Did we have help capturing the
17   invention?
18           There was people hired.  We're not the
19   only people, as inventors.  And there was some people
20   hired who had expertise in the field.  So I know there
21   was people hired to bring their expertise to help.
22        Q.  So you'd agree with Mr. Becker?
23        MR. BECKER:  Object.  Form.
24        THE WITNESS:  I would agree that there was
25   people that were hired to help who had expertise that
```

Page 91

```
 1   we didn't have.
 2   BY MR. STEPHENS:
 3        Q.  Would you also agree with Mr. Becker
 4   when he told the judge that you -- you and your father
 5   had had a limited understanding based solely on the
 6   advice of the attorneys?
 7        MR. BECKER:  Object.  Form.
 8        THE WITNESS:  Again, I don't know what
 9   Mr. Becker was thinking.  I didn't think about it at
10   the time.
11   BY MR. STEPHENS:
12        Q.  So you don't know whether it's true or
13   not?
14        A.  There are certain things that I don't
15   have an understanding of because I'm not a lawyer, I'm
16   not an engineer, I've never -- hadn't filed a patent
17   before.
18           So there's plenty of things that are
19   beyond my expertise that I had to rely on counsel for,
20   for an understanding of.
21        Q.  Is it true that you have a limited
22   understanding of the patents based solely on the
23   advice of attorneys?
24        MR. BECKER:  Object.  Form.
25        THE WITNESS:  I would say it's limited.  I
```

Page 92

```
 1   would say based on the conversations with my attorney.
 2   As far as applying for a patent, I never applied for a
 3   patent.  I'm not a -- a attorney by trade, I'm not an
 4   engineer by trade.  So I did rely a lot on attorneys
 5   for understanding aspects of the patent process and
 6   the patent application process.
 7   BY MR. STEPHENS:
 8        Q.  Okay.  So you'd agree, then, that you
 9   have a limited understanding based solely on the
10   vice -- advice of attorneys --
11        MR. BECKER:  Object.  Form.
12   BY MR. STEPHENS:
13        Q.  -- right?
14        A.  As far as the patent process?
15        Q.  As far as what's in the patents that
16   have your name on it as an inventor?
17        MR. BECKER:  Object.  Form.
18        THE WITNESS:  I would say it's attorney-client
19   privileges.  I do have a limited understanding as far
20   as legalities of a -- of a -- of filing a patent.
21   BY MR. STEPHENS:
22        Q.  I'm not asking about the legalities of
23   filing.  I'm asking about what's in the patent.
24           Is it true that you have a limited
25   understanding of what's in the patent and that
```

Page 93

```
 1   understanding is based solely on the advice of
 2   attorneys?
 3        MR. BECKER:  Object.  Form.
 4        THE WITNESS:  No, it's not.
 5   BY MR. STEPHENS:
 6        Q.  Okay.  So Mr. Becker was wrong when he
 7   told that to the judge.
 8           Right?
 9        MR. BECKER:  Object.  Form.
10        THE WITNESS:  I don't know what he told to the
11   judge.
12   BY MR. STEPHENS:
13        Q.  Okay.  Fair enough.
14           And Mr. Becker also said that there was
15   no evidence that you had read the patents.
16           Do you remember that?
17        MR. BECKER:  Object.  Form.
18        THE WITNESS:  I don't recall.
19   BY MR. STEPHENS:
20        Q.  In fact, you have read the patent,
21   right, at the time it was filed?
22        A.  Yes, I did.
23        Q.  Okay.
24        MR. BECKER:  Object.  Form.
25        / / /
```

24 (Pages 90 to 93)

Page 94

BY MR. STEPHENS:
2      Q.   Did you have any discussion with anyone
3  about whether or not the 497 patent discloses your
4  contribution of manipulating a region of the screen
5  for scrolling and/or zooming over the lunch break?
6      A.   I did not.
7      Q.   Okay.  Have you had any discussions with
8  your father about this deposition since yesterday?
9      A.   Since yesterday?
10         Well, we spoke yesterday.  I was here at
11  the deposition, so --
12     Q.   Okay.  What did you say?
13         MR. BECKER:  And if it's -- if you're going to
14  divulge a group consultation that we had, I will
15  instruct you not to divulge that, only something you
16  had with him without me present.
17         THE WITNESS:  It was with my attorney present
18  at all times.
19  BY MR. STEPHENS:
20     Q.   So you've never had -- you have had no
21  discussions, whatsoever, with your father since
22  yesterday when Mr. Becker was not present.
23         Right?
24     A.   Correct.
25     Q.   Okay.  Did you have any discussions with

Page 95

your father about this case any time without
2  Mr. Becker or another attorney involved in that
3  conversation?
4      A.   Maybe over the years, I've had a few
5  conversations.
6      Q.   When is the last time you had a
7  discussion with your father about this case without a
8  lawyer?
9      A.   I don't recall.
10     Q.   Tell me what you remember about any
11  discussions you may have had with your father about
12  this case.
13     A.   I don't recall.  We talk from
14  time-to-time and --
15         MR. BECKER:  And -- also, I will caution
16  you, if he told you some advice that we gave him for
17  you, then you're not to divulge that advice.
18         THE WITNESS:  Okay.  He would just tell me a
19  few things, where the status of the application was,
20  where the status of the patent was, status of the
21  lawsuits.
22         But I did not -- we did not talk in a
23  lot of detail.
24  BY MR. STEPHENS:
25     Q.   What did you do to prepare for this

Page 96

deposition?
2      A.   I had spent a little bit of time with my
3  counsel.
4      Q.   Anything else?
5      A.   No.
6      Q.   When did you do that?
7      A.   Yesterday and --
8      Q.   Yesterday, outside the time you were in
9  the deposition room?
10     A.   Yeah, outside the time.
11         And also, I spoke to my counsel last
12  time he was in town, chatted a little bit, as well.
13     Q.   When was that?
14     A.   During the medi -- the mediation, I
15  believe it was.
16     Q.   Okay.  Who's paying Mr. Becker's bills
17  for representing you?
18     A.   I don't know.
19     Q.   But it's not you?
20     A.   It's not me.
21     Q.   Okay.  Do you work for EMG?
22     A.   No, I do not.
23     Q.   Do you have any -- what -- what is your
24  connection with EMG?
25     A.   One of the owners.  I have a percentage

Page 97

share.
2      Q.   What's your percentage share?
3      A.   25 percent.
4      Q.   And does any trust that you own or
5  control own a percentage?
6      A.   Well, that's what I meant.  It's
7  controlled by the trust, sorry.
8      Q.   So you control the trust and the trust
9  has the ownership?
10     A.   I'm the trustee of the trust, yes.
11     Q.   And you're also a beneficiary of the
12  trust?
13     A.   Yes.
14     Q.   Now, is that the same trust that's on
15  the face of the 196 patent, the -- sorry -- on
16  the face of the -- yeah, the 196 patent, the
17  Grant Gottfurcht 2003 Irrevocable Trust?
18     A.   I -- I believe so.
19     Q.   Okay.  Are there any other trusts that
20  you're involved with?
21     A.   No, there are not.
22     Q.   Now, you mentioned that you contributed
23  something other than manipulating a region of the
24  screen for scrolling and/or zooming.
25         What exactly were those contributions?

25 (Pages 94 to 97)

Page 98

1    A.  I worked on some of these -- these
2  simplified navigation pages.
3    Q.  Okay.  Which ones?
4    A.  And again, I don't recall which ones I'd
5  worked on.  I was around while they were being done.
6        So I don't recall which ones
7  specifically I worked on.
8    Q.  So you can't identify what your
9  contribution was.
10        Is that right?
11    A.  Well, I believe I -- it was a
12  collaborative effort.  These ones, you know, some of
13  the format, I might have collaborated on with him.
14    Q.  Why don't you tell me exactly what
15  format you collaborated on.
16    A.  Okay.  Which patent are you talking
17  about?
18    Q.  Take your pick.  You've got the 497, the
19  845, I think, or maybe it's the 196, whichever one you
20  contributed to.
21    A.  Okay.  We'll go with the 196.
22        Figure 2-B, I might have contributed to
23  that.
24    Q.  What was your contribution?
25    A.  I might have come up with some of the

Page 99

1  words on the page.
2    Q.  Which words?
3    A.  I don't recall.
4    Q.  Anything else besides the words?
5    A.  I do not recall.
6    Q.  Okay.  Anything else?
7    A.  I do not recall.
8    Q.  Now, you said you might have come up
9  with some words on the page.
10        Did you or not, or you're just not sure?
11    A.  Well, I don't recall -- I was involved
12  in -- when these were -- some of these were being put
13  together.  So I don't recall what specific words, if I
14  did come up, if it was just a full collaborative
15  effort.  I don't recall specifically.
16    Q.  Anything else that you contributed to
17  the 196 patent?
18    A.  Just all those -- all the simplified
19  navigation interface pages.  Some of them -- although
20  I don't recall exactly which ones, I might have
21  contributed on a collaborative effort.
22    Q.  Contributed words, or something else?
23    A.  Mainly words, yeah.  Mainly words.
24    Q.  Now, you said you might have.
25        Did you or not, or you just don't

Page 100

1  remember?
2    A.  Well, I was around when some of these
3  were being put together, some of the templates and
4  some of the words were trying to put into the template
5  and divided into these segments, and I, on a
6  collaborative effort --
7    Q.  Okay.  Anything else --
8    A.  -- came up with some of them.
9    Q.  Okay.  Anything else besides words and
10  some of the simplified interface pages?
11    A.  That would be it as far as the figures
12  go.
13    Q.  Okay.  How about in the 497?
14  MR. BECKER:  Object.  Form.
15  THE WITNESS:  I would say the same thing.
16  Again, the navigation pages.
17  BY MR. STEPHENS:
18    Q.  Anything else in the 497?
19    A.  Well, I'd have to -- as far as figures
20  or in the descriptions?
21    Q.  Let's stay with the figures for now.
22    A.  I don't recall if there was any other
23  figures besides the navigational pages that I
24  contributed to.
25    Q.  And on those navigational pages, did you

Page 101

1  contribute to anything other than the words?
2    A.  The words, advertisement, I guess, as
3  well, laying -- laying out some of it, some of the
4  layout.
5    Q.  You mean like the picture of the watch
6  in Figure 9-B, for example?
7    A.  Possibly, as an example.
8    Q.  Any other contributions that you see
9  that were yours to the 497 figures besides
10  collaborative contribution to words on the navigation
11  pages and layout of some of the advertising?
12    A.  Just running through really quick, I
13  don't -- that's all I see at this time, but there
14  could be other stuff in there.
15    Q.  What do the letters "EMG" stand for?
16    A.  Elliott, Marlo, and Grant.
17    Q.  That's you and your sister and your
18  father?
19    A.  Yes.
20    Q.  Who picked the name?
21    A.  Who picked our birth names or --
22    Q.  No, no, I'm sorry.  The name EMG.
23    A.  It was probably something Elliott came
24  up with, but I do -- I do not recall specifically.
25    Q.  Okay.  And are you three the sole

26 (Pages 98 to 101)

Page 102

1  beneficial owners of EMG?
2      A.  Yes, we are.
3      Q.  Now, yesterday, your father testified
4  about your contribution to the invention in July of
5  1999, and he mentioned the words "manipulating a
6  region of the screen for scrolling and/or zooming."
7          Is it your recollection that you used
8  those exact words on that day in July of 1999?
9      A.  I don't recall the exact words.
10      Q.  Do you remember what you did say about
11  your contribution on that day?
12      A.  I recall saying we would have to find a
13  way to move around the screen without a mouse and
14  you'd probably have to use your hands to move around,
15  to scroll and to zoom in different features, different
16  segments of the page.
17      Q.  Do you remember talking about touching
18  the screen to do that?
19      A.  Yeah, manipulating with your hands, so
20  that would be touching.
21      Q.  Well, you can manipulate a mouse with
22  your hands, too, right, and use that to make
23  selections on a screen.
24          Right?
25      MR. BECKER:  Object.  Form.

Page 103

1      THE WITNESS:  Yeah, you can use a mouse, sure.
2  I mean, that's been around, yeah.
3  BY MR. STEPHENS:
4      Q.  And I'm -- so I guess my question is, do
5  you specifically recall talking about using a touch
6  screen to manipulate a region of the screen for
7  scrolling and/or zooming?
8      A.  Yes.
9      Q.  And did you write that down at the time?
10      A.  I didn't -- I don't believe I wrote down
11  any notes.  I believe Elliot wrote down all the notes.
12      Q.  Okay.  Now, you had your computer, is
13  that right, there?
14      A.  It was -- I'm not sure if it was my
15  computer or a computer that -- I don't recall.
16      Q.  Was it a laptop or a desktop?
17      A.  I believe it was a laptop.
18      Q.  Did you have it plugged into the plasma
19  TV?
20      A.  I don't recall.
21      Q.  Is it possible that you did?
22      A.  It's possible.
23      Q.  Had you ever done that before, plugged
24  your -- plugged a computer into a television set?
25      A.  I'd probably seen it done, probably.

Page 104

1      Q.  Before July of 1999, you -- you had seen
2  it done?
3      A.  No, not before July.
4      Q.  What kind of pointing device did you
5  have on the laptop?
6          Was it a mouse plugged into it or was it
7  a touch pad?
8      A.  I do not recall.
9      Q.  Do you remember what kind of laptop it
10  was?
11      A.  I do not recall.  It could have been a
12  Dell.
13      Q.  Do you remember where in the house you
14  were?
15      A.  Yes.
16      Q.  Where was that?
17      A.  It was in the living room.
18      Q.  Do you remember what kind of cell phone
19  it was that your father had?
20      A.  No, I do not.
21      Q.  When's the first time you used the
22  Internet?
23      A.  I do not recall.
24      Q.  Was it before July of 1999?
25      A.  Yes, it was.

Page 105

1      Q.  Was it more than a month before then?
2      A.  Yes.
3      Q.  More than a year?
4      A.  I do not recall.  It could have been.
5      Q.  Was it more than two years?
6      A.  I do not recall.
7      Q.  Have you ever owned a computer?
8      A.  Yes.
9      Q.  Did you own one at the time that you
10  came up with the invention with your father?
11      A.  Yes, I did.
12      Q.  What kind of computer was it?
13      A.  I do not recall.
14      Q.  Laptop or desktop?
15      A.  I know I had a desktop at the time.
16      Q.  Did you have a laptop, as well?
17      A.  I do not recall.
18      Q.  Had you ever used a computer with a
19  track pad?
20      A.  At the time, I do not recall.
21      Q.  You're aware that there were computers
22  that had track pads before July of 1999.
23          Right?
24      MR. BECKER:  Object.  Form.
25      THE WITNESS:  I don't know.

27 (Pages 102 to 105)

Page 106

BY MR. STEPHENS:
1 
2    Q.   Well, you're aware that you didn't have
3 to use a mouse to manipulate the screen on a computer,
4 right --
5       MR. BECKER:  Object.  Form.
6 BY MR. STEPHENS:
7    Q.   -- before you came up with your
8 invention?
9    A.   I -- I do not recall.  I don't know if
10 the track pad was out before or after.  I just don't
11 remember that.  I know now there's a track pad, so now
12 you don't need a mouse.
13    Q.   Is it possible that your desktop
14 computer had a track pad back in those days?
15    A.   I don't think so.
16    Q.   Is it possible that you'd used a
17 computer of some kind that had a track pad?
18    A.   It's possible.  I just don't recall.
19    Q.   Okay.  Had you used the Web before you
20 came up with your invention?
21    A.   Yes, I had.
22    Q.   Had you ever scrolled a Web page?
23    A.   Yes, I had.
24    Q.   Had you ever zoomed a Web page?
25    A.   I don't -- I don't recall.

Page 107

1    Q.   Had you ever used a Web page with
2 frames?
3       MR. BECKER:  Object.  Form.
4       THE WITNESS:  Can you define "frames"?
5 BY MR. STEPHENS:
6    Q.   You don't know what a frame is?
7    A.   Just a -- a window on top of another
8 window?
9    Q.   Well, it's a way of having multiple
10 independent scrollable regions within a single Web
11 page, among other things.
12       MR. BECKER:  Object.  Form.
13 BY MR. STEPHENS:
14    Q.   Had you ever seen a page like that
15 before you came up with your invention?
16    A.   I don't recall.
17    Q.   It's possible you had, you just don't
18 know?
19       MR. BECKER:  Object.  Form.
20       THE WITNESS:  I don't recall.
21 BY MR. STEPHENS:
22    Q.   Had you ever used a link that you could
23 follow by pushing a button on the -- on a keypad of
24 your computer when you were surfing the Web?
25    A.   I owned a desktop at the time with a

Page 108

1 mouse, so that was the computer I used.
2    Q.   Even with a browser that you control
3 with a mouse, you could still set up Web pages to push
4 a button and follow a link.
5       Were you aware of that?
6       MR. BECKER:  Object.  Form.
7       THE WITNESS:  To be able to press a link and
8 go to another page?
9 BY MR. STEPHENS:
10    Q.   Press a button on your keypad in order
11 to follow a link.
12    A.   No, I wasn't.
13    Q.   You weren't aware of that?
14    A.   No, not that I can recall.
15    Q.   Had you ever used a touch pad -- I'm
16 sorry -- a touch screen?
17    A.   At that time, I -- I don't think so, no.
18    Q.   Do you know if touch screens existed
19 before you came up with your invention?
20    A.   I don't recall.
21    Q.   Other than the contributions that you've
22 testified about to the invention, have you had any
23 other role in connection with your father's efforts to
24 license or develop the inventions?
25    A.   No.

Page 109

1    Q.   So you hadn't been involved in MallTV,
2 for example?
3    A.   No, I had not.
4    Q.   And you had not been involved in any
5 discussions with any parties to take a license.
6       Right?
7    A.   That's correct.
8    Q.   Or -- and you haven't been involved in
9 any discussions around the joint venture or any other
10 kind of business venture relating to the patents.
11       Is that right?
12    A.   That's correct.
13    Q.   When's the last time you had any
14 substantive involvement with the inventions?
15    A.   When they were filed.
16    Q.   So you haven't had anything to do with
17 the inventions after the filing of the 196 patent.
18       Is that right?
19    A.   In the continuations, in the 497, just
20 reading -- reading through and having meetings with
21 the lawyer, that's it.
22    Q.   How many applications relating to these
23 inventions have you been involved in filing?
24    A.   I don't know.
25    Q.   Can you give me a rough idea?

Page 110

1    A.   I don't know.  My -- my father's --
2  was -- has been doing all of that.  I've not been
3  involved with a lot of that.
4    Q.   Well, you've had to sign declarations
5  for each one.
6       Right?
7    MR. BECKER:  Object.  Form.
8    THE WITNESS:  I don't know.
9  BY MR. STEPHENS:
10    Q.   You don't remember signing declarations
11  for other patents beside the ones in this lawsuit?
12    A.   There are other patents, yeah, I do
13  remember signing.  I just don't know which ones.  I
14  don't recall how many.  My involvement was very
15  limited to --
16    Q.   Well, did you read the specification or
17  claims of any other patents --
18    MR. BECKER:  Object.  Form.
19  BY MR. STEPHENS:
20    Q.   -- in connection with filing patent
21  applications?
22    A.   In connection with these patents?
23    Q.   Any patents.
24    A.   Yes.
25    Q.   When's the last time you did that?

Page 111

1    A.   I don't recall.
2    Q.   More than a year ago?
3    A.   Could have been.
4    Q.   More than two years ago?
5    A.   I don't know.  I don't recall.
6    Q.   More than five years ago?
7    A.   There was definitely patents that I had
8  signed more than five years ago, so --
9    Q.   But I'm asking about whether there were
10  any -- any since then, within the last five years.
11    A.   Oh, I -- I don't -- I don't recall
12  specifics, but I'm sure there were.
13    Q.   Okay.  Any idea how many since the
14  filing of the 196 patent in March of 2006?
15    A.   I don't know.
16    Q.   More than one?
17    A.   It's possible.
18    Q.   More than two?
19    A.   It's possible.
20    Q.   More than ten?
21    A.   It's possible.
22    Q.   More than 20?
23    A.   Anything's possible.  I don't recall
24  more than 20, but --
25    Q.   But it could be --

Page 112

1    A.   -- I don't -- I don't remember.  I don't
2  recall.
3    Q.   But it could be more than 20 that you've
4  signed declarations for since March of 2006.
5       Right?
6    MR. BECKER:  Object.  Form.
7    THE WITNESS:  It's possible.
8  BY MR. STEPHENS:
9    Q.   Can you describe in your own words what
10  the invention is in this lawsuit?
11    MR. BECKER:  Object.  Form.
12    THE WITNESS:  Well, based on my part of the
13  invention, what I contributed to, it would be having
14  the ability to manipulate a screen -- a region of a
15  screen for zooming and scrolling using your hands.
16       There's other inventors.
17       As far as the invention as a whole,
18  that's something -- it was a collaborative effort and
19  it was put together with the attorney, and my
20  understanding I gained from that was through
21  conversations with my attorney.
22  BY MR. STEPHENS:
23    Q.   So other than telling us your
24  contribution of manipulating a region of the screen
25  for scrolling and/or zooming, you can't tell me what

Page 113

1  the invention is in this suit?
2    A.   Well, I've explained to you from day one
3  the initial conception, the initial vision for being
4  able to display content from the Internet on a TV
5  screen or on a mobile device in a simplified
6  navigation form; having a sister site, being able to
7  have one-to-one unique inputs; and being able to
8  navigate the screen by zooming and scrolling using
9  your hands.
10    Q.   Anything else?
11    A.   At this time, I don't recall.
12    Q.   Okay.  Let me just make sure I got it
13  right.
14       So your understanding of the invention
15  is displaying content from the Internet on a
16  television or mobile device with a simplified user
17  interface, having one-to-one navigation, and
18  manipulating a region of the screen for scrolling
19  and/or zooming.
20       Is that right?
21    MR. BECKER:  Object.  Form.
22    THE WITNESS:  Using your fingers and hands.
23  But that's -- that was the initial -- the initial
24  vision for the invention, and then there was other
25  parts that were put in through other experts.

29 (Pages 110 to 113)

Page 114

1           And it was all put together in an
2   application form, which I'm not an expert to
3   interpret.
4           So I gained my -- a lot of knowledge
5   through my understanding legally with my attorney.
6   BY MR. STEPHENS:
7       Q.   Okay.  I just want to make sure I
8   understand what you understand the invention to be.
9           So you testified, I think, that it was
10  displaying content from the Internet on a television
11  or mobile device with a simplified user interface,
12  having one-to-one navigation, and manipulating a
13  region of a screen for scrolling and/or zooming using
14  fingers and hands.
15          MR. BECKER:  Object.
16  BY MR. STEPHENS:
17      Q.   Is that right?
18          MR. BECKER:  Object.  Form.
19          THE WITNESS:  That could be some -- some of
20  the aspects of the invention, yes.
21  BY MR. STEPHENS:
22      Q.   Okay.  What else is there?
23      A.   Well, there's other things in here.
24  There's having a sister site.  And there's a lot of
25  things in here that were discussed amongst my

Page 115

1   attorney, which would be attorney-client privileges,
2   because -- beyond that, I told you the original
3   concept for --
4       Q.   I'm just trying to understand what you
5   believe the invention to be.
6       A.   I wouldn't say I believe the invention
7   to be anything beyond what is in the patent
8   application, what has been approved as far as -- in
9   the patents, and they speak for themselves, so --
10      Q.   Okay.  But I'm --
11      A.   There's other aspects to the -- the
12  patent.  There's a lot of aspects to the patent, which
13  those aren't my expertise on, so --
14          I'm not saying it's limited to what I
15  just described.  I'm saying those are some of the
16  aspects of it.  There are many -- there are other
17  aspects, and that's all I could elaborate on at this
18  time.
19      Q.   Now, you understand that this videotape
20  can be played to the judge and jury at the trial.
21          Right?
22      A.   Yes.
23      Q.   So your testimony here today is
24  essentially the same as if you were at trial.
25          Right?

Page 116

1       A.   Yes.
2       Q.   Okay.  What I'm asking you to tell me
3   now is what you intend to tell the jury and
4   Judge Davis you understand the invention to be at
5   trial.
6           MR. BECKER:  Object.  Form.
7           Is that a question?
8   BY MR. STEPHENS:
9       Q.   Yes.
10          MR. BECKER:  What's the question?
11          MR. STEPHENS:  I just -- I just said it.
12          Would you read it back, please?
13      (Whereupon the record was read as follows:)
14      "QUESTION:  What I'm asking you to tell
15      me now is what you intend to tell the
16      jury and Judge Davis you understand the
17      invention to be at trial."
18          MR. BECKER:  That's a statement.
19          MR. STEPHENS:  No, it's a question.
20  BY MR. STEPHENS:
21      Q.   Could you answer the question, please?
22          MR. BECKER:  Object.  Form.
23          THE WITNESS:  Can you repeat the question?
24      (Whereupon the record was read as follows:)
25      "QUESTION:  What I'm asking you to tell

Page 117

1   me now is what you intend to tell the
2   jury and Judge Davis you understand the
3   invention to be at trial."
4           THE WITNESS:  I understand the invention to be
5   what's in the application, what is -- you know, what's
6   claimed in the application.
7   BY MR. STEPHENS:
8       Q.   Okay.  And what is that?
9       A.   The document speaks for itself.
10      Q.   I'm asking for your understanding.  And
11  that's what you're telling the jury, is that your
12  understanding of what the invention is, is what's in
13  the patent and that speaks for itself, and you don't
14  have any other understanding.
15          Is that right?
16          MR. BECKER:  Object.  Form.
17  BY MR. STEPHENS:
18      Q.   Is that right?
19      A.   If that's your interpretation of what I
20  said.
21      Q.   I'm asking you to tell me whether that
22  interpretation is correct.
23      A.   I said the document speaks for itself.
24  It's a patent that was filed and issued by the
25  United States Government.

Page 118

1      And so there are things in here, some of
2  the things which are beyond my expertise, some
3  technicalities beyond my legal knowledge of the patent
4  application process.
5      And a lot of the information I attained
6  was during the conversations with my attorney, and my
7  contributions to the patent, I've explained already
8  today.
9      Q.  Okay.  I'm going to -- I'm going to ask
10 you one more time to state for the video camera and
11 for Judge Davis and for the jury what your
12 understanding of the invention is.
13     A.  I stand --
14     MR. BECKER:  Object.  Form.
15     THE WITNESS:  I stand by my answer.
16 BY MR. STEPHENS:
17     Q.  Okay.  That's your complete answer?
18     A.  At this time, that's my answer, yes.
19     Q.  Are you planning on changing it later?
20     MR. BECKER:  Object.  Form.
21     THE WITNESS:  No, I think this is -- the
22 invention's here.  It speaks for itself, so --
23 BY MR. STEPHENS:
24     Q.  And at trial when you're asked what the
25 invention is, you're just going to refer to the

Page 119

1  patent.
2      Right?
3      MR. BECKER:  Object.  Form.
4  BY MR. STEPHENS:
5      Q.  Right?
6      MR. BECKER:  Object.  Form.
7      THE WITNESS:  I don't know.  I mean, I -- I
8  would think this would be the best and -- whatever is
9  in here would be the best way to interpret the patent,
10 and I think it would be --
11 BY MR. STEPHENS:
12     Q.  Okay.  As long as that's what you're
13 going to do at trial --
14     A.  -- important.
15     Q.  As long as that's what you're going to
16 do at trial, I'm okay with it.
17     So when you're asked by your -- by
18 Mr. Becker at trial what the invention is, you're
19 going to say, "Look at the patent, it speaks for
20 itself."
21     Right?
22     MR. BECKER:  Object.  Form.
23     You're just badgering him.  I can
24 only --
25     / / /

Page 120

1  BY MR. STEPHENS:
2      Q.  Right?
3      MR. BECKER:  -- let it go on so long.
4      MR. STEPHENS:  Hey, you have the right to say,
5  "Object to form," and that's it.
6  BY MR. STEPHENS:
7      Q.  Go ahead, sir.
8      MR. BECKER:  (Inaudible) --
9      THE WITNESS:  I answered your question
10 already.
11 BY MR. STEPHENS:
12     Q.  Sorry?
13     A.  I answered your question already, many
14 times.
15     You can read it back.
16     Q.  Okay.  Is a laptop computer a mobile
17 device?
18     MR. BECKER:  Object.  Form.
19     THE WITNESS:  I don't know.
20 BY MR. STEPHENS:
21     Q.  If it had a touch screen, how would it
22 be different from your invention?
23     A.  I don't know.
24     Q.  Now, you've referred to the patent as
25 speaking for itself.

Page 121

1      Does that mean that if I ask you again
2  to explain Claim 58, you're going to tell me you can't
3  do that because it's attorney-client privileged,
4  Claim 58 of the 196 patent?
5      A.  Yes, I would.
6      Q.  Okay.  I wanted to make sure.
7      Now, you didn't invent scrolling Web
8  pages.
9      Right?
10     MR. BECKER:  Object.  Form.
11     THE WITNESS:  With a mouse, no.
12 BY MR. STEPHENS:
13     Q.  And you didn't invent zooming Web pages.
14     Right?
15     A.  I don't know.
16     Q.  And you didn't invent using a touch
17 screen to surf the Internet.
18     Right?
19     MR. BECKER:  Object.  Form.
20     THE WITNESS:  I don't know.
21 BY MR. STEPHENS:
22     Q.  You didn't invent mobile Web browsing.
23     Right?
24     MR. BECKER:  Object.  Form.
25     THE WITNESS:  I don't know.

31 (Pages 118 to 121)

Page 122

1 BY MR. STEPHENS:
2     Q.  You didn't invent HTTP.
3       Right?
4     A.  No.
5     Q.  Do you know what HTTP is?
6     A.  I'm not sure.
7     Q.  You didn't --
8     A.  The protocol, something maybe.
9     Q.  You didn't invent XML, either.
10      Right?
11    A.  That's correct.
12    Q.  Do you know what XML is?
13    A.  I believe it's a computer language.
14    Q.  Do you know what XML stands for?
15    A.  I think it's extensible markup language,
16 maybe.
17    Q.  And what's it used for?
18    A.  Programming computer pages, Web pages
19 maybe.
20    Q.  How?
21    A.  I don't know.  That's not my expertise.
22    Q.  Did you invent XSL?
23    A.  No, I did not.
24    Q.  Do you know what it is?
25    A.  No, I do not.

Page 123

1     Q.  Did you invent CSS?
2     A.  No, I did not.
3     Q.  Do you know what that is?
4     A.  I've heard something style sheets,
5 cascading style sheets.
6     Q.  Do you know what those are?
7     A.  I'm not familiar, no.
8     Q.  Did you invent HTML?
9     A.  No, I did not.
10    Q.  Do you know what that is?
11    A.  It's a language.
12    Q.  What kind of language?
13    A.  Computer language.
14    Q.  For what?
15    A.  I'm not sure.  For making Web pages --
16    Q.  Okay.  Have you ever written --
17    A.  -- if I believe.
18    Q.  Have you ever written any HTML?
19    A.  Never, no.
20    Q.  Can you read it?
21    A.  No.
22    Q.  Did you invent XHTML?
23    A.  No.
24    Q.  Do you know what it is?
25    A.  Another computer language.

Page 124

1     Q.  And what's it for?
2     A.  I don't know.
3     Q.  What's the relationship between HTML and
4 XHTML?
5     A.  I don't know.  Maybe they're related
6 languages.
7     Q.  In what way?
8     A.  I don't know.  I'm guessing.
9     Q.  Okay.
10    A.  I shouldn't guess.  I don't know.
11    Q.  Did you invent the notion of having a
12 simple user interface for a website?
13    A.  Maybe.
14    Q.  Okay.  You're not sure?
15    A.  Well, I could have, yeah.  I mean, I
16 could have contributed to a patent that came up with
17 that, yes.
18    Q.  So you and your father invented the idea
19 of having a simple user interface for a website.
20     Is that right?
21    MR. BECKER:  Object.  Form.
22    THE WITNESS:  Possibly.
23 BY MR. STEPHENS:
24    Q.  You're not sure?
25    A.  I don't know.

Page 125

1    MR. BECKER:  Object.  Form.
2 BY MR. STEPHENS:
3     Q.  Okay.  Did you invent the idea of having
4 an alternate Web page that's easier for some people to
5 use?
6    MR. BECKER:  Object.  Form.
7    THE WITNESS:  It's possible.
8 BY MR. STEPHENS:
9     Q.  You're not sure?
10    A.  I think so.
11    Q.  You think you did invent that?
12    A.  It's possible.
13    Q.  But you're not sure?
14    A.  I contributed to, I think -- whether
15 somebody came up with it before, that's possible.  I
16 don't know.
17     At the time, I hadn't seen anything.  So
18 at the time, my knowledge would think that, yes.
19    Q.  Had you ever read any of the documents
20 published by the World Wide Web Consortium before the
21 invention?
22    A.  No.
23    Q.  Had you ever used WebTV?
24    A.  No.
25    Q.  Had you ever seen WebTV?

Page 126

1    A.  I don't recall.
2    Q.  Do you know what it is?
3    A.  From the last deposition, I heard some
4  stuff about it -- or from -- it might have been the
5  mediation that I attended with you.
6    Q.  Do you know what WebTV is?
7    A.  I don't know exactly.  A box that has
8  Web on TV, maybe.
9    Q.  Were you aware of it in January of 1999?
10    A.  I don't know.  I don't recall.
11    Q.  Do you know whether or not WebTV did
12  what you and your father claim to have invented?
13    A.  I have no idea.
14    Q.  It's possible that it did?
15    MR. BECKER:  Object.  Form.
16    THE WITNESS:  I don't know.
17  BY MR. STEPHENS:
18    Q.  You didn't invent cell phones.
19    Right?
20    A.  No.
21    Q.  And you didn't invent browsing the Web
22  on cell phones.
23    Right?
24    MR. BECKER:  Object.  Form.
25    THE WITNESS:  I don't know.

Page 127

1  BY MR. STEPHENS:
2    Q.  You think you might have?
3    A.  Some of -- some of the ways to do it.
4    Q.  But I'm talking about the ability to
5  browse the Web on Web pages [sic].
6    Did you invent that?
7    MR. BECKER:  Object.  Form.
8    THE WITNESS:  The ability to just browse any
9  Web page on a cell phone?
10  BY MR. STEPHENS:
11    Q.  Yeah.
12    A.  I don't know.
13    Q.  You might have, you're just not sure?
14    A.  Depends the interpretation of it, but I
15  don't -- I don't know.
16    Q.  What is it that you don't understand
17  about the question?
18    A.  Whether it was in a simplified form
19  and --
20    Q.  I'm talking about being able to do it at
21  all.
22    A.  You know, just navigate to -- at all, I
23  don't believe so.
24    Q.  People could surf the Web on cell phones
25  before your invention.

Page 128

1    Right?
2    MR. BECKER:  Object.  Form.
3    THE WITNESS:  That, I don't know.
4  BY MR. STEPHENS:
5    Q.  You just don't know one way or another?
6    A.  I do not know one way or another.
7    Q.  And people could surf the Web on
8  handheld devices before your invention, also.
9    Right?
10    A.  I -- I don't know.
11    Q.  You didn't invent the iPod.
12    Right?
13    A.  No.
14    Q.  You didn't invent the iPhone.
15    Right?
16    A.  The actual hardware, no.
17    Q.  Or the software?
18    A.  Well, there's components in the software
19  that --
20    Q.  Which components did you invent?
21    A.  Zooming with your fingers and hands.
22    Q.  Okay.  Anything else?
23    A.  Scrolling with your fingers and hands.
24    Q.  Okay.  Anything else?
25    A.  And manipulating a region of a screen

Page 129

1  using your hands or fingers.
2    Q.  Anything else?
3    A.  Simplified navigation.
4    Q.  Okay.  Anything else?
5    A.  That's all I could recall at the time.
6    Q.  What kind of simplified navigation does
7  the iPhone do?
8    MR. BECKER:  Object.  Form.
9    THE WITNESS:  You know, on an iPhone, from the
10  little bit I've seen, that there's some Web pages that
11  if you're on a computer, they're much more complex and
12  they're condensed down into more simplified
13  navigational interface.
14  BY MR. STEPHENS:
15    Q.  On the iPhone?
16    A.  I believe so.
17    Q.  And you've seen that?
18    A.  I've seen it a couple times.
19    Q.  Do you know whether that happens on the
20  iPhone or whether the server does that?
21    MR. BECKER:  Object.  Form.
22    THE WITNESS:  I don't know.
23  BY MR. STEPHENS:
24    Q.  Does that matter?
25    MR. BECKER:  Object.  Form.

33 (Pages 126 to 129)

Page 130

1        THE WITNESS:  I don't know.
2    BY MR. STEPHENS:
3        Q.   So you don't know whether it matters
4    whether the server makes the simplified user interface
5    or the iPhone, for whether or not Apple practices your
6    invention?
7        MR. BECKER:  Object.  Form.
8        THE WITNESS:  That would be -- I don't know.
9    I don't know how to answer that right now.
10   BY MR. STEPHENS:
11       Q.   Okay.  You didn't invent iTunes.
12            Right?
13       A.   No.
14       Q.   And you didn't invent the iTunes Store.
15            Right?
16       A.   No.
17       Q.   You didn't invent displaying a
18   two-dimensional matrix of cells.
19            Right?
20       A.   I don't know.
21       Q.   Did you invent displaying a
22   two-dimensional matrix of cells containing Web links?
23       MR. BECKER:  Object.  Form.
24       THE WITNESS:  I don't know.
25       / / /

Page 131

1    BY MR. STEPHENS:
2        Q.   Did you invent providing a website
3    organized by a hierarchy of categories?
4        A.   I don't know.
5        Q.   Did you invent reformatting HTML into
6    XML?
7        A.   I don't know.
8        Q.   Did you invent displaying Web
9    advertisements?
10       A.   I don't know.
11       Q.   Did you invent --
12            Never mind.  Sorry.
13            Do you have any reason to think that
14   Apple copied anything that you and your father did?
15       A.   I don't know.
16       Q.   Who is Fred Gottfurcht?
17       A.   He's my grandfather.
18       Q.   Was he in the real estate business?
19       A.   I don't know.
20       Q.   You don't know one way or another?
21       A.   No.
22       Q.   Did you know your grandfather?
23       A.   Yes, I did.
24       Q.   Did you know him while he was working?
25       A.   I might have, but I was a very small

Page 132

1    child.
2        Q.   Okay.  Did you invent multi-touch?
3        MR. BECKER:  Object.  Form.
4        THE WITNESS:  It's possible.
5    BY MR. STEPHENS:
6        Q.   What is multi-touch?
7        A.   I don't own an iPhone, so I'm not
8    familiar exactly what that refers to, but if it's
9    referred to zooming or -- or widening a screen or
10   scrolling with your fingers, then yes.
11       Q.   Now, how do you understand the phrase
12   "manipulating a region of the screen to" -- excuse me
13   "-- for scrolling and/or zooming"?
14            Let me ask the question again.
15            How do you understand the phrase
16   "manipulate a region of the screen for scrolling
17   and/or zooming"?
18       MR. BECKER:  First, I'll object under
19   Rule 2.5.
20            And I'll instruct you, if that will
21   require you to divulge advice of counsel, I instruct
22   you not to divulge that advice.
23   BY MR. STEPHENS:
24       Q.   Let me make clear that I'm asking how
25   you understood that at the time of the invention in

Page 133

1    1999, before you had spoken to the lawyers.
2        A.   At the time of the invention, I imagined
3    being able to move around a screen, to be able to
4    scroll and zoom using your hands and fingers, to be
5    able to manipulate any region of a screen for zooming
6    and scrolling.
7        Q.   So does it specifically mean touching
8    the screen with your hand or finger?
9        A.   It could, yes.
10       Q.   Does it mean anything else?
11            You know, like would it -- could it also
12   mean using a mouse?
13       MR. BECKER:  Object.  Form.
14       THE WITNESS:  The definition of "manipulate"
15   would be to use your hands, your fingers, to --
16   BY MR. STEPHENS:
17       Q.   Touch the screen?
18       A.   -- to move something around.
19            So that was my vision at that time.
20       Q.   Okay.  But I'm --
21       A.   But it wouldn't be limited to that.  It
22   could mean some other things, as well.  It's a
23   broad --
24       Q.   Well, that's what I'm trying to
25   understand, whether it -- it encompasses a broad range

34 (Pages 130 to 133)

Page 134

of ideas, like using a mouse or a keypad, or whether it really just means touching the screen with your hand or your finger --
MR. BECKER: So wait --
BY MR. STEPHENS:
Q. -- as you understood it in 1999, before you talked to the lawyers.
MR. BECKER: Okay.
THE WITNESS: I understood it to mean with your hands, not using a mouse, using your fingers to manipulate a region of a screen, whether it was to move it around by zooming or scrolling, using your hands.
BY MR. STEPHENS:
Q. Using your hands to touch the screen?
A. Yes.
Q. Okay. Are you aware of anybody, anywhere, who knows what the claims in this patent mean, without having to rely on advice of counsel?
MR. BECKER: Object. Form.
THE WITNESS: I don't know.
BY MR. STEPHENS:
Q. Okay. Now, you were here yesterday when your father testified about Mr. Long.
Is that right?

Page 135

A. Yes.
Q. And your father testified that Mr. Long had contacted you relatively recently.
Is that right?
A. Yes.
Q. How did that happen?
A. I believe he called me and left a voice message.
Q. Okay. When was that?
A. I don't recall.
Q. A month ago?
A. It was more than a month ago.
Q. More than two months ago?
A. More than two months, I believe.
Q. More than three months ago?
A. Could have been.
Q. More than four months ago?
A. Could have been.
Q. More than six months ago?
A. That would date us back to -- I believe it was after July sometime. It could have been in August, could have been in September, could have been October. I don't recall exactly.
Q. And what did the voice mail say?
A. I don't recall exact words.

Page 136

Q. Do you recall generally what he said?
A. I recall him saying that, "It's Albert. It's been a long time," something along those lines, and "I want to get in touch with you or -- or your dad," and -- something along those lines.
Q. Okay. Anything else you remember about the voice mail?
A. No.
Q. And what happened after that?
A. I believe I called him back, maybe it was a week later. I think I left a message for him.
Q. What did you say?
A. I don't recall exactly, but it was, in substance, "I'm returning your call."
Q. Okay. And what happened after that?
A. He called me back sometime after that.
Q. And did he get you on the phone?
A. I believe so. I might have called him again and he might have left another message. I don't recall exactly. But I know we -- we talked at some time, at some point.
Q. Did you make any effort to preserve the voice mail that he left you?
A. No.
Q. Did you have any e-mails with him?

Page 137

A. No.
Q. Okay. So after some number of voice mails were left, you finally spoke to him on the phone?
A. Yes.
Q. When was that?
A. I don't recall exactly. Sometime in the initial time period I gave you.
Q. Within a few weeks of the time he first left you a voice mail?
A. It's probably within a few weeks.
Q. And what did you say to him?
A. We exchanged some formalities, and I think he wanted to get in contact with my dad and he wanted his number, I think.
So I think I gave -- either gave my father Albert's number or gave Albert my father's number and put them -- let them two to talk.
Q. Okay. Anything else that you exchanged on that call?
A. Not that I recall.
Q. Did you have any other communication with him?
A. Yes, yeah.
Q. When?

Page 138

1     A.   We had dinner after that, maybe a few
2  weeks after that, at Houston's.
3     Q.   That's the dinner that your father
4  testified about yesterday?
5     A.   Yes.
6     Q.   Who else was there?
7     A.   Just the three of us.
8     Q.   And that was within a few weeks of the
9  time you spoke to him?
10    A.   To the best of my recollection.
11    Q.   Have you had any communications with him
12 since that dinner?
13    A.   I -- I don't think so, not that I could
14 recall.
15    Q.   What happened at the dinner?
16    A.   We talked, we ate, we exchanged
17 formalities.  We hadn't seen each other in a long
18 time.
19         And he had mentioned that he had been in
20 touch with Apple and some of their legal counsel, and
21 I believe he said they wanted to maybe hire him but --
22 and that they were concerned about some of the
23 patents.
24    Q.   Anything else you remember?
25    A.   That was the gist of it.

Page 139

1          I remember him saying something about
2  the valuation of the patents, what he thought it was
3  worth, and that's all I could recall.
4     Q.   What did he think they were worth?
5     A.   I remember him saying somewhere around
6  $250 million.
7     Q.   Do you know where he got that number?
8     A.   No, I do not.
9     Q.   Now, you said that he said they were
10 concerned about the patents.
11         Do you know who he was talking about?
12    A.   He just said he talked to a few
13 different people there, lawyers.  I don't know.  He
14 didn't give any names, at least I don't recall any
15 names.
16    Q.   He told you specifically that Apple told
17 him -- someone representing Apple told him that Apple
18 was concerned about the patents?
19    A.   Yes.
20    Q.   Do you remember his exact words?
21    A.   No, I do not.
22    Q.   What did you say to him during this
23 conversation?
24    A.   I didn't talk much.  I was more of a --
25 I don't know -- just kind of sat there.  We talked

Page 140

1  about our lives and family and kids and things like
2  that, and then I left.  I left early.
3     Q.   And what did your father say to Mr. Long
4  during the conversation?
5     A.   I don't recall.
6     Q.   So you really only remember what
7  Mr. Long told you, not what you or your father told
8  him.
9          Is that right?
10    A.   He just told us a few things, and those
11 are things that stuck in my mind.  I don't recall -- I
12 don't even recall myself saying that much and I don't
13 recall anything specific my father said.
14         I know I had to leave early and I was
15 kind of in a rush.  I came, I ate, and I left.
16    Q.   Do you recall any discussions about
17 hiring him or paying him money?
18    A.   I don't recall.
19    Q.   Do you remember anything else at all
20 about the dinner with Mr. Long?
21    A.   No, not specifically, no.
22    Q.   Okay.
23    A.   Might have even been a late lunch, to
24 tell you the truth.  I forget if it was a dinner or
25 late lunch.  I just remember we met at Houston's, and

Page 141

1  I was really busy that day and tried to squeeze it in.
2     Q.   What day of the week was it?
3     A.   I don't recall.
4     Q.   What kind of --
5          Well, I guess -- let me ask it
6  differently.
7          When Mr. Long left you a voice mail,
8  what phone number did he leave it on?
9     A.   It would be my cell phone.
10    Q.   Does your cell phone have voice -- it
11 obviously has voice mail.
12         Does it automatically delete voice mail?
13    A.   No.
14    Q.   So you had to delete it yourself?
15    A.   Yes.
16    Q.   Did you delete the voice mail Mr. Long
17 left?
18    A.   Yes.
19    Q.   When did you do that?
20    A.   It was probably soon after.  It was
21 probably soon after.
22    Q.   You knew the lawsuit was pending at that
23 point.
24         Right?
25    A.   Pending?

36 (Pages 138 to 141)

Page 142

1      Yes.
2      Q.  Have you had any communications with any
3  of the other inventors on the 497 patent since, let's
4  say, 2000?
5      A.  Since the end of 2000?
6      Q.  Yes.
7      A.  I don't recall.  I don't think so.
8      Q.  Do you know if your father has had any
9  contact with any of them?
10     A.  I don't know.  And besides when I spoke
11  to Albert and --
12     Q.  I'm sorry?
13     A.  I said, besides with Albert, I don't
14  know.
15     Q.  Yeah.  So Mr. Long --
16     A.  I believe there's Teague McKnight, too.
17     Q.  Your father spoke with Teague?
18     A.  I believe he called at some point.
19     Q.  What do you know about that
20  communication?
21     A.  I just heard that -- that he was being
22  hired by Apple as a consultant.
23     Q.  Anything else?
24     A.  No, that's as much as I heard.
25     Q.  And you're not aware of any other

Page 143

1  contacts that you or your father have had with any of
2  the inventors?
3      A.  No, I'm not aware of any other contacts.
4      Q.  How much is the 196 patent worth?
5      A.  I don't know.
6      Q.  Have any idea?
7      A.  No, I don't.
8      Q.  How much is the 845 patent worth?
9      A.  I don't know.
10     Q.  Have any idea?
11     A.  No, I do not.
12     Q.  Is there anything Apple could change in
13  the iPhone that would allow them to continue to sell
14  it without infringing EMG's patents?
15     MR. BECKER:  Object.  Form.
16     THE WITNESS:  I guess so.
17  BY MR. STEPHENS:
18     Q.  What?
19     A.  Well, I wouldn't know everything, but
20  some of the things are, you know, the touch and zoom
21  and scroll a Web page with your fingers.
22     Q.  Anything else?
23     MR. BECKER:  Object.  Form.
24     THE WITNESS:  Well, displaying simplified Web
25  pages, sister sites.

Page 144

1      There's probably some other things -- a
2  lot of other things, too, but those are just off the
3  top of my head that I can recall at this time.
4  BY MR. STEPHENS:
5      Q.  How would Apple stop third parties from
6  displaying or from providing simplified websites?
7      MR. BECKER:  Object.  Form.
8      THE WITNESS:  I don't know.
9  BY MR. STEPHENS:
10     Q.  You don't know if it's possible?
11     A.  I just don't know.
12     Q.  So if Apple removed the touch and zoom
13  and scrollable Web pages and stopped displaying
14  simplified Web pages, they could continue selling the
15  iPhone, as far as you're concerned.
16     Is that right?
17     MR. BECKER:  Object.  Form.
18     THE WITNESS:  I'm not -- again, there might be
19  some other things that -- that I can't think of at
20  this time.
21  BY MR. STEPHENS:
22     Q.  Okay.  Is it your understanding that
23  anyone who offers a website and then a different
24  simplified version for a mobile device infringes your
25  patents?

Page 145

1      MR. BECKER:  Object.  Form.
2      And also, if that will require you to
3  divulge advice of counsel, I instruct you not to
4  divulge that advice.
5      THE WITNESS:  I don't know, without divulging
6  attorney-client privilege.
7  BY MR. STEPHENS:
8      Q.  Okay.  Well, is it your belief that you
9  invented the idea of having a simplified version of a
10  normal Web page for use on a mobile device --
11     MR. BECKER:  Object.  Form.
12  BY MR. STEPHENS:
13     Q.  -- that you and your father invented
14  that?
15     A.  Well, it's one -- one of the ideas of
16  many, so --
17     Q.  But I'm asking, is it your understanding
18  that you and your father invented that notion?
19     MR. BECKER:  Object.  Form.
20  BY MR. STEPHENS:
21     Q.  I know you had a bunch of ideas, but now
22  the question is whether or not you invented the idea
23  of having a simplified version of a website for
24  mobile devices.
25     A.  I believe a lot of that would be

37 (Pages 142 to 145)

Page 146

1  discussions I had with our attorney.
2     Q.  So you can't tell me the answer to that
3  question without revealing attorney-client --
4     A.  Attorney-client information, yes.
5     Q.  -- privileged information.
6        Is that right?
7     A.  Yes.
8  MR. STEPHENS:  Can we take a break?
9  MR. BECKER:  Okay.
10  THE VIDEOGRAPHER:  Going off the record.
11     The time is 3:28 p.m.
12     (Whereupon a recess was taken)
13  THE VIDEOGRAPHER:  Back on the record.
14     The time is 3:38 p.m.
15  BY MR. STEPHENS:
16     Q.  Mr. Gottfurcht, do you think what you
17  and your father came up with on that day in July of
18  1999 is an important contribution to technology?
19  MR. BECKER:  Object.  Form.
20  THE WITNESS:  Yes.
21  BY MR. STEPHENS:
22     Q.  Why?
23     A.  Well, I see people using aspects of it
24  today, so --
25     Q.  Where do you see that?

Page 147

1     A.  On mobile handheld devices.
2     Q.  What mobile handheld devices?
3     A.  I guess on all of them, the iPhone --
4     Q.  Any --
5     A.  -- one of them.
6     Q.  Any others?
7     A.  Other phones, too.  I haven't -- I don't
8  have every phone, so --
9     Q.  Can you name any others besides the
10  iPhone?
11     A.  I can name a lot of other phone
12  companies, I guess.
13     Q.  Well, I'm asking about ones that
14  practice your technology that you invented.
15     A.  I guess most all of them.
16     Q.  I'm asking for some specific examples,
17  please.
18     A.  I don't know.  I -- I have a BlackBerry.
19  I don't even go online with it a lot, so --
20     Q.  Does it practice your invention?
21     A.  Parts of it, yes.
22     Q.  What parts?
23     A.  Simplified navigation pages, and other
24  aspects that I'm not qualified to answer.
25     Q.  Okay.  Any other phones you can think of

Page 148

1  that --
2     A.  I just -- I haven't looked at every
3  phone out there, so I haven't gone online with every
4  phone, so --
5     Q.  I'm not asking about every phone.  I'm
6  asking about any phone.
7     A.  Any -- those are the only two phones
8  I've really observed online.
9     Q.  Do you use your phone to navigate the
10  Internet?
11     A.  Not really.
12     Q.  Why not?
13     A.  I just don't.
14     Q.  Because your invention doesn't make it
15  worthwhile.
16        Right?
17     A.  No.
18     Q.  Good.
19        You just don't feel like using your
20  phone to navigate the Internet.
21        Is that the idea?
22     A.  I just -- I'm -- I'm by a laptop a lot,
23  so I don't try to go on the regular computer.  I have
24  at times gone on there by phone.  I just don't do it a
25  lot.

Page 149

1     Q.  Okay.  Do you know how to implement your
2  invention?
3  MR. BECKER:  Object.  Form.
4  THE WITNESS:  No, I -- I do not have that
5  technical expertise to do that.
6  BY MR. STEPHENS:
7     Q.  So on that day in July of 1999, you and
8  your father would not have been able, working
9  yourselves, to implement what you envisioned.
10        Is that right?
11  MR. BECKER:  Object.  Form.
12  THE WITNESS:  With my technical expertise, it
13  would be beyond my abilities.
14  BY MR. STEPHENS:
15     Q.  And -- and your father's, as well.
16        Right?
17     A.  Yes.
18     Q.  Did you have any idea how to implement
19  it on that day?
20  MR. BECKER:  Object.  Form.
21  THE WITNESS:  Technically, no.
22  BY MR. STEPHENS:
23     Q.  Do you know if your father had any idea
24  how to implement it on that day?
25  MR. BECKER:  Object.  Form.

38 (Pages 146 to 149)

1      THE WITNESS:  I don't know.
2  BY MR. STEPHENS:
3      Q.  Are you excited about your invention?
4      A.  Yes.
5      Q.  Why are you excited?
6      A.  Because I think it's good.  I think it's
7  a great invention.
8      Q.  Okay.  Will it change your life in a
9  meaningful way if Apple stops practicing the aspects
10  of your invention that EMG alleges it infringes?
11      A.  Would it change my life in a meaningful
12  way, would it make me live longer or be happier, have
13  a better relationship with my friends and family?
14      No.
15      Q.  No?
16      Would it make you rich if Apple stopped
17  doing that?
18      A.  Not necessarily.
19      Q.  Do you care if Apple stops doing it?
20      A.  Yes.
21      Q.  Why?
22      A.  Because it's intellectual property and
23  it should be protected.
24      Q.  Okay.  But it's not going to --
25      A.  It has value.

1      Q.  Okay.  Are you actively trying to pursue
2  a business or other activity that Apple's interfering
3  with by providing those features in the iPhone?
4      A.  Myself, no.  I'm doing other things with
5  my life.
6      Q.  Is EMG?
7      A.  Possibly.
8      Q.  You don't know?
9      A.  I'm not sure.
10      Q.  Is your father?
11      A.  Is he pursuing other things?
12      Q.  Is he pursuing things that Apple's
13  iPhone is interfering with?
14      MR. BECKER:  Object.  Form.
15      THE WITNESS:  I don't know.
16  BY MR. STEPHENS:
17      Q.  You don't know?
18      How much money do you think Apple should
19  pay EMG in this case?
20      A.  I don't know.
21      Q.  Do you have any idea?
22      A.  I don't know.
23      Q.  Do you know -- how much time have you
24  spent on the inventions in this case, yourself?
25      A.  Not a great deal of time.

1      Q.  Can you quantify it?
2      A.  In hours, weeks, months?
3      Q.  Yeah.
4      A.  Myself, not a whole lot of time.
5      Q.  Few days?
6      A.  Possibly, yes.
7      Q.  No more than that?
8      A.  I attended some meetings, so -- it was
9  ongoing for a little while.  It was a little more than
10  a few days, but not a substantial amount of time.  My
11  father did most of the work on that.
12      Q.  Okay.  I'm going to hand you a whole
13  stack of documents here that your father testified
14  yesterday that he had mailed to himself.
15      A.  Uh-huh.
16      Q.  Could you just look through those and
17  see if you contributed to any of those?
18      MR. BECKER:  Object.  Form.
19      THE WITNESS:  I'll start off by saying none of
20  it is my writing, so I did not write any of these.  I
21  could have contributed, but I don't recall.
22  BY MR. STEPHENS:
23      Q.  Do you remember your father mailing
24  things to himself?
25      A.  I don't remember ever going to the post

1  office with him, but I kind of do recall him saying --
2  him telling me he was going to mail some stuff to
3  himself from time-to-time.
4      Q.  What do you recall about it?
5      A.  Nothing more than what I just said.
6      Q.  Did you ever tell him he was crazy with
7  all his patent stuff?
8      A.  I don't recall.
9      Q.  Did you ever express skepticism to your
10  father in any way about his patent endeavor?
11      A.  I don't recall.  I know it's not easy to
12  get a patent.  I know it takes a lot of time, a lot of
13  money, a lot of heart.  And I didn't have all that
14  time on my hands to go forward with -- or the money to
15  go forward with all of it.
16      Q.  And you didn't, in fact, do that.
17      Your father did.
18      Right?
19      A.  Yes, he did.
20      Q.  What did you think when he first told
21  you he was going to file a patent on what you guys
22  talked about on the first of July 1999?
23      A.  I thought it was a good idea.
24      Q.  At the time you were discussing it on
25  that day in July 1999, did you think, We should patent

Page 154
1 this?
2     A.  I think it came up and I thought it was
3 a good idea.
4     Q.  Whose idea was it to file a patent?
5     A.  I don't recall.  It was mostly --
6 probably was his, but I don't recall.
7     Q.  Okay.  Go ahead.  I didn't mean to
8 distract you from that.
9         Look through there, and tell me if you
10 see anything that you contributed to.
11     A.  Just browsing through, I really don't
12 recall if there was any of this I contributed to.
13         I know it's all -- none of it's my
14 writing.
15     Q.  Okay.  Well, just flip through the rest
16 of them to make sure.
17     A.  But they could have come out of some of
18 the discussions we had, and maybe things that stuck in
19 his head and he wrote down.  It's possible.
20         I mean, without spending a lot of time
21 reading every detail and every word and -- I -- if
22 you'd like me to spend the next --
23     Q.  Well --
24     A.  -- hour -- hour plus, I can read every
25 word and --

Page 155
1     Q.  I'm not asking you to do that.  I'm
2 looking -- asking you to -- to look through it as you
3 are.  Look at each page, but --
4     A.  I'm -- I'm just skimming through it and
5 I'm --
6     Q.  Okay.
7     A.  -- just flipping through.
8         There's -- none of the writings are
9 mine, but some of the things he listed, some of the
10 words, you know, I could have had some input on it,
11 but it's been awhile.
12         So I don't recall specifically which
13 exact -- out of everything that he wrote here, that I
14 would have contributed to exactly.
15         Just browsing through, most of this
16 looks like a lot of his stuff.
17         I'm seeing here it says, "Online Labs"
18 on the back of it.  This one says 9/9/99, probably a
19 date.
20         I guess these are all dated.  They're
21 all in his writing, so --
22     Q.  You didn't see anything that you thought
23 you contributed to?
24     A.  I would have to go through each thing
25 word-by-word.

Page 156
1     Q.  Okay.
2     A.  I'd have to spend a vast deal of time.
3 There's a lot of papers here, so -- I don't see
4 anything that's my handwriting, and there's
5 possible -- I don't recall, just skimming over it, if
6 there's a word or a phrase or something, sort of a
7 concept I could have contributed to.  I'd have to take
8 some time.
9     Q.  I understand.
10         But you did look through each page and
11 nothing jumped out at you as something you contributed
12 to.
13         Right?
14     A.  I didn't even look through each page.  I
15 think I was just going through each one of these
16 packages here.
17     Q.  But if you look -- well --
18     A.  There's about, you know, 80 pages here,
19 maybe, or 60 or 70, and some are his writings and some
20 are typed writings.  So I don't --
21     Q.  Do you recall any involvement with the
22 mailings that your father made to himself?
23     A.  I don't recall, no.
24     Q.  So you don't recall sitting down with
25 him and saying, Let's record the ideas we came up with

Page 157
1 today and -- and get them in the certified mail, or
2 anything like that?
3     A.  I don't recall.  Maybe -- I remember --
4 I do recall him from -- you know, saying he's going to
5 send some stuff to himself, certified, for a date
6 purpose.
7         I don't recall looking at it -- ever
8 looking at any papers he put in an envelope or going
9 with him to the post office or reviewing any packages
10 that he compiled to send to himself.
11     Q.  What were you doing in your career
12 history, let's say, at the time that you guys came up
13 with the invention in July of 1999?
14     A.  I was pursuing real estate.
15     Q.  And you were working with your father in
16 real estate at that point.
17         Is that right?
18     A.  Well, I was a broker -- or a
19 salesperson, so I had my salesperson's license under a
20 broker of record, which he was, and it might have been
21 Westside Realty at the time, the dba.  So I did not
22 necessarily work with him.
23         He didn't -- he wasn't a practicing
24 broker or salesperson.  He had a license I think from
25 the early '60's, that he always just kept active.

1    And so it made sense for me to -- as a
2 salesperson, to hang it under him; therefore, I would
3 be able to get a full commission on -- on a
4 real estate transaction.
5    So as far as looking for clients to buy
6 and sell real estate, that was something I was doing
7 on my own.
8    Q.  Did your father back you in any of your
9 real estate ventures?
10    A.  He might have loaned me some money on
11 some of the spec homes I had done.
12    Q.  Is he an investor in your yoga activity?
13    A.  No, he's not.
14    Q.  Do you have any outside investors in
15 that?
16    A.  No, I do not.
17    Q.  Have you discussed with your father what
18 you will do with the proceeds from this lawsuit?
19    A.  The only thing discussed is giving a
20 part of it to charity, 50 percent to charity.
21    Q.  What's your understanding of what will
22 happen with the rest?
23    A.  That it would be put into, I guess, EMG.
24    Q.  Would it end up in the trusts?
25    A.  I don't know exactly.

1    Q.  What's your expectation?
2    A.  I would assume that it would.
3    Q.  And that ultimately, you'd be the
4 beneficiary of at least part of the money that comes
5 into this lawsuit.
6    Right?
7    A.  Yes.
8    Q.  I'm handing you E. Gottfurcht 12.
9    Take a look at that and tell me if
10 you've seen that before.
11    A.  I don't recall.
12    Q.  What's your understanding of the role of
13 the other inventors in the patents in this lawsuit?
14    A.  They were hired to work on some of the
15 technical specifications for the patent.
16    Q.  And what did they do?
17    A.  They put together some flow charts and
18 diagrams.
19    Q.  Anything else?
20    A.  Not that I could recall.
21    Q.  What's your understanding of Mr. Long's
22 contribution to the 845 patent?
23    A.  The 845?
24    Do you have a copy of that?
25    Q.  It should be one of those you have

1 there.
2    A.  I have 497 and 196.
3    My overall understanding of what he did
4 was work on some of the graphical interfaces.
5    Q.  Anything else?
6    A.  I don't know.
7    Q.  Okay.
8    A.  I know he was part of the group at
9 Online Labs.  I don't know what input he had in some
10 of these flow charts.  He might have had some input,
11 he might have not.  I don't know.
12    Q.  When is the first time that you met with
13 patent lawyers in connection with the invention?
14    A.  Probably the first week of July of 1999.
15    Q.  What do you remember about that meeting?
16    A.  I don't recall a lot about the meeting.
17    Q.  Do you remember where it was?
18    A.  It's been awhile.
19    I don't recall if it was first by phone
20 or if we went into his office, Tom Coester.  The firm
21 was Blakely Sokoloff, and his offices I believe were
22 in West L.A.
23    Q.  Do you remember anything else about that
24 meeting?
25    A.  Not specifically beyond what I've told

1 you.
2    Q.  Who participated besides you and
3 Mr. Coester?
4    A.  Elliot Gottfurcht.
5    Q.  Anybody else?
6    A.  No.
7    Q.  Now, can you tell me the difference
8 between the 459 patent and the 845 or 196 patent?
9    The disclosures are different, and I'd
10 like for you to tell me your understanding of why
11 they're different.
12    A.  Can you repeat which patents you're
13 talking about?
14    Q.  Yeah.  What -- you've got the -- tell me
15 which ones you have.
16    A.  196, 497.
17    Q.  Okay.  Yeah, what's the difference
18 between the disclosures in those two patents?
19    A.  There's different dates.
20    Q.  Yeah, one is later.
21    Right?
22    A.  Yes.  One was issued July 29, 2003; one
23 was October 21st, 2008.
24    Q.  I'm wondering where the 845 patent went.
25    Is it in that stack somewhere?

41 (Pages 158 to 161)

1      A.   I don't see it in here.
2      MR. LANE:  It was Exhibit 1.
3      MR. STEPHENS:  Here it is.  I have it after
4  all.  Sorry.
5  BY MR. STEPHENS:
6      Q.   I'm handing you Exhibit E. Gottfurcht 1.
7           And that's the 845 patent in this
8  lawsuit.
9           Right?
10     A.   Yes, I believe so.
11     Q.   And you can tell from looking at that
12  patent that it was filed March of 2000.
13          Right?
14     A.   March 3rd, 2000, yes.
15     Q.   Do you remember when that patent was
16  filed?
17     A.   It says March 3rd, 2000.
18     Q.   I know, but do you remember the
19  activities leading up to that, I guess I should say?
20     A.   I don't recall.
21     Q.   Do you know why there are two different
22  disclosures from the 497 and the 845?
23     A.   I don't know exactly.  I've heard of --
24  one has been a continuation in part.
25     Q.   And it has things that are not in the

1  earlier patent.
2           Right?
3      A.   There might be some things that were
4  continued from the earlier one.
5      Q.   And were those ideas that you -- came up
6  after the first patent was filed?
7      A.   Without reading it, I don't know.  I
8  haven't read these.
9      Q.   Ever?
10     A.   Well, I don't believe so.
11          I mean, besides what I read today?
12     Q.   Yeah.
13     A.   I read the application; the final
14  patents, I didn't read, no.
15     Q.   So you -- you've never read the patents,
16  themselves.
17          You read the application when it was
18  filed, and that's it?
19     A.   Yes.
20     Q.   Okay.  Well, was there material that was
21  added for the 845 patent application that you came up
22  with after the filing of the earlier patent?
23     A.   I don't know.
24     Q.   Did you continue to work on the
25  invention and come up with new ideas after November of

1  1999, when -- when the --
2      A.   You mean July 1999?
3      Q.   No, no, November 15th, 1999.  That's the
4  date the 497 patent was filed.
5      A.   Oh, I see.
6      MR. BECKER:  Object.  Form.
7      THE WITNESS:  I don't recall working on it or
8  coming up with anything, no, after.
9  BY MR. STEPHENS:
10     Q.   So you think that whatever inventive
11  ideas you and your father together had, you'd had
12  prior to November 15, 1999.
13          Is that right?
14     A.   I think my major contribution was done
15  prior to that, yes.
16     Q.   Okay.
17     A.   He might have added some more stuff in
18  or --
19          I can't speak for him.
20     Q.   Okay.  Did you ever write up anything
21  describing your contribution, yourself?
22     A.   Back in July, I might have written some
23  notes, but I don't think I did.  I believe I just --
24  I believe Elliot took all the writings on that.
25     Q.   Did you ever --

1           Well, never mind?
2           What was Fogie & Jack?
3      A.   You know, I believe it was two
4  characters that Elliot came up with, some cartoon
5  caricatures.
6      Q.   What were they?
7           What were the characters?
8      A.   One was a older person called Fogie and
9  one was a younger person called Jack.
10     Q.   And what was the idea behind
11  Fogie & Jack?
12     A.   I don't know.  I think it was some
13  marketing -- some ideas he had for marketing.
14     Q.   Had you contributed any ideas to the
15  Fogie & Jack marketing plan?
16     A.   Not that I recall.
17          I might have been around while some of
18  the brainstorming was -- while he was talking about
19  it, but I don't recall contributing to --
20     Q.   Was there ever a Fogie & Jack website?
21     A.   I don't know.
22     Q.   Do you remember ever seeing one?
23     A.   I don't remember ever seeing one.
24     Q.   Do you remember ever seeing a
25  Fogie & Jack prototype?

Page 166

1      A.   I remember seeing a cartoon that was
2  made at sometime.
3      Q.   Who made the cartoon?
4      A.   I don't -- I don't know who.
5      Q.   Was it an animated cartoon?
6      A.   It was some kind of animated cartoon,
7  yeah.
8      Q.   Like a Flash animation or something like
9  that?
10     A.   Yeah, something like that.
11     Q.   When was the last time you saw that?
12     A.   I don't recall.  Years, yeah, a long --
13  long time ago.
14     Q.   Are you aware of any prototypes of the
15  inventions?
16     MR. BECKER:  Object.  Form.
17     THE WITNESS:  No, I'm not.
18  BY MR. STEPHENS:
19     Q.   Have you ever looked at MallTV.com?
20     A.   I might have gone there once or twice.
21     Q.   Does that reflect your invention?
22     MR. BECKER:  Object.  Form.
23     THE WITNESS:  I don't know.  I haven't really
24  looked at all of it.
25     / / /

Page 167

1  BY MR. STEPHENS:
2      Q.   Were there any earlier websites or
3  prototypes that you're aware of before MallTV?
4      A.   I don't -- I don't recall.  If there
5  were, I don't know.
6      Q.   Have you received any money from this
7  lawsuit yet?
8      A.   No.
9          Well, this lawsuit against --
10     Q.   Against all the defendants.  There's
11  been some settlements, I think you are aware.
12         Right?
13     A.   Right.  I believe I -- we got a little
14  bit on -- on a loan.
15     Q.   How much?
16     A.   I don't recall.  Maybe around 50- or
17  60,000, something.
18     Q.   Okay.  Do you have any written
19  arrangement in connection with that loan?
20     A.   No.
21     Q.   Do you know Rick Soss?
22     A.   No, I do not.
23     Q.   Do you know Bob Bajaris?
24     A.   No.
25     Q.   Do you know Angel Gulermovich?

Page 168

1      A.   I do not.
2      Q.   Do you know who any of those people are?
3      A.   I've -- from being in the deposition
4  yesterday, I heard their names mentioned.
5      Q.   But other than that, you never heard of
6  them before?
7      A.   Other than that, no.  They don't ring a
8  bell.  I don't know who they are.
9      Q.   Have you ever been to Texas?
10     A.   No, I have not.
11     Q.   Do you know if your father has ever been
12  to Texas?
13     A.   I don't know.
14     Q.   Do you know why this lawsuit was filed
15  in Texas?
16     A.   No, I don't.
17     Q.   Do you know why EMG has an office in
18  Texas?
19     A.   I don't know.
20     Q.   Has any of the money that's been
21  received in settlement so far been donated to charity?
22     A.   I don't know.
23     Q.   Now, earlier, you mentioned some
24  discussions about half of the proceeds going to
25  charity.

Page 169

1          Right?
2      A.   Yes.
3      Q.   What charity?
4      A.   I don't know.
5      Q.   Is there a charitable trust that your
6  father or anyone else in your family is a trustee for?
7      A.   I don't know.  Not that I'm aware of.
8  We just have a charitable trust, years ago.  I don't
9  know if it's still operable.
10     Q.   What was the name of that?
11     A.   I believe it was called the Elliot Marlo
12  & Grant Charitable Foundation.
13     Q.   And what kind of activities did that
14  foundation engage in?
15     A.   They just donated money.
16     Q.   And what kind of organizations did it
17  donate money to?
18     A.   You know, I was -- I was pretty young at
19  the time.  I didn't -- I didn't -- wasn't involved as
20  much.
21     Q.   Okay.
22     A.   I know they gave some money to
23  Cedars-Sinai and I think other health organizations.
24     Q.   I'm sorry, I didn't quite --
25     A.   I said I believe other health

43 (Pages 166 to 169)

1 organizations.
2     Q. But before that, you mentioned
3 something --
4     A. I said I wasn't in the oper -- I wasn't
5 operating the charity or --
6     Q. But they gave some money to what?
7     I'm sorry, I just didn't hear you.
8     A. Oh, Cedars Sinai, I mentioned --
9     Q. Okay.
10     A. -- and other health organizations,
11 maybe.
12     Got you.
13     A. But I don't recall specifically.
14     Q. Now, earlier today, you testified that
15 you had contributed some words to Figure 2-B of the
16 845 or 196 patent. They're the same.
17     Do you remember that?
18     A. I said, yeah, there might have been some
19 words I contributed, I believe, in some of the
20 figures.
21     Q. And I think you couldn't identify the
22 specific words.
23     Is that right?
24     A. Right, because some of this was
25 collaborative.

1     Q. Do you know how you would generate
2 Figure 2-B from Figure 2-A?
3     A. Just looking at it, no, I do not.
4     Looks like a simplified navigation page
5 of the site above.
6     Q. Yeah, and that's what the specification
7 says. And I'm just wondering if you know how you
8 would create the Web page -- or create the simplified
9 page in Figure 2-B from the page in Figure 2-A.
10     A. I don't know.
11     Q. You don't have any idea?
12     A. No.
13     Q. Is it your understanding that if you
14 clicked on the sister site link in Figure 2-A, you
15 would then get to the simplified interface in
16 Figure 2-B?
17     A. I don't -- I don't know. It could be.
18     Q. You don't know how it works?
19     A. It could be. I would have to review it
20 and -- at the time -- I haven't -- like I say, I
21 haven't reviewed this, so I'd have to review it.
22     Q. Well, if you need to review it to answer
23 my question, that's fine; if you're just going to tell
24 me you can't --
25     A. Well, it's been -- you know, it's been

1 awhile and -- since the original application. So as
2 far as is 2-A a configuration of 2-B, just looking at
3 the two figures, it looks like it could be.
4     Q. Could be what? Sorry.
5     A. A configuration or -- you said you get
6 2-B from 2-A, so that's why -- it's a possibility.
7     Q. I'm afraid I'm not understanding what
8 you're saying.
9     A. I was just trying to answer your
10 question. Sorry.
11     Q. No, I appreciate that, but I just didn't
12 understand what you're saying.
13     You mean it could be that -- that
14 Figure 2-B is generated from 2-A, or did you
15 mean something else?
16     A. No, it was -- it was a simpler
17 navigation -- a simpler page of 2-A, a sister site of
18 2-A. It's possible.
19     But I -- again, what's in the patent
20 is -- it's a collaborative effort by different
21 inventors.
22     A lot of my understanding came from my
23 lawyer. And so when you're asking me to go through
24 this, a lot of this -- my understanding of it would
25 have been from conversations with my lawyer, but --

1 who drafted this, so --
2     Q. Well, that's what I'm trying to find
3 out.
4     Can you tell me how you get Figure 2-B
5 from Figure 2-A, or would you have to rely on advice
6 of counsel to answer and, therefore, you'd waive
7 attorney-client privilege?
8     A. Well, reading here, it says -- I'm just
9 reading the description of the drawing, which you can
10 read it, and it says, "2-B is an exemplary first
11 matrix page of a sister site for the Web page."
12     So just reading what it says, that would
13 be explanatory, I guess.
14     Q. Okay. And my question is, how would you
15 create --
16     A. I don't know.
17     Q. You don't know?
18     A. No.
19     Q. Okay. If you'd look at Column 5 of the
20 845 patent, Line 5, if you could just read that first
21 sentence beginning with "Figure 5-B" out loud, I'd
22 appreciate it.
23     A. "Figure 5-B is a flow diagram of client
24 side manipulation of a segmented page in one
25 embodiment of the invention."

44 (Pages 170 to 173)

Page 174

1    Q.   Is that section there describing
2 Figure 5-B about your contribution?
3    MR. BECKER: Object. Form.
4    THE WITNESS: I don't know. It could have
5 been part of it or an embodiment of it.
6 BY MR. STEPHENS:
7    Q.   Okay. Can you explain how it reflects
8 your contribution?
9    A.   Well, it talks about a segmented page
10 and it talks about -- has the word "manipulation" in
11 it, so --
12    Q.   So that's -- those are words you
13 contributed?
14    A.   Could have been. I don't recall.
15    Q.   What's a segmented page?
16    A.   It says, "in one embodiment of the
17 invention, client side manipulation of a segmented
18 page."
19    Q.   And what is a segmented page?
20    A.   Without divulging attorney-client
21 privileges, this is something -- a draft of my
22 attorney, and relied on his understanding and his
23 legalese expertise to put this together, so --
24    Q.   So you can't tell me what a segmented
25 page is without revealing attorney-client privileged

Page 175

1 information?
2    A.   That's correct.
3    Q.   Okay.
4    MR. STEPHENS: Let's take one more short break
5 and I think we'll wrap up here pretty soon.
6    MR. BECKER: Okay.
7    THE VIDEOGRAPHER: Going off the record.
8    The time is 4:12 p.m.
9    (Whereupon a recess was taken)
10    THE VIDEOGRAPHER: Back on the record.
11    The time is 4:17 p.m.
12 BY MR. STEPHENS:
13    Q.   Mr. Gottfurcht, if you could take a few
14 minutes now and read the 845 patent, starting at
15 Column 4, Line 51, where it refers to Figure 5-A, and
16 then read through the description of Figure 5-C, which
17 ends I believe at Column 6, Line 34.
18    So take a few minutes, read that, look
19 at the figures that it's talking about, and tell me,
20 if you will, whether that describes your contribution
21 of manipulating a region for scrolling and/or zooming.
22    A.   Okay.
23    Q.   Okay. Does anything in that section
24 you've just read reflect your contribution of
25 manipulating a region of the screen for scrolling

Page 176

1 and/or zooming?
2    MR. BECKER: Object. Form.
3    THE WITNESS: I mean, there's some language in
4 here about manipulating and zooming and scrolling,
5 so --
6 BY MR. STEPHENS:
7    Q.   And that reflects your contribution?
8    A.   Yeah, it reflects some of my
9 contribution.
10    Q.   Okay. Can you explain how it works in
11 the embodiment described in the patent?
12    A.   That would be attorney-client privilege
13 based on my understanding, information I gave to my
14 attorney and he explained to me.
15    Q.   So you can't tell me anything about how
16 the embodiment in the patent works with respect to
17 your contribution, without revealing attorney-client
18 privileged information.
19    Is that right?
20    A.   That's correct, yes. I mean, there's --
21    Q.   Now, you testified earlier that you
22 understood "manipulating a portion of the screen" at
23 the time you came up with the invention to refer to
24 touching the screen, itself, with a hand or a finger.
25    Right?

Page 177

1    A.   Yes.
2    Q.   Did you understand it to mean pressing a
3 button?
4    A.   It could have meant anything, using your
5 hands or fingers.
6    Q.   So using your hand to press a button
7 would also be within manipulating a portion of the
8 screen to zoom or scroll at the time that you came up
9 with your invention?
10    A.   No, it wasn't my original vision of the
11 invention. It could have under -- it could have been
12 one embodiment, I guess.
13    Q.   So could using a mouse?
14    MR. BECKER: Object. Form.
15    THE WITNESS: It wasn't my vision, no.
16 BY MR. STEPHENS:
17    Q.   Well, so what were you envisioning?
18    That's what I'm trying to understand.
19    A.   To be able to move a screen around using
20 your hands or fingers, being able to scroll and
21 zoom --
22    Q.   Touching the screen?
23    A.   Yes, touching the screen.
24    Q.   Okay. But not quite pressing buttons.
25    Right?

45 (Pages 174 to 177)

Page 178

1      A.   Pressing the screen if the button's on
2   the screen.
3      Q.   Yeah, okay.  I -- I don't mean virtual
4   buttons on the screen.  I mean like a keyboard button.
5        You didn't mean that.
6        Right?
7      A.   No.
8      Q.   Okay.  So as you understood it,
9   "manipulating a region of the screen for scrolling
10  and/or zooming" meant only touching something on the
11  screen.
12       Is that right?
13     MR. BECKER:  Object.  Form.
14     THE WITNESS:  It was -- it was my -- yeah,
15  that's what I envisioned.
16  BY MR. STEPHENS:
17     Q.   Okay.  Did someone else come up with the
18  idea of pushing a physical button to cause scrolling
19  and/or zooming?
20     A.   I don't know.  I don't recall.
21     Q.   You're not aware of anybody coming up
22  with that idea?
23     A.   I don't recall.
24     MR. STEPHENS:  Okay.  I have no more
25  questions.

Page 179

1        I do want to say, though, that we did
2   address the issue of the assertion of privilege today,
3   but I don't think we addressed the issue of waiver of
4   privilege, so we still may revisit that issue.
5        But I don't have any more questions.
6      MR. BECKER:  Anything further?
7        Is American asking questions?
8      MR. GENET:  No, not today.
9      MR. BECKER:  Okay.  Thank you.
10       No questions for me.
11     THE VIDEOGRAPHER:  This concludes Volume I in
12  the deposition of Grant Gottfurcht.
13       The number of tapes used was two.  The
14  original videotapes will be retained by Merrill Legal
15  Solutions, Woodland Hills.
16       Going off the record.
17       The time is 4:26 p.m.
18     COURT REPORTER:  And I'll send you both your
19  roughs.
20     MR. STEPHENS:  Thank you.
21     MR. BECKER:  Thank you.
22     COURT REPORTER:  And you just want the copy,
23  no rough.
24       Correct?
25     MR. GENET:  Yes, thank you.

Page 180

1   (Whereupon the deposition was concluded
2   at 4:28 p.m.)

Page 181

1        PENALTY OF PERJURY
2
3
4
5        I hereby declare I am the deponent in the
6   within matter; that I have read the foregoing
7   proceeding and know the contents thereof and I declare
8   that the same is true of my knowledge except as to the
9   matters which are therein stated upon my information
10  or belief, and as to those matters I believe it to be
11  true.
12       I declare under penalty of perjury that the
13  foregoing is true and correct.
14       Executed on the _____ day of
15  _____, 2009, at _____,
16  California.
17
18
19
20
         _____
21           GRANT GOTTFURCHT
22
23
24
25

46 (Pages 178 to 181)

1  STATE OF CALIFORNIA   )
                         )
2                        )  ss.
   COUNTY OF LOS ANGELES )

3

4        I, SUSAN LYNN POBOR, Certified Shorthand
5  Reporter No. 5132 for the State of California, do
6  hereby certify:
7        That prior to being examined, the witness
8  named in the foregoing deposition, was duly sworn to
9  testify the truth, the whole truth, and nothing but
10 the truth;
11       That said deposition was taken down by me in
12 shorthand at the time and place therein named and
13 thereafter reduced by me to typewritten form and that
14 the same is a true, correct, and complete transcript
15 of said proceedings.
16       Before completion of the deposition, review of
17 the transcript [X] was [ ] was not requested.  If
18 requested, any changes made by the deponent (and
19 provided to the reporter) during the period allowed
20 are appended hereto.
21       I further certify that I am not interested in
22 the outcome of the action.
23       Witness my hand this _____ day of
24 _____, 2009.
25       _____
           Susan Lynn Pobor, CSR No. 5132